RECEIVED

09 OCT -2 PM 9:16

U.S. DISTRICT COURT
S.D.N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

:
:
:                          **Civ. No. 09-CIV-1951 (DC)**
:
In re General Electric Co. Sec. Litig.    :          ECF CASE
:
:          <u>JURY TRIAL DEMANDED</u>
:
:
_____          :

**CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION .......................................................2

    A.   The Global Economic Crisis .........................................2

    B.   GE Falsely Portrayed Its True Financial Condition .................4

II.  OVERVIEW OF THE SEPARATE CLAIMS...................................7

III. JURISDICTION AND VENUE................................................7

IV.  PARTIES ................................................................8

    A.   Lead Plaintiff.....................................................8

    B.   Defendants ........................................................9

        1.   General Electric Company.....................................9

        2.   Officer Defendants ..........................................9

        3.   Director Defendants.........................................10

        4.   Underwriter Defendants......................................13

V.   LEAD PLAINTIFF'S INVESTIGATION
    AND CONFIDENTIAL SOURCES..........................................17

    A.   Description of Confidential Sources................................17

VI.  VIOLATIONS OF THE SECURITIES ACT ...............................23

    A.   Overview of the October Offering..................................24

    B.   The Offering Materials Failed to Disclose
    Material Information and Contained Untrue
    and Misleading Statements .........................................26

        1.   The Value of GE Capital's Assets Was
        Inflated In the Company's Financial
        Statements and the True Condition of
        these Assets was not Disclosed ...........................26

      2.    **GE Capital's Portfolio Consisted of a Substantial Portion of Sub-Prime, Below Investment Grade or "Junk" Loans** ........................................................**30**

      3.    **GE Capital Maintained Insufficient Reserves**..................**32**

      4.    **Business Was Drying Up at GE Capital** ...........................**34**

      5.    **GE's AAA Rating and $0.31 Quarterly Dividend Were in Imminent Jeopardy** .............................**35**

  C.    **The Untrue and Misleading Offering Materials** .......................**36**

**VII.**    <u>**CAUSES OF ACTION UNDER THE SECURITIES ACT**</u>..............**44**

### COUNT I

**(Against GE, Defendants Immelt and Sherin, the Director Defendants, and the Underwriter Defendants) <u>Violations of Section 11 of the Securities Act</u>** .....................................**44**

### COUNT II

**(Against the GE and the Underwriter Defendants) <u>Violations of Section 12(a)(2)</u>** .................................................................**46**

### COUNT III

**(Against Defendants Immelt, Sherin and Director Defendants) <u>Violations of Section 15</u>** ........................................................................**48**

**VIII.**    <u>**VIOLATIONS OF THE EXCHANGE ACT**</u> .....................................**49**

  A.    **The Exchange Act Defendants' False and Misleading Statements**.................................................................**52**

      1.    **The Third Quarter 2008 ("Q3 2008) Results**....................**52**

          a.  **September 25, 2008 Q3 2008 Earnings Release** .........................................................**52**

          b.  **October 10, 2008 Q3 2008 Earnings Release** .........................................................**64**

   c. **October 30, 2008 Form 10-Q**
     **for Q3 2008** ................................................**71**

   d. **November 13, 2008 Website Statement**......................**72**

  2. **December 2, 2008 Financial Services**
   **Investor Meeting** ...........................................**73**

  3. **December 16, 2008 Annual Outlook Meeting**..................**80**

B. **The Truth Begins to Emerge**......................................**83**

  1. **January 23, 2009 Announcement of**
   **Q4 2008 and FY 2008 Results** ..............................**83**

  2. **January 23, 2009 CEO Immelt**
   **Interview on CNBC**........................................**89**

  3. **February 6, 2009 Announcement of**
   **Board Approval of Dividend Plan**.....................**93**

  4. **February 10, 2009 Barclay's Conference**...........................**94**

  5. **FY 2008 Form 10-K Filed on**
   **February 18, 2009** ...........................................**97**

  6. **February 27, 2009 Surprise Announcement**
   **of Decision to Cut the Dividend to**
   **$0.10 per share** .................................................**100**

  7. **Immelt's Letter to Shareholders**.......................**101**

  8. **Defendant Sherin's Attempt to Stop**
   **the Bleeding on March 5, 2009**..........................**102**

  9. **March 12, 2009 S&P Downgrade** ....................**104**

  10. **The Truth is Revealed – GE Capital is**
   **in Dire Straits** .................................................**104**

C. **Defendants' Violations of GAAP**..........................**109**

  1. **GAAP Violations With Respect to Accounting**
   **for GE Capital Financing Receivables**............................**112**

|  | 2. | GAAP Violations With Respect to the Reclassification of Assets | ................................128 |
|  | 3. | Additional Fundamental GAAP Violations | ....................131 |
|  | 4. | Defendants' Lack of Capacity and Commitment to Strengthen The Company's Internal Controls Existed Throughout the Class Period | .............134 |
| D. |  | Additional Scienter Allegations | .................................139 |
|  | 1. | Confidential Sources Reveal That GE Capital's Distressed Condition Was Regularly Reported Throughout the Class Period | ............................139 |
|  | 2. | GE Capital Closely Monitored and Reported on the Status of Loans | ........................................140 |
|  | 3. | Loans Were in Distressed and Overvalued and Business Was "Drying Up" at GE Capital Before and During the Class Period | ................................142 |
|  | 4. | GE Capital Rolled Financial and Other Business Information Up Within GE Capital and Up to the GE Corporate Level | .......................146 |
|  | 5. | Defendants' Motivation to Hit EPS Estimates | ...............149 |
|  | 6. | Post Class Period Admissions | ...........................151 |
| E. |  | Loss Causation/Economic Loss | .....................................152 |
| IX. |  | CAUSES OF ACTION UNDER THE EXCHANGE ACT | .............155 |

## COUNT IV

(Against GE and Defendants Immelt, Sherin, Neal, Bornstein and Cary)
Violations of Section 10(b) of the Exchange Act and Rule 10b-5 ..................................................................155

## COUNT V

(Against Defendants Immelt and Sherin)
Violations of Section 20(a) of the Exchange Act .............................157

**X.      CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS** ..............................................................................158

**XI.     NO SAFE HARBOR**..........................................................................160

**XII.    PRAYER FOR RELIEF**....................................................................161

Court-appointed Lead Plaintiff, the State Universities Retirement System of Illinois ("Lead Plaintiff" or "SURS"), by and through its undersigned counsel, brings claims arising under the Securities Act of 1933 (the "Securities Act"), individually and on behalf of a class of similarly situated persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired $12 billion in General Electric Company ("GE" or the "Company") common stock in a secondary public offering, commencing on October 1, 2008 and ending on October 7, 2008 (the "October Offering"). The Securities Act claims solely allege strict liability and negligence causes of action. Those claims are set forth first below and do not sound in fraud.

Separately, Lead Plaintiff, by and through its undersigned counsel, brings claims arising under the Securities Exchange Act of 1934 (the "Exchange Act"), individually and on behalf of a class of similarly situated persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired GE common stock in the open market from September 25, 2008 through and including March 19, 2009 (the "Class Period"). To assist the Court in distinguishing the allegations of fraud that underlie the Exchange Act claims, those allegations are set forth separately below following the Securities Act claims.

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an investigation by its counsel which included, among other things, (i) review and analysis of documents filed publicly by GE with the United States Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning GE and other Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning GE's securities and business; (iv)

discussions with consulting experts; (v) discussions with confidential witnesses; and (vi) review and analysis of certain pleadings filed in connection with other litigation naming GE as a defendant or nominal defendant. Lead Plaintiff believes that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.      This is a federal securities class action brought on behalf of: (1) purchasers of $12 billion in GE common stock in the October Offering for violations of the Securities Act; and (2) purchasers of GE's common stock during the Class Period for violations the Exchange Act.

2.      At its core, this case is about one of the world's largest and historically most venerable corporations – a purportedly safe and reliable company with a history spanning three centuries that traces its roots back to Thomas Edison – that, during a time of extreme and extraordinary uncertainty in the global financial markets, was concealing its true and imperiled financial condition.

### A.    The Global Economic Crisis

3.      The global economic crisis of 2007-2009 has been called the most serious financial crisis since the Great Depression by leading economists, with global effects including the failure of major institutions, declines in consumer wealth estimated in the trillions of dollars, and substantial financial commitments incurred by governments. The global economic landscape immediately before and during the Class Period was still reeling from the subprime crisis and related meltdowns involving mortgage-backed securities. Exposure to subprime and below investment grade debt was crippling companies, unraveling confidence in financial institutions, and causing investors to see their wealth shrink.

4.      The economic crisis accelerated and hit a critical point in September, 2008 – just prior to, and at the start of, the Class Period.  On September 7, 2008, troubled mortgage finance companies Fannie Mae and Freddie Mac, which account for nearly 80% of the outstanding residential mortgages in the U.S., were placed into conservatorship by the U.S. government. Within a span of three days, September 14 – 16, 2008, several of the world's largest and oldest financial institutions fell - either bankrupt, bought or bailed out by the government.  Notably: Merrill Lynch was sold in a fire sale to Bank of America; the United States Federal Reserve Bank created an $85 billion credit facility for the insurance giant American International Group; and investment banking powerhouse Lehman Brothers went under, filing for bankruptcy - the largest bankruptcy in U.S. history.

5.      When Lehman Brothers collapsed, banks worldwide experienced massive withdrawals.  Withdrawals from money market mutual funds, the major buyers of commercial paper issued by major corporations, such as GE, to finance their day-to-day operations, including their payrolls, skyrocketed to $144.5 billion by close of business on September 17, 2008, up from $7.1 billion the prior week.  The panic paralyzed the commercial paper market, leaving companies stranded with insufficient cash, threatening their ability to meet short-term obligations.  Nearly one-third of the U.S. lending mechanism was frozen and continued to be frozen throughout the Class Period.

6.      In response to the economic crisis, the U.S. Government took unprecedented action.  On September 20, 2008, the Bush Administration formally proposed a $700 billion bailout of financial institutions.  Subsequently, the Emergency Economic Stabilization Act was signed into law on October 3, 2008 and authorized the Treasury Secretary to spend up to $700

billion to purchase distressed assets, including mortgage-backed securities, and make capital injections into banks.

7.     Throughout the Class Period, and as large institutions continued to fail due to the sharp declines in the value of subprime and other non-investment grade debt, companies' credit ratings were in serious jeopardy as the major credit rating agencies, such as Moody's, Fitch, and Standard & Poor's, were warning of downgrades, and downgrading, credit ratings of companies that had substantial exposure to such debt.

8.     Given this economic environment of unprecedented uncertainty, investors were concerned and acutely interested in knowing the true financial condition of the companies in which they invested – particularly in the case of financial services companies.  Specifically, investors were extremely interested in the kinds of assets these companies held in their portfolios and the condition and quality of those assets.   Likewise, investors were focused on the credit ratings of these companies.  Accordingly, investors relied on companies to make proper and complete disclosures with respect to their assets, risk profiles, and financial health.

**B.     GE Falsely Portrayed Its True Financial Condition**

9.     In the midst of this global economic crisis and throughout the Class Period, GE held itself out as a secure and reliable company.  Defendant Jeffrey Immelt, GE's CEO, and Defendant Keith Sherin, GE's CFO, and GE repeatedly touted GE's AAA rating as distinguishing it from other companies and otherwise providing unique advantages to GE.  At the same time, GE, Immelt, and Sherin consistently repeated the Company's commitment to paying its full $0.31 per share quarterly dividend, and further stated that GE's commitment to the dividend was not in tension with the Company maintaining its AAA rating.  Indeed, Immelt, as late as January 23, 2009, informed investors that GE had more than sufficient cash to both

maintain the AAA rating and pay the dividend "without stretching."  Yet, one month later, GE

cut its dividend and was told by Moody's that GE Capital was under review for a downgrade.  In

reality, GE's massive financial services arm, General Electric Capital Services ("GE Capital"),

was suffering from the severe economic downturn just like its financial services peers – except

the Defendants concealed this truth from investors.  GE Capital is, by far, GE's largest segment,

making up almost 50% of GE's reported net income and 80% of its reported assets in FY 2008.

GE Capital's assets fall into two broad categories: (1) commercial assets, including commercial

real estate, commercials loans, energy loans, equipment loans, project finance, and loans tied to

aircraft; and (2) consumer assets, including mortgages, private label credit cards, and auto and

personal loans, and other sales credit financing.

       10.     For most of its long history, GE maintained a particularly sterling reputation as

being one of the world's safest and most secure investments.  GE distinguished itself by its

repeatedly touted quarterly dividend that GE paid to shareholders continuously since 1899 and

that until February, 2009, had not been cut since 1938, and a AAA credit rating the Company

had maintained since 1956.  At the time of the Class Period, however, GE Capital was, in fact,

highly exposed to significant losses, and maintained a portfolio with a substantial portion of

subprime consumer and non-investment grade (or "junk" status) commercial loans.[1]

Significantly, in the time of intense scrutiny on financial services companies like GE Capital as

---

[1] The three Rating Agencies, Standard & Poor's ("S&P"), Fitch, and Moody's rate commercial borrowers using a letter-based rating system that represents the agencies' opinions as to the underlying strength of the particular borrower.  These ratings range from "AAA," representing "prime" credit quality, to "D" indicating a borrower in default.  (Moody's uses slightly different, but essentially identical, alphanumeric rating scores.)  Between these ends of the spectrum are "high grade" ratings of AA, "upper medium grade" ratings of A, "lower medium grade" ratings of BBB, "non-investment grade, speculative" ratings of BB, and "highly speculative" ratings of "B."  Plus or minus designations may also be added to letter ratings to show shades of risk within a given rating score.  While ratings may take into account various factors, they primarily are based on the likelihood of default.  Ratings below the score of BBB- are referred to as "non-investment grade," "speculative," or "junk" status ratings, reflecting the riskiest categories of borrowers.

to the make up of their portfolios and the amount of subprime and junk debt they held, GE

withheld this material information from investors – information that should have been disclosed

throughout the Class Period, and in connection with the $12.2 billion common stock offering in

early October, 2008.  Moreover, under pressure to maintain its AAA credit rating, GE forecasted

$5 billion in earnings for GE Capital in 2009, which the Rating Agencies considered a crucial

component of keeping GE at a AAA rating, while concealing from the market that GE Capital's

operating structure and risk exposure were such that it was a virtual certainty that GE Capital

would not be able to produce such earnings.  As a result, contrary to Defendants' representations,

both GE's quarterly dividend and its AAA credit rating were in serious jeopardy.

11.     At a time when investors were in a panic and intensely interested in the true

financial condition of GE and the makeup of GE Capital's portfolio, GE failed to disclose this

information and instead falsely portrayed itself as a safe and secure investment.  In fact, the

Company engaged in repeated violations of GAAP in an attempt to conceal the true scope of

losses at GE Capital and the risk inherent in GE Capital's lending to low credit quality

borrowers, and to overstate the Company's reported assets and period income to falsely portray

itself as a financially healthy company and retain its AAA rating.

12.     Indeed, GE has a very recent history of engaging in improper accounting and

managing its earnings.  In August, 2009, GE agreed to pay the SEC $50 million to settle charges,

unrelated to the specific allegations in this case, that, over the course of several years during

Defendant Immelt's tenure as GE's CEO and Defendant Sherin's tenure as GE's CFO, it

distorted its true financial condition and misled investors by using various improper accounting

methods to increase its reported earnings and/or revenues and to avoid reporting negative

financial results.

13.     When GE was ultimately forced to cut its dividend by 70% on February 27, 2009, lost its AAA rating on March 12, 2009, and on March 19, 2009, finally disclosed its true financial condition, including the poor quality of its loan portfolio and the inadequacy of its loan loss reserves, and revised its 2009 earnings forecast for GE Capital, GE's stock price plunged from close to $26 per share at the start of the Class Period to less than $10 per share the day after the Class Period ended, causing Lead Plaintiff and the Class significant damages.

## II.     OVERVIEW OF THE SEPARATE CLAIMS

14.     In Counts I through III, Lead Plaintiff asserts claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against GE, Defendants Immelt and Sherin, the Director Defendants (as defined below), and the Underwriter Defendants (as defined below) (collectively, the "Securities Act Defendants") who are statutorily liable for the materially untrue and misleading statements set forth in the Offering Materials. Lead Plaintiff specifically disclaims any allegations of fraud in connection with the Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

15.     In Counts IV and V, Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b5"), against GE and Defendants Immelt, Sherin, Neal, Bornstein and Cary (collectively, the "Exchange Act Defendants").

## III.     JURISDICTION AND VENUE

16.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b) and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the SEC promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  GE is a New York corporation and maintains offices in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

### IV.     PARTIES

#### A.     Lead Plaintiff

20.     Lead Plaintiff SURS is the retirement system established for the benefit of the staff members and employees of the University of Illinois and certain other state educational and scientific agencies.  SURS currently serves over 70 employers in Illinois including state universities, community colleges, and state agencies.  It employs more than 100 people in offices in Champaign and Chicago.  SURS provides benefit services to over 180,000 members throughout the world and has approximately $11.5 billion in assets under management.  As set forth in the certification submitted in support of its motion for appointment as Lead Plaintiff, Lead Plaintiff SURS purchased GE common stock on the open market during the Class Period and in the October Offering and suffered damages as a result of the misconduct alleged herein.

### B. Defendants

#### 1. General Electric Company

21. Defendant GE is a New York corporation with its principal place of business located in Fairfield, Connecticut. GE operates as a technology, media, and financial services company worldwide. The Company produces a variety of items, from aircraft engines to medical imaging equipment. GE has a massive financial services arm, GE Capital, which operates in commercial finance, consumer finance, leasing and real estate services. GE Capital, a wholly owned subsidiary of GE, is headquartered in Stamford, Connecticut and is separately incorporated in Delaware. GE is owned by its shareholders, and its common stock is listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GE." GE is also the Registrant for the October Offering.

#### 2. Officer Defendants

22. Defendant Jeffrey Immelt ("Immelt") served as the Company's Chairman and Chief Executive Officer ("CEO") at all relevant times hereto. The October Offering was made pursuant to a shelf registration statement on Form S-3 filed on December 5, 2005, Registration Statement No. 333-130117 (the "Registration Statement"). Immelt signed the Registration Statement. Further, pursuant to the October Offering, GE entered into an October 2, 2008 Underwriting Agreement. The Underwriting Agreement specifies that, as a condition of each Underwriter's obligation to purchase GE shares, the Underwriters received letters signed on behalf of each director and executive officer of the Company.[2] As a director and officer of the Company, a letter signed on Immelt's behalf was sent to the Underwriters.[3] Further, Immelt is

---

[2] The letters specified that each of the undersigned directors and officers would not trade or transfer any GE common stock during the period from the start of the October Offering to thirty days after the Offering closed.

[3] The Underwriting Agreement for the October Offering is referenced in the October 2, 2008 Prospectus for the October Offering. The Prospectus states that "[GE] and the underwriters named below have entered into an

quoted in a press release filed as part of the Free Writing Prospectus filed on October 1, 2008 in connection with the October Offering.

23. Defendant Keith Sherin ("Sherin") served as the Company's Vice Chairman and Chief Financial Officer ("CFO") at all relevant times hereto. Sherin signed the Registration Statement and the Underwriting Agreement. Further, as an officer of the Company, a letter signed on Sherin's behalf was sent to the Underwriters.

24. Defendant Michael Neal ("Neal") served as the Company's Vice Chairman and as Chairman and CEO of GE Capital at all relevant times hereto. As an officer of the Company, a letter signed on Neal's behalf was sent to the Underwriters.

25. Defendant Jeffrey S. Bornstein ("Bornstein") served as CFO of GE Capital and Commercial Finance at all relevant times hereto.

26. Defendant William H. Cary ("Cary") served as GE Capital's Chief Operating Officer ("COO") from November 2008 through the end of the Class Period and previously served as President of GE Money (Global).

27. Defendants Immelt, Sherin, Neal, Bornstein, Cary and GE are collectively referred to herein as the "Exchange Act Defendants."

**3. Director Defendants**

28. Defendant James I. Cash, Jr. ("Cash") served as a director of the Company at all relevant times hereto, and signed the Registration Statement. As a director of the Company, a letter signed on Cash's behalf was sent to the Underwriters.

---

underwriting agreement with respect to the shares being offered. Subject to certain conditions, each underwriter has severally agreed to purchase the number of shares indicated in the following table. Goldman, Sachs & Co. is the representative of the underwriters."

29.     Defendant William M. Castell ("Castell") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Castell's behalf was sent to the Underwriters.

30.     Defendant Ann M. Fudge ("Fudge") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Fudge's behalf was sent to the Underwriters.

31.     Defendant Claudio X. Gonzalez ("Gonzalez") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Gonzalez's behalf was sent to the Underwriters.

32.     Defendant Andrea Jung ("Jung") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Jung's behalf was sent to the Underwriters.

33.     Defendant Alan G. Lafley ("Lafley") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Lafely's behalf was sent to the Underwriters.

34.     Defendant Robert W. Lane ("Lane") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Lane's behalf was sent to the Underwriters.

35.     Defendant Ralph S. Larsen ("Larsen") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Larsen's behalf was sent to the Underwriters.

36.     Defendant Rochelle B. Lazarus ("Lazarus") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Lazarus's behalf was sent to the Underwriters.

37.     Defendant Samuel A. "Sam" Nunn, Jr. ("Nunn") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Nunn's behalf was sent to the Underwriters.

38.     Defendant Roger S. Penske ("Penske") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Penske's behalf was sent to the Underwriters.

39.     Defendant Robert J. Swieringa ("Swieringa") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Swieringa's behalf was sent to the Underwriters.

40.     Defendant Robert C. Wright ("Wright") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Wright's behalf was sent to the Underwriters.

41.     Defendant Douglas A. Warner, III ("Warner") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  As a director of the Company, a letter signed on Warner's behalf was sent to the Underwriters.

42.     Defendant Susan Hockfield ("Hockfield") served as a director of the Company at all relevant times hereto.  As a director of the Company, a letter signed on Warner's behalf was sent to the Underwriters.

43.     Defendant James J. Mulva ("Mulva") served as a director of the Company at all relevant times hereto.  As a director of the Company, a letter signed on Warner's behalf was sent to the Underwriters.

44.     Defendants Cash, Castell, Fudge, Gonzalez, Jung, Lafley, Lane, Larsen, Lazarus, Nunn, Penske, Swieringa, Wright, Warner, Hockfield and Mulva are collectively referred to as the "Director Defendants."

### 4.     Underwriter Defendants

45.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") maintains offices at 85 Broad Street, New York, NY 10004.  Goldman Sachs was an underwriter and bookrunning lead manager of the October Offering and served as the representative of all of the underwriters pursuant to the October Offering.  Goldman Sachs sold 153,965,000 shares of GE stock in the October Offering.

46.     Defendant Banc of America Securities LLC ("Banc of America") maintains offices at 9 West 57th Street, New York, NY 10019.  Banc of America was an underwriter and bookrunning lead manager of the October Offering.  Banc of America sold 73,030,000 shares of GE stock in the October Offering.

47.     Defendant Citigroup Global Markets Inc. ("Citigroup") maintains offices at 399 Park Avenue, New York, NY 10043.  Citigroup was an underwriter and bookrunning lead manager of the October Offering.  Citigroup sold 73,030,000 shares of GE stock in the October Offering.

48.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") maintains offices at 60 Wall Street, New York, NY 10005.  Deutsche Bank was an underwriter and bookrunning lead manager of the October Offering.  Deutsch Bank sold 36,540,000 shares of GE stock in the October Offering.

49.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") maintains offices at 270 Park Avenue, New York, NY 10017.  JP Morgan was an underwriter and bookrunning lead manager of the October Offering.  JP Morgan sold 73,030,000 shares of GE stock in the October Offering.

50.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") maintains offices at 1585 Broadway, New York, NY 10036.  Morgan Stanley was an underwriter and bookrunning lead manager of the October Offering.  Morgan Stanley sold 36,540,000 shares of GE stock in the October Offering.

51.     Defendant Barclays Capital Inc. ("Barclays") maintains offices at 200 Park Avenue, New York, NY 10166.  Barclays was an underwriter and junior bookrunner of the October Offering.  Barclays sold 12,165,000 shares of GE stock in the October Offering.

52.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") maintains offices at 11 Madison Avenue, New York, NY 10010.  Credit Suisse was an underwriter and junior bookrunner of the October Offering.  Credit Suisse sold 12,165,000 shares of GE stock in the October Offering.

53.     Defendant UBS Securities LLC ("UBS") maintains offices at 677 Washington Blvd., Stamford, CT 06901.  UBS was an underwriter and junior bookrunner of the October Offering.  UBS sold 12,165,000 shares of GE stock in the October Offering.

54.     Defendant ABN AMRO Incorporated ("ABN AMRO") maintains offices at 55 East 52nd Street, New York, NY 10055.  ABN AMRO was an underwriter of the October Offering.  ABN AMRO sold 3,835,000 shares of GE stock in the October Offering.

55.     Defendant Banca IMI S.p.A. ("Banca IMI") maintains offices at 1 William Street, New York, NY 10004.  Banca IMI was an underwriter of the October Offering.  Banca IMI sold 3,835,000 shares of GE stock in the October Offering.

56.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") maintains offices at 787 7th Avenue, 31st Floor, New York, NY 10019.  BNP Paribas was an underwriter of the October Offering.  BNP Paribas sold 3,835,000 shares of GE stock in the October Offering.

57.     Defendant Daiwa Securities America Inc. ("Daiwa") maintains offices at Financial Sq. 32 Old Slip, New York, NY 10005.  Daiwa was an underwriter of the October Offering.  Daiwa sold 3,835,000 shares of GE stock in the October Offering.

58.     Defendant HSBC Securities (USA) Inc. ("HSBC") maintains offices at 452 5th Avenue, New York, NY 10018.  HSBC was an underwriter of the October Offering.  HSBC sold 3,835,000 shares of GE stock in the October Offering.

59.     Defendant ING Financial Markets LLC ("ING") maintains offices at 1325 Avenue of the Americas, New York, NY 10019.  ING was an underwriter of the October Offering.  ING sold 3,835,000 shares of GE stock in the October Offering.

60.     Defendant Lloyds TSB Bank Plc ("Lloyds") maintains offices at 1095 Avenue of the Americas, 34th Floor, New York, NY 10036.  Lloyds was an underwriter of the October Offering.  Lloyds sold 3,835,000 shares of GE stock in the October Offering.

61.     Defendant Merrill Lynch, Pierce Fenner & Smith Incorporated ("Merrill Lynch") maintains offices at 1251 Avenue of the Americas, Suite 24, New York, NY 10020.  Merrill Lynch was an underwriter of the October Offering.  Merrill Lynch sold 3,835,000 shares of GE stock in the October Offering.

62.     Defendant Mitsubishi UFJ Securities International plc ("Mitsubishi") maintains offices at 1251 Avenue of the Americas, New York, NY 10020.  Mitsubishi was an underwriter of the October Offering.  Mitsubishi sold 3,835,000 shares of GE stock in the October Offering.

63.     Defendant Mizuho Securities USA Inc. ("Mizuho") maintains offices at 1251 Avenue of the Americas, 33rd Floor, New York, NY 10020.  Mizuho was an underwriter of the October Offering.  Mizuho sold 3,835,000 shares of GE stock in the October Offering.

64.     Defendant Santander Investment Securities Inc. ("Santander") maintains offices at 45 East 53rd Street, New York, NY 10022.  Santander was an underwriter of the October Offering.  Santander sold 3,835,000 shares of GE stock in the October Offering.

65.     Defendant SG Americas Securities, LLC ("SG Americas") maintains offices at 1221 Avenue of the Americas, 6th Floor, New York, NY 10020.  SG Americas was an underwriter of the October Offering.  SG Americas sold 3,835,000 shares of GE stock in the October Offering.

66.     Defendant Blaylock Robert Van, LLC ("Blaylock Robert Van") maintains offices at 600 Lexington Avenue, 3rd Floor, New York, NY 10022.  Blaylock Robert Van was an underwriter of the October Offering.  Blaylock Robert Van sold 3,835,000 shares of GE stock in the October Offering.

67.     Defendant Castleoak Securities, L.P. ("Castleoak") maintains offices at 110 East 59th Street, 2nd Floor, New York, NY 10022.  Castleoak was an underwriter of the October Offering.  Castleoak sold 3,835,000 shares of GE stock in the October Offering.

68.     Defendant Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") maintains offices at 61 Broadway, Room 2924, New York, NY 10006.  Samuel A. Ramirez was

an underwriter of the October Offering.  Samuel A. Ramirez sold 3,835,000 shares of GE stock in the October Offering.

69.     Defendant Utendahl Capital Group, L.L.C. ("Utendahl") maintains offices at 30 Broad Street, 21st Floor, New York, NY 10004.  Utendahl was an underwriter of the October Offering.  Utendahl sold 3,835,000 shares of GE stock in the October Offering.

70.     Defendant The Williams Capital Group, L.P. ("Williams Capital") maintains offices at 650 5th Avenue, 11th Floor, New York, NY 10019.  Williams Capital was an underwriter of the October Offering.  Williams Capital sold 3,835,000 shares of GE stock in the October Offering.

71.     Defendants Goldman Sachs, Banc of America, Citigroup, Deutsche Bank,  J.P. Morgan, Morgan Stanley, Barclays, Credit Suisse, UBS, ABN AMRO, Banca IMI, BNP Paribas, Daiwa, HSBC, ING, Lloyds, Merrill Lynch, Mitsubishi, Mizuho, Santander, Castleoak, Blaylock Robert Van, SG Americas, Williams Capital, Utendahl, and Samuel A. Ramirez are collectively referred to as the "Underwriter Defendants."

## V.     LEAD PLAINTIFF'S INVESTIGATION AND CONFIDENTIAL SOURCES

72.     As noted herein, Lead Plaintiff's allegations are based upon the investigation of Lead Counsel which included, among other things: review of GE's public filings with the SEC; GE press releases; publicly available trading information; articles in the general and financial press; and investment analyst reports.

### A.     Description of Confidential Sources

73.      Lead Plaintiff's allegations are also based upon information provided by former employees of GE and GE Capital[4] with knowledge of the Company's and/or GE Capital's

---

[4] During the course of Lead Counsel's investigation, several former GE and GE Capital employees declined to speak with investigators, citing restrictions placed on those individuals by "non-disparagement" language in their

business practices including: GE Capital's lending practices; GE Capital's asset management business practices; GE Capital's and the Company's accounting policies and practices, and GE Capital's monitoring of its various portfolios. These former employees include, but are not limited to, the following:

Confidential Witness 1 is a former GE employee who held several positions as an accountant and financial analyst at GE and GE Capital from 2002 through March 2009. From 2007 through 2009, Confidential Witness 1 held various positions in Commercial Finance in GE Capital's Stamford, Connecticut offices. In this position, Confidential Witness 1 conducted analyses of investment portfolios for insurance stakeholders, management, clients, and rating agencies. In addition, Confidential Witness 1 assisted with financial reporting for insurance companies affiliated with GE. Confidential Witness 1 has direct, personal knowledge of GE Capital's accounting policies and procedures, including those concerning the valuation of GE Capital assets and the processes by which GE Capital would determine the possible impairment of those assets, as well as the processes by which accounting data was, as Confidential Witness 1 recalled, rolled up on a quarterly basis from GE Capital to the GE Corporate level using a "Data Parking Lot" system. Confidential Witness 1 attended monthly and quarterly meetings at which GE Capital would consider asset impairments and related reserves. According to Confidential Witness 1, personnel from GE Corporate attended the quarterly impairment meetings.

Confidential Witness 2 is a former GE Capital employee who held several management positions at GE Capital from 1997 through June 2008. Confidential Witness 2's responsibilities included forming relationships with vendors who sold industrial equipment so that GE Capital would provide financing for that equipment. Within the context of Confidential Witness 2's position at GE Capital, Confidential Witness 2 became knowledgeable about GE Capital's policies and procedures regarding the tracking of delinquent loans based on 30, 60, and 90 day delinquencies, preparing monthly "delinquency reports" concerning the status of those loans, holding periodic "portfolio meetings" to discuss loan delinquencies, and writing down loans that were not paid after 90 days. Confidential Witness 2 is not aware of an instance in which GE Capital wrote down any loans that were less than 90 days delinquent within Confidential Witness 2's particular division during Confidential Witness 2's tenure at the Company. Confidential Witness 2 also reported that the Company did not typically perform appraisals on equipment that was backing industrial loans that

---

severance agreements. Lead Counsel's investigation has revealed that the Company required that its former employees agree to severance agreements that included the Company's "non-disparagement" and non-disclosure language in connection with those employees' receipt of severance payments and/or other continuation of benefits. Lead Counsel understands that GE severance agreements provide, in boldface type: "I further agree to not denigrate the Company or any of its divisions" and also requires former employees to not reveal "confidential information" about the Company.

were experiencing losses given that the cost of such appraisals was "highly astronomical." Confidential Witness 2 noted that GE Capital was sometimes not informed of adverse events affecting its industrial borrowers, including bankruptcies. According to Confidential Witness 2, GE Capital "would sometimes be the last to know" if a borrower was having problems."

Confidential Witness 3 is a former GE Capital Employee who held multiple management positions at GE Capital, including service in GE Capital's structured finance and capital finance groups from 1991 through 2003 and 2004 through March 2009, respectively, achieving the positions of Senior Vice President and Manager and Senior Vice President and Business Development Officer during Confidential Witness 3's tenure at GE Capital. By nature of Confidential Witness 3's position at GE Capital, Confidential Witness 3 is aware that there were "Portfolio Groups" at GE Capital that monitored and managed loan accounts, prepared a "Portfolio Quarterly Report" addressing the status of loans in the portfolio, and made recommendations regarding asset write-downs to upper management of the Company. According to Confidential Witness 3, the Portfolio Groups were staffed by GE Capital's Chief Risk Officer, an account manager, and the head of the portfolio. With respect to loans at risk of default, Confidential Witness 3 noted that the Company was very reluctant to write down loans and would "always [take] the approach that they [GE] could work things out [with the borrower]."

Confidential Witness 4 worked in structured and project finance at GE Capital from 1997 through May 2008, ultimately holding the position of Senior Vice President. Based on Confidential Witness 4's position with GE Capital, Confidential Witness 4 is aware that each business segment within GE Capital performed its own underwriting, with the exception of "big ticket" items from GE Corporate that were performed by the specific business unit. Underwriting results were, per Confidential Witness 4, reported "up the chain" throughout the business segment and then up to GE Corporate. Confidential Witness 4 also reported that the structured and project finance group provided frequent reports "up the chain" to senior management at GE Capital, including loan status reports, loan delinquency reports (also called "credit reports"), and workout reports for "bad" (defaulted) loans. Similarly, Confidential Witness 4 stated that each business unit at GE Capital calculated its own loss reserves. As with the other reporting, results of the reserve calculations were reported "up the chain" to either "the segment CCO or CRO" and then on to GE Capital corporate. According to Confidential Witness 4, "management would either accept the reserves reported or adjust them."

Confidential Witness 5 is former Senior Portfolio Manager who worked in the Commercial Distribution Finance Group ("CDFG") at GE Capital from 2002 through March 2009. Confidential Witness 5's responsibilities included tracking loans in GE Capital's asset-based financing portfolio. Confidential Witness 5 explained that CDFG tracked defaulted loans and reported that information up to GE Capital, and that this data was "rolled up and reported to the corporate level

[at GE]." Confidential Witness 5 is aware of GE Capital's asset write-down policies and procedures during the Class Period, and also CDFG's typical expectation that if a borrower did not make a payment, the Company would be "taking a hit in 180 days." Confidential Witness 5 also described how business slowed considerably at CDFG when the broader economy weakened and demand for the products financed fell off, particularly at "second- and third-tier manufacturers" – those customers of GE Capital's that were "greatly affect[ing] GE Capital's performance." Confidential Witness 5 is also aware that as of the end of 2008, GE Capital was "beginning to reduce its assets . . . [intending to] eliminate[e] its overall risk."

Confidential Witness 6 is a former GE Capital employee who worked as an underwriter in GE Transportation Finance from 2006 through the Summer of 2009. Confidential Witness 6 became knowledgeable about the Company's positions with respect to the payment of the quarterly dividend and maintaining GE's AAA credit rating based on Confidential Witness 6's position with the Company, including attendance at employee meetings – including "leadership discussion" and/or "Quarterly Caucus" meetings held by Chief Credit Officer-level personnel from GE and GE Capital – and review of internal corporate communications sent to employees from Defendant Immelt. Confidential Witness 6 is also aware that, during the Class Period, the commercial paper market became "frozen," which impacted GE Capital's business.

Confidential Witness 7 worked as a portfolio/commercial loan analyst in Commercial Finance at GE Capital for approximately a year and a half, until departing the company in June 2009. Confidential Witness 7 described receiving daily e-mail notices called "metrics" that included detailed Excel spreadsheets, in connection with problem loans in Confidential Witness 7's portfolio. These e-mail notices were sent from an analytics team in Commercial Finance. Confidential Witness 7's position was "basically a [loan] servicer" at GE Capital who "made sure accruals matched up, made sure [loan] covenants were adhered to, and made sure that GE Capital was getting paid." Confidential Witness 7 worked with approximately 50 loan accounts, some of which had payments due on either a quarterly or yearly basis. Confidential Witness 7 recalls that it was not unusual for energy company borrowers to have trouble repaying GE Capital, including at least one borrower that "just stopped paying . . . because it had no money." Confidential Witness 7 also recounted the example of one of the borrowers in Confidential Witness 7's portfolio, an energy company called SemGroup. According to Confidential Witness 7, GE made a $55 million loan to SemGroup on July 11, 2008. Ten days later, SemGroup declared bankruptcy. Confidential Witness 7 is knowledgeable about GE Capital's policies and procedures with respect to dealing with delinquent borrowers.

Confidential Witness 8 is a former GE Capital employee who worked as a Vice President of Risk Underwriting in the Energy Financial Services group from March 2008 through January 2009. Confidential Witness 8 recalls that Energy Financial services was doing very well and "had record profits" until September

2008 when "credit markets began to fall apart" and business "more or less halted." At that time, Confidential Witness 8 recalls that the thinking at GE Capital was, "[a]re we going to have funds to invest – and at what price?" In addition, Confidential Witness 8 is aware that borrowing costs were "going through the roof" at the same time. Confidential Witness 8 is also aware that there was a "portfolio group" at Energy Financial Services that tracked loans after deals were made.

Confidential Witness 9 is a former Senior Vice President for Operations in the Commercial Lending group within GE Capital's Corporate Financial Services department. Confidential Witness 9 had a long tenure with GE and GE Capital, serving in positions overseas for GE from 1985 through 2004. From 2004 through May 2008, Confidential Witness 9 worked in operations for GE Capital's commercial portfolio in the Americas region. Confidential Witness 9 described how deal volume "fell off a cliff" at GE Capital in early-to-mid 2008. Confidential Witness 9 further described how, following the Lehman Brothers collapse in September 2008, GE Capital was "hung" because it had no deals in the pipeline and that a standstill in the commercial paper market meant that GE Capital could not support itself because it "was mostly funded by 30-day commercial paper."

Confidential Witness 10 is a former credit risk administrator at GE Capital who worked at GE Corporate Financial Services from 1998 through June 2009. Confidential Witness 10 described Corporate Financial Services as offering credit to companies that were "distraught" – loans that were typically backed by those distressed borrowers' inventory and receivables. Confidential Witness 10 is also knowledgeable about the processes by which loans were reviewed and structured upon GE Capital's entry into a credit agreement with the borrower.

Confidential Witness 11 is a former Assistant Vice President in Commercial Finance in the Media, Communications, and Entertainment division of GE Capital who served from 2001 through June 2008. Confidential Witness 11 performed financial modeling and risk analysis for leveraged buyout loans and other deals in a group that underwrote and took management fees for deals in media and telecommunications markets. Confidential Witness 11 described how "our group's business collapsed" in March 2008 following the demise of Bear Stearns. The collapse was, according to Confidential Witness 11: "literally overnight we did not have new business. It was like a domino and things did not get better." Confidential Witness 11 described how the lack of business forced GE Capital to close the Media, Communications, and Entertainment division in June 2008.

Confidential Witness 12 worked as a Senior Underwriter in the North American Equity division at GE Real Estate from October 2002 through February 2009. Confidential Witness 12 performed underwriting on commercial properties that GE Real estate purchased with joint venture partners throughout North America. Confidential Witness 12 is knowledgeable about GE's real estate investment activity and financing arrangements made in connection with those investments.

Confidential Witness 12 explained that deal volumes in North America had already fallen by about 25-30% in the first eight months of 2008, and that underwriters "knew markets were turning." Then, starting in September 2008, Confidential Witness 12 stated that, "transactions [at GE] were at a halt and deals were not getting done. Nobody was willing to buy and banks weren't lending." Confidential Witness 12 noted that, because GE was not required to mark its assets to market and was in a general position to buy and hold real estate assets, certain assets "held on the books versus real value could easily be a lot different" and that "I'm sure the true value was less."

Confidential Witness 13 was a Senior Underwriter and Asset Manager for commercial mortgage-backed securities within the Real Estate Group at GE Capital from October 2005 through September 2008. Confidential Witness 13's responsibilities included risk assessment, analysis, and underwriting. Confidential Witness 13 described a corporate culture within GE as being one in which "the company only wanted you to know what you needed to know." Nonetheless, Confidential Witness 13 stated that he was aware of broad problems at GE Capital during the Class Period. Within the Real Estate Group, Confidential Witness 13 described deals where "pro formas for rent, income and capitalization rates were outrageous" in overstating estimated benefits to the Company. In addition, Confidential Witness 13 stated that GE Capital did not write down bad real estate deals, but would "take the asset and shift it to an investment to hold" to avoid taking a write-down. Confidential Witness 13 described this process as being used so that the Company could "hide assets until the market turned around" by making a "switch on the balance sheet" – shifting deals to the long term in the hope that the value would increase, and by doing so, avoid losses to the Company.

Confidential Witness 14 is a former GE Capital employee who held various administrative positions in the Company from December 1996 through March 2009. During the Class Period, Confidential Witness 14 provided support to the Human Resources, Finance (including the CFO of GE Capital), and Legal departments at GE Capital. Confidential Witness 14 also provided backup support to the CEO of GE Capital. Confidential Witness 14 described being aware that in the Fall of 2008, GE Capital stopped making new deals, and that the Company was only taking on new commitments rather than new deals. Around the same time period, Confidential Witness 14 began to hear discussions within the Company that borrowers were beginning to default on their loans when the overall economy started to decline. Confidential Witness 14 also described assisting in the preparation of quarterly reports for the GE Capital finance department that were used to present GE Capital's financial results to GE Corporate senior management each quarter. According to Confidential Witness 14, these reports included a PowerPoint presentation that Confidential Witness 14 helped compile.

Confidential Witness 15 is a former GE and GE Capital employee who held several positions with the Company from 1997 through March 2009. Confidential

Witness 15 worked as a Commercial Real Estate Director at GE Real Estate before becoming a Regional Commercial Real Estate Manager at GE Commercial Finance within GE Capital, a position Confidential Witness 15 held during the Class Period. Confidential Witness 15's department worked with both equity and debt loans during the Class Period, with most of the debt transactions originated in the United States and most of the equity transactions originating from Asia. Most of the deals Confidential Witness 15 worked with were equity based, short-term, three- to five-year deals with interest only payments. GE was typically a partner in these transactions, taking an equity stake as a part owner of the property. Beginning in mid-2007 and continuing into 2008, in circumstances when GE would learn that its equity stake and/or periodic equity payments were at risk, GE would "shift its equity position to long term on the balance sheet" if it could not sell its stake or otherwise refinance it to avoid writing the asset down to fair value and taking a loss. According to Confidential Witness 15, this practice would only be done for assets that were having problems, for the purpose of improving the Company's equity position. Confidential Witness 15 described how GE would move their troubled equity positions to long-term equity investments if the Company felt that there was an upside to the transaction, thereby avoiding writing down their position. Similarly, Confidential Witness 15 describes how GE Capital would, for the same reasons, move acquired assets to long-term status if their value decreased so as to avoid taking a loss in the then-current quarter. Confidential Witness 15 described how GE would do everything it could to avoid valuing assets at fair value because these assets were not worth what they were when the investment was made (thus exposing the company to write downs and losses) and further stated, "GE manages its earnings very well." Confidential Witness 15 also described how there were quarterly loan portfolio reviews at GE Capital and that there was an internal "watch list" that identified troubled loans. Confidential Witness 15 described a "committee" of senior GE managers in Risk Management and Asset Management from the Company's Norwalk, Connecticut Offices (including Jane Day, Head of Risk, Ron Pressman, Head of Real Estate, and Alex Burger, among other members) and how that committee made the final decisions on all loan transactions including moving equity investments to long term on the balance sheet. Confidential Witness 15 noted, however, that Defendant Immelt was specifically involved in the decision making with respect to larger transactions.

## VI. VIOLATIONS OF THE SECURITIES ACT

74. Allegations set forth in this section of the Complaint assert strict liability and negligence claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act. As noted above, the Securities Act claims are not based on any allegation that any Securities Act Defendant engaged in fraud or any other deliberate or intentional misconduct and Lead Plaintiff

expressly disclaims any reference to or reliance upon allegations of fraud in connection with the Securities Act claims.

### A.  Overview of the October Offering

75.     As previously noted, September 2008 was a period of unprecedented chaos in the financial markets.  Wall Street stalwarts such as Lehman Brothers filed for bankruptcy; Merrill Lynch was acquired by Bank of America so it could survive; the Federal Government placed both Fannie Mae and Freddie Mac into conservatorship and lent tens of billions of dollars to AIG to avoid its collapse and prevent a feared collapse of the entire financial system.  Moreover, during this time credit markets and the commercial paper markets froze.  Nonetheless, despite this economic calamity, GE portrayed GE Capital as a safe, secure and AAA rated financial institution that did not suffer from the financial mistakes made by others.

76.     On September 25, 2008, during a business update conference and in response to an analyst inquiry into whether "the idea of any new equity [is] still off the table," Defendant Immelt responded that "we just don't see it right now.  Again, we feel very secure about how the funding looks and the strength of the company and the strength of the balance sheet.  Cash flows are great.  The liquidity profile has been strong; it's now stronger.  Leverage is better."

77.     Notwithstanding Immelt's categoric denial that GE would seek to raise capital, six days later, on October 1, 2008, GE announced the October Offering of at least **$12 billion** of GE common stock to the public, as well as an agreement to sell $3 billion of perpetual preferred stock in a private offering to Berkshire Hathaway, Inc.

78.     In response, an October 1, 2008 Oppenheimer report stated that "[t]oday's announcement improves liquidity and allays concerns over AAA rating, which management says was not a factor in deciding to raise capital."

79.     On October 2, GE filed its prospectus for the October Offering.

80.     That day, a Morgan Stanley analyst report noted that GE's decision to raise

capital through the October Offering seemed to have alleviated investor fears, stating "GE's

announcement plus today's equity offering seems to be calming investor concerns over GE's

short term liquidity; and the reaffirmation of the dividend and credit rating."

81.     The October Offering was conducted pursuant to a shelf registration statement

filed on December 5, 2005 (the "Registration Statement")[5] and a prospectus supplement Form

424B2 filed and dated October 2, 2008, preliminary versions of which were filed on October 1,

2008, and which supplemented and included a prospectus dated December 5, 2005 (together, the

"Prospectus").  The Prospectus provides that it is "part of" the Registration Statement.  Because

the October Offering was pursuant to the Registration Statement, the October 2, 2008 date of the

Prospectus Supplement is the "effective date" of the Registration Statement.

82.     The "Offering Materials" for the October Offering are as follows:

(a)     The Registration Statement, Prospectus Supplement and
        Prospectus discussed above;

(b)     GE's Form 10-K for year ended December 31, 2007, Forms 10-Q
        for the periods ending March 31 and June 30, 2008, and current
        reports on Form 8-K filed on January 18, February 1, March 12,
        April 7, April 30, May 30, July 23, July 25, August 6, September
        5, September 25 and October 1, 2008, which the Prospectus
        Supplement incorporates by express reference;

(c)     GE's Form 10-K for the year ended December 31, 2004, as
        amended by the amendment thereto filed on Form 10-K/A, Forms
        10-Q for the quarters ended March 31, June 30, and September 30,
        2005, Current Reports on Form 8-K filed May 6, June 14, June 21,
        June 23, August 2, September 16, September 20, and
        November 25, 2005, and any SEC filings under Sections 13(a),

---

[5] The Registration Statement states that GE may offer from time to time "shares of our common stock, par value
$.06 per share."  The Registration Statement specifies that "[t]his prospectus only provides you with a general
description of the securities we may offer.  Each time we sell securities, we will provide a prospectus supplement
that contains specific information about the terms of those securities. The prospectus supplement may also add,
update or change information contained in this prospectus."

13(c), 14, or 15(d) from December 5, 2005 through October 7, 2008 which the Prospectus incorporates by express reference;

(d) GE's Free Writing Prospectus, with press release, filed on October 1, 2008, in which the Company announced plans to offer at least $12 billion of common stock to the public; and

(e) GE's Underwriting Agreement, dated October 2, 2008, which the Company entered into with Goldman, Sachs & Co. for the issuance and sale by GE of 547,825,000 shares of common stock at an initial public offering price of $22.25 per share. To the extent that the underwriters sold more than 547,825,000 shares of common stock, the underwriters had the Option, for 30 days from the date of the Underwriting Agreement, to purchase from GE up to an additional 82,173,750 shares.

83. On October 7, 2008, GE completed the October Offering, raising **$12.2 billion** in capital for GE.

**B.      The Offering Materials Failed to Disclose Material Information and Contained Untrue and Misleading Statements**

84. The Offering Materials contained a series of materially untrue and misleading statements and failed to disclose material information concerning GE and GE Capital's financial strength and value of its assets, risk exposure and the substantial portion of sub-prime consumer and below investment grade or "junk" grade commercial loans in the GE Capital portfolio. Likewise, the Offering Materials contained a series of materially untrue and misleading statements and failed to disclose material information concerning GE's need for the capital raised in the October Offering and the Berkshire Hathaway investment as business at GE Capital was drying up, GE's ability to pay its full dividend, and GE's capacity to retain its AAA credit rating.

**1.      The Value of GE Capital's Assets Was Inflated In the Company's Financial Statements and the True Condition of these Assets was not Disclosed**

85.     In the Offering Materials, the Company disclosed that GE Capital purported to have over $695 billion in assets.  However,  as the Company later disclosed on March 5, 2009, only 2% of GE Capital's assets were held at current market value – leaving approximately 98% of its portfolio accounted for at historical values.  At a time of utmost unprecedented uncertainty in the financial markets, GE withheld and misrepresented from investors material information concerning the makeup and value of GE Capital's portfolio.

86.     As described herein, according to former GE Capital employees, including Confidential Witnesses 1, 13 and 15, GE originally classified certain assets as available for sale and then, when these assets became troubled and lost value, GE transferred them to investments held for long term on its balance sheet to avoid writing down the asset to fair value and avoid recording a loss on those assets.  This practice violates GAAP and resulted in an inflation of the true value of GE Capital's assets.

87.     Moreover, Confidential Witness 15 said that, as of the Fall of 2008, GE Capital's assets were not worth what they have been reported over the past several years, "anyone would say that."  In fact, Defendant Immelt subsequently conceded, as alleged in ¶¶ 417-18, that GE Capital's assets were not worth what they were reported at – misleading investors who purchased stock in the October Offering.

88.     Additionally, Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities* ("SFAS 115") establishes standards for financial accounting and reporting for investments in equity securities that have readily determinable fair values and for all investments in debt securities.  Under SFAS 115, these investments must be classified in one of three categories, *at the time of acquisition*, and accounted for as one of the following three categories: (1) debt securities that the enterprise has

the positive intent and ability to hold to maturity are classified as held-to-maturity securities ("HTM") and reported at amortized cost; (2) debt and equity securities that are bought and held principally for the purpose of selling them in the near term are classified as "trading securities" and reported at fair value, with unrealized gains and losses included in earnings; and (3) debt and equity securities not classified as either HTM or trading securities are classified as available-for-sale securities ("AFS") and reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of shareholders' equity.

89.     SFAS 115 provides that the appropriateness of the particular classification assigned to an investment should be reassessed at each reporting date.  Once a security is given a particular classification, however, it cannot be moved into a different category except under limited circumstances.

90.     SFAS 115 further states, with respect to the determination of impaired assets: "For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary."

91.     As an entity may not engage in reclassifications of assets at will, it is therefore inappropriate under SFAS 115 to change a classification to conceal a loss in an investment portfolio, to avoid having to mark a particular asset to market, and/or to otherwise avoid recording a loss on that asset in the current period.   Furthermore, when an entity reclassifies an asset pursuant to SFAS 115, it must do so using the fair value of that asset as determined at the time of the reclassification.  An entity may not reclassify an asset using a value based on the amount paid for that asset and/or other historical values, and must take appropriate impairment charges when that asset has lost value.  As such, GE Capital failed to follow the requirements of

SFAS 115 in connection with the reclassification of assets from AFS to long-term "investments" and/or HTM.

92. As FAS 115 does not apply to unsecuritized individual loans, the appropriate GAAP guidance with respect to such loans issued by GE Capital is Statement of Financial Accounting Standards 65, *Accounting for Certain Mortgage Banking Activities* ("SFAS 65"). Similar to the application of SFAS 115 discussed above, SFAS 65 provides that all loans shall be classified as either short-term "held for sale" or long-term "investment" assets. Loans held for sale shall be reported at the lower of cost or fair value, as determined as of the balance sheet date. Transfer of a loan from held for sale to investment status must be based on the entity's ability and intent to hold the asset for the foreseeable future or to maturity. Cherry-picking of troubled loans to move into the investment category to avoid short-term losses is improper. Analogous to the guidance under FAS 115, to the extent that a loan is transferred from one category to another, the loan must be marked-to-market and transferred at the lower of cost or fair value at the transfer date. SFAS 65 also requires that, with respect to loans for which the recovery of the carrying amount of the loan is doubtful, the entity must write down that loan to its expected collectible amount.

93. Further, Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan,* is the primary authoritative accounting guidance for establishing loan loss impairment. Under SFAS 114, if it is probable that some or all of the principal or interest on a loan will not be collected, the loan is considered impaired. Losses on impaired loans should be recognized immediately.

94. GAAP violations, including violations of SFAS 115 and SFAS 65, constitute a significant internal control deficiency. As such, GE's internal controls were deficient during the Class Period.

### 2. GE Capital's Portfolio Consisted of a Substantial Portion of Sub-Prime, Below Investment Grade or "Junk" Loans

95. As the Company ultimately disclosed on March 19, 2009, GE Capital's portfolio included a substantial portion of loans to non-investment grade borrowers or "junk" grade borrowers in its commercial portfolio, and sub-prime borrowers in its consumer portfolio. For these categories of borrowers, the probability that their debt will be repaid is speculative. The low quality of a substantial portion of the loans issued by and held by GE Capital is material information that would be of extreme importance to an investor, particularly at the time of the October offering; yet the Offering Materials failed to disclose this information.

96. Among the material weaknesses at GE Capital, the Company disclosed at an investor conference on March 19, 2009 that almost half, 42%, of GE Capital's $183 billion consumer loans were to non-prime borrowers. Further, within the consumer loans:

     (a)     74% of the $22 billion in U.K. mortgages were to subprime borrowers. Over half, 56%, of these loans were booked during 2006 and 2007;

     (b)     Almost half, 46%, of GE Capital's private label credit card, which represents approximately 14% of GE Capital's $25.62 billion in total consumer lending business, was to non-prime borrowers;

     (c)     39% of its $21.5 billion sales financing portfolio was to subprime, non-investment grade or "junk" status borrowers; and

     (d)     37% of its global banking was to subprime, non-investment grade or "junk" status borrowers.

97. Further, within GE Capital's commercial lending and leasing portfolio, the largest piece of GE Capital's asset base, which GE valued at $230 billion:

     (a)     81% of the $55 billion in GE Capital's equipment leases in the Americas were to below investment grade or "junk" grade borrowers, with 40% rated B+ or lower;

(b)    93% of GE Capital's $38 billion in leveraged loans were to below investment grade or "junk" grade borrowers, with 76% to borrowers that were rated below B+ and 28% were below B-;

(c)    81% of GE Capital's $20 billion equipment loans in the Asia Pacific regions were to below investment grade or "junk" grade borrowers, with 22% to borrowers rated B+ and below;

(d)    89% of its $18 billion in equipment leases in the European Unions were to below investment grade or "junk" grade borrowers, with 38% to borrowers rated B+ and below;

(e)    95% of its $13 billion franchise finance portfolio were to below investment grade or "junk" grade borrowers, with 37% to borrowers rated B+ and below;

(f)    95% of its $10 billion asset-based lending in the United States were to below investment grade or "junk" grade borrowers, with 86% to borrowers rated B+ and below and 42% to borrowers rated B- or below; and

(g)    85% of GE Capital's $13 billion global aircraft portfolio (lending in connection with corporate jets) involved credit to customers with "junk" credit ratings, with 72% to borrowers with credit ratings below BB-.

98.    Further, approximately 30% of the $20 billion in U.S. corporate debt held by GE Capital was non-investment grade, or "junk" status debt, $1.1 billion of which was to Fannie Mae, Freddie Mac and Wells Fargo.

99.    Additionally, as discussed herein, according to Confidential Witnesses 5 and 7 who were former GE Capital employees, GE had "plenty of customers" that ended up filing for bankruptcy, including filing for bankruptcy just days after obtaining a multi-million dollar loan from GE Capital.

100.    The low quality of a substantial portion of GE Capital's portfolio is material information that would have been of paramount importance to an investor deciding whether to

purchase GE common stock at close to $22.25 per share in the Fall of 2008, yet the Offering Materials failed to disclose this information.

101. The quality of GE Capital's assets and loans, and the risk level of its assets and loans, was crucial to determining, among other things, the value of assets recorded on GE's balance sheet and the loss exposure facing GE in connection with those loans.

102. GAAP, specifically Statement of Financial Accounting Standards No. 107, *Disclosures About Fair Value of Financial Instruments*, requires disclosures of certain information regarding "significant concentrations of credit risks arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties." In violation of GAAP, GE failed to make the required disclosures regarding the significant credit risks arising from the substantial portion of loans to junk grade borrowers within GE Capital's portfolio.

### 3. GE Capital Maintained Insufficient Reserves

103. GE faced enormous and growing exposure to increasing losses on commercial loans, mortgages, and other loans made and held by GE Capital. However, the Offering Materials failed to disclose to investors the size of potential losses at GE Capital.

104. Despite the low quality of a substantial portion of GE Capital's assets and loans and the deterioration of the U.S. and global economy that began before the start of the Class Period, GE Capital maintained insufficient reserves to cover its potential losses and failed to take necessary steps in connection with assets in its loan portfolios. The Offering Materials also failed to disclose this material information.

105. The industry average for reserves to loans among comparable companies is 2.36%. However, GE Capital's reserves were only 1.43% of its loans. In fact, the actual

reserves in 2008 for most of the sectors of its commercial lending and leasing portfolio, which contain large portions of noninvestment grade and junk loans, were even less than that, with several under 1%.

    (a)    equipment leases in the Americas – .79%

    (b)    leveraged loans – .8%

    (c)    franchise financing – 1.73%

    (d)    European Union equipment leases – 1.24%

    (e)    Asia Pacific loans – 1%

    (f)    U.S. asset-based lending – .3%.

106.    The reserves for the sectors within the commercial lending and leasing portfolio were not disclosed in the Offering Materials.

107.    GE Capital's reserves were fundamentally insufficient as they did not accurately reflect the risk associated with GE Capital's lending practices in those lines of business, notably its lending to non-investment grade or "junk" grade borrowers.  Further, as described herein, Confidential Witnesses 2 and 14 reported that GE Capital had increases in loan defaults beginning in the third quarter of 2008.

108.    GAAP requires companies to make estimates of the recoverability of revenues that are recorded but may not be received, and to set up accruals (or "reserves") to reflect reductions in those revenues.  *See, e.g.,* FASB Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements*; Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*.

109.    GE did not accurately account for the risk inherent in the GE Capital loan portfolio, particularly in light of the risks of default in GE Capital's portfolio given the poor

credit quality of a substantial portion of GE Capital's borrowers and the overall decline in the U.S. and global economic situation. GE Capital's loan portfolio was particularly at risk for losses given the poor, sub-prime, credit quality of nearly half of GE Capital's consumer borrowers and the non-investment grade or "junk" credit ratings of majorities of GE Capital's commercial borrowers.

110. By failing to record appropriate loan loss reserves and failing to properly account for acknowledged loan losses, GE overstated its financial results, including its net income, earnings, and assets, while at the same time artificially understating deflating its expenses and provisions for loan losses.

111. The Company's inappropriate and misleading accounting caused the Company's financial statements, incorporated into the Offering Materials, to be untrue and misleading insofar as investors were not given an accurate impression of the Company's financial position, thus preventing investors from being able to understand and evaluate the true condition of GE.

### 4. Business Was Drying Up at GE Capital

112. As described herein, according to several former GE Capital employees, including Confidential Witnesses 8, 9, 11, 12 and 14, beginning in 2008, business at GE Capital began to decline significantly and by the time of the October Offering business had halted. According to Confidential Witness 9, commercial lending at GE Capital "fell off a cliff" as deal volume evaporated at GE Capital. Confidential Witness 9 further stated that after Lehman Brothers collapsed in mid-September 2008, GE Capital found itself "hung" because it had no deals in the pipeline and that a general standstill in the commercial paper market meant that GE Capital could not support itself because it "was mostly funded by 30-day commercial paper." Confidential Witnesses 8 and 12 likewise discussed how the credit markets fell apart after

Lehman Brothers collapsed and business halted in several departments within GE Capital halted in September 2008.

113.     However, the Offering Materials failed to disclose this halt in business.  Further, as a result of business drying up at GE Capital, the overall economic malaise, and the weakness of its financial condition and low quality of its assets discussed above, GE needed the $15 billion capital infusion raised through the October Offering and the private offering to Berkshire Hathaway to shore up the its capital and liquidity position, including to have resources to support the $0.31 per share quarterly dividend it repeatedly promised.  However, the Offering Materials failed to disclose this material information.

### 5.     GE's AAA Rating and $0.31 Quarterly Dividend Were in Imminent Jeopardy

114.     The Offering Materials stated that GE would maintain its quarterly $0.31 per share dividend, while concealing that GE did not have sufficient cash and revenues to achieve that goal.  By repeatedly insisting that it would not cut the dividend, GE also misrepresented its financial strength and soundness.  Less than five months after the October Offering, GE announced that it would cut the dividend by almost 70%, to $0.10 per share, for the second half of 2009.

115.     The Offering Materials also repeatedly touted GE's AAA credit rating and its commitment to retaining that rating when, in fact, the AAA rating was in jeopardy of an imminent downgrade based on the Company and GE Capital's deteriorating financial condition.  In particular, given the crisis surrounding subprime and other related sub-investment grade debt, the rating agencies were downgrading the credit ratings of numerous companies that held substantial amounts of such debt.  Thus, by concealing the material amount of subprime and other non-investment grade debt at GE Capital, Defendants misled investors as to its real ability

to maintain its AAA rating.  By repeatedly touting the AAA rating that was in imminent

jeopardy of a downgrade, GE also falsely portrayed its financial strength and soundness.

Subsequently, on March 12, 2009, GE announced a downgrade of GE's long-term debt from

AAA to AA+ by Standard & Poor's ("S&P") rating agency.  In addition, Moody's downgraded

GE's long-term debt two notches, from Aaa to Aa2 on March 23, 2009.

### C.  The Untrue and Misleading Offering Materials

116.  In the October 1, 2008 Free Writing Prospectus announcing the October Offering,

Defendant Immelt stated that the October Offering and Berkshire Hathaway investment, "does

two things for GE investors. First, it <u>enhances our flexibility and allows us to execute on our</u>

<u>liquidity plan even faster.  Second, it gives us the opportunity to play offense in this market</u>

<u>should conditions allow.</u>[6]  (Emphasis added).

117.  Defendant Immelt went on to state:

> In addition, <u>we remain committed to the Triple A rating</u> and in
> the recent market volatility, we continue to successfully meet our
> commercial paper needs.  The economic environment remains
> volatile … [h]owever, the company's performance remains on
> track with the earnings guidance we provided last week for 2008**,**
> including third quarter financial services earnings of
> approximately $2 billion and industrial earnings growth of
> between 10 and 15 percent, excluding our Consumer & Industrial
> business.

118.  The October 2, 2008 Prospectus discussed GE's promise to pay its quarterly

dividend of $0.31 per share through the end of 2009:

> <u>As announced on September 25, our Board of Directors has</u>
> <u>approved management's plan to maintain our quarterly dividend of</u>
> <u>$0.31 per share, totaling $1.24 per share annually, through the end</u>
> <u>of 2009.</u>

[6] Unless otherwise noted, emphasis in quotations from Defendants has been added by counsel throughout the Amended Complaint.

119.    The Prospectus also "reaffirmed [GE's] longstanding commitment to [its] Triple-

A credit rating and announced steps to strengthen our capital and liquidity position", including:

> Increasing capital in GE Capital to reduce leverage ratios through a
> reduction in the GE Capital dividend to us from 40% to 10% of GE
> Capital earnings and by suspending our common stock buyback.
>
> Having already completed $70 billion in long-term funding year-
> to-date, GE Capital will not have to raise any additional long-term
> debt for the remainder of 2008.
>
> Reducing GE Capital's commercial paper debt to a level of 10 to
> 15% of GE Capital's total debt.
>
> Accelerating the attainment of our goal of a 60-40 industrial-
> financial services earnings split to the end of 2009.

120.    Likewise, the Prospectus stated:

> Following our announcement, Standard & Poor's Ratings Services
> affirmed our and GE Capital's "AAA" long-term and "A-1+"
> short-term corporate credit ratings with a stable outlook and
> Moody's Investor Services commented that our revised operational
> and financial strategies for GE Capital "are supportive of" our and
> GE Capital's "Aaa" long-term and "Prime-1" short-term ratings
> with a stable outlook.

121.    The Prospectus further detailed the purported purpose of the October Offering and

Berkshire Hathaway offering:

> We believe this offering and the Berkshire Investment will enable
> us to accelerate our previously announced plan for enhancing our
> capital base and liquidity position. The net proceeds will provide
> us with additional flexibility to strengthen GE Capital or
> participate in other market opportunities. In the event of further
> deterioration in the commercial paper and other credit markets, we
> may apply all or a portion of the net proceeds of this offering and
> the Berkshire Investment to reduce GE Capital's commercial paper
> borrowings. To the extent not used for this purpose, the net
> proceeds will be used for general corporate purposes.

*          *          *

> In light of continuing volatility and developments in the financial markets since September 25, including uncertainty as to if, when and in what form the U.S. government's proposed Emergency Economic Stabilization Act of 2008 (the "EESA") will be enacted, we are seeking through this offering to accelerate our plan to enhance our capital base and liquidity position. The net proceeds of the offering and the Berkshire Investment will give <u>us additional flexibility in the event of further deterioration in the commercial paper and other credit markets</u>.

122. At the time of the October Offering, these statements were materially untrue and misleading because: (1) GE concealed that the true value of GE Capital's assets were well below what the Company was reporting; (2) due to the significant make-up of subprime and other below investment grade assets, GE Capital was subject to much larger losses and write-downs than GE revealed; (3) GE, in fact, under reserved for losses; (4) GE avoided taking losses on assets by improperly shifting them to a "held for investment" account; and (5) GE Capital's business had dried up in September 2008. These facts rendered the statements identified above materially untrue and misleading. Moreover, these statements misled investors as to the security of the quarterly common stock dividend through 2009, when GE did not have the capital to support it. The Company also failed to disclose material information regarding the poor quality of a substantial portion of GE Capital's assets, further misleading investors about GE's financial health. Further, statements regarding the Emergency Economic Stabilization Act were misleading as the government bailout was proposed prior to September 25, 2008.

123. The documents incorporated by reference into the Offering Materials likewise contained materially untrue and misleading statements.

124. On September 25, 2008, in a Form 8-K and accompanying press release, GE stated that it "<u>reaffirmed its longstanding commitment to its Triple-A rating</u>."

125.    The Company further stated that it was "taking steps to strengthen its capital and liquidity position," including:

>   Increasing capital in GE Capital to reduce leverage ratios through a reduction in the GE Capital dividend to GE from 40% to 10% of GE Capital earnings and by suspending the current GE stock buyback.
>
>   With a strong liquidity position and having already completed $70 billion in long-term funding year-to-date, GE Capital does not need to raise any additional long-term debt for the remainder of 2008.
>
>   Although demand remains strong, reducing GE Capital's commercial paper debt to a level of 10-15% of GE Capital total debt going forward.
>
>   Resizing GE to deliver 60%/40% industrial-financial services earning split to the end of 2009.

126.    In addition, the September 25, 2008 press release touted that the GE "Board approves plan to maintain $0.31 per share quarterly dividend, totaling $1.24 per share annually, through 2009."

127.    The September 25, 2008 press release further stressed that "GE's funding position is strong and GE has performed well during the recent market volatility" and that "[w]hile the financial services markets remain challenging and require us to adapt quickly to the rapidly changing environment, we will continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business."

128.    Finally, as to the AAA rating, Defendant Immelt expressly stated:

>   "We run the company for the long term and are taking the actions expected from a Triple-A-rated company. Given the recent dramatic developments in the financial markets, we have made some tough decisions to further reduce risk and strengthen our balance sheet while maintaining our dividend. We have suspended the stock buyback to reduce GE Capital leverage, while still being able to pursue opportunistic acquisitions.  We remain fully committed to the Triple-A credit rating, which distinguishes GE."

129.    These statements were materially untrue and misleading at the time of the October Offering because: (1) GE concealed that the true value of GE Capital's assets were well below what the Company was reporting; (2) due to the significant make-up of subprime and other below investment grade assets, GE Capital was subject to much larger losses and write-downs than GE revealed; (3) GE, in fact, under reserved for losses;  (4) GE avoided taking losses on assets by improperly shifting them to a "held for investment" account; and (5) GE Capital's business had dried up in September 2008.  Each of these facts rendered the statements identified above materially untrue and misleading.  Further, GE touted its AAA rating when, in truth, the credit rating was in serious jeopardy of a downgrade as a result of GE and GE Capital's deteriorating financial condition.  Moreover, these statements misled investors as to the security of the quarterly common stock dividend through 2009, when GE did not have the capital to support it.

130.    In a Form 10-Q filed prior to the October Offering, 10-Q for Q2 2008, filed on July 25, 2008, GE stated that GE Capital's, "[i]nvestment securities comprise mainly investment-grade debt securities" and that it "regularly review[s] investment securities for other-than-temporary impairment based on criteria that include the extent to which cost exceeds market value, the duration of that market decline, our intent and ability to hold to recovery and the financial health and specific prospects for the issuer."  The 10-Q also reported that GE Capital's "assets were $695.8 billion at June 30, 2008."

131.    The Q2 2008 10-Q further stated that "Financing receivables is our largest category of assets and represents one of our primary sources of revenues. The portfolio of financing receivables, before allowance for losses, was $428.4 billion at June 30, 2008…The

related allowance for losses at June 30, 2008…representing our best estimate of probable losses inherent in the portfolio."

132.    These statements were materially untrue and misleading at the time of the October Offering because: (1) GE concealed that the true value of GE Capital's assets were well below what the Company was reporting; (2) due to the significant make-up of subprime and other below investment grade assets, GE Capital was subject to much larger losses and write-downs than GE revealed; (3) GE, in fact, under reserved for losses;  (4) GE avoided taking losses on assets by improperly shifting them to a "held for investment" account; and (5) GE Capital's business had dried up in September 2008.  Each of these facts rendered the statements identified above materially untrue and misleading.  The Q2 2008 10-Q also omitted material information regarding the poor quality of a substantial portion of GE Capital's assets, further misleading investors about its financial health.  As discussed above, the Company's also violated several GAAP provisions, which further makes GE's statements materially untrue and misleading.

133.    GE's most recent form 10-K prior to the October Offering, 10-K for FY 2007, filed on February 20, 2008, touted GE Capital's Commercial Finance business as having "disciplined risk management" and "continued strong credit quality."

134.    Likewise, the FY 2007 10-K stated that "GE Money tightened underwriting standards related to the U.S. consumer. GE Money will continue its process of regularly reviewing and adjusting reserve levels in response to when it is probable that losses have been incurred in the portfolio."

135.    With respect to GE's dividend, the FY 2007 10-K stated:

> In December 2007, our Board of Directors raised our quarterly dividend 11% to $0.31 per share. We have rewarded our shareowners with over 100 consecutive years of dividends, with 32 consecutive years of dividend growth.

*     *     *

<u>Based on past performance and current expectations, in combination with the financial flexibility that comes with a strong balance sheet and the highest credit ratings, we believe that we are in a sound position to grow dividends</u>, continue making selective investments for long-term growth and execute our newly authorized three-year $15 billion share repurchase program.

136. With respect to its AAA rating, the FY 2007 10-K stated:

The major debt rating agencies routinely evaluate the debt of GE, GECS and GE Capital, the major borrowing affiliate of GECS. <u>These agencies have given the highest debt ratings to GE and GE Capital</u> (long-term rating AAA/Aaa; short-term rating A-1+/P-1). <u>One of our strategic objectives is to maintain these ratings, as they serve to lower our cost of funds and to facilitate our access to a variety of lenders. We manage our businesses in a fashion that is consistent with maintaining these ratings.</u>

<u>GE, GECS and GE Capital have distinct business characteristics that the major debt rating agencies evaluate both quantitatively and qualitatively</u>.

Quantitative measures include:

Earnings and profitability, revenue growth, the breadth and diversity of sources of income and return on assets

<u>Asset quality, including delinquency and write-off ratios and reserve coverage</u>

Funding and liquidity, including cash generated from operating activities, leverage ratios such as debt-to-capital, market access, back-up liquidity from banks and other sources, composition of total debt and interest coverage

Capital adequacy, including required capital and tangible leverage ratios

Qualitative measures include:

Franchise strength, including competitive advantage and market conditions and position

Strength of management, including experience, corporate governance and strategic thinking

Financial reporting quality, including clarity, completeness and transparency of all financial performance communications.

137.     As to GE's assessment of risks of loan losses and possible impairments, the FY 2007 10-K stated:

**Investment securities** <u>comprise mainly investment-grade debt securities</u>…We regularly review investment securities for impairment using both quantitative and qualitative criteria. Quantitative criteria include length of time and amount that each security is in an unrealized loss position and, for fixed maturities, whether the issuer is in compliance with terms and covenants of the security. Qualitative criteria include the financial health of and specific prospects for the issuer, as well as our intent and ability to hold the security to maturity or until forecasted recovery.  Our impairment reviews involve our finance, risk and asset management functions as well as the portfolio management and research capabilities of our internal and third-party asset managers. Our qualitative review attempts to identify issuers' securities "at-risk" of impairment, that is, with a greater than 50% chance of default in the following 12 months.

\*          \*          \*

**Losses on financing receivables** <u>are recognized when they are incurred, which requires us to make our best estimate of probable losses inherent in the portfolio.</u> Such estimate requires consideration of historical loss experience, adjusted for current conditions, and judgments about the probable effects of relevant observable data, including present economic conditions such as delinquency rates, financial health of specific customers and market sectors, collateral values, and the present and expected future levels of interest rates. Our risk management process, which includes standards and policies for reviewing major risk exposures and concentrations, ensures that relevant data are identified and considered either for individual loans or financing leases, or on a portfolio basis, as appropriate.

138.     These statements were materially untrue and misleading at the time of the October Offering because: (1) GE concealed that the true value of GE Capital's assets were well below what the Company was reporting; (2) due to the significant make-up of subprime and other below investment grade assets, GE Capital was subject to much larger losses and write-downs than GE revealed; (3) GE, in fact, under reserved for losses;  (4) GE avoided taking losses on assets by improperly shifting them to a "held for investment" account; and (5) GE Capital's business had dried up in September 2008.  Each of these facts rendered the statements identified above materially untrue and misleading.  The 10-K also omitted material information regarding the poor quality of a substantial portion of GE Capital's assets, further misleading investors about its finical health.  Further, GE relied on statements regarding the safety of its dividend and AAA rating at a time when both were in jeopardy.  As discussed above, the Company also violated several GAAP provisions, which further makes GE's statements materially untrue and misleading.

## VII.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I
### (Against GE, Defendants Immelt and Sherin, the Director Defendants, and the Underwriter Defendants)
### Violations of Section 11 of the Securities Act

139.     Lead Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein and further allege as follows.

140.     This Count is asserted against GE, Defendants Immelt and Sherin, the Director Defendants, and the Underwriter Defendants (herein the "Section 11 Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired GE shares pursuant or traceable to the October Offering.

141.     GE is the issuer of the securities and is liable under 15 U.S.C. § 77k(a).  Immelt, Sherin and the Director Defendants each signed the Registration Statement and were directors of GE when the Registration Statement became effective and are liable pursuant to 15 U.S.C. § 77k(a)(1)(2) and (3).  The Underwriter Defendants were underwriters of the October Offering and are liable pursuant to 15 U.S.C. § 77k(a)(5).  This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

142.     The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above.  GE was the Registrant, while Defendants Immelt, Sherin and the Director Defendants were executive officers and representatives of the Company who were responsible for the contents and dissemination of the Registration Statement.  Defendants Immelt, Sherin and the Director Defendants signed the Registration Statement.  As such, said Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to liability for violations of Section 11 of the Securities Act.

143.     The Underwriter Defendants were underwriters of the October Offering.  The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired GE securities issued in the October Offering.

144.     Lead Plaintiff and other members of the Class who acquired the securities in the October Offering pursuant to the Registration Statement did not know of the negligent conduct

alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

145.    None of the untrue statements or omissions contained herein was a forward-looking statement but, rather concerned existing facts.  Moreover the Defendants named in this count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

146.    Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

147.    Lead Plaintiff and the other members of the Class have sustained damages. The value of GE's shares sold in the October Offering has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

148.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired GE shares in the October Offering pursuant to the Registration Statement.

**COUNT II**
**(Against the GE and the Underwriter Defendants)**
<u>**Violations of Section 12(a)(2)**</u>

149.    Lead Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

150. This Count is asserted against GE and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired the GE shares issued in the October Offering.

151. By means of the Offering Materials, including the Prospectus, GE and the Underwriter Defendants, through the public October Offering, solicited, offered and sold GE securities to Lead Plaintiff and members of the Class.

152. The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Prospectus. The Underwriter Defendants are sellers within the meaning of the Securities Act because they (a) transferred title to Lead Plaintiff and other members of the Class who purchased GE securities in the October Offering and (b) solicited the purchase of GE securities by Lead Plaintiff and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of their client, GE, including, but not limited to, commissions on their own sales of those securities and separate commission on the sale of those securities by non-underwriter broker-dealers. The Underwriter Defendants used the means and instrumentalities of interstate commerce and the United States mail.

153. The Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

154. The Underwriter Defendants owed to Lead Plaintiff and other members of the Class who purchased or otherwise acquired securities in the October Offering pursuant to the materially untrue and misleading Prospectus the duty to make a reasonable and diligent

investigation of the statements contained in the Prospectus, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Prospectus were true and without omissions of any material facts and were not misleading.

155. Lead Plaintiff and other members of the Class who purchased or otherwise acquired securities in the October Offering pursuant to the materially untrue and misleading Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

156. Lead Plaintiff and other members of the Class who purchased or otherwise acquired securities in the October Offering have sustained damages as a result of the untrue statements of material facts and omissions in the Prospectus, for which they hereby elect to rescind and tender their shares of GE securities to GE and the Underwriter Defendants in return for the consideration paid for those securities, together with interest thereon. Lead Plaintiff and members of the Class who have sold the securities they purchased pursuant to the October Offering are entitled to rescissory damages.

157. By virtue of the conduct alleged herein, GE and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

**COUNT III**
**(Against Defendants Immelt, Sherin and Director Defendants)**
**Violations of Section 15**

158. Lead Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

159. This Count is asserted against Defendants Immelt, Sherin and the Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead

Plaintiff and the other members of the Class who purchased or otherwise acquired the GE shares issued in the October Offering.

160.    At all relevant times, Defendants Immelt, Sherin and the Director Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of these Defendants served as an executive officer or director of GE prior to and at the time of the October Offering.  Defendants Immelt, Sherin and the Director Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of GE's business affairs.  As officers of a publicly owned company, Defendants Immelt and Sherin had a duty to disseminate accurate and truthful information with respect to GE's financial condition and results of operations.

161.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and the other members of the Class who purchased securities in the October Offering. As a direct and proximate result of the conduct of GE, Defendants Immelt and Sherin, and the Director Defendants, Lead Plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of GE securities.

## VIII.   VIOLATIONS OF THE EXCHANGE ACT

162.    As alleged herein, the Exchange Act Defendants engaged in a course of conduct throughout the Class Period intended to:  (1) deceive investors as to the financial health of GE and its GE Capital subsidiary; (2)  conceal the true present value of GE Capital's assets, including that a significant portion of those assets were to subprime borrowers; (3) avoid taking write-downs on assets by moving troubled and/or non-performing assets into a "held for

investment account" so as to avoid having to record a current loss and manage its earnings; (4) conceal known or reasonably anticipated losses at GE Capital; (5) overstate the Company's reported income by failing to properly account for known or reasonably anticipated loan losses at GE Capital; (6) mislead investors with respect to the Company's intention to engage in the October Offering and to conceal the true purpose of the October Offering – which was to shore up the faltering GE Capital; (7) mislead investors with respect to the Company's ability to pay its authorized quarterly dividend in FY 2009; and (8) conceal the fact that the Company's AAA credit rating was in grave jeopardy. This scheme included:

(a) Concealing the risk profile of assets, notably financing receivables, held by GE Capital, by failing to disclose that materially significant portions of GE Capital's lending were made to sub-prime or other low-credit quality consumer borrowers, and that vast majorities of loans made in crucial GE Capital commercial lending portfolios were made to borrowers with non-investment grade or "junk" credit ratings. Defendants concealed this information from investors until March 19, 2009 – the end of the Class Period;

(b) Failing to record adequate reserves as compared to industry standard metrics in connection with known or reasonably ascertainable loan losses in GE Capital's loan portfolios based on the inherent credit risks in those portfolios during the Class Period, thereby increasing period revenues for the Company throughout the Class Period;

(c) Failing to properly account for non-earning receivables throughout the Class Period by failing to record an allowance for loan losses that covered the amount of these non-earning receivables in each quarter throughout the Class Period. This shortfall in the allowance to cover non-earning receivables inflated GE's period income by $3.0 billion, $2.7 billion, and $4.39 billion in Q3 2008, Q4 2008, and Q1 2009, respectively;

(d)　　Misleading investors with respect to the Company's intent to undertake an equity offering to raise $15 billion during the October Offering and the related preferred stock investment by Berkshire Hathaway (as described in detail otherwise herein).　Similarly, the Company further misled investors throughout the Class Period with respect to the purpose of this capital raising event by failing to disclose that a substantial portion, if not all, of the $15 billion in capital was required to keep GE Capital afloat;

(e)　　Issuing materially false and misleading financial statements by transferring non-performing assets into an investment account and avoiding recording current loss on such assets in violation of SFAS 115 and SFAS 65;

(f)　　Repeatedly misleading investors throughout the Class Period with respect to the Company's ability to pay its $0.31 per share quarterly dividend throughout 2009 given the strain on capital resources at the Company, mounting losses at GE Capital, and the challenges faced by the Company with respect to maintaining its AAA credit rating;

(g)　　Projecting that GE Capital would earn $5 billion in 2009, despite the fact that business at GE Capital had "fallen off a cliff," GE failed to record sufficient reserves and write downs for known or expected losses, and Immelt and Sherin were motivated to make this baseless projection solely to "protect" the Company's AAA credit rating; and

(h)　　Failing to disclose that the Company was in serious jeopardy of losing its AAA credit rating based on its deteriorating financial condition and discussions with the credit rating agencies.

163.　　Accordingly, the Exchange Act Defendants engaged in a scheme to conceal the financial troubles at GE Capital by failing to disclose the true composition of GE Capital's asset base – which consisted of significant proportions of subprime consumer lending and commercial

lending to borrowers with non-investment grade or "junk" credit status, overstating the value of GE Capital's assets by failing to take appropriate impairment charges or otherwise write down distressed assets, failing to take appropriate impairment charges, failing to record adequate loan loss reserves, and therefore artificially inflating GE's reported period income throughout the Class Period – all for the purpose of inflating GE's stock price.

164.    Similarly, the Exchange Act Defendants continued to falsely and misleadingly reassure investors with respect to GE's ability to continue to pay its $0.31 per share quarterly dividend, knowing that the problems at GE Capital were far more grave than disclosed and would result in the Company being unable to make its commitment to pay the dividend.

165.    Examining the particular acts and consequences of the Exchange Act Defendants' conduct as alleged herein, it is clear that the Exchange Act Defendants engaged in systematic and pervasive earnings management to meet the Company's stated and/or analyst consensus earnings per share ("EPS") targets throughout the Class Period.  As alleged herein, this practice of earnings management was intended to give GE the appearance of meeting expected earnings targets – and had the effect of artificially inflating GE's stock price throughout the Class Period.

**A.      The Exchange Act Defendants' False and Misleading Statements**

        **1.      Third Quarter 2008 ("Q3 2008") Results**

                **a.      September 25, 2008 Q3 2008 Earnings Release**

166.    The Class Period begins on September 25, 2008.  On that day, GE issued a press release announcing that "its Board of Directors had approved management's plan to maintain GE's quarterly dividend of $0.31 per share, totaling $1.24 per share annually, through the end of 2009."

167.    The press release further stated that GE "now expects that its financial services businesses will earn approximately $2 billion in the third quarter, which, while impacted by

current market conditions, is expected to exceed the earnings of any financial services company." In that same press release, GE further reassured investors that it "reaffirmed its longstanding commitment to its Triple-A credit rating," and was taking steps to "strengthen its already strong capital and liquidity position." GE further stated that its funding position is strong and GE has performed well during the recent market volatility, it is taking steps to strengthen its capital and liquidity position, including:

1. Increasing capital in GE Capital to reduce leverage ratios through a reduction in the GE Capital dividend to GE from 40% to 10% of GE Capital earnings and by suspending the current GE stock buyback.

2. With a strong liquidity position and having already completed $70 billion in long-term funding year-to-date, GE Capital does not need to raise any additional long-term debt for the remainder of 2008.

3. Although demand remains strong, reducing GE Capital's commercial paper debt to a level of 10-15% of GE Capital total debt going forward.

4. Resizing GE to deliver 60%/40% industrial-financial services earning split to the end of 2009.

168. In that same press release, Defendant Immelt reassured investors:

We run the company for the long term and are taking the actions expected from a Triple-A-rated company. Given the recent dramatic developments in the financial markets, we have made some tough decisions to further reduce risk and strengthen our balance sheet while maintaining our dividend. We have suspended the stock buyback to reduce GE Capital leverage, while still being able to pursue opportunistic acquisitions. We remain fully committed to the Triple-A credit rating, which distinguishes GE. . . . While the financial services markets remain challenging and require us to adapt quickly to the rapidly changing environment, we will continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business.

169. On September 25, 2008, GE also hosted a conference call to discuss the Company's Q3 2008 financial results. During the conference call, Defendant Immelt acknowledged the "tough [economic] environment," but nonetheless announced that "GE's

performing well" and stated that "<u>our financial services will earn in excess of $9 billion in 2008,</u> <u>really dramatically outperforming [GE Capital's] peers.</u>" Immelt further stated:

> Our GE Capital and Financial Service business model remains strong. We've got a great cost base. <u>We're a senior secured and diversified</u> <u>lender</u>. We're match-funded. We've never been a trader or a market maker. I think the results this year prove that the general framework that we've got for GE Capital remains very strong. We expect to see higher losses in loss provisions and lower gains as the economy evolves.

Defendant Immelt also stated during that conference call:

> <u>Lastly, the GE dividend is secure for investors. The Board has approved</u> <u>management's plan to maintain the current dividend through '09 even in</u> <u>these relatively uncertain economic times at $1.24 a share</u>. That's roughly a 5% yield. So really the steps we're taking and that we'll outline today I think strengthen GE for the long term and really improve the overall operations and running of the company.

170. On that same investor call, Defendant Sherin further reassured investors as to the health of GE Capital. Sherin began by describing what he believed was a key advantage of GE Capital: the Company's AAA credit rating. In noting that the AAA credit rating permitted GE Capital to engage more secure lending practices than other institutions, including lower risk lending, Sherin stated:

> And in Financial Services, the positives for us are certainly pricing. Today, when you have capital to put to work, you can get a significant premium to your cost of funds, and <u>you can enter into investments at low</u> <u>risk levels, low loan-to-values, and senior secured positions at high</u> <u>returns. The AAA is significantly a competitive advantage for us.</u>

171. Sherin continued, "<u>[w]e've got a great portfolio; our measurements and</u> <u>delinquencies and asset quality are all very strong.</u>" Sherin further noted that, "Jeff [Immelt] mentioned the proactive steps we're taking as Triple A. This is what investors should expect from a Triple A [company]." Sherin also noted GE's priorities in terms of "maintaining a strong liquidity position" that "starts with our commercial paper programs and our liquidity plans. We have great CP programs."

172.     Defendant Sherin also assured investors as to the quality of GE Capital's real estate portfolio. Noting investor concerns about the size of that portfolio, Sherin stated that "[w]e have a fantastic real estate portfolio. It's very high quality. The delinquencies on the book are 0.27% of assets, so it's performing very well." Sherin noted that GE was planning to reduce its commercial real estate portfolio from $90 billion to $80 billion, and also that the Company was going to "de-emphasize equity" in real estate by not originating new equity in this business.

173.     Defendant Sherin further admitted that GE Capital expected to see higher delinquencies in its loan portfolio. He noted:

> Especially today we're seeing it in the consumer side, not so much in the commercial side, but we do expect that going forward. And as you have higher delinquencies, we will put up higher provisions. We do have some mark-to-market pressure in the third quarter, and that's been a function of the capital markets and the volatility we've seen.

174.     Attempting to minimize likely investor concern about GE Capital's position in light of the revelation about increasing delinquencies and provisions, Defendant Sherin assured investors:

> The benefit of the GE business model is we have really strong financial flexibility because we generate a lot of cash. If you look at our estimates today, based on these revised forecasts, we're going to have over $23 billion of cash from our net income and our working capital management programs and some small amount of dispositions. <u>And that gives us the financial strength to protect our dividend to shareholders. The Board has approved our plan to maintain the dividend at the $0.31 a share per quarter through 2009.</u> . . . So our 2008 annual dividend remains at the $1.24, and <u>we continue to have really great financial flexibility,</u> driven by we've got tremendous industrial cash flow <u>over top of the Financial Services businesses, which have a very strong position. That protects our investor dividend while at the same time strengthening GE Capital.</u>

175.     Defendant Immelt followed up on these comments later in the conference call, further reassuring investors with respect to GE Capital's position, as well as the state of GE's overall health, particularly with respect to the company's AAA credit rating:

And 40% Financial Services, with global origination, diversified risk, and deep domain. <u>This is a business that we think will outperform in this cycle and be well positioned as the economy turns to provide good earnings growth.</u> So we really do like the way the company looks. We think we are very well positioned in this cycle. . . . The Industrial business's fundamentals remain strong: <u>Triple A rated;</u> global growth; infrastructure; huge backlogs of both product and service; strong free cash flow; and great service revenues. <u>The Triple A is a key priority for GE. We've always said that we would manage this proactively. That's what we are doing now; that's confirmed by the rating agencies. It helps us have access to the capital markets. It lowers our borrowing costs. It's a validation for both equity and debt investors, and it really does sync up with our operating disciplines on how we run the company.</u> So we believe we're doing what investors expect from a Triple A rated company. . . . We're running the company for the long term, and we feel like we've really positioned the company to be successful in this cycle.

176.    In response to a question from analyst Jeff Sprague of Citigroup regarding "what has driven the [downward] revision in GE Capital," Defendant Sherin described the "largest category" of revisions as "mark-to-market pressure" on "equity securities and preferred positions we hold in companies," "retained interest from our securitizations," and marked-down value of assets for sale. While Sherin also noted that there were going to be some impacts resulting from "lower gains in the real estate business" and "higher provisions in the quarter, as we have delinquencies in the GE Money business principally," Sherin attempted to downplay those projected losses by stating that "the biggest piece would be the mark-to-market versus guidance." When further pressed by analyst Sprague as to the "provision ratio . . . over the course of the cycle," Sherin stated that he did not have a specific number – yet provided a vague assessment of "continued pressure on losses in the next year period of another $1 billion after tax across the portfolio . . . we're already seeing the credit pressure on the consumer side."

177.    In that same conference call, analyst Sprague asked Defendant Immelt, "is the idea of any new equity still off the table? . . . Is that type of thing open for discussion in any type of permutation?" Although the Company would announce the $12 billion October Offering and

$3 billion Berkshire Hathaway private offering just six days later, Defendant Immelt expressly

denied that GE was planning on any equity offerings, stating:

> [W]e just don't see it right now. Again, we feel very secure about how the
> funding looks and the strength of the company and the strength of the
> balance sheet. Cash flows are great. The liquidity profile has been strong;
> it's now stronger. Leverage is better. And so we really believe in our
> business model and feel secure that we're well-positioned here.

178.    Later in the conference call, Defendant Immelt further sought to reassure

investors with respect to GE Capital's position in light of the deterioration of financial markets:

> There's clearly a lot going on in the financial markets and stuff like that.
> But I think if you step back, there's always going to be a place for a very
> disciplined and well-run financial company, which is what GE Capital is.
> We have excellent cost of funds. We have 10,000 originators. We
> originate to our own balance sheet. Through this cycle where banks,
> investment banks, have written off more than $500 billion, we haven't had
> exposure to any of these things. And so fundamentally, we're going to go
> through ups and downs, and we think that Triple A is incredibly important.
> But we believe that the structure of GE Capital remains very strong. And
> at the end of the day, earning $9 billion in Financial Services this year is a
> pretty good proof statement of that.

179.    Sherin further attempted to allay investor fears by minimizing the risks facing GE

Capital, stating:

> I think the starting point that if I were a financial analyst looking at these
> results, I'd say what are the actuals that this business is delivering today?
> And we're somewhere around $2 billion of earnings. And that does
> include some pressure from mark-to-markets. I don't think all those
> repeat, but I don't think it'd be prudent for us to plan 2009 without having
> some room for mark-to-markets or impairments. Clearly, I think on a
> credit cycle basis, you're going to have additional pressure. We're
> planning for higher provisions, and we're expecting higher delinquencies.
> Based on the outlook we see, I think that's a prudent thing for us to be
> doing. I think in terms of the shrinking and downsizing a little of the GE
> Capital, I think that does have some impact on earnings. As I said, in
> terms of absolute dollars, it's not dramatic, but you're probably going to
> see a mix shift from some of the global consumer higher leverage assets
> into some of the more commercial core assets. And then finally, you're
> going to get a benefit from the pricing on the new business that we put in.

180.     Following the Company's rosy assessments, markets responded favorably.  GE's stock price closed the day on September 25, 2008 at $25.68 per share, up from its $23.66 open – representing an increase of approximately 8.5%.

181.     The above statements were false and misleading insofar as:

(a)     Defendant Immelt's denials that the Company was planning any equity offerings were false and misleading in that as the Company was mere days away from the October Offering and the Berkshire Hathaway Investment.  Given that planning and preparation for events as significant and complex as the offering and/or negotiations with Berkshire Hathaway would have necessarily had to have been underway or at the very least in their earliest discussion stages as of September 25, 2008 to effectuate the October Offering and the Berkshire Hathaway Investment – an investment that was agreed upon and in place before the announcement of the October Offering – Defendant Immelt's denials of GE's plans for an equity offering were necessarily false or misleading when made.

(b)     Each of the statements describing GE's earnings for Q3 2008 were false and misleading given that, as alleged herein: (1) GE overstated its Q3 2008 earnings by approximately $3 billion given the shortfall between the Company's allowance for loan losses and its non-earning receivables; and (2) GE also overstated its Q3 2008 earnings by failing to record adequate loan loss reserves and impairments as required by GAAP, given the decline in the performance of GE Capital's loan portfolios, the poor credit quality of substantial portions of GE Capital's consumer and commercial borrowers, and the overall deteriorating condition in the U.S. and global economies.

(c)     Each of the statements concerning GE's "strong capital and liquidity position," that the company's "funding position [was] strong" and each of the other statements

concerning or commenting on the Company's liquidity, funding, cash, and capital positions were false and misleading given that, as alleged herein, the Company required the October Offering to shore up the Company's capital and liquidity position, including to have resources available to prop-up GE Capital and to support the planned payment of the full $0.31 per share quarterly dividend. Similarly, as alleged otherwise herein and as noted by Confidential Witnesses including Confidential Witnesses 8, 9, 11, 12, and 14, business and revenue generation throughout GE Capital's divisions had "halted," "collapsed," or "fell off a cliff" as of September 25, 2008, and, as noted by Confidential Witness 6, commercial paper markets were "frozen" as of September 25, 2008. Both the fall-off in substantial portions of GE Capital's lending and/or commercial real estate businesses and the freezing of the commercial paper markets gravely threatened the Company's ability to continue to generate revenues and cash. Furthermore, as alleged herein and described by Confidential Witnesses including Confidential Witnesses 1, 2, 4, 5, 7, 8, 9, 11, 13, and 15, information regarding the poor and declining financial health of GE Capital was collected, analyzed, and reported within GE Capital and then reported "up the chain" to senior management at GE, including the Exchange Act Defendants.

(d) Each of the statements touting GE's AAA credit rating, concerning GE's "taking the actions expected of a Triple-A rated company," and other related statements with respect to the Company's expectations of retaining its AAA credit rating were false and misleading given that the Company was, as alleged herein, aware that earnings were and would remain dramatically lower than forecast at GE Capital, that there were increasing capitalization, cash, and liquidity concerns at GE Capital, and that those circumstances resulted in there being grave threats to GE's AAA Credit rating. Furthermore, as alleged herein, facts concerning the threats to GE Capital's credit rating were particularly of interest to investors and the rating

agencies during the Class Period given the context of the then-volatile economic situation including broad concerns about the quality of assets held by financial services companies such as GE Capital – including the then undisclosed low credit quality nature of substantial portions of GE Capital's loan portfolios. As alleged herein and described above, those facts were known to the Exchange Act Defendants as of September 25, 2008. In addition, GE's efforts to raise capital during the October Offering demonstrated that the Company was aware that it needed to take substantial measures to preserve its financial position and protect its AAA credit rating. To the extent that the Exchange Act Defendants' statements with respect to GE's AAA credit rating did not disclose adverse facts and the very real threats to GE's Credit rating (the truth of which was ultimately demonstrated by the S&P and Moody's downgrades), those statements were false and misleading.

(e)     The Exchange Act Defendants statements concerning GE's AAA credit rating, including its behaving as a AAA company, the rating agencies confirmation of the AAA credit rating, and the advantages with respect to its AAA credit rating, including having access to markets and lower borrowing costs, and statements that GE could engage in more secure lending practices and lower risk lending – including but not limited to Sherin's statements that with a AAA rating, "you can enter into investments at low risk levels, low-loan-to-values, and senior secured positions at high returns. The AAA is significantly a competitive advantage for us" – are false and misleading with respect to GE Capital's actual, undisclosed practices of lending to high risk borrowers because, as alleged herein and as the Company admitted in its March 19, 2009 investor presentation regarding GE Capital, GE Capital's actual lending practices involved making substantial volumes of loans to consumer and commercial borrowers that were <u>not</u> low-risk, i.e., below investment grade status. Sherin's statements were intended to deceive investors

by concealing the fact that while GE may have been theoretically able to be a low-risk lender, it was, in fact substantially engaging in high-risk consumer and commercial lending. Sherin's and the Exchange Act Defendants' statements with respect to "low risk" lending were eventually shown to be false and misleading when the Company disclosed on March 19, 2009 that 42% of its consumer lending was to borrowers with sub-prime credit and that substantial majorities of borrowers in key commercial loan portfolios were non-investment grade or "junk" status borrowers. Furthermore, Confidential Witnesses 5 and 10 descriptions of segments of GE Capital's commercial borrowers as being "second- and third-tier manufacturers" or "distressed" corporate borrowers also demonstrate that Sherin's statements with respect to how GE Capital's AAA credit rating caused it to be a more secure and selective lender were false and misleading.

(f)     The above statements concerning the strength and quality of GE Capital's various loan portfolios, including Defendant Sherin's statements describing GE Capital's portfolios as "great portfolio[s]; our measurements and delinquencies and asset quality are all very strong" and Sherin's description of the real estate portfolio as being "a fantastic real estate portfolio" that was "performing very well" and his statement that the real estate portfolio was being reduced as a result of "de-emphasiz[ing] equity" and not originating new deals were false and misleading for the reasons alleged herein and for the reasons described above describing the substantial curtailment of business and revenue generation at GE Capital as of September 25, 2008. In addition, Sherin's statements with respect to why the real estate portfolio was shrinking and why the company was not originating new equity were false and misleading insofar as they failed to disclose the facts, as alleged herein and as supported by Confidential Witnesses, including Confidential Witnesses 12, 13, and 15 who described the reduction in equity and other deal generation at GE Real Estate as being a function of the economic situation including the fact

that "transactions were at a halt and deals were not getting done.  Nobody was willing to buy and banks weren't lending" as of September 25, 2008.  Accordingly, Sherin was both concealing the poor health of GE Capital and attributing a reduction in business activity to a conscious corporate decision, rather than as a reflection that the Company was doing poorly in the down economy – a disclosure that would have rightly raised doubts about the overall health of GE Capital, by itself and as compared to its peers.

(g)     Defendant Immelt's statements that GE Capital was "dramatically outperforming [its] peers" and otherwise touting the success and strength of GE Capital were false and misleading given that, as alleged herein, GE, unlike traditional banks and other financial institutions, was not required to mark all of its assets to market.  As alleged herein, by carrying assets at inflated historical values and otherwise engaging in accounting and business practices that concealed the true nature and composition of GE Capital's assets (which was revealed on March 19, 2009) and actively attempting to hide losses suffered in connection with those assets during the Class Period, GE concealed from investors the fact that its financial position was, in reality, substantially worse than reported.  In addition, as alleged herein and as supported by Confidential Witnesses 15, 1, and 13, during the Class Period, GE failed to comply with GAAP accounting principles (including SFAS 115 and SFAS 65) in connection with reclassifying short-term assets for sale as long-term "investment" assets without marking those assets to market at the time of the reclassification, and, more significantly, taking affirmative steps to "hide assets until the market turned around" by making "a switch on the balance sheet" using these reclassifications.  By engaging in these GAAP violations, GE was able to conceal its true financial position, rendering Immelt's statements false and misleading when made.

(h)     The Exchange Act Defendants' statements that GE Capital was well-positioned for future success relative to its peers – including Defendant Immelt's statement that "there's always going to be a place for a very disciplined and well-run financial company, which is what GE Capital is" – were false and misleading for the reasons outlined above, including the facts that: (1) GE Capital was engaging in undisclosed lending practices to low-credit-quality borrowers that carried a substantially higher than disclosed risk profile; and (2) GE Capital was misapplying GAAP, "hiding" losses on its balance sheet by transferring short-term assets into long-term investments without marking those assets to market, and otherwise engaging in lending, accounting, and other business practices that were not reflective of a well-disciplined financial company.

(i)     The Exchange Act Defendants' statements with respect to GE maintaining its $0.31 per share quarterly dividend, including Defendant Immelt's statements that GE Capital's ability to generate cash "gives us the financial strength to protect our dividend to shareholders.  The Board has approved our plan to maintain the dividend at $0.31 a share per quarter through 2009" – and that the "strong position" of GE Capital "protects our investor dividend while at the same time strengthening GE Capital" were false and misleading given that, as alleged herein and described above, GE Capital was in dire financial straits in terms of not generating new business and revenues and therefore could not be a source of cash to fund the quarterly dividend.

182.    On October 1, 2008, Deutsche Bank analyst Nigel Coe issued a note, lowering its earnings outlook and price targets for GE for FY 2008 and FY 2009.  In doing so, Deutsche Bank cited concerns about "deterioration at GE Capital – driven by tighter credit markets, asset shrinkage, and debt pay-down."  Deutsche Bank also warned that GE was vulnerable to

"negative sentiment" about GE Capital, but noted that the Company's 5% dividend yield was "an important support, particularly in today's low-yield environment." On this news, GE's stock price fell, closing at $24.50, down $1.00 from the prior day's close, or a decline of over 3.9%.

183. On October 1, 2008, the Company announced its October Offering and filed the Offering Materials, as described above. The statements contained in the Offering Materials were false and misleading for the reasons described above, including, but not limited to, the Company's assurances with respect to the financial health of GE Capital and the Company's failure to disclose details with respect to the poor credit quality of substantial portions of GE Capital's borrowers and the risks associated with GE Capital's lending practices. On news of the October Offering, GE's stock price fell, closing at $22.15 on October 2, 2008, down $2.35 from the prior day's close, or a decline of over 9.5%.

**b.      October 10, 2008 Q3 2008 Earnings Release**

184. Fifteen days after the Q3 2008 earnings announcement that began the Class Period, on October 10, 2008 – just one week following the Company's announcement of its $15 billion secondary offering – GE issued a further Q3 2008 Earnings Release. In that release, Defendant Immelt stated, "[GE] continues to outperform our financial services peers. We are improving our margins and focusing these businesses on the right products and markets. GE Capital is on track to earn over $9 billion for the year." The release further quotes Immelt as stating that "GE has taken proactive steps to reduce leverage and improve liquidity, consistent with being one of six Triple-A-rated industrial companies in the U.S. We have raised $15 billion of committed capital that makes the Company more secure in the short term, but could be used to play offense in the long term." Immelt also stated, "We have taken a number of steps to protect investors from the downside risk in financial services . . . [t]he Company is well positioned to

perform in a very difficult environment, and <u>our Board has approved our plan to sustain the GE dividend through 2009</u>."

185.    On that same day, October 10, 2008, GE hosted an analyst conference call to discuss the Company's Q3 2008 earnings.  On that call, Defendant Immelt noted that while GE had increased reserves "to reflect the higher loss environment" and was planning additional increases, "[w]e really believe <u>we have aggressively risk-reduced the Company</u> in this volatile market, and <u>our Board has approved the management plan to maintain the GE dividend through 2009.  We think that gives our investors some real strength for looking at the current markets.</u>"

186.    Also on that analyst call, Defendant Sherin noted that GE Capital's real estate business remained "strong," with over $89 billion in assets, "driven by the investments we've been making in senior secured debt at high returns."  Sherin also noted that "we've capped off our Real Estate business just based on size today and we're continuing to downsize the portfolio and we will continue to do that through 2009. . . . the portfolio quality remains strong."

187.    Defendant Sherin further stated that the company had "taken proactive actions and <u>we have dramatically improved our liquidity situation</u> [at GE Capital]. . . <u>our portfolio remains robust.  We've got a great portfolio. We've stuck to our risk management but we are going to see a credit cycle here</u>.  We're going to see higher delinquencies, we're already seeing those.  As we have higher delinquencies we're going to put up more loss provisions."  Sherin stated that GE was "thinking about $800 million to $1 billion of provisions this year for the losses in the Americas based on the delinquencies and where we are . . . ."  Sherin also touted GE's credit rating in an effort to distinguish the company from other financial services companies, noting that the difference with GE "starts with Triple A, this is an advantage for us we know it, it's been confirmed by the rating agencies and from the Board of Directors through

65

the leadership team and to every employee we're committed to run the company as a Triple A and it's certainly serving us well."

188.    With respect to justifying the October Offering, Sherin attempted to portray it as a proactive measure in terms of preparing for possible difficulties in the overall commercial paper market.  Sherin stated:

> We do have more protection today if the CP market remains under stress. Jeff talked about it. We had a liquidity plan that said we were going to get our bank lines plus our cash equal to our CP by the end of the year. After our earnings call last week -- or the preannouncement, we said that may not be fast enough and we went right to work on -- well, how do you accelerate that?  That's why we did the equity offering. We have accelerated today our bank lines plus our committed cash are greater than our CP. And that is a great place to be.

189.    Later in the presentation, Sherin also attempted to minimize the credit risks facing GE Capital, noting that:

> Fourth topic is the quality of the portfolio. The question everyone wants to know is what's the potential for future loss impact and I'm going to walk you through pieces.  I'm going to start with the portfolio.  At the end of the third quarter we had $413 billion of Commercial assets and $209 billion of Consumer assets.  On the Commercial side we're very diversified.  Our risk management policies outline delegations of authority and concentration limits for every asset class and every investment we make.  We have got very broad spread of risk, 72% of the Commercial exposures are $100 million each, and 60% are under $50 million.  Our largest exposures basically if you look at the top 20 exposures they're to the airlines and railroads and a couple power plants.  All of them are senior and secured and collateralized by the assets. There's no unsecured exposure in the top 20 of any size.  Our diversification and our risk management has served us well.  If you look at the 10 year average loss have been 0.3% the highest over that 10 year period was 0.9%.  We've got a conservative model.  We do not originate to sell.  We originate to hold. We don't have any SIVs, we don't have any CDOs, we've never sold CDS, and we don't have any exposure to counter parties on that from things that we write because we don't do that business.   On the right side is the Consumer, we're also very diversified.  We have over $100 million accounts and we've responded early to the tougher environment we've seen.  I went through the mortgage portfolio at the last call.  These mortgages are not US.  Our underwriting has been strong.  We have an average loan to value of 75% that's updated every month based on the

market. Everything that we did that was underwritten over 80% has mortgage insurance on it globally. Seventy nine percent of the portfolio is outside the US so it's very global book. We've tightened underwriting and collections early in the cycle. Our mortgage reserves are up 20% since the end of last year. We just don't have any write offs data, it's less than $100 million of mortgage write offs because we're senior and secured. We've got mortgage insurance on the highest risk exposure positions and we've been very conservative about the amount of loan to value that we'll underwrite. It's something we're watching. . . . We've got a very seasoned risk team. We've got a very disciplined set of policies and risk management infrastructure. We've consistently outperformed the benchmark. . . . Our non-earnings are up 21 basis points versus the second quarter, up. There's two specific transactions in the verticals; both are senior and secured. One is SemGroup went into bankruptcy, and we are very well collateralized there. The other, we have some planes that we got back where we have senior debt; and we are cross-collateralized on three more planes that they are going to give back that more than secure our position. So on the $309 million we don't think we have any loss exposure.

. . . The loss provisions are growing faster across the globe than our write-offs for the fourth consecutive quarter here. This is going to continue. We do see more pressure on the consumer book. We're adding to the provision in line with the delinquency and loss experience we have and we expect this to continue. If you look in the third quarter alone we had pre-tax losses of $451 million higher than the year over year but we had higher reserves by $762 million so we're putting up more provisions than the losses we're experiencing and we're ready for the future here. . . . We're gong to see more pressure, and I think we are going to have higher losses, and we are planning for them. So if you look at that framework, it substantially takes into account very challenging economic scenario on the high end of the loss range and better than that scenario on the low end. . . . I think the guidance range that we have given and the loss estimates that we are prepared for substantially protect you in terms of how you think about GE Capital risk going forward.

190.    Following on to these comments, Defendant Immelt further sought to reassure

investors, particularly with respect to the impact on the GE dividend:

We see the risks but we're also trying to plan mitigants that I think are going to allow us to outperform in any environment that we see going forward in the future. . . . We're going to return $13.5 billion to investors in 2009 through dividends. We really believe that the dividend is safe, and we're making great plans to protect that.

191. Despite his prior statements earlier in the call, Defendant Sherin's further comments took on a much more positive tone later on in the call:

> I really don't think we're going to see the maximum level of losses that we've outlined here but our view is that there's a concern about it and the guidance framework that we've given you we ought to be taking that into account and making sure that people understand that we can handle a significant increase in provisions based on a tougher environment and that's in our range. . . . I think we do have capital, we are planning on originating, we are planning on continuing to invest in our Commercial Finance businesses and we've got to see what opportunities are available. . . . I'm not worried about it but I want to make sure everyone understands we're operating the company to be a Triple A. It's obviously a very high rating; it's something that a lot of companies don't have. We're committed to it and that means that we're going to take proactive steps like cutting the GECS dividend and strengthening the leverage ratios and reducing our reliance on CP. At the end of the day if we had to raise cash to rid a perceived liquidity issue we did it. . . . That's what I mean by it, it's not something I'm worried about. We want to make sure we run the company to be a Triple A and we're confident about that. Obviously it's something that you have to make sure you're protecting your bond holders with the actions you take and we think we've been very proactive and very consistent on doing that. When I talk about committed to running the Triple A it isn't because I'm concerned about it, it's because the philosophy of how we run the company from the Board of Directors through the leadership team on down.

192. Sherin also specifically spoke to the continuation of the dividend payments, assuring investors:

> We feel like in 2009 [the dividend] is protected. We do not need the cash that we raise to pay the dividend in any way. It obviously is a high payout ratio but as we look into 2010, 2011 we've obviously thought through that and we think we get the payout ratio back down to the low 50% by 2011. I think this is a thing that we feel strongly about. We've obviously looked at our Industrial cash flow. We do get some cash flow out of GECS it's not zero. We feel like we're in a position to protect that dividend even in a very tough environment.

193. In response to a question from Oppenheimer analyst Christopher Glynn as to whether Glynn was "reading too much into" GE's speaking in terms of a "commitment to keep [its AAA rating]" as opposed to "saying you are not at all worried about it" and also whether

"you are continuing to originate, maintaining the shareholder dividend. Would that be a pretty strong commentary that you're simply not worried about it?" Defendant Immelt completely dismissed Glynn's concerns. Immelt stated:

> Well, I want to make sure that I'm clear about it. <u>I am not worried about it</u>, but <u>I want to make sure everyone understands we are operating the Company to be a Triple-A</u>. It's obviously a very high rating. <u>It's something that a lot of companies don't have. So we are committed to it.</u> That means that we're going to take proactive steps like cutting the GECS dividend and strengthening the leverage ratios and reducing our reliance on CP. <u>At the end of the day if we had to raise cash to get rid of a perceived liquidity issue, we did it</u>.

194. Finally, Defendant Immelt summarized the Company's position:

> First is just to recap all the proactive things we've done to I think <u>substantially risk reduce the company from protection of Triple A</u>. <u>I think the equity raise that generated cash that I think accelerated the backup lines in cash being greater than CP takes that risk off the table</u>. I think ultimately that the making Fed window available to the industry I really do think, this volatile economic time <u>we've done a good job of protecting the company and risk reducing the company</u>.

195. Following GE's favorable portrayal of its financial position, GE's stock closed at $21.50 on October 10, 2008, up $2.49 from the prior day's close of $19.01 on October 9, 2008, or a 13% increase.

196. The above statements regarding GE Capital's performance relative to its peers, GE Capital's being different from its peers, the status and advantages of GE's AAA credit rating, credit risks in the GE Capital portfolio, risk management, capitalization, liquidity and/or cash position, the financial position of the Company and GE Capital, earnings, loan loss reserves, loss risks at the Company and GE Capital, the strong position of GE's real estate business and GE Capital's real estate investments, and the ability to maintain the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181. The above statements were also false and misleading insofar as:

(a)　　　Defendant Immelt and Sherin's statements concerning the October Offering and the Berkshire Hathaway Investment, including Defendant Immelt's statement that the company's raising of $15 billion through that capitalization event "makes the Company more secure in the short term, but could be used to play offense in the long term" and Defendant Sherin's statements that the equity offering was a proactive measure undertaken to "have more protection today if the CP market remains under stress" was false and misleading insofar as GE and GE Capital undertook the October Offering and the Berkshire Hathaway investment for the purpose of attempting to cover liquidity and capitalization shortfalls at GE Capital for the reasons set forth in ¶ 181 and otherwise herein.

(b)　　　Defendant Sherin's statements that GE Capital operated under a "conservative model" and that "[w]e don't have any SIVs, we don't have any CDOs, we've never sold CDS, and we don't have any exposure to counter parties on that from things we write because we don't do that business" were false and misleading given that, in trying to distinguish GE Capital from other financial services companies in the midst of the subprime and related financial crises, as described herein, Defendant Sherin failed to disclose – as the company ultimately revealed on March 19, 2009, and as otherwise alleged herein – that GE Capital was, in fact, significantly exposed to substantial losses related to risky assets in its loan portfolios due to its involvement with substantial volumes of sub-prime consumer and non-investment grade or "junk" commercial lending.  Risky assets of those types were at the heart of the types of securities Sherin listed.  Indeed, Defendant Sherin was going so far to distinguish GE Capital from other troubled financial institutions that his statement that "we don't do that business" was fundamentally misleading given that the Company had disclosed in its Form 10-K for FY 2008 that GE Capital, in fact, held approximately $6.4 billion in mortgage-backed securities (including

$1.3 billion in securities with sub-prime exposure), assets that were within the same classes of assets in troubled SIVs and CDOs.

(c)     Defendant Sherin's statements with respect to a non-earning asset associated with the SemGroup bankruptcy is false and misleading insofar as it omits the material fact that, as alleged herein and as described by Confidential Witness 7, GE Capital made a $55 million loan to SemGroup on July 11, 2008, *ten days before SemGroup went into bankruptcy* on July 21, 2008.

**c.     October 30, 2008 Form 10-Q for Q3 2008**

197.    In its Form 10-Q for the period ended September 30, 2008, filed on October 30, 2008, GE stated:

> <u>We regularly review investment securities for impairment using both quantitative and qualitative criteria</u>. . . . Our qualitative review attempts to identify issuers' securities 'at risk' of impairment, that is, with a possibility of other-than-temporary impairment recognition in the following 12 months. . . . The global credit markets have recently experienced unprecedented volatility, which has affected both the availability and cost of our funding sources. In this current volatile credit environment, <u>we have taken a number of initiatives to strengthen our liquidity, maintain our dividend, and maintain the highest credit ratings</u>.
>
> Specifically, we have:
>
> > 1.   Reduced the GECS dividend to GE from 40% to 10% of GECS earnings and suspended our stock repurchase program;
> >
> > 2.   Raised $15 billion in cash through common and preferred stock offerings in October 2008;
> >
> > 3.   Reduced our commercial paper borrowings at GECS to $88 billion at September 30, 2008;
> >
> > 4.   Targeted to further reduce GECS commercial paper borrowings to $80 billion by the end of 2008 and to 10-15% of total GECS borrowings going forward;
> >
> > 5.   Begun resizing GE to deliver a 60%/40% industrial-financial services earnings split by the end of 2009;

6.   Grown our deposit funding to $33.5 billion at September 30, 2008; and

7.   Registered to use the Federal Reserve's Commercial Paper Funding Facility for up to $98 billion, which is available through April 30, 2009.

198.   GE also described its allowance for loan losses of $4.6 billion, as compared to $4.2 billion at the end of FY 2007, as "representing our best estimate of probable losses inherent in the portfolio and reflecting the current credit and economic environment."

199.   Following these disclosures, GE's stock price closed at $19.35 on October 30, 2008, up $0.15 from the prior day's close of $19.20 on October 29, 2008.

200.   The above statements regarding liquidity, the October Offering and Berkshire Hathaway Investment, allowances for loan losses, the Company's analyses of impairments, and the ability to maintain the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181.

### d.   November 13, 2008 Website Statement

201.   In a November 13, 2008 statement published on its website, GE specifically reassured investors that it was able to maintain the planned dividend of $0.31 per share, stating:

There has been speculation in the media and among analysts recently about GE's plans for its dividend.  Here are a few facts:

GE has paid a dividend each quarter for more than 100 years.

On Sept. 25, GE stated that its Board of Directors had approved management's plan to maintain GE's quarterly dividend of $0.31 per share, totaling $1.24 per share annually, through the end of 2009. That plan is unchanged.

GE expects cash flow to be greater than the amount needed to fund the dividend in 2009.

GE has taken a number of steps to strengthen its liquidity plan, including participation in the U.S. Government's Commercial

Paper Funding Facility (CPFF) and FDIC's Temporary Loan Guarantee (TLGP). <u>Both of these government programs provide additional levels of security for our investors, strengthen our ability to support the planned dividend in 2009, and do not place any restrictions on our dividend policy</u>.

202.　Following this announcement, GE's stock price closed at $16.86 on November 13, 2008 having traded on extremely high volume of nearly 301 million shares, up $0.57 from the prior day's close of $16.29.

203.　The above statements regarding GE's ability to maintain the GE dividend, and the Company's cash flows and liquidity were false and misleading for the reasons set forth in ¶ 181.

## 2.　December 2, 2008 Financial Services Investor Meeting

204.　On December 2, 2008, GE issued a press release announcing an "updated strategic framework" for GE Capital and stating that <u>the Company was taking steps to reduce risk at GE Capital</u>.  The Company stated that it would announce "plans on how it will continue to diversify funding, re-mix [GE Capital's] financial services businesses, and position its portfolio for future growth."  The Company announced that it would also update its guidance for Q4 2008 earnings, noting that EPS was "trending toward $.50-.52, the low end of its previously guided range of $.50-.65."  The Company further announced that it was also "<u>evaluating restructuring and other charges to accelerate cost out and reviewing losses in current credit environment, expecting a $1.0-1.4 billion after tax charge</u>. <u>These restructuring and other actions would strengthen the Company to better perform in the current economic environment</u> and position it for profitable long-term growth."

205.     In that same December 2, 2008 press release, Defendant Sherin assured investors:

> We are operating in an extremely difficult environment, but <u>we are outperforming our peers</u> and we have strong franchises to build upon for long-term growth. We are a mid-market finance company <u>differentiated</u> by an originate-to-hold approach, product and geographic diversification, deep experience in risk assessment and collateral management, and senior secured positions for many of our receivables.

*    *    *

> <u>We are taking a number of tough, but prudent actions to make GE Capital safer, stronger and more secure during this financial crisis. We are committed to being a Triple-A company</u> … [t]hese actions include a funding plan that reflects the current market, and we are lowering our leverage ratio and commercial paper balance. Our forecast anticipates a challenging loss environment.  We are also reorganizing the business to reduce costs and allocate capital more efficiently.

206.     Also in the December 2, 2008 press release, Defendant Neal, while noting sharply diminished earnings projections for FY 2009, also sought to reassure investors with respect to GE Capital's position: "<u>We have established a framework for GE Capital to earn approximately $5 billion in 2009</u>.  From there, we believe <u>the business is positioned to sustain solid, 10% earnings growth in the future</u>."  Neal further assured investors that GE Capital was somehow different from other financial services companies, noting that "[w]ith the strategic adjustments we have made<u>, we will reinforce our strong competitive position, enhance our funding model and create greater flexibility</u>."

207.     Lastly in the December 2, 2008 press release, Defendant Sherin further assured investors that the GE dividend remained secure: "<u>We are reaffirming our plan to maintain a $1.24 per share dividend in 2009.  We have leadership businesses that continue to generate strong margins and cash flow, supporting the dividend</u>."

208. On December 2, 2008, GE also held a Financial Services investor meeting. During this meeting, while GE began to disclose weaknesses in the GE Capital portfolio, the Company continued to tout GE Capital's purported relative strength among financial services institutions. For example, an investor presentation titled "GE Capital Finance Overview" states that GE Capital, "is a vital financial services business" and touts GE Capital as "Safe + conservative in economic environment," "Creating a financial framework to earn ~$5B in 2009," "Business model that performs for the long term," and "a strong fit with GE." That document also states that, "GE is well positioned to perform in a difficult 2009" and that "Board approved management plan to sustain dividend at $1.24/share." Defendant Sherin echoed these statements and spoke of GE maintaining its AAA credit rating during the call.

209. During the investor meeting, Defendant Neal stated that "GE Capital is and has been a strong financial services franchise. We've been a great source of liquidity this year, including the third and fourth quarter." Despite this purported success, Neal stated that "we have to reposition the business as a well-funded but smaller financial services company on a going forward basis. Our plan for next year 2009 is to continue to outperform and reposition the business for growth in 2010 and going forward."

210. Also during the investor meeting, Defendant Bornstein, GE Capital's CFO, set forth the assumptions behind the Company's expectations for 2009. These assumptions included 8.5% unemployment rates in the U.S. at YE 2009 that were expected to drive losses in the U.S. Consumer portfolio of approximately $4 billion. With respect to the Company's UK mortgage business, Bornstein stated: "The UK mortgage business is 4% of our portfolio and in 2008 home prices fell 17% and we're assuming another 15% decline in 2009. That results in an expectation of about $600 million of losses in 2009, up approximately 90% from 2008."

211.    In addition, Defendant Bornstein discussed loan losses and reserves for the entire GE Capital portfolio, noting that the Company has "enjoyed a fairly benign loss environment" despite the fact that "[GE] expect[s] losses to increase to about $7 billion pre-tax in 2008, or up about 64% year over year."    Bornstein further noted that: "Historically commercial [loan] losses would be expected to lag consumer losses but in this credit cycle that lag will likely be much shorter."  Defendant Bornstein further discussed the process by which GE Capital's assets were evaluated for impairment.  Referencing a slide in the GE Capital Finance Overview presentation, Bornstein stated that GE Capital has "a detailed and rigorous process for reviewing valuations with a series of reviews and escalations that start at the business unit level and then are reviewed through the leadership team, our corporate accounting team, as well as our audit staff and external audit firms."  Bornstein stated that GE recorded $700 million in impairments through Q3 2008, and that "we're expecting a similar kind of profile next year."  Further seeking to reassure investors, Bornstein attempted to distinguish GE Capital from other distressed financial services providers by stating that its portfolio was free of certain instruments that were of high concerns to investors at the time: "these securitizations are market securitizations, they don't include SIVs or CDOs or other very highly structured transactions, very straightforward transactions and structures that we've been using for years."

212.    Defendant Neal further sought to reassure investors with respect to the Company's preparation for mounting loan losses: "So we believe we have the company well positioned and positioned appropriately for what's going to be a very difficult cycle.  Reserves are 2x what they were in 2007, substantial resources are involved with many being shifted from offence to defense, adverse credit impact is well understood and incremental."

213.     Defendant Cary, GE Capital's Chief Operating Officer, assured investors during the investor call that GE Capital was well positioned to continue to invest in business and see high margins on its investments.  Cary also stated, "Lastly while we think we've planned prudently, we have a funding hedge of about $10 billion in our back pocket to manage any disruptions that we might see in the marketplace. <u>We feel pretty good about our plans around both collections and our forecast for new volume</u>."

214.     Defendant Sherin concluded the presentation by assuring investors that GE Capital was in a strong position with respect to its liquidity.  He stated, "So that leaves us with about $16 billion of cash which we'll use to pay the $13.4 billion of dividends [from GE Capital to GE] with a $2 billion to $3 billion cushion for M&A and other cash needs."  Sherin further insisted that "GE Capital is in solid shape.  <u>The funding plan; safe and more secure.</u>  We're going to be very realistic about the loss environment and we like our business model and think we remain very competitively advantaged . . . . <u>So, we're positioned to perform in 2009 while also maintaining the dividend</u> . . . ."

215.     In response to a question from analyst Robert Cornell of Barclay's capital (who prefaced his question with the observation that the presentation made "a lot of people feel more comfortable with what you're doing") regarding the factors that drove GE Capital to become a smaller company, Defendant Sherin attempted to spin the impact of the credit crisis on that decision, noting: "So, has the financial crisis precipitated a harder relook at the whole business model?  I'd say yes.  <u>But we started with safe and secure from a funding perspective and then competitively advantaged from a business model perspective and that's how </u>we worked forward."

216.    In response to questioning from analyst Jeff Sprague of Citigroup about the importance of "the book leverage target" to the rating agencies with respect to GE's maintaining a AAA rating, Defendant Neal stated:

> Well we have a whole package of metrics with both Moody's and S&P. I don't know whether there's one metric that's more important then the other.  I would tell you that we're committed to the book leverage metrics. <u>That's part of the plans that we presented to them and clearly that's something that we're going to meet those commitments on</u>.  I think there's several, certainly liquidity, managing our liquidity risk and getting our commercial paper down is important to us.  It's important to them. Leverage both book and tangible leverage are important to them. Absolute size, and how much are we counting on long-term debt markets are important.  <u>We have capital, liquidity, size, risk metrics that we work with</u> but I can tell you we're committed to the book leverage metrics.  The 7:1 at the end of 2008 and the 6:1 at the end of 2009 are things that we're going to meet.

217.    Following GE's positive assessments of GE Capital's position, GE's stock price jumped $2.11 to close at $17.61 on December 2, 2008, up from the prior day's close of $15.50 on December 1, 2008, a gain of over 13.6%.  Volume was very heavy, with over 219 million shares traded.

218.    The above statements regarding GE Capital's risk level and business practices, GE Capital's performance relative to its peers, GE Capital's being different from its peers, the status and advantages of GE's AAA credit rating, credit risks in the GE Capital portfolio, risk management, capitalization, liquidity and/or cash position, the financial position of GE Capital, earnings, loan loss reserves, loss risks at GE Capital, the strong position of GE's real estate business, and maintaining the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181.  The above statements were also false and misleading insofar as:

(a)    Defendant Neal's statement concerning GE Capital having "established a framework for GE Capital to earn approximately $5 billion in 2009" was false and misleading insofar as statements about GE Capital's earnings were false and misleading for the reasons set

forth in ¶ 181 above.  In addition, Defendant Neal's statement was false and misleading given that, as alleged herein, Neal failed to disclose the fact that the $5 billion target had particular significance given that the rating agencies were conditioning GE's maintenance of its AAA credit rating on GE Capital being able to earn $5 billion in FY 2009.

(b)     Defendant Bornstein's statements with respect to GE Capital's UK mortgage portfolio are false and misleading insofar as they neglect to disclose the material fact – as the Company ultimately disclosed on March 19, 2009 – that 74% of GE Capital's UK mortgages were made to subprime borrowers.

(c)     Defendant Bornstein's statements with respect to the financial health of GE Capital, including his statement that GE Capital "enjoyed a fairly benign loss environment" is false and misleading insofar as GE Capital was experiencing significant losses throughout its loan portfolios (and was acting to conceal those losses in the manner described by Confidential Witnesses including Confidential Witnesses 1 and 15) and was experiencing a virtual standstill in its business as described by Confidential Witnesses including Confidential Witnesses 8, 9, 11, 12, and 14 and as otherwise set forth in ¶ 181 above.

(d)     Defendant Cary's statements with respect to GE Capital's ability to continue to invest in business and see high margins on its investments, including his statement that "[w]e feel pretty good about our plans around both collections and our forecast for new volume" were false and misleading insofar as, as alleged herein and set forth in ¶ 181 above, GE Capital was experiencing significant losses throughout its loan portfolios (and was acting to conceal those losses in the manner described by Confidential Witnesses including Confidential Witnesses 1 and 15) and was experiencing a virtual standstill in its business as described by Confidential Witnesses including Confidential Witnesses 8, 9, 11, 12, and 14.

### 3.     December 16, 2008 Annual Outlook Meeting

219.     On December 16, 2008, GE held its Annual Outlook meeting.  At that meeting, Defendant Immelt reassured investors with respect to GE Capital:  "[W]e have strengthened financial services.  We've accumulated cash.  We've done a lot of things to get this company ready for this environment.  And so, again, we're not Pollyannaish about what the environments going to be, but we've done a lot of things we think to get ready."

220.     Immelt explicitly and strongly reassured investors about the GE dividend, stating: "What can you count on?  You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $0.31 a share in the first quarter."

221.     Immelt stated, with respect to GE Capital's capital position and earnings targets for 2009, "And the way that we're going to run the company in 2009 is to have GE Capital at $5 billion, to have industrial earnings between flat and up 5%, and have corporate costs; this is the ins and outs around tax rate pension, restructuring things like that, about flat year over year."  Immelt further stated, that with respect to the GE Capital dividend paid to the Company and how that relates to the Company's position to pay shareholders the GE dividend:

> We're counting on $500 million from GE Capital in 2009.  That goes back to 40% payout in 2010.  And then we always have dispositions other things at corporate the $2 billion.  So we've got good working capital programs inside the company. . . . We're running the company really focused on cash.  And so we have about a $3 billion coverage on the dividend. . . . And so the company really operationally is very well grounded to cover the dividend handily and to be in good shape as we think about next year.

222.     Similarly, Immelt touted GE Capital's ability to generate cash and the Company's purportedly strong cash position, stating:

> As we focus on collections greater than originations, GE Capital generates a lot of cash as you go through that.  That's $25 billion.  We did the equity raise of $15 billion.  And then we've got cash – Keith got cash under his desk let's say at $16 billion.  Somewhere in the company we've got $16

billion of cash in the company.  So we've got cash inside GE that can do a lot of things.

223.     Defendant Immelt also touted the Company's AAA credit rating as an advantage

to investors:

> And lastly, leveraging kind of size and breadth being AAA, being able to drive the company and the country, generating best practices across the company in lean and driving cost out.  Having margins that are better than our peers, returns that are better than our peers.  These are advantages that scale brings, and advantages we think that we bring to GE investors.

224.     Defendant Immelt also stated, with respect to GE Capital's real estate portfolio:

> I just want to do a deep dive on real estate debt portfolio. The left-hand side of the chart basically talks about the way we've structured the debt, low loan to value, high structured debt financing, well underwritten, great spread of risk. Through these cycles, we never lost any of our risk disciplines, any of our underwriting disciplines.

225.     Winding down the presentation, Immelt acknowledged the importance of the GE

dividend to investors, stating:

> . . . with about 40% retail investor with a high percentage of value investors and the type of volatility we're going to see in 2009, I just think dividend is important.  It's a culturally important part of the company. I think important to our investor base today.  It's affordable.  And I just think this is an important touchstone vis-à-vis how we think about GE in 2008 and 2009.

226.     In response to the first analyst question regarding the AAA credit rating "in the

context of the dividend," Defendant Immelt responded:

> I frequently get the question, what do you favor more the AAA or the dividend?  And I always give the answer both.  I always say the way we allocate capital is to make sure, we've got plenty of capital to do both. And that's just the way we run the place.  And so I just think both are important in the cycle. And that's how we think about the company.

227.     Immelt was further pressed on this topic, with another analyst describing a

"dividend versus AAA tug of war," noting that Immelt's remarks were "much more focused on

the dividend than AAA," and asking whether there had been any issues arising from the

company allocating capital to support the dividend given that "obviously things have gotten worse" since the company's September 25, 2008 presentation. Immelt responded:

> Again I want to make it clear. <u>The AAA is a philosophy how you run the company.</u> In other words, I've always liked the discipline around the AAA because I thought it made sense in the context of the company itself. So, those disciplines shouldn't go away, won't go away and the AAA remains important. And look we've put $5 billion into making sure that the leverage comes down. And if we need to do more, we'll do more in that context, as time goes on, because I think the AAA's important.

228. The Company also issued a slide presentation on December 16, 2008 in connection with the Annual Outlook Meeting entitled, "Winning in the Long Term." These slides included the following statements:

> 1. Our framework in 2009 is to outperform the S&P 500 with Industrial earnings growing slightly … 0-5% … <u>while Financial Services deliver ~ $5B.</u>

> 2. We are taking actions to protect the company for the difficult environment we project.

> 3. We are driving initiatives to improve long term organic growth, expand margins & generate cash.

> 4. GE's investor message is simple:
> <u>+ Plan to maintain $1.24/share dividend during a challenging 2009</u>
> + Post recession … growth rate returns to long-term average of ~10%.

A slide in this presentation also listed as among "Our actions" plans to "<u>Strengthen Financial Services</u>; <u>Accumulate cash</u>; and <u>Increase reserves</u>."

229. In a press release issued that same day, December 16, 2008, Immelt further stated "<u>[o]ur financial services businesses, while slowed by the current financial crisis, are strong,</u> global, middle market franchises with a conservative originate-to-hold model backed by senior secured collateral. <u>We expect financial services to earn approximately $5 billion in 2009</u>."

230.     Following these positive assessments of the Company's position and the dividend payment, GE's stock price rose $0.97, closing the day at $17.92, up from the prior day's close of $16.95, a gain of over 5.7%.

231.     The above statements regarding the financial position of the Company and GE Capital, the Company's liquidity and/or cash position, capitalization, earnings, the Company's AAA credit rating and the advantage of that rating, the strong position of GE's real estate business and GE Capital's real estate investments, GE Capital's low risk, and the ability to maintain the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181.  The above statements were also false and misleading insofar as:

(a)     Defendant Immelt's statements with respect to GE being able to maintain both its AAA credit rating and pay the full $0.31 per share quarterly dividend were false and misleading for the reasons set forth in ¶ 181, and also given that the Company was aware of the serious threat to its AAA credit rating including the rating agencies' conditioning GE's maintenance of its AAA credit rating on GE Capital earning $5 billion in FY 2009 – an earnings target that the company set as of December 2, 2008 and as addressed otherwise herein.

**B.     The Truth Begins to Emerge**

**1.     January 23, 2009 Announcement of Q4 2008 and FY 2008 Results**

232.     On January 23, 2009, before the market opened, GE issued a press release announcing its fourth quarter 2008 and full year 2008 earnings results, reporting that its Q4 profits dropped by 46% and that GE Capital's quarterly profits dropped by a third.  The release quoted Defendant Immelt as stating, "We run the company to have a Triple-A credit rating, and we have significantly strengthened our liquidity position."  Immelt further stated:

> We generated $16.7 billion of industrial cash flow from operations, up 5%.  We ended the year with $48 billion in total cash, after paying down our commercial paper balance to $72 billion from $88 billion at the third

quarter. We used $5.5 billion of our equity offering to meet our stated GE Capital debt-to-equity leverage goal of 7:1 by the end of 2008. Through today, we have been able to fund $29 billion of our $45 billion long-term debt needs for 2009. The first quarter dividend is done, and we are committed to our plan for $1.24 per share for the year. We believe the GE dividend provides our investors with a solid return in this uncertain time.

233.    While acknowledging a difficult environment in 2009, Immelt stated: "we have taken strong actions to prepare the Company, including strengthening cash flow and liquidity; managing costs; taking restructuring charges; intensifying risk mitigation; accelerating cycle of management reviews; and protecting revenue." With respect to GE Capital, Immelt stated:

In addition, we have a differentiated financial services model and should earn approximately $5 billion in Capital Finance earnings. This continues to be our operating framework for 2009. We will keep the Company safe and secure in these challenging times, but we will continue to invest in future growth. We are building a strong foundation for 2010 and beyond.

234.    Also on January 23, 2009, GE posted a statement on its website. That statement said: "We remain committed to running GE as a Triple-A company and to our plan to pay the $1.24 dividend in 2009."

235.    During GE's fourth quarter 2008 earnings call held that same day on January 23, 2008, Defendant Immelt touted GE's "cash focus" with "[a]bout $48 billion in cash on hand at the end of the year," including "lots of cash on the GE Capital balance sheet," and also stated:

We are executing the plan we outlined on December 2 with the financial services business model towards a smaller, more focused business. We exited some product lines at the end of the year and we think we have dramatically risk reduced financial services. . . . First is to go back to the December meeting and talk about the results you're seeing today and what we did to prepare for 2009. We'll talk about liquidity and cash plan and then we'll go back to the framework that we outlined both in Capital Finance and with our Infrastructure and Media businesses and outline how we're driving the earnings to be on track or consistent with the framework we laid out in December.

236.    Also on that earnings call, Defendant Sherin described restructuring and other charges from Q4 2008. Sherin, referring to the Company's December 2008 projections of

restructuring loss provision charges, noted that "[w]e said we're going to evaluate $1 to $1.4 billion. Jeff said we'd be at the high end of the rate. We came in at $1.5 billion." Sherin also added, with respect to reserves and impairments:

> [w]e've also funded incremental reserve provision in GE Capital. To talk about reserves for a second, you can see we added an extra $0.5 billion. Our reserves are primarily calculated based on statistical models. We use historical losses, historical recoveries, we use delinquency data and as we saw an uptick in delinquencies in the fourth quarter we took a comprehensive look at all our reserve models. These charges that we added here reflect updates to the most recent loss experience, to get changes in recovery experience and to get updates on loss severity assumptions. It was about $300 million in the consumer business and about $200 million in commercial. . . . we also had marks and impairments in the quarter. You can see we had about $700 million after tax . . . [a]bout $500 million of these were in GE Capital services . . . .

237. With respect to GE Capital seeing increases in the number of non-performing loans or "nonearning assets," Sherin attempted to minimize this result, stating:

> We also saw an increase in non-earnings. Non-earnings were up 37 basis points up almost $700 million versus third quarter and it's driven by senior secured loans. We do expect significant recovery. This is where our senior secured positions are so important. In the quarter we had nine accounts that were greater than $30 million that was all the rest of the non-earnings that went in were less than $30 million. That represented about $450 million of exposure but our expected loss is less than $60 million. On the accounts that went into non-earning were senior secured, that's about a 13% net exposure but our overall commercial reserves to non-earnings is 53%. I think we're going to see non-earnings; we're going to see delinquencies rise. The senior secured position diversification is so important.

238. Sherin further stated "[o]verall, we expect both the commercial and the consumer delinquencies to get worse in 2009, but we're well reserved for this." Sherin explained data presented in slides as showing that the Company concerning loan losses and reserves:

> incurred $7.5 billion [in loan losses] for the total year. We've increased our forecast for 2009 from what was previously $9 billion to $10 billion. We also increased the reserves in the quarter by $700 billion and by $1.1 billion for the year while having write offs up $2 billion. We've done a lot of strengthening in this portfolio. The reserves ended at $5.3 billion in

line with our forecast adjusting for the impact of FC and some of the business exits we did in the fourth quarter.  As I mentioned, our US consumer and UK mortgage businesses are the pressure points.

239.    Defendant Sherin further explained the $4 billion of losses in real estate where

GE is an "operator of these assets.  He stated:

> We have the ability to hold for the long term.  The assets from an accounting perspective are carried at historical costs.  We test them for impairment under FAS144 impairment for long live assets, it's reviewed every single quarter, but they are not mark to market.  We're not a trading RE.  If you look at this equity book we have here we generate about $1.7 billion in net operating income from these properties.  We also record depreciation annually on the properties we own that lower our basis about $1.2 billion per year.  We originated these properties to hold them.  We put them on our balance sheet. We work on value creation, lease up, and property improvements, manage the property over time.  We'll hold these properties for five years or more. I think the portfolio is in pretty good shape.

240.    Defendant Immelt concluded the presentation by assuring investors:

> . . . we really have prepared the company to perform in this environment.  We hit or beat every cash and liquidity commitment since the crisis began . . . We end the year with very strong positions in cash . . . From a capital liquidity cash flow standpoint, I think we're in great shape.  Our management attention is very focused.  The operating council, the GECS drives results. . . . We've aligned compensation around cash . . . We've increased loss reserves and I feel very confident that we fully reflected what we expect in this environment.  The key thing is to maintain our discipline.  We believe that the dividend represents a good shareholder return in this environment, and we continue to run the company to the Triple-A.  We have a lot of cash.  We've improved the liquidity. . . . Our priorities for 2009 are just in line with our December outlook, which is to grow the company organically, maintain the GE dividend, and execute our financial services plan that we've outlined at the December 2 meeting.

241.    When asked by Deutsche Bank analyst Nigel Coe why the balance sheet reserve

for loan losses was running below the loss provision on the P&L ("If you're expecting a $10

million of losses in 2009, why wouldn't the balance sheet reflect that $10 million?"), Defendant

Sherin stated the following:

> What we have to do is we have to have losses reflect what's the embedded loss in the portfolio and it's very statistically driven. If you look at the fourth quarter provision of 3.1 it's probably a little higher on a run rate. The provision that we have for losses is exactly what we need based on what's embedded in the current book. Unfortunately we can't book losses for things that we think might happen in the future. For example, our loss estimate of $10 billion has an average assumption of over 9% unemployment but that's not where it is today. I can't book losses for things that I'm forecasting in the future but I am anticipating it and how I put my framework together.

242. Similarly, the lack of a build up in reserves was noted by analyst Scott Davis of Morgan Stanley. Davis noted that, "you look back at 2002-2003 your reserve coverage was a lot higher. Given how dire this crisis has been so far how do you tweak these models to make them realistic?" Defendant Sherin, largely avoiding Davis' question, responded:

> We have a significant amount of work going on on it. If everyone goes back to 2000 levels the business prior to 2001-2002, I don't know exactly when the change was made based on accounting requirements had kept a loss provision of 2.63 year in and year out. The accounting change where you had to reflect the embedded loss in your book and as a result as the portfolio quality improved and delinquencies went down and we had a very good period from a credit perspective that went down to what the actual embedded loss was. The change in loss reserves going back to historic time is really driven by a different requirement from a loss provisioning perspective. If you look at where we are today we have done a complete study in the fourth quarter based on the delinquencies we saw and based on the pressure that everybody has on it. Obviously we'd be crazy not to be putting a ton of resources on it, making sure we get it right. The entire team is focused on getting it right. We look at our statistical models, we look at historic loss rates, and we look at an updated in the fourth quarter for more recent loss experience based on delinquency rates. We increased provision by over $0.5 billion after tax based on that study. I think we're really trying to make sure we're current and getting it right but we're in a terrible credit environment, we're going to see more pressure from the consumer, we're going to see more pressure from the commercial, we're anticipating it. The provisions are going to have to increase as we see that materialize. We're trying to forecast the worst environment that we see today and that's going to be reflected in higher loss provisions as we go forward. It's just the way the math is going to work in the formulas.

243.    In response to an additional question from Scott Davis regarding the dividend in which Davis noted "[i]t's [the dividend] clearly not supporting your stock. . . Can you talk a little bit about, the capital markets are telling you something but does that play into your decision whether to keep the dividend, does it not?"  Defendant Immelt stated:

> The results that we got in the quarter were what we thought we would get when we had the December meeting.  The cash flow was actually stronger so our cash position is actually improved today versus even where we were in December.  The overall capital inside the company cash inside the company is almost $50 billion.  Our industrial cash flow for the quarter was $5.3 billion.  We feel good about the liquidity and the cash plan inside the company.  It's just been our feeling that the dividend is a good return to investors in this moment of uncertainty.  We're not straining in order to pay it.  In other words, we've got lots of cash and lots of free cash flow and lots of capital inside the company and it's been the judgment that this has been the most investor friendly use of this capital.

244.    Further, in response to a question from analyst Jason Feldman of UBS regarding reserves being increased $2 billion into 2009 and the provisions only increasing $2.5 billion ("Am I missing something or are you basically only expecting write-offs to increase $500 or $600 million next year"), Defendant Sherin noted that write offs were up $2 billion and that "[w]e really had a massive acceleration of write offs.  With the provision up $3 billion the write offs up $2 billion I think you're seeing those at a run rate that's more reflective certainly on the consumer side then probably going to accelerate on the commercial side, yes."  Sherin added that he expected a deceleration of the growth rate of write offs on the consumer side.

245.    Defendant Immelt closed the conference call by stating:

> In a very tough environment we delivered results that were consistent with what we talked about in December, earned almost $4 billion in the quarter and $18 billion for the year.  The highlight of the quarter is the strong industrial cash flow and the strength of the balance sheet particularly with the cash on hand on the balance sheet.  The framework for 2009 we have no change to and that's what we talked about in December.  Lastly, I want to go back to a point which I think was part of Scott's question that we think given the strong operating performance of the company and the framework and the strong capital position that we still believe that

supporting the dividend and doing it without straining, doing it just by controlling our own destiny and by executing with excellence that is the best use of capital and capital allocation. We run the company to be a triple A. We've supported and have on hand lots of cash and lots of capital and we're really running the place controlling our own destiny with real excellence and focus.

246. The above statements regarding the Company's earnings, cash and/or liquidity position, risk profile, the differences between GE Capital and other financial services companies, the financial safety and security of GE Capital including that the Company had "dramatically risk reduced financial services," loan loss reserves and impairments, the Company's AAA credit rating and continuing to "run the Company as Triple A," the strong position of GE's real estate business and GE Capital's real estate investments, the strength of GE's balance sheet, and maintaining the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181. The above statements were also false and misleading insofar as:

(a) Each of the statements describing GE's earnings for Q4 2008 were false and misleading given that, as alleged herein: (1) GE overstated its Q4 2008 earnings by approximately $2.7 billion given the shortfall between the Company's allowance for loan losses and its non-earning receivables; and (2) GE also overstated its Q4 2008 earnings by failing to record adequate loan loss reserves and impairments as required by GAAP, given the decline in the performance of GE Capital's loan portfolios, the poor credit quality of substantial portions of GE Capital's consumer and commercial borrowers, and the overall deteriorating condition in the U.S. and global economies.

## 2. January 23, 2009 CEO Immelt Interview on CNBC

247. Also on January 23, 2009, Defendant Immelt appeared on the cable financial network CNBC. During the course of that interview, Immelt strongly reaffirmed GE Capital's commitment to paying the full $1.24 per share annual dividend. Immelt stated that GE had $48

billion in cash and that its operating model would unequivocally assure continued dividend payments at the same rate and that from a capital standpoint, payment of dividends to shareholders is the best thing to do for investors in view of GE's cash position. Immelt also reaffirmed his commitment to maintaining both the dividend and the Company's AAA credit rating and projected $5 billion in profits at GE Capital.

248.    During the interview, Immelt was asked about the tension between maintaining the full dividend payment and keeping GE's credit rating. Immelt dismissed this concern, stating, "I hate the fact that there's so much speculation around the dividend and AAA. I wish my words could end the speculation. The facts of what we've done here, I think, should let investors know that we've got the cash, and we've got the operating model that's going to secure the dividend in this environment." When asked whether he would pick slashing the dividend over losing the company's AAA credit rating. Immelt responded, "I wouldn't even go there," emphasizing that both its credit rating and the dividend were safe.

249.    Also during the CNBC interview, Immelt assured investors that GE's cash and liquidity were in strong positions and that GE had a realistic plan for 2009 that management knew how to execute. Emphasizing the company's relative strength, Immelt stated, "We've always run the company to be AAA, we run the company to be AAA…that's the philosophy with which we run the company." Immelt also stated, "We've go the cash and we've got the operating model that's going to secure the dividend in this environment."

250.    Investors were not convinced by Immelt's assurances. Following the day's negative news about the Company and its financial position, GE's stock price fell by $1.45, dropping from a price of $13.48 per share on January 22, 2009 to close at $12.03 per share on

January 23, 2009, a decline of 10.75%. GE stock traded on extremely high volume of over 326 million shares.

251. Press coverage of this interview described the Immelt interview thusly:

1. A January 23, 2009 *MarketWatch* article stated: "In an interview on CNBC, CEO Immelt declined to say if he would pick slashing the dividend over losing the company's high credit rating. 'I won't even go there,' he said, again emphasizing that the dividend was safe."

2. A January 23, 2009 *TheStreet.com* article stated: "Nonetheless, GE Chairman and CEO Jeff Immelt was clear the company believes the dividend is sacred on Friday's conference call to discuss fourth quarter earnings. . . . Immelt added shortly afterward that the plan for 2009 included 'grow the company organically, maintain the dividend.'"

3. A January 24, 2009 *New York Times* article described Immelt's comments with respect to the dividend, "Mr. Immelt replied that GE had decided it was both shareholder-friendly and affordable. 'We're investing in the future, we're not starving the company. We're not straining to pay it.'"

252. Defendant Immelt's statements regarding the cash and/or liquidity position, its AAA credit rating, and maintaining the GE dividend through 2009, including his statement that, "we've got the cash, and we've got the operating model that's going to secure the dividend in this environment" were false and misleading for the reasons set forth in ¶ 181. The above statements were also false and misleading insofar as:

(a) Defendant Immelt's statements with respect to GE being able to maintain both its AAA credit rating and pay the full $0.31 per share quarterly dividend were false and misleading for the reasons set forth in ¶ 181, and also given that the Company was aware of the serious threat to its AAA credit rating including the rating agencies' conditioning GE's maintenance of its AAA credit rating on GE Capital earning $5 billion in FY 2009 given that UBS Investment Research had noted in January 2009 that both Moody's and S&P specifically

cited GE Capital's earnings guidance of $5 billion as being crucial to GE maintaining its AAA rating.

253.     On January 27, 2009, GE issued a press release announcing that the rating agency Moody's had informed the Company that its prime credit rating was under review. The press release stated:

> Moody's informed us today it has placed General Electric Company's and General Electric Capital Corporation's (GECC) long-term Aaa ratings on review for possible downgrade. This review does not affect GE's and GECC's short-term funding ratings of Prime-1 (P-1), which were affirmed by Moody's. This action is a follow-up to Moody's December review of GE's 2009 operating plan. GE has outlined a plan for the year that is based on the difficult global economic environment we see. During the next few months, we will work constructively with Moody's on its review. <u>Our objective is to maintain our Triple-A rating but we do not anticipate any major operational impacts should that change</u>. We expect to deliver on the 2009 financial framework that we outlined last week.

254.     The press release went on to reassure investors, however, that "GE has taken steps to strengthen its liquidity position, including reducing GE Capital Services' commercial paper from $88 billion in 3Q '08 to $65 billion today. . . . The company has more than $50 billion in cash on hand."

255.     The Company's statements with respect to its liquidity position and cash on hand, and the Company's ability to deliver on its 2009 financial framework were, however, false and misleading for the reasons stated herein. The Company's statement with respect to not anticipating "any major operational impacts" from a credit downgrade is false and misleading because the Company and the Exchange Act Defendants knew or recklessly disregarded the fact that a downgrade in GE's credit rating would have a significant impact on the Company's cost of borrowing and its stock price.

256.     The above statements regarding maintaining the company's AAA credit rating, the Company's liquidity and/or cash position, and the Company's ability to deliver on its 2009

financial framework were false and misleading for the reasons set forth in ¶ 181. The above statements were also false and misleading insofar as:

(a) The statement "we do not anticipate any operational impacts should [the credit rating] change" are false and misleading insofar as GE knew or recklessly disregarded the fact that GE's cost of borrowing would increase following a rating downgrade, and, in turn, margins on loans made by GE Capital would be reduced given the greater financing costs facing the Company.

### 3. February 6, 2009 Announcement of Board Approval of Dividend Plan

257. On February 6, 2009, GE issued a press release stating that its Board of Directors had approved the Company's regular quarterly dividend of $0.31 per share of common stock, thus completing the dividend for the first half of 2009. In that press release, Defendant Immelt is quoted as saying:

> The Board and I believe that it is in the best interests of the Company's shareholders to continue to pay an attractive dividend. The Board and I will continue to evaluate the Company's dividend level for the second half of 2009 in light of the growing uncertainty in the economy, including U.S. government actions, rising unemployment and the recent announcements by the rating agencies. Our fundamental priorities will remain keeping the Company safe and secure in the current environment and investing in attractive growth opportunities.

258. In the above quote, Defendant Immelt refers to "recent announcements by the rating agencies." Defendant Immelt did not however specify that on January 28, 2009, GE had filed a Form 8-K with the SEC, attaching the Company's January 27, 2009 press release announcing that the Moody's rating agency would be reviewing GE's credit rating.

259. Defendant Immelt was further quoted in the February 6, 2009 press release as stating that "GE has taken steps to strengthen its liquidity position, including reducing GE

Capital Services' commercial paper from $88 billion in 3Q '08 to $60 billion today. GE also has raised 64% of its long-term funding for 2009. The company has $48 billion in cash on hand."

260.    A *Bloomberg* story dated February 6, 2009 reported that on February 5, 2009, Defendant Immelt stated that GE generates enough cash to maintain its shareholder dividend in 2009. "[Immelt] told investors in January that GE had the earnings power and cash to justify the payout and its highest-possible AAA credit ratings, now under review."

261.    Buoyed by news of GE's commitment to paying its full dividend in 2009, GE's stock price rose $0.25 to close the day at $11.10 on February 6, 2009, up from the prior day's close of $10.85. On the next trading day, February 9, 2009, as news of the dividend filtered through the market, GE's stock price rose again, closing at $12.64, up $1.54 or nearly 13.9% from Friday's close. Volume was extremely high on each day, with nearly 219 million shares traded on February 6, 2009 and nearly 233 million shares traded on February 9, 2009.

262.    The above statements regarding maintaining the GE dividend throughout the second half of 2009, the Company's liquidity and/or cash position, and the above allusions to rating agency review of GE's AAA credit rating were false and misleading for the reasons set forth in ¶ 181 and as otherwise alleged herein.

### 4.      February 10, 2009 Barclay's Conference

263.    On February 10, 2009, Defendant Sherin, on behalf of GE, presented at the Barclay's Capital Industrial Select Conference. After being introduced by a Barclay's representative, who gushed "you are going to look back at today's conference and Keith's [Sherin's] speech, and you are going to say, I wish I had bought GE at those share prices," Sherin spoke to issues concerning "safe and secure and how we think about that for GE" and "to cover a quick overview of where we are with GE Capital."

264.     Sherin assured investors that, "we have really responded and put the Company in a much safer, more secure place.  We've raised our cash and improved our liquidity dramatically."  Sherin cited the Company's finishing Q3 2008 with $16 billion in cash, and finishing FY 2008 with $48 million in cash.

265.     Sherin told the Barclay's conference that the company had decided to take $9.5 billion of the equity raised in the October offering "and put that into GE Capital Corp. sometime in the first quarter."

266.     Sherin also told the Barclay's conference with respect to GE Capital:

> Right now, we've got a plan in 2009 to make about $5 billion [for GE Capital, after earning $8.5 billion the prior year].  The first piece that is critical of this plan is to run the Company safely and securely, and you can see what we've done from a cash and liquidity and funding ourselves.  I think we are in great shape there.  We are going to continue to do that with intensity.  The second thing we've got to do is we've got to work through this credit cycle. And I will talk to you about where we are on delinquencies and losses. We are having a very challenging consumer credit cycle, as everyone is. And unemployment is going to be the main driver that is going to determine how large those losses get, and we are prepared to deal with those.  We are also dealing with a slowing commercial credit cycle.  And the loss's lag and the fact that we are senior secured in most of our positions will mute a lot of the impact of that, but we are going to be affected by the credit cycle on both the consumer and the commercial side, and we are going to work our way through that.  I think we've given a pretty good framework of how to think about that. But we've got to run that with intensity.

267.     Speaking directly on the issue of GE Capital reserves, Sherin reassured investors:

> One thing that we get asked a lot and it is written a lot about us is how is GE Capital reserved in comparison to its competitors.  And there is a blanket statement that GE Capital is either under-reserved or a lot lower reserved than the banks.  I think you've really got to separate the books out.  I think it is hard to find directly comparable commercial data.  We have been working on it, and we haven't been able to find something that we could actually put a page together, except for the fact that over a long period of time our loss rates are significantly lower than the banks, based on the way we do business.   On the consumer side, we can find some comparable data.  . . .  But at the end of the day, when you take a look at where we are relative to the banks, on a comparable asset pool, private

label credit cards versus bank cards, we are at 6.2% coverage. That's our reserves to our financing receivables. And if you look at the range here, we are dealing with 4.8 to 7.3. We are clearly in the range. The JPMorgan team put up some big reserves as part of WaMu, and they are at a higher end, and some of the others are at a lower end. If you look at our allowance, our reserve position that we have on our books to our 90-plus day delinquencies, we are 2.24 times covered. So we've got 224% of our non-earnings -- 90 day non-earnings -- and that is when we take it to a non-accrual basis --in our provisions, and the banks have somewhere in a range from 146% to 314%. So again, to have a blanket statement that GE Capital is under-reserved relative to the banks, <u>I think if you break it out and you can look on a comparable basis, we feel like we are properly reserved</u>.

268. Sherin further defended the Company's reserves:

I would also say that from a reserve perspective, we are absolutely adequately reserved. We, in the fourth quarter, went through a very rigorous process with our own internal controllership team and our public accountant. And we brought in a third-party public accounting firm to come in and assess all of our reserve models. And in the fourth quarter, as you know, we added about $800 million to reserves to get current on reflecting the current experience we are seeing on delinquencies turning into losses, the current experience we are seeing on severity of loss and the current experience we're seeing on recovery of loss. And so that extra amount, I think, was appropriate. It put us in a good spot and positioned us for 2009.

269. On the subject of running the company as a AAA company and maintaining the

dividend, Sherin stated:

<u>But we are running the Company like a AAA and we are going to continue to be conservative and focus on being safe and secure</u>, and we will see how this discussion goes with them over the next several weeks, months. So capital allocation, the dividend. <u>We have put together a plan that said we were going to keep the dividend flat with 2008 levels -- $0.31 a quarter, $1.24 per share for the year, which would be $13.1 billion of common dividends.</u> As you know, we paid the January dividend at $0.31 a share. And <u>last Friday, our Board approved the second-quarter payment of the dividend at $0.31 per share to be paid in April.</u> And when we get through that, we will have paid $6.5 billion against the total year commitment.

270. With respect to forecasts for GE Capital earnings, Sherin maintained the $5

billion estimate for 2009. He stated:

You know, <u>I'm not quite sure how to deal with the $5 billion</u>. We've got an operating framework. We've got a plan. People have a different view of that plan. And we are not giving guidance, so we are going to have to work our way through how do we operate in that world where we don't give guidance. So that is the plan Mike Neal and his team have. There are going to be a lot of puts and takes, and we are just going to have to see how the year plays out. We will acknowledge that there are views there are higher losses to come. We'll have to see. We built that plan with a $9 billion loss estimate at 8.5% unemployment. Now, we added $1 billion to just make them plan for an even more conservative scenario, and we are going to have to see how things play out. Maybe unemployment goes above 9% for the average for the year. I think we are close to that, when you look at the $10 billion estimate.

271. The market, increasingly skeptical about GE's ability to pay out the full $0.31 per share quarterly dividend throughout 2009 did not believe Sherin's assessments, as GE's stock price slid $1.02 on this news, closing at $11.62 per share, down 8% from the prior day's close of 12.64.

272. The above statements regarding GE being in a "much safer, more secure place," cash and/or liquidity position, Capital's financial condition relative to its peers, GE Capital's being different from its peers, the status and advantages of GE's AAA credit rating, credit risks in the GE Capital portfolio, risk management, capitalization, loan loss reserves, earnings, and the ability to maintain the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181.

### 5.    FY 2008 Form 10-K Filed on February 18, 2009

273. On February 18, 2009, GE filed its form 10-K for FY 2008 with the SEC. The 10-K was signed by Defendants Sherin, and Immelt.

274. The form 10-K stated, with respect to GE Capital:

Capital Finance (37% and 39% of consolidated three-year revenues and total segment profit, respectively) is a strong, focused business with leading positions in several mid-market, corporate and consumer financing segments. <u>Our performance has been strong over the long-term, with solid risk management and underwriting through various credit cycles.</u> More

recently, we have been affected by economic changes, specifically the disruptions in capital markets, challenging credit market environment and rising unemployment.  Our earnings in 2008 and 2007 were $8.6 billion and $12.2 billion, respectively.  We expect the current challenging credit and economic environment to continue to affect our earnings in 2009.  Throughout 2008, we tightened underwriting standards, shifted teams from origination to collection and maintained a proactive risk management focus.  Our focus is to manage through the current challenging credit environment and reposition GE Capital as a diversely funded and smaller finance company.

275.   With respect to the dividend, the 10-K stated:

On February 6, 2009, our Board of Directors approved a regular quarterly dividend of $0.31 per share of common stock, which is payable April 27, 2009, to shareowners of record at close of business on February 23, 2009.  This payment will complete the dividend for the first half of 2009.

276.   In regard to the assessment of risks of loan losses and possible impairments, the

10-K stated:

We regularly review investment securities for impairment using both quantitative and qualitative criteria.  Quantitative criteria include the length of time and magnitude of the amount that each security is in an unrealized loss position and, for securities with fixed maturities, whether the issuer is in compliance with terms and covenants of the security.  Qualitative criteria include the financial health of and specific prospects for the issuer, as well as our intent and ability to hold the security to maturity or until forecasted recovery.  In addition, our evaluation at December 31, 2008, considered the continuing market deterioration that resulted in the lack of liquidity and the historic levels of price volatility and credit spreads.  With respect to corporate bonds, we placed greater emphasis on the credit quality of the issuers.  With respect to RMBS and CMBS, we placed greater emphasis on our expectations with respect to cash flows from the underlying collateral and, with respect to RMBS, we considered the availability of credit enhancements, principally monoline insurance.  . . . Our other-than-temporary impairment reviews involve our finance, risk and asset management functions as well as the portfolio management and research capabilities of our internal and third-party asset managers.  When an other-than-temporary impairment is recognized for a debt security, the charge has two components: (1) the loss of contractual cash flows due to the inability of the issuer (or the insurer, if applicable) to pay all amounts due; and (2) the effects of current market conditions, exclusive of credit losses, on the fair value of the security (principally liquidity discounts and interest rate effects).  If the expected loss due to credit remains unchanged for the remaining term of the debt instrument,

the latter portion of the impairment charge is subsequently accreted to earnings as interest income over the remaining term of the instrument. When a security is insured, a credit loss event is deemed to have occurred if the insurer is expected to be unable to cover its obligations under the related insurance contract. . . . <u>Our qualitative review attempts to identify issuers' securities that are "at-risk" of impairment, that is, with a possibility of other than temporary impairment recognition in the following 12 months</u>. . . . <u>Our objective is to maintain our Triple-A rating, but we do not anticipate any major operational impacts should that change</u>. . . . **<u>Losses on financing receivables</u>** <u>are recognized when they are incurred, which requires us to make our best estimate of probable losses inherent in the portfolio</u>. Such estimate requires consideration of historical loss experience, adjusted for current conditions, and judgments about the probable effects of relevant observable data, including present economic conditions such as delinquency rates, financial health of specific customers and market sectors, collateral values, and the present and expected future levels of interest rates. Our risk management process includes standards and policies for reviewing major risk exposures and concentrations, and evaluates relevant data either for individual loans or financing leases, or on a portfolio basis, as appropriate. . . . **Real Estate.** We review our real estate investment portfolio for impairment routinely or when events or circumstances indicate that the related carrying amounts may not be recoverable. The cash flow estimates used for both estimating value and the recoverability analysis are inherently judgmental, and reflect current and projected lease profiles, available industry information about expected trends in rental, occupancy and capitalization rates and expected business plans, which include our estimated holding period for the asset. Our portfolio is diversified, both geographically and by asset type. However, the global real estate market is subject to periodic cycles that can cause significant fluctuations in market values. At December 31, 2008, the carrying value of our Capital Finance Real Estate investments exceeded the estimated value by about $4 billion. At December 31, 2007, the estimated value exceeded the carrying value by about $3 billion. This decline in the estimated value of the portfolio reflected sales of properties with a book value of $5.8 billion, resulting in pre-tax gains of $1.9 billion, and also reflected deterioration in current and expected real estate market liquidity and macroeconomic trends throughout the year, resulting in declining market occupancy rates and market rents as well as increases in our estimates of market capitalization rates based on historical data. Declines in estimated value of real estate below carrying value result in impairment losses when the aggregate undiscounted cash flow estimates used in the estimated value measurement are below carrying amount. As such, estimated losses in the portfolio will not necessarily result in recognized impairment losses. When we recognize an impairment, the impairment is measured based upon the fair value of the underlying asset which is based upon current market data, including current capitalization

rates. During 2008, Capital Finance Real Estate recognized pre-tax impairments of $0.3 billion in its real estate held for investment, as compared to $0.2 billion in 2007. Continued deterioration in economic conditions or prolonged market illiquidity may result in further impairments being recognized. Furthermore, significant judgment and uncertainty related to forecasted valuation trends, especially in illiquid markets, results in inherent imprecision in real estate value estimates.

We also elevate customers for further attention when we observe a decline in collateral values for asset-based loans. While collateral values are not always available, when we observe such a decline, we evaluate relevant markets to assess recovery alternatives – for example, for real estate loans, relevant markets are local; for aircraft loans, relevant markets are global. We provide allowances based on our evaluation of all available information, including expected future cash flows, fair value of collateral, net of disposal costs, and the secondary market value of the financing receivables. After providing for specific incurred losses, we then determine an allowance for losses that have been incurred in the balance of the portfolio but cannot yet be identified to a specific loan or lease. This estimate is based on historical and projected default rates and loss severity, and it is prepared by each respective line of business.

277. On this news, GE's stock price closed at $10.86 on February 18, 2009, up $0.05, or less than 1%, above the prior day's close of $10.81. Trading on this day was light, with over 95 million shares traded.

278. The above statements regarding GE Capital's performance, including GE Capital being a "strong, focused business," GE Capital's earnings and financial position, loan loss reserves and impairments, credit quality of GE Capital's borrowers, risk analysis and assessments, and maintaining the GE dividend through 2009 were false and misleading for the reasons set forth in ¶ 181.

### 6. February 27, 2009 Surprise Announcement of Decision to Cut the Dividend to $0.10 per share

279. On February 27, 2009, GE shocked the market by stating through a press release that it "today authorized a plan to reduce the Company's quarterly dividend to $0.10 from $0.31

per outstanding share of the Company's common stock, effective for the second half of 2009. This decision will preserve approximately $9 billion for the Company on an annualized basis."

280.     This stunning announcement came just one month after Immelt emphatically defended the Company's ability to both pay the dividend – at $.31 per share per quarter – and maintain its AAA rating.  Immelt assured investors that GE had more than sufficient cash on hand for the year to pay the dividend "without stretching."

281.     On this news, the Company's stock price fell from $9.10 on February 26, 2009 to $8.51 per share on February 27, 2009, a loss of $0.59 share, or 6.5%.  GE's stock price continued to plunge during the next trading day, falling from $8.51 per share on February 27, 2009 to $7.60 per share on March 2, 2009, a loss of $0.91 per share, or over 10.7%.  Trading on these two days was extremely high, with over 320.7 million shares traded on February 27, 2009 and 295.7 million shares traded on March 2, 2009.

282.     Analyst consensus was that the dividend cut did not eliminate uncertainty with regard to GE.  In fact, a Morgan Stanley research report issued on February 27, 2009 explicitly stated that "GE's reserve levels and eventual "mark to market" losses continue to be the greatest debate" concerning GE.

### 7.     Immelt's Letter to Shareholders

283.     Late on March 2, 2009, GE released its annual report along with a letter, dated February 6, 2009, to its shareholders signed by Defendant Immelt.  That letter acknowledged that GE's reputation was "tarnished because we weren't the 'safe and reliable' growth company that is our aspiration."  Immelt further stated that 2009 would be even more difficult and that "[w]e have prepared for a difficult economy in 2009. To that end, we have lowered costs, increased loss reserves, improved our cash position, and intensified our management processes."  Immelt

added, "We are prepared for a very rough economy and have been realistic about our loss estimates." Immelt further stated, "But, our top priority for capital allocation at the present time must be safety. To that end, we will continue to run the Company with the disciplines of a "Triple A," including adequate capital, low leverage, solid earnings, and conservative funding."

284.     In the February 6, 2009 letter, Immelt admitted that financial services earnings from GE Capital would move from "below 50%" to "30% of our [total GE] earnings." Immelt admitted that there was too much exposure to commercial real estate and UK mortgages. Still, Immelt reassured investors that GE continued "to have a set of strong businesses" and that GE remained convinced that it had "an effective financial services business model."

285.     On March 2, 2009, the day GE's Annual Report was released, GE's stock closed at $7.60 per share, a drop of $0.91 from the prior day's close. As news of the Annual Report and the Immelt letter filtered to the market on March 3, 2009, GE's stock price continued to fall, closing at $7.01 on March 3.

**8.     Defendant Sherin's Attempt to Stop the Bleeding on March 5, 2009**

286.     After GE's announcement that it was cutting its quarterly dividend from $0.31 per share to $0.10 per share, GE's stock price took a beating as markets reacted to this devastating announcement and began to question GE management's veracity with respect to the financial condition of GE capital. On February 26, 2009, the day before the dividend announcement, GE's stock closed at $9.10. As noted above, the Company's announcement on February 27, 2009 caused GE's stock price to fall to $8.51, a drop of nearly 6.5% on that day. In the following trading days, the stock was battered on this news and related concerns, falling nearly 10.7% on March 2, 2009, 7.8% on March 3, 2009 (also in the wake of the Immelt letter), and an additional 4.6% on March 4, 2009. In the first three days of the first week in March 2009, GE's stock lost nearly 26.5% of its value.

287.     In the hopes of turning the tide against the market's negative reaction during this devastating week, GE sought to make another attempt to reassure investors as to GE Capital's soundness and the Company's overall financial health. To deliver this message, the Company sent Defendant Sherin to appear on CNBC's "Squawk Box" television program before the market opened on March 5, 2009. During his appearance on "Squawk Box," Sherin dismissed speculation that GE Capital or GE had cash flow or liquidity problems, stating "[w]e do not have a time bomb in GE Capital." During the interview, Sherin also admitted that the fair value of 98% of GE Capital's assets was completely unknown to investors.

288.     Following Sherin's CNBC appearance, the Company issued a press release on March 5, 2008. In that release, GE attempted to further reassure investors, stating that GE Capital "expects to be profitable in the first quarter of 2009 and for the full year … [o]ver a three-year period here, we expect GE Capital to be profitable, even after $35 billion of losses and impairments."

289.     On this news, GE's stock price slid lower, closing at $6.66 on March 5, 2009, down $.03 from the prior day's close, hitting an intra-day low of $6.53. At this closing price, GE's stock was $2.44, or nearly 27% below its closing price of $9.10 on February 26, 2009, the day before the dividend cut.

290.     Analysts acknowledged that investor fears over potential losses to GE Capital's portfolio were weighing heavily on GE's stock price. For example, a March 6, 2009 Bernstein research report stated "[p]robably the biggest controversy surrounding GE right now is what the fair value of [GE Capital's] $661 billion in assets is if/when a write-down to fair value should occur."

291.     Despite GE's repeated rosy assessments to the contrary, the concerns of analysts and investors with respect to losses at GE Capital would ultimately prove to be well-founded.

292.     The Company did not disclose, however, that the likely causes of this downgrade included the fact that GE Capital would be incapable of earning $5 billion in FY 2009. As UBS Investment Research had noted in January 2009, both Moody's and S&P specifically cited GE Capital's earnings guidance of $5 billion as being crucial to GE maintaining its AAA rating.

### 9.     March 12, 2009 S&P Downgrade

293.     On March 12, 2009, GE filed a Form 8-K with the SEC and issued a press release regarding a downgrade of GE's long-term debt from AAA to AA+ by the Standard & Poor's (S&P) rating agency. The Company's press release stated that, "GE does not anticipate any significant operational or funding impacts from this change. The Company has taken steps to strengthen its balance sheet and liquidity position, including building $48 billion in cash, raising over 90% of its 2009 long-term debt needs . . . [and reducing its commercial paper]." Defendant Immelt is quoted in the release as saying, "[w]hile no one likes a downgrade, this review and rating reaffirm the relative strength of the Company." The press release further stated that GE would provide a detailed update regarding GE Capital at an investor meeting on March 19, 2009.

### 10.     The Truth is Revealed – GE Capital is in Dire Straits

294.     On March 19, 2009, GE held a six-hour long investor meeting specifically to discuss the financial condition at GE Capital. In connection with that meeting, the Company circulated a 176 page PowerPoint presentation detailing topics including the Company's financial position, projections, and the results of different "stress test" scenarios on GE Capital. The investor meeting and presentation document revealed a number of disturbing truths about GE Capital that had previously not been disclosed to investors.

295.     During the March 19, 2009 investor meeting, GE revealed, among other things, that it was cutting the 2009 profit estimate for GE Capital by more than half from its December 2008 estimate of $5 billion, to approximately $2.0-$2.5 billion.  In addition, the Company admitted that it needed to increase loss reserves for several asset categories.

296.     With respect to the profit estimate, the Company presented alternative scenarios based on different projections from its "2009 Outlook" of approximately $5 billion, the current estimate based on Federal Reserve "base" economic projections of approximately $2.0-$2.5 billion, and an "adverse" Federal Reserve scenario in which GE Capital would roughly break even in 2009.  The fact that due to the inherent risk in GE Capital's loan portfolio there was a reasonable risk GE Capital could earn <u>no profit</u> in 2009 had not been previously disclosed.

297.     The investor meeting revealed several troubling details about GE Capital and its lending practices that had not been previously disclosed to GE investors and the market – notably, that GE Capital's portfolio was subject to considerable risk of substantial losses due to the poor quality of many GE Capital borrowers in both its consumer and commercial lines of business.  As noted otherwise herein, this information was crucial to investors at the time of the Class Period.

298.     Among the disclosures in the March 19, 2009 investor meeting, the Company admitted that it would face increasing pressure on its earnings from non-earning assets, and that the source of this pressure was the result of pervasive problems with GE Capital's deeply distressed portfolio.

299.     With respect to its consumer portfolio, the Company disclosed that approximately 42% of GE Capital's $183 billion in total consumer loans were made to non-prime borrowers.  Specifically, within GE Capital's consumer loan portfolio, the Company disclosed that:

(a)    74% of the Company's $22 billion in U.K. mortgages – the largest proportion of GE Capital's mortgage portfolio – were made to sub-prime borrowers. 56% of these loans were booked during 2006 and 2007;

(b)    Nearly half, or 46%, of the Company's private label credit card business, which the Company stated represents approximately 14% of GE Capital's $25.62 billion in total consumer lending, involves obligations of non-prime bowers, based on their FICO scores;

(c)    39% of GE Capital's $21.5 billion sales financing portfolio was to non-prime, non-investment grade or "junk" status borrowers; and

(d)    37% of GE Capital's $22 billion global banking portfolio involves loans to non-prime, non-investment grade or "junk" status borrowers.

300.    This low quality of a substantial portion of GE Capital's consumer loans is material information that would be of paramount importance to an investor, particularly during the Class Period; yet the Company failed to disclose this information.

301.    With respect to GE Capital's $230 billion commercial lending and leasing portfolio – the largest component of GE Capital's asset base, the Company disclosed during the March 19, 2009 investor meeting that:

(a)    81% of the $55 billion in GE Capital equipment loans in the Americas were made to borrowers with non-investment grade, or "junk" credit ratings. 40% of all of GE Capital's equipment loans were made to borrowers rated B+ or lower;

(b)    93% of the $38 billion in GE Capital's leveraged loans were made to borrowers with non-investment grade, or "junk" credit ratings. 76% leveraged loans were made to borrowers that were rated below B+, and 28% of these loans were made to borrowers with credit ratings below B-;

(c)    95% of GE Capital's $13 billion franchise finance portfolio involves loans made to non-investment grade or "junk" status borrowers, and 37% of borrowers were rated B+ or below;

.

(d)    85% of GE Capital's $13 billion global aircraft portfolio (lending in connection with corporate jets) involves credit extended to

customers with "junk" credit ratings. A shocking 72% of these customers have credit ratings below BB-;

(e) 89% of GE Capital's $18 billion in equipment loans in the European Union were made to borrowers with non- investment grade, or "junk" credit ratings. 38% of all of these loans were made to borrowers rated B+ and below;

(f) 81% of GE Capital's $20 billion in equipment loans made in the Asia Pacific region were made to borrowers with non-investment grade, or "junk" credit ratings. 22% of all of these loans were made to borrowers rated B+ and below; and

(g) 95% of GE Capital's $10 billion in asset-based lending in the United States was made to borrowers with non-investment grade, or "junk" credit ratings. 86% of these loans were made to borrowers that were rated B+ and below, and 42% of these loans were made to borrowers with credit ratings of B- or below.

302. Further, approximately 30% of the $20 billion in U.S. corporate debt held by GE Capital was non-investment grade, or "junk" status debt, $1.1 billion of which was to Fannie Mae, Freddie Mac and Wells Fargo.

303. The GE Capital consumer and commercial loans that were the subject of the March 19, 2009 investor meeting had been in the portfolio for a substantial period of time. As acknowledged by both GE defendants and the Confidential Witnesses interviewed by Lead Plaintiff's counsel, Defendants continually reviewed and assessed the credit quality and make-up of the portfolio, and each of the Exchange Act Defendants had access to all information concerning the portfolio of assets at GE Capital. The poor credit quality of GE Capital's borrowers was therefore not a new fact – and this was a fact of material importance to investors given the stresses on the U.S. and global economy. Otherwise stated, GE Capital knew of these negative facts throughout the Class Period and failed to disclose them to investors until March 19, 2009.

304.    Similarly, GE Capital was aware of mounting and reasonably anticipated losses in its loan portfolios – portfolios that bore substantial, undisclosed risk – considerably before these losses and/or stresses were disclosed to investors on March 19, 2009.  This information was material to investors' consideration as to whether to invest in GE common stock.

305.    The quality of GE Capital's loans and the risk level of its loans attributable to the creditworthiness of GE Capital's borrowers were crucial to determining, among other things, the value of GE's balance sheet and the loss exposure facing GE for these loans.   As a result, GE Capital's financial statements throughout the Class Period materially overstated the value of GE Capital's assets.

306.    Throughout the Class Period, GE Capital had insufficient reserves to cover its known or reasonably ascertainable losses, and understated the impairments of distressed assets on the Company's books.  Among comparable financial institutions, the industry average for loan loss reserves is 2.36%.  GE Capital's reserves were, however, a mere 1.43% of its loans.  In fact, the actual reserves in 2008 for most of the sectors of its commercial lending and leasing portfolio, which, as described above, contain enormous and material portions of non-investment grade or "junk" status loans, were maintained at levels far less than that, with several under 1%:

    (a)    equipment leases in the Americas – .79%

    (b)    leveraged loans – .8%

    (c)    franchise financing – 1.73%

    (d)    European Union equipment leases – 1.24%

    (e)    Asia Pacific loans – 1%

    (f)    U.S. asset-based lending – .3%.

Those reserves were fundamentally insufficient in that they did not accurately reflect the known or reasonably ascertainable risk associated with GE Capital's lending practices in those lines of business, notably its lending to non-investment grade borrowers. As discussed otherwise herein, the failure to record appropriate reserves overstated the value of these assets on GE's balance sheet, and resulted in the inflation of GE's period income.

307. The import of these disclosures was acknowledged by market observers. In a March 20, 2009 article, the *Wall Street Journal* noted that the GE Capital investor meeting revealed that "[l]arge amounts of GE Capital's loans are to borrowers with junk, or sub-investment grade, ratings."

308. Following the Company's disclosures about the poor quality of GE Capital's portfolio, investors were alarmed and GE's stock price closed at $10.13 per share on March 19, 2009. This was a drop of $0.19, or 1.8%, from the prior day's close of $10.32. More tellingly, however, this was a drop of $0.88, or approximately 7.9% from the opening price of $11.20 on March 19, 2009, and a drop of $1.22, or nearly 10.1%, from the intra-day high of $11.35 on that day. As the market continued to digest the news, GE's share price continued to fall the next day, closing at $9.54 per share on March 20, 2009, a drop of 5.8% from the prior day's close.

C. **Defendants' Violations of GAAP**

309. As noted otherwise herein, during the Class Period, the Company, through its GE Capital subsidiary, faced enormous exposure to increasing losses on consumer loans, commercial loans, non-US mortgages, and other loans made by GE Capital and/or its subsidiaries, particularly loans made to sub-prime consumer and/or non-investment grade commercial borrowers. Accordingly, it was especially critical that Defendants ensured the accuracy of the Company's reported financial results and other corporate financial information with respect to the accounting for GE Capital's financing receivables. Defendants failed to do so.

310.    In addition, as noted otherwise herein, Defendants' public statements demonstrate that during the Class Period, GE was pursuing two distinct and essentially mutually exclusive goals despite deteriorating economic conditions within the Company, in the U.S., and around the world: (1) maintaining GE's AAA credit rating; and (2) committing the company to paying the full amount of its approved quarterly dividend.  Faced with the challenge of achieving both of these goals, Defendants engaged in systematic violations of GAAP in an attempt to conceal the true scope of losses in the Company's GE Capital subsidiary, conceal the risk inherent in GE Capital's lending to low-credit-quality borrowers, overstate the Company's assets, and overstate the Company's period income throughout the Class Period.

311.    Under basic accounting principles, revenues are offset against expenses on the basis of their cause-and-effect relationship.  This essential concept is referred to by accounting professionals as the "matching principle."  Foundational GAAP accrual accounting further provides that income is reported as earned and expenses are reported as they are incurred.  *See*, *e.g.*, FASB Statement of Financial Accounting Concepts No. 6 (Elements of Financial Statements) at ¶¶ 134-152 ("FASB Statement of Concepts No. 6").[7]  Furthermore, GAAP requires companies to make estimates of the recoverability of revenues that are recorded but may not be received, and to set up accruals (or "reserves") to reflect reductions in those revenues.  *See id*. at ¶¶ 144-49 (describing matching of costs to revenues and the deduction from period revenues of any costs/expenses associated with that transaction or event).

312.    While in a certain sense, a reserve may be thought of as a reflection of an expected loss, GAAP accrual accounting for this "expectation" requires the loss to be recorded

---

[7] Accrual accounting differs from "cash" accounting in that accrual accounting is intended to reflect the reality that various transactions and events have on an entity's financial position *at the time they have a substantive financial effect on the entity*, rather than in the period in which there is a change in the entity's cash position.  *See, e.g.,* FASB Statement of Concepts No. 6 at ¶ 139.

against revenues in the period in which that loss becomes ascertainable. It is at that point that the loss is deemed to be incurred by the entity and should be reflected on the balance sheet – not at some later point when an entity's cash flows may be affected. Therefore, a reserve or allowance for loan losses is a present-tense statement as to the financial condition of a company and must reflect – on the current period financial statements. The accuracy of a company's financial statements, including the expectation that those financial statements reflect the true economic position of the company in terms of loan losses, is of central concern to investors.

313. As described otherwise herein, GE's books and records did not accurately reflect the known or reasonably anticipated loan losses inherent in GE Capital's loan portfolio throughout the Class Period, particularly in light of the risks of default in GE Capital's consumer and commercial loan portfolios given the poor credit quality of GE Capital's borrowers and the overall decline in the U.S. and global economic environment.

314. Otherwise stated, GE's books and records during the Class Period did not accurately account for the risk inherent in the GE Capital loan portfolio as of the relevant balance sheet dates. To the extent that GE's financial statements during the Class Period would have accurately reflected the risk inherent in the GE Capital Loan portfolio in terms of properly calculated loan loss reserves and other accounting for transactions at GE Capital, GE stood to lose money in each relevant period in terms of having revenues that were lower than those that the Company reported during the Class Period. As such, Defendants violated GAAP.

315. Lastly, despite their public statements to the contrary, throughout the Class Period, the Company suffered from a pervasive weakness in its internal controls and repeatedly and systematically violated GAAP.

### 1. GAAP Violations With Respect to Accounting for GE Capital Financing Receivables

316.     The SEC has the statutory authority for promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB") and the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

317.     GAAP "recognize[s] the importance of reporting transactions and events in accordance with their substance." AU § 411.06. GAAP should be applied consistently. AU § 420.01 ("The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.").

318.     If GE were consistent in applying GAAP principles to the accounting for GE Capital's loan portfolio, then one would expect to see proportionally rising allowances for loan losses as the risk of defaults or losses in the loan portfolio increased, taking account factors such as the credit quality of the borrowers and macro-level considerations as the domestic and international economy deteriorated throughout 2008. As described herein, however, GE was neither accurate nor consistent in its application of GAAP accounting for loan losses at GE Capital during the Class Period.

319.     SEC Rule 13a-13 requires issuers to file quarterly reports. SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

320.     The SEC has stated, in Securities Act Release No. 6349 (September 8, 1981),

that:

> ... it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

321.     In addition, as noted by the SEC in Accounting Series Release 173:

> it is important that the <u>overall impression</u> created by the financial statements <u>be consistent with the business realities</u> of the company's financial position and operations.

322.     As alleged herein, the Company failed to properly account for material increases in credit risks and known or reasonably ascertainable losses during the Class Period that were associated with the declining value of "financing receivables" assets in GE Capital's portfolio. These financing receivables were presented in summary form in the Company's financial statements in terms of their full historical values, despite the fact that there were numerous indicia suggesting that those values were no longer appropriate given the deterioration of the credit quality of GE Capital's commercial borrowers, rising default rates in non-U.S. mortgages, and the general historic deterioration of general economic conditions in the U.S. and around the world. As a consequence, the Company overstated the value of GE Capital's financing receivables, inflated its period income, and otherwise attempted to create the illusion that the Company was in a strong enough financial position to pay its fully authorized dividend.

323.     During the Class Period, GE Capital financing receivables represented GE's largest category of assets and were one of the Company's primary sources of revenues. Accordingly, the Company's disclosures with respect to these financing receivables were a matter of crucial interest to investors.

324.     The Company did not adequately reserve for known or reasonably anticipated loan losses that were associated with the decline in the value of GE Capital's financing receivables despite Defendants' awareness of mounting uncertainty about the recoverability of certain GE Capital financing receivables given the poor credit quality of substantial portions of GE Capital's borrowers – as well as the historic deterioration of the U.S. and global economy that was well-known before the start of the Class Period.  As such, the Company maintained a recklessly rosy outlook in the face of considerable evidence suggesting that all was not well at GE Capital, and did so for the purpose of artificially inflating GE's reported earnings and deceiving investors with respect to the overall financial health of the Company, including the Company's ability to pay the full amount of its authorized dividend.

325.     The Company further overstated its earnings during the Class Period by failing to provide for an allowance for loan losses that matched the full amount of GE Capital's reported "nonearning" financing receivables.

326.     The Company defined financing receivables in "delinquency" as being "those that are 30 days or more past due" and "nonearning" financing receivables as "those that are 90 days or more past due (*or for which collection has otherwise become doubtful*)."  The Company did not provide guidance as to what criteria were used to determine when the collection of a receivable would become "otherwise . . . doubtful" nor did it provide any detail with respect to either the nature or patterns of aging for delinquent receivables and/or whether certain receivables were deemed "nonearning" before the 90 day period.  Furthermore, as described by Confidential Witness 7, certain commercial financing receivables in GE Capital's Commercial Finance division were due and payable on either a quarterly or annual basis.  Delinquencies and/or other information relating to future prospects for repayment in such accounts may

therefore not be accurately reflected in a traditional month-to-month delinquency analysis such as the one provided by the Company. As such, the true timing, status, and nature of GE Capital's receivables in delinquency and/or otherwise doubtful recovery were presented in an unnecessarily opaque and fundamentally misleading manner.

327. With respect to the percentage of receivables in delinquency, the Company reported delinquencies separately for Commercial and Consumer (or GE Money) lines of business. Historically, the percentages of delinquencies in each line of business tended to be relatively stable, with minor fluctuation (both up and down) from period to period. For periods prior to the Class Period, delinquencies were reported as follows:

|  | **Commercial Finance** | **GE Money/Consumer** |
| --- | --- | --- |
| YE 2005 | 1.31% | 5.08% |
| Q1 FY 2006 | 1.31% | 5.14% |
| Q2 FY 2006 | 1.29% | 5.22% |
| Q3 FY 2006 | 1.33% | 5.14% |
| YE 2006 | 1.22% | 5.05% |
| Q1 FY 2007 | 1.26% | 5.48% |
| Q2 FY 2007 | 1.28% | 5.36% |
| Q3 FY 2007 | 1.35% | 5.24% |
| YE 2007 | 1.21% | 5.22% |
| Q1 FY 2008 | 1.36% | 5.64% |
| Q2 FY 2008 | 1.48% | 5.92% |

328. During the quarters relevant to the Class Period, Commercial Finance and GE Money/Consumer delinquencies rose as follows:

|  | **Commercial Finance** | **GE Money/Consumer** |
|---|---|---|
| Q3 FY 2008 | 1.61% | 6.17% |
| YE 2008 | 2.17% | 7.47% |
| Q1 FY 2009 | 2.84% | 8.2% |

329.    As shown by the above tables, during quarters relevant to the Class Period delinquencies on GE Capital loans consistently and rapidly increased.  For Commercial Finance lending, delinquencies increased by nearly 9% between the second and third quarters of FY 2008, reaching 1.61% in Q3 2008 - a percentage that was over 19% higher than the prior year quarter, and nearly 23% higher than the average Commercial Finance delinquency rate from YE 2005 through Q2 2008.  By the end of FY 2008, Commercial Finance delinquencies shot up nearly 35% beyond their Q3 2008 level – representing an increase of over 79% over the prior year quarter, and were nearly 66% higher than the average Commercial Finance delinquency rate from YE 2005 through Q2 2008.  By the end of Q1 2009, Commercial Finance delinquency rates had jumped to a level of 2.84%, nearly 31% higher than at YE 2008 – more than double (a staggering 109%) the delinquency rate of the prior year quarter, and 117% higher than the average Commercial Finance delinquency rate from YE 2005 through Q2 2008.

330.    For GE Money/Consumer loans, the delinquency picture was similarly dramatic in its unraveling.  While GE Money/Consumer delinquencies increased by 4% between Q2 2008 and Q3 2008, the delinquency rate at Q3 2008 nonetheless represented an increase of approximately 18% above the rate from the prior year quarter, and more than 16% higher than the average GE Money/Consumer delinquency rate from YE 2005 through Q2 2008.  GE Money/Consumer delinquencies increased by over 21% between Q3 2008 and Year End 2008 – an increase of over 27% over prior year quarter and more than 40% higher than the average GE

Money/Consumer delinquency rate from YE 2005 through Q2 2008. By the end of Q1 2009, GE Money/Consumer delinquency rates increased to 8.2%, approximately 9.8% higher than at YE 2008 – more than 45% higher than prior year quarter, and more than 54% higher than the average GE Money/Consumer delinquency rate from YE 2005 through Q2 2008.

331. As financing receivables delinquencies age, a certain proportion of delinquent accounts would continue to remain delinquent to the point of their being written off or otherwise moved into the category of "nonearning" receivables. While it is likely that some portion of delinquent accounts would resume payments and cease to be "delinquent" as borrowers returned to paying their obligations, either under the original terms of their loan agreements or under alternative workout plans entered into with the lender, rising delinquencies typically signal upcoming losses in loan portfolios.

332. To the extent that there are successive periods of elevated delinquencies (particularly in a period of broad economic distress), one would expect to see a company's books and records reflect two changes to account for the likely growth of nonearning receivables. First, a company would increase its loan loss reserves or allowance for loan losses to reflect and prepare for the increased risk. Second, later periods would show increases in nonearning receivables that are roughly in proportion to amounts of delinquencies reported in the prior period. This was not, however, the case at GE, where the allowance for loan losses failed to keep up with the amount of rapidly rising nonearning receivables on the Company's books.

333. Historically, GE Capital's nonearning receivables – particularly when viewed as a percentage of all of GE Capital's financing receivables – were relatively consistent in periods prior to the Class Period. Between YE 2005 and Q1 FY 2008, nonearning receivables accounted

for, on average, $5.1 billion and made up, on average, approximately 1.45% of GE Capital's total financing receivables. The following table illustrates this pattern.

| | **Nonearning Receivables** | **Nonearning Receivables as % of Total Financing Receivables** |
|---|---|---|
| YE 2005 | $4.2 billion | 1.44% |
| Q1 FY 2006 | $4.2 billion | 1.44% |
| Q2 FY 2006 | $4.5 billion | 1.46% |
| Q3 FY 2006 | $4.7 billion | 1.49% |
| YE 2006 | $5 billion | 1.48% |
| Q1 FY 2007 | $5 billion | 1.47% |
| Q2 FY 2007 | $5 billion | 1.41% |
| Q3 FY 2007 | $5 billion | 1.37% |
| YE 2007 | $5.5 billion | 1.40% |
| Q1 FY 2008 | $6.2 billion | 1.50% |
| Q2 FY 2008 | $6.5 billion | 1.50% |

334. Starting in Q3 of FY 2008, however, the amount of nonearning receivables – and the proportion of nonearning receivables compared to GE Capital's total financing receivables – began to increase at a steady and dramatic rate. The following table illustrates this rapid growth.

| | **Nonearning Receivables** | **Nonearning Receivables as % of Total Financing Receivables** |
|---|---|---|
| Q3 2008 | $7.60 billion | 1.80% |
| YE 2008 | $8.00 billion | 2.10% |
| Q1 2009 | $10.049 billion | 2.80% |
| Q2 2009 | $13.103 billion | 3.58% |

335.    The percentage increases in nonearning receivables and the proportion of nonearning receivables were striking.  At Q3 FY 2008, nonearning receivables stood at $7.6 billion, an increase of $1.1 billion (nearly 17%) from Q2 FY 2008, or 52% over prior year quarter and 49% greater than the average amount of nonearning receivables between YE 2005 and Q2 2008.  The percentage of nonearning receivables as a percentage of total financing receivables increased by 20% between Q2 and Q3 2008 and was more than 31% greater than at the prior year quarter and 24% higher than the average percentage from YE 2005 through Q2 2008.  At YE 2008, nonearning receivables had increased by a more modest 5.3%, but given a sharp, nearly $49 billion decline in the overall value of GE Capital's financing receivables, the proportion of nonearning receivables had increased by nearly 17% from their Q3 percentage, and was 50% greater than at prior year quarter.

336.    At Q1 2009, nonearning receivables had spiked to over $10 billion, representing 2.8% of all of GE Capital's financing receivables.  To put those numbers in perspective, the Q1 2009 level was more than $2 billion or 25% greater than at YE 2008, $3.849 billion or 62% greater than at prior year quarter, and nearly *double* the average amount of nonearning receivables from YE 2005 through Q2 2008.  The proportion of nonearning assets in Q1 2009 was a third higher than at YE 2008, a staggering 87% greater than at prior year quarter, and 93% greater than the average proportion from YE 2005 through Q2 2008.

337.    Further, despite a nearly $6 billion uptick in the amount of total financing receivables on GE's books at Q2 2009, nonearning receivables continued to balloon, reaching a post-Class Period high of over $13 billion in Q2 2009.  The percentage of nonearning receivables reached 3.58% of all GE Capital's financing receivables a further 28% higher than the already astronomical levels from Q1 2009.

338.     The growth in nonearning receivables experienced both during and after the Class Period was steeper, more consistent, and more pronounced than in prior periods, even the leap in Q1 2008 when the Company's nonearning receivables first crossed the $6 billion mark, at which time nonearning receivables increased 12.7% and the proportion of nonearning receivables grew approximately 7% in terms of all financing receivables.[8]  The subsequent movement from Q1 2008 to Q2 2008 was insignificantly small, with a less than 5% increase in nonearning receivables, and no change in the proportion of nonearning receivables compared to total financing receivables.[9]

339.     Despite the run-up in nonearning receivables and delinquencies, the Company failed to appropriately account for rising amounts of nonearning receivables by increasing its Allowance for Loan Losses during the Class Period to levels that matched the nonearning receivables.

340.     Prior to the Class Period, GE's allowance for loan losses was relatively stable and averaged $4.436 billion from YE 2005 through Q2 FY 2008.  As the size of GE Capital's total financing receivables grew over time, however, the percentage that the allowance for loan losses represented in terms of the Company's total financing receivables shrank, from 1.574% at YE 2005 to a mere 0.98% in Q2 FY 2008.  This pattern is reflected in the table below.

---

[8] Growth in these categories was somewhat surprising, however, given that delinquencies in the prior quarter had decreased.

[9] The lack of growth in non-earning receivables in this quarter was similarly unexpected given that delinquencies increased in the prior period by 12.3% and 5% in Commercial Finance and GE Money/Consumer, respectively.

| Period | Total Financing Receivables | Allowance for Loan Losses | ALL as % of Total Financing Receivables |
|---|---|---|---|
| YE 2005 | $292.2 billion | $4.6 billion | 1.574% |
| Q1 2006 | $291.3 billion | $4.5 billion | 1.545% |
| Q2 2006 | $308.5 billion | $4.6 billion | 1.491% |
| Q3 2006 | $314.8 billion | $4.5 billion | 1.429% |
| YE 2006 | $338.9 billion | $4.7 billion | 1.387% |
| Q1 2007 | $340 billion | $4.6 billion | 1.353% |
| Q2 2007 | $354.6 billion | $4.5 billion | 1.269% |
| Q3 2007 | $365.6 billion | $4.0 billion | 1.094% |
| YE 2007 | $388.3 billion | $4.2 billion | 1.082% |
| Q1 2008 | $422.4 billion | $4.4 billion | 1.042% |
| Q2 2008 | $428.4 billion | $4.2 billion | 0.980% |

341.     During the Class Period, while the Exchange Act Defendants knew of increasing

delinquencies in its GE Capital Commercial Finance and GE Money/Consumer loan portfolios,

increasing volumes and percentages of nonearning assets among GE Capital's financing

receivables, the declining credit quality of GE Capital's commercial borrowers, increasing

defaults in the non-U.S. mortgage portfolio, and the distressed economic situation in the U.S. and

around the world, there was a modest uptick in the absolute dollar value of the allowance for

loan losses.  As a proportion of GE Capital's total financing receivables, however, the allowance

for loan losses remained at historically low levels, as the below table illustrates.

| Period | Financing Receivables | Allowance for Loan Losses | ALL as % of Total Financing Receivables |
|---|---|---|---|
| Q3 2008 | $426.4 billion | $4.6 billion | 1.079% |
| YE 2008 | $377.78 billion | $5.3 billion | 1.403% |
| Q1 2009 | $360.75 billion | $5.7 billion | 1.580% |
| Q2 2009 | $366.085 billion | $6.607 billion | 1.805% |

342.     The above data, when examined in connection with the known and reasonably anticipated losses among GE Capital's financing receivables, demonstrates that the Company continued to under-reserve for its known or reasonably anticipated loan losses, overstating the value of GE Capital's financing receivables and the Company's period income, and misleading investors with respect to the overall financial health of the Company and its GE Capital subsidiary. These shortfalls are shown in the following table, where the column on the right represents the amount by which GE overstated its earnings. The shortfall calculations assume no other losses for the remainder of the portfolio.

| Period | Allowance for Loan Losses | Nonearning Receivables | Shortfall in Allowance to Cover Non-Earning Receivables |
|---|---|---|---|
| Q3 2008 | $4.6 billion | $7.60 billion | $3 billion |
| YE 2008 | $5.3 billion | $8.00 billion | $2.7 billion |
| Q1 2009 | $5.7 billion | $10.049 billion | $4.39 billion |
| Q2 2009 | $6.607 billion | $13.103 billion | $6.496 billion |

343.     The Company's inappropriate and misleading accounting caused the Company's financial statements to be false and misleading insofar as investors were not given an accurate

impression of the Company's financial position, thus preventing investors from being able to understand and evaluate the true condition of the Company and its GE Capital subsidiary.

344. The Company's presentation of GE Capital's financial condition during the Class Period was false and misleading insofar as the financial statements were not reflective of the business realities facing the Company given that the Company failed to: adequately reserve for expected loan losses at GE Capital; disclose the criteria by which the Company was designating "nonearning" receivables, and furthermore failed to take into account the possibility that certain loans that were less than 90 days delinquent could also be "nonearning" based on known and/or reasonably observable criteria; take necessary impairment charges in connection with assets that the Company knew to be impaired.

345. By concealing GE Capital's – and by extension the Company's – true risk profile, failing to record appropriate loan loss reserves, and failing to properly account for acknowledged loan losses, GE overstated its financial results, including its net income, earnings, and assets, while at the same time artificially deflating its expenses and provisions for loan losses. The Company therefore violated GAAP, thereby resulting in the misstatement of its financial results.

346. The Exchange Act Defendants' representations that the Company's financial statements were prepared in accordance with GAAP were, therefore, materially untrue and misleading. Each of these misrepresentations standing alone was a material violation of GAAP, applicable SEC regulations and the Company's own accounting policies.

347. Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5") was issued in March 1975 by the FASB. The principles described in SFAS 5 set forth the standards of financial accounting and reporting for loss contingencies.

SFAS 5 sets forth the standards that the Company was required to adhere to in order to properly account for loss contingencies at GE Capital.

348. SFAS 5 provides in paragraph 8:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.     Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.     The amount of loss can be reasonably estimated.

349. Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan* ("SFAS 114"), was issued in May 1993 by the FASB and is the primary authoritative accounting guidance for recognizing loan loss impairment.  SFAS 114 amends SFAS 5 to clarify how a creditor should evaluate the collectability of both contractual interest and contractual principal of all receivables when assessing the need to write down the value of a loan or otherwise recognize when a loan has been impaired.  Under SFAS 114, if it is probable that some or all of the principal or interest on a loan will not be collected, the loan is considered impaired.  Losses on impaired loans should be recognized *immediately* per a dollar impact to earnings.

350. GE's accounting violated  SFAS 5 and SFAS 114 because, as indicated above, the Company failed to properly account for known or reasonably ascertainable probable loss contingencies at GE Capital throughout the Class Period and record reserves for those losses on their balance sheet in the periods in which those losses were first probable, and failure to properly recognize loan impairments and loan loss reserves in accordance with SFAS 114, SFAS 5, and as otherwise required under GAAP.  As noted herein, GE Capital purported to perform

extensive portfolio and loan repayment monitoring throughout the Class Period and, as such, would have been in possession of data that (when viewed separately or in the context of the overall economic situation in the U.S. and around the world) would have indicated that material amounts of GE Capital financing receivables were at risk for impairment throughout the Class Period. GE Capital or personnel at the GE "Corporate" level including the Exchange Act Defendants, however, deliberately ignored or recklessly disregarded the evidence that material amounts of GE Capital financing receivables were impaired and/or were increasingly likely to be non-recoverable by keeping its allowance for loan losses – including the percentage that that allowance represented as a proportion of total financing receivables – relatively flat until the very end of the Class Period, and consistently below industry-wide averages throughout the Class Period.

351.    Furthermore, the fact that the company failed to sufficiently increase its loan loss reserves and/or impairment charges in a stressed economic environment was particularly egregious given the previously undisclosed risks that GE Capital's loan portfolio was particularly at risk for losses given the poor, sub-prime, credit quality of nearly half of GE Capital's consumer borrowers and the non-investment grade or "junk" credit ratings of majorities of GE Capital's commercial borrowers.

352.    SFAS 114 amended prior guidance in SFAS 15 ("*Accounting by Debtors and Creditors for Troubled Debt Restructurings*") to address accounting for loans that are restructured in troubled debt restructurings involving a modification of terms – sometimes referred to as loan modification or a "work-out." Generally, the relevant GAAP guidance requires that if a restructured loan will provide lower future cash payments to the lender, a loss on the restructuring must be recognized, and normal earnings on the reduced principal sum will

be recognized until the loan is fully amortized. Therefore, even to the extent that the Company intended and/or attempted to "work out" delinquent or distressed loans or otherwise seek to recover the underlying collateral backing those loans in the context of GE Capital collateralized loans – notably commercial, aviation, and/or industrial equipment loans – including by taking advantage of GE Capital's "senior secured" status in event of the bankruptcy of a GE Capital borrower, the Company was nonetheless required to take impairment charges under SFAS 114. In such cases, an impairment charge is necessary given the reduced economic value of those loans when compared to their previously recorded full contractual values. As noted by the relatively low levels of impairment charges taken by GE Capital in the Class Period, the Company therefore failed to follow the requirements of SFAS 114.

353. The Company's knowing and/or reckless violations of SFAS 5 and SFAS 114 are particularly evident when viewed in light of the spike in these allowances at the end of the Class Period and in the quarters following the Class Period, when the Company could not conceal the precarious financial condition of GE Capital. As noted above, in Q2 2009, the Company reported over $13 billion in non-earning receivables, nearly double the amount that existed at the start of the Class Period in 2008, when the U.S. and global economies were in the midst of the worldwide recession, and approximately 250% higher than when the U.S. recession officially began in December 2007.

354. As a result of these GAAP violations, the Company repeatedly made materially false and misleading statements within its annual and quarterly financial statements. The Company's income statement line items for provision of losses were misstated due to the Company's improper accounting for the allowance for loan losses and impairments in violation of SFAS 5 and SFAS 114. Further, the Company's balance sheet accounts for loan losses were

misstated due to Defendants' improper accounting for the Company's Allowance in violation of SFAS 5 and SFAS 114.

355. SFAS 107 requires disclosures of certain information regarding "significant concentrations of credit risks arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties." As alleged herein, and in violation of GAAP, GE failed to make the required disclosures in its financial statements regarding the significant credit risks arising from the substantial portion of loans to subprime consumer borrowers and non-investment grade, "junk" status borrowers within GE Capital's commercial loan portfolios.

356. Staff Accounting Bulletin 102, Selected Loan Loss Allowance Methodology ("SAB 102"), is accounting guidance issued by the SEC on July 6, 2001 that expresses the SEC staff's position with respect to the development, documentation, and application of a systematic methodology (required by Financial Reporting Release 28, Accounting for Loan Losses by Registrants Engaged in Lending Activities) for determining allowances for loan and lease losses in accordance with GAAP. SAB 102 focuses on the kind of documentation that the SEC would typically expect registrants to maintain in support of their reported allowances for loan losses. GE was required to adhere to the specific guidance provided by the SEC. The Company did not, however, disclose its documentation of the calculation of its loan loss reserves pursuant to FRR 28 and SAB 102.

357. By presenting untrue and misleading financial results for the reasons outlined above, GE violated SFAS 5, SFAS 107, SFAS 114, and SAB 102 (including FRR 28), among other GAAP provisions.

## 2. GAAP Violations With Respect to the Reclassification of Assets

358.     Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities* ("SFAS 115") is GAAP guidance effective for fiscal years beginning after December 1993. SFAS 115 establishes standards for financial accounting and reporting for investments in equity securities that have readily determinable fair values and for all investments in debt securities. Under SFAS 115, these investments must be classified in one of three categories, *at the time of acquisition*, and accounted for as one of the following three categories: (1) debt securities that the enterprise has the positive intent and ability to hold to maturity are classified as held-to-maturity securities ("HTM") and reported at amortized cost; (2) debt and equity securities that are bought and held principally for the purpose of selling them in the near term are classified as "trading securities" and reported at fair value, with unrealized gains and losses included in earnings; and (3) debt and equity securities not classified as either HTM or trading securities are classified as available-for-sale securities ("AFS") and reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of shareholders' equity.

359.     SFAS 115 provides that the appropriateness of the particular classification assigned to an investment should be reassessed at each reporting date. Once a security is given a particular classification, however, it cannot be moved into a different category except under limited circumstances as for the specific reasons and/or changed circumstances as set forth in the rule. These reasons include:

> (a)     Evidence of a significant deterioration in the issuer's creditworthiness [with respect to a debt security held by the entity]
>
> (b)     A change in tax law that eliminates or reduces the tax-exempt status of interest on the debt security (but not a change in tax law that revises the marginal tax rates applicable to interest income)

(c)     A major business combination or major disposition (such as sale of a component of an entity) that necessitates the sale or transfer of held-to maturity securities to maintain the enterprise's existing interest rate risk position or credit risk policy

(d)     A change in statutory or regulatory requirements significantly modifying either what constitutes a permissible investment or the maximum level of investments in certain kinds of securities, thereby causing an enterprise to dispose of a held-to maturity security.

(e)     A significant increase by the regulator in the industry's capital requirements that causes the enterprise to downsize by selling held-to-maturity securities

(f)     A significant increase in the risk weights of debt securities used for regulatory risk-based capital purposes.

360.    SFAS 115 further states, with respect to the determination of impaired assets:

"For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary."

361.    As an entity may not engage in reclassifications of assets at will, it is therefore inappropriate under SFAS 115 to change a classification to conceal a loss in an investment portfolio, to avoid having to mark a particular asset to market, and/or to otherwise avoid recording a loss on that asset in the current period.   Furthermore, when an entity reclassifies an asset pursuant to SFAS 115, it must do so using the fair value of that asset as determined at the time of the reclassification.   An entity may not reclassify an asset using a value based on the amount paid for that asset and/or other historical values, and must take appropriate impairment charges when that asset has lost value.   As described herein, GE Capital failed to follow the requirements of SFAS 115 in connection with the reclassification of assets from AFS to long-term "investments" and/or HTM.

362.     As SFAS 115 does not apply to unsecuritized individual loans, the appropriate GAAP guidance with respect to such loans issued by GE Capital is Statement of Financial Accounting Standards 65, *Accounting for Certain Mortgage Banking Activities* ("SFAS 65"). Similar to the application of SFAS 115 discussed above, SFAS 65 provides that all loans shall be classified as either short-term "held for sale" or long-term "investment" assets.  Loans held for sale shall be reported at the lower of cost or fair value, as determined as of the balance sheet date.  Transfer of a loan from held for sale to investment status must be based on the entity's ability and intent to hold the asset for the foreseeable future or to maturity.  Cherry-picking of troubled loans to move into the investment category to avoid short-term losses is improper. Analogous to the guidance under SFAS 115, to the extent that a loan is transferred from one category to another, the loan must be marked-to-market and transferred at the lower of cost or fair value at the transfer date.

363.     As described by Confidential Witnesses 1 and 13 and as otherwise alleged herein, GE initially classified certain real estate investments and other assets as held for sale, and then, when faced with having to mark those assets to market and thereby record losses with respect to those investments, classified those assets as "investments" held for the long term.  In addition, as Confidential Witness 13 describes, GE also intended to reclassify those assets once again as AFS at some point in the future – to "hide [those] assets until the market turned around" – in the hopes that they could be re-sold when market conditions improved.  Accordingly, GE abused the flexibility inherent in SFAS 115 and SFAS 65 in a fashion that had tangible benefits to the Company in terms of concealing losses in its real estate and investment portfolios by moving certain assets of diminished value into the longer-term HTM category.  This practice suggests that this was an area in which GE was actively managing its earnings during the Class Period.

364.     Also, as alleged herein, GE failed to take appropriate measures to determine and record impairments in connection with assets GE Capital pursuant to SFAS 114. SFAS 65 also requires that, with respect to loans for which the recovery of the carrying amount of the loan is doubtful, the entity must write down that loan to its expected collectible amount. With respect to impaired real estate assets and other loans, GE Capital failed to record appropriate impairment charges associated with those assets, and concealed losses associated with those assets by reclassifying those assets as held on a long-term basis.

### 3.     Additional Fundamental GAAP Violations

365.     The Company's financial statements issued during the Class Period also violated the following fundamental GAAP, among others:

(a)     The matching principle and related foundational accrual accounting principles set forth in FASB Statement of Concepts No. 6, among others;

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to these resources, and the effects of transactions, events and circumstances that change resources and claims to these resources (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period; investors and creditors use information about the past to help in assessing the prospects of an enterprise; thus, although investment and credit decisions reflect investors expectations about the future enterprise performance, those expectations are commonly based, in substantial part, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of

enterprise resources entrusted to it; to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent; that information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2 ¶79);

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered; the best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97);

(i) The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of financial position (APB Opinion No. 22, ¶12);

(j) The principle that if no accrual is made for a loss contingency, then full disclosure of the contingency shall be made when there is a reasonable possibility that a loss or an additional loss may have been incurred (Statement of Financial Accounting Standards No. 5, ¶10);

(k) The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28, ¶22);

(l) The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial (APB Opinion No. 28, ¶22); and

(m)    The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28, ¶32).

366.    In addition, Regulation S-X (17 C.F.R. § 210), which "sets forth the form and content of and requirements for financial statements required to be filed [with the SEC]" applies to interim financial statements.  17 C.F.R. §§ 210.1-01(a).

367.    "The term 'financial statements' as used in [Regulation S-X] shall be deemed to include all notes to the statements and all related schedules."  17 C.F.R. § 210.1-01(b). Thus, "the interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim financial information presented not misleading." 17 C.F.R. § 210.01(a)(5).

368.    "[D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant. . . . Notwithstanding the [foregoing], where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."  17 C.F.R. § 210.10(a)(5).  "Any unaudited interim financial statements furnished shall reflect all adjustments which are, in the opinion of management, necessary to a fair statement of the results for the interim periods presented."  17 C.F.R. § 210.10(b)(8).

369.    As noted herein, GE's financial statements issued during the Class Period violated the principles and regulations set forth in this section.  For example, among other reasons, the Company's results:  (i) were not useful to present and potential investors in making rational investment decisions; (ii) were not reliable; and (iii) were not complete and did not rely on conservative accounting estimates.

### 4. Defendants' Lack of Capacity and Commitment to Strengthen The Company's Internal Controls Existed Throughout the Class Period

370. Pervasive violations of GAAP at GE as alleged herein are highly suggestive of a lack of appropriate internal controls at the Company throughout the Class Period.

371. Section 13(b)(2)(B) of the Exchange Act requires every issuer that has securities registered pursuant to the federal securities laws to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP. *See also* AICPA's Generally Accepted Auditing Standards definition of "Material Weakness" in internal controls:

> A material weakness is a condition that precludes the entity's internal control from providing reasonable assurance that material misstatements in the financial statements in the financial statements will be prevented or detected on a timely basis.

AT § 501.55.f

372. Furthermore, in an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, § 302 of the Sarbanes-Oxley Act of 2002, entitled "Corporate responsibility for financial reports," directs that the SEC shall promulgate regulations requiring that, in relevant part:

> for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 . . . the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that:

(1)     the signing officer has reviewed the report;

(2)     based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3)     based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4)     the signing officers—

   (A)     are responsible for establishing and maintaining internal controls;

   (B)     have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

   (C)     have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

   (D)     have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

(5)     the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)-

   (A)     all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls;  and

        (B)      any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

      (6)      the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

     373.    Likewise, § 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350, entitled

"Failure of corporate officers to certify financial reports", requires, in relevant part, that:

      (a)      Certification of periodic financial reports.– Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.

      (b)      Content.– The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

     374.    Pursuant to ¶ 404 of the Sarbanes-Oxley Act of 2002, on June 5, 2003, the SEC

issued a final rule and amended Item 307 of Regulations S-K and S-B.  *See In re Management's*

*Report on Internal Control Over Financial Reporting and Certification of Disclosure in*

*Exchange, S7-40-02,* 2003 WL 21294970, at *11 (S.E.C. Release No. 8238) (June 5, 2003).

Specifically, as part of a company's corporate governance obligations, management is required

"to include an internal control report of management that contains" the following in its annual

report:

(a)    A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

(b)    A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

(c)    Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective. The assessment must include disclosure of any 'material weaknesses' in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

(d)    A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

[footnotes omitted].

375.    The Public Company Accounting Oversight Board ("PCAOB") adopted the long-standing auditing provision that a company has a control deficiency "when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis." *See* Notice of Filing of Proposed Rule on Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed In Conjunction With an Audit of Financial Statements*, File No. PCAOB-2004-03 (Apr. 8, 2004).  Furthermore, the PCAOB believes that a "deficiency in operation exists when a properly designed control does not operate as designed, or when the

person performing the control does not possess the necessary authority or qualifications to perform the control effectively." *Id.*

376. In connection with GE's Forms 10-Q for Q3 2008 and Q4 2009 and form 10-K for FY 2008, on October 30, 2008, February 27, 2009, and May 1, 2009, Defendants Immelt and Sherin signed virtually identical SOX certifications attesting to the accuracy and reliability of the Company's reported financial results in Q3 2008, FY 2008, and Q1, 2009, respectively. These certifications provided that: the Company's "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company; and certified that Defendants Sherin and Immelt were responsible for establishing and maintaining disclosure controls for "financial statements, and other financial information included in this report" and that they:

> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting

Given that the Company's financial statements did not fairly present in all material respects the financial condition, results of operations and cash flows of GE for the reasons alleged herein, and given the pervasive violations of GAAP at GE and GE Capital as alleged herein, the SOX certifications signed by Defendants Immelt and Sherin were false and misleading.

> **D.** **Additional Scienter Allegations**
>
> **1.** **Confidential Sources Reveal That GE Capital's Distressed Condition Was Regularly Reported Throughout the Class Period**

377. Throughout the Class Period, GE management, including the Exchange Act Defendants, were regularly apprised of the mounting financial difficulties at GE Capital, including the status of increasing loan delinquencies and loans at risk of default, the poor credit quality of substantial portions of GE Capital's consumer and commercial borrowers, the dramatic curtailment of new lending activity at GE Capital, and the drying up of commercial paper markets. As described herein, GE Capital's practices included extensive monitoring and reporting within the Company with respect to its lending activity.

378. Lead Counsel's investigation has revealed that GE Capital was extensively monitored, with routing reports created regarding the status of its loans, including the tracking of delinquencies, defaults, and occasionally changes in borrowers business or credit status. These results were reported "up the chain" from GE Capital's operating units, up to GE Capital management, including Neal, Bornstein and Cary, and then up to GE "Corporate" for consideration by the Company's top executives, including Immelt and Sherin. This data was not only presented in the form of periodic reports and meetings, but was also stored in an electronic data repository that was accessible by GE Capital and GE Corporate.

379. The information in these reports and databases included data on loan delinquencies and defaults, loan production numbers (which were sharply declining prior to and

during the Class Period), and other information that showed that the financial health of GE Capital was in a poor and declining condition throughout the Class Period.

### 2. GE Capital Closely Monitored and Reported on the Status of Loans

380.     Lead Counsel's investigation reveals that GE Capital paid very close attention to the status of its loans throughout the Class Period.  As noted below, Confidential Witnesses describe systems and policies at GE Capital that were in place to track loan delinquencies and otherwise monitor GE Capital's borrowers.

381.     Confidential Witness 2 described receiving monthly reports on loan delinquencies and write-downs on loans within the Commercial Finance department.  Confidential Witness 2 understood that the monthly delinquency reports, which catalogued 30, 60, and 90 day delinquencies, were the result of GE Capital's policies and procedures with respect to the tracking of delinquent loans based on 30, 60, and 90 day delinquencies.  In addition to the monthly delinquency reports, Confidential Witness 2 stated that he understood that there were periodic "portfolio meetings" at GE Capital.  At the portfolio meetings – which Confidential Witness 2 understood to be a part of GE Capital's procedures for tracking its accounts – GE Capital personnel discussed loan delinquencies and whether to write down loans that were approaching 90 days delinquent or were otherwise not paid after 90 days.  According to Confidential Witness 2, it was GE's policy to write down loans that were 90 days delinquent, although loans could be written down in under 90 days if it was known that the loan was a loss. Confidential Witness 2 does not recall an instance in which a Commercial Finance loan was written down in less than 90 days period for any reason.

382.     With respect to monitoring loan losses for purposes of adjusting loan loss reserves, Confidential Witness 2 described a "risk organization" at GE Capital that regularly

conducts analyses and tracking of loan loss reserves of the portfolios and departments within GE Capital. Based on the risk organization's review, Confidential Witness 2 recalls that it was those risk management personnel that made assessments with respect to reserve levels.

383.    Confidential Witness 3 described "Portfolio Groups" at GE Capital that monitored and managed loan accounts. Each Portfolio Group, which consisted of an account manager, the Chief Risk Officer at GE Capital, and the head of the relevant portfolio, prepared a "Portfolio Quarterly Report" that addressed the status of loans in the portfolio, and made recommendations regarding asset write-downs for any nonperforming loans. According to Confidential Witness 3, the Portfolio Group would meet to discuss specific accounts and how those accounts were performing, and other aspects regarding the condition of those accounts.

384.    Likewise, Confidential Witness 15 also described quarterly loan portfolio reviews at GE Capital. According to Confidential Witness 15, a "committee" of senior GE managers in Risk Management and Asset Management from the Company's Norwalk, Connecticut Offices (including Jane Day, Head of Risk, Ron Pressman, Head of Real Estate, and Alex Burger, among other members) made decisions on all loan transactions.

385.    Confidential Witness 5 explained that, at times within the Class Period, the CDFG department would not write down a loan automatically when a borrower entered bankruptcy. . Confidential Witness 5 also stated that in August or September 2008, CDFG "saw the effects of a worsening economy" given loans in connection with consumer products like RVs and boats – things that were "dispensable items [that] were greatly effected by the economy." In those areas, "second- and third tier manufacturers slowed while first tier companies remained solid." Given that GE Capital was not typically lending to "first tier" companies, it was those "second- and third-tier borrowers [that] greatly affected GE Capital's performance."

386.     Confidential Witness 1 described how GE Capital would track the cash flows of

its loans to determine whether the loan was still performing, and stated that for the loans that it

held on a long term basis, GE Capital primarily looked at the cash flows.  Although Confidential

Witness 1 recalls that there were risk reviews for certain loan portfolios that considered credit

ratings and related information, as long as the current cash flows continued to "support[] the

deal," an asset would not be written down, regardless of other risk-related criteria concerning

that loan.  For example, as long as a loan was being paid, Confidential Witness 1 noted that it did

not matter to GE Capital if the value of the collateral underlying the loan had decreased.

387.     Confidential Witness 7 described a system of reporting during the Class Period

that was even more frequent and detailed.  Confidential Witness 7 recalls receiving <u>daily</u> detailed

e-mail reports, including Excel spreadsheets, from an "analytics" team within the Commercial

Finance group.  These reports, referred to among the analysts as "metrics," contained data on

"problem loans" in the relevant portfolios.  Confidential Witness 7 described these reports as

"basically anything that might be wrong with your portfolio."  The reports were sent to the

analysts, with a ":cc" to their supervisors, and the supervisors would, according to Confidential

Witness 7, frequently ask why loan payments were late and why problems with the loans had not

been resolved.

> **3.     Loans Were in Distress and Overvalued and Business Was
> "Drying Up" at GE Capital Before and During the Class
> Period**

388.     Lead Counsel's investigation also reveals that GE Capital's lending business was

in severe trouble before and during the Class Period.

389.     Confidential Witness 1 described how, "[o]ver the past three years, the market has

been so depressed that there are assets currently held by GE that are not worth what they once

were." Confidential Witness 1 attributes some of the decline in value of those assets, notably real estate assts, to the fact that there were no buyers for those assets, noting that it would be "tough to get an honest price [if GE Capital attempted to sell those assets, it would have to be at] fire sale prices." Moreover, Confidential Witness 15 stated that, as of the Fall of 2008, GE Capital's assets were not worth what they have been reported over the past several years, "anyone would say that."

390. Confidential Witness 1 described how, given the lack of a market for certain of those real estate assets, the Company would move certain of those real estate assets from being "available for sale" to being held longer-term as "investments" so as to avoid having to mark those assets to market (and therefore requiring the Company to record losses associated with those assets). This process of changing the classification of assets was confirmed by Confidential Witnesses 13 and 15.

391. Confidential Witness 15 stated that, beginning in mid-2007 and continuing into 2008, if a loan made in connection with an equity position held by GE could not be sold or refinanced, or if a borrower could not make payment, GE would "shift its equity position to long term on the balance sheet" and not take a write down to fair value, thus avoiding recording a loss. Confidential Witness 15 further stated that assets purchased by GE would also be shifted to long term if their values decreased. According to Confidential Witness 15, GE "would do everything it could" to avoid valuing assets at fair value because these assets were not worth what they were when the investment was made. This witness noted that GE only shifted troubled assets to held for long term. Confidential Witness 15 stated that the "committee" of senior GE managers in Risk Management and Asset Management from the Company's Norwalk, Connecticut Offices (including Jane Day, Head of Risk, Ron Pressman, Head of Real Estate, and

Alex Burger, among other members) made the decisions regarding moving equity investments to long term on the balance sheet. Confidential Witness 15 also reported that Defendant Immelt was specifically involved in the decision making with respect to larger transactions.

392.    Likewise, Confidential Witness 13 described how GE Capital did not write down bad real estate deals, but would "take the asset and shift it to an investment to hold" to avoid taking a write-down. Confidential Witness 13 stated that this practice was used so that the Company could "hide assets until the market turned around" by making "a switch on the balance sheet" – shifting deals to the long term in the hope that the value of those assets would eventually increase.

393.    Confidential Witness 9 described how, during Fiscal 2008, commercial lending at GE Capital "fell off a cliff" as deal volume had evaporated at GE Capital starting in early-to-mid 2008. According to Confidential Witness 9, following the Lehman Brothers collapse in September 2008, GE Capital found itself "hung" because it had no deals in the pipeline and that a general standstill in the commercial paper market meant that GE Capital could not support itself because it "was mostly funded by 30-day commercial paper."

394.    Confidential Witness 2 stated that loan defaults in Commercial Finance increased in 2008 and 2009. Likewise, Confidential Witness 14 described an increase in loan defaults at GE Capital during this time.

395.    Confidential Witness 7 reported being aware of a "big decline in business in early 2009" and that work became "very slow." Confidential Witness 7 stated, "[i]t got to the point that there were days when I had no work to do. Nobody was borrowing." Commercial Finance's business, which Confidential Witness 7 knew to be "very lucrative" for GE Capital, had declined. Confidential Witness 7 added, "[t]hey were putting a lot into commercial finance

in the last few years . . . they were overleveraged on debt." With little work to do, Confidential Witness 7 was laid off and "they [GE Capital] sent my loans to India."

396.     Confidential Witness 7 also provided details with respect to a loan made to one of GE Capital's Commercial Finance borrowers, an energy company called SemGroup. According to Confidential Witness 7, GE Capital made a $55 million loan to SemGroup on July 11, 2008, after due diligence was purportedly performed by GE Capital energy services underwriters. A mere ten days later, on July 21, 2008, SemGroup filed for bankruptcy. According to Confidential Witness 7, this type of event "happened to a lot of energy companies" that GE Capital lent to, noting that there had been another company in Confidential Witness 7's portfolio that "just stopped paying" on its loan "because it had no money."

397.     Confidential Witness 8 described how, until September 2008, the Energy Financial Services group was "hit[ting] all our targets" and had been experiencing "record profits." Starting in September 2008, however, Confidential Witness 8 explained that Energy Financial Services' lending activity "more or less halted." Confidential Witness 8 explained that, at that time, the thinking at GE Capital was, "[a]re we going to have funds to invest – and at what price?" Confidential Witness 12 confirmed that similarly in the GE Real Estate group, "transactions were at a halt and deals were not getting done" starting in September 2008.

398.     Confidential Witness 11 described how "our group's business collapsed" in March 2008 following the demise of Bear Stearns. The collapse was, according to Confidential Witness 11: "literally overnight we did not have new business. It was like a domino and things did not get better." Confidential Witness 11 described that the lack of business forced GE Capital to close the Media, Communications, and Entertainment division in June 2008.

399. Confidential Witness 6 described how, during the Class Period, commercial paper markets had become "frozen" in the period leading up to the Company's decision to cut its quarterly dividend payment.

### 4. GE Capital Rolled Financial and Other Business Information Up Within GE Capital and Up to the GE Corporate Level

400. Lead Plaintiff's investigation further reveals that there was a complex and thorough system of reporting the status – including problems – of GE Capital's loan portfolios "up the chain" both within GE Capital, and eventually to GE Corporate. As described by several Confidential Witnesses, it was at the GE Corporate level that crucial accounting and reporting decisions were made with respect to loan losses at GE Capital

401. Confidential Witness 1 described the process by which accounting data was rolled up from GE Capital to the GE Corporate level in several ways, including the use of an automated "Data Parking Lot" system. According to Confidential Witness 1, the Data Parking Lot provided a template by which GE departments would report their financial results to Corporate, including financial results and supporting schedules, information on bad debts, loan reserves, and write-downs. According to Confidential Witness 1, each department that had financial reporting responsibility at GE Capital used this system to pass its results to the corporate level for reporting and consolidation purposes. Confidential Witness 1 also described how "management at the Corporate level reviewed information that was provided on the [Data Parking Lot] templates" and that "if Corporate had questions, they would go back to the business units for explanations."

402. Confidential Witness 14 described quarterly reports including PowerPoint presentations that were prepared by Finance personnel at GE Capital and reported up to senior management at GE Corporate each quarter during the Class Period.

403.     The Portfolio Groups described by Confidential Witness 4 above would use the data compiled in their Portfolio Quarterly Reports and make recommendations to senior management at GE Capital regarding possible write-downs of loans, although adding that throughout this process, "GE was diligent in managing to avoid write-downs."

404.     According to Confidential Witness 4, underwriting results, loan impairments, and opinions about loan loss reserves were similarly reported "up the chain" through the relevant GE Capital business segment and then up to GE Corporate.  Confidential Witness 4 described how the structured and project finance group provided frequent reports "up the chain" to senior management at GE Capital, including loan status reports, loan delinquency reports (also called "credit reports"), and workout reports for "bad" (defaulted) loans.  Similarly, Confidential Witness 4 stated that each business unit at GE Capital calculated its own loss reserves that were also reported "up the chain" to either "the segment CCO or CRO," who then reported this information to the GE Capital corporate level.  According to Confidential Witness 4, "management would either accept the reserves reported [by the operating units] or adjust them."

405.     According to Confidential Witness 7, in other parts of GE Capital, in addition to the meetings with supervisors described above, there were weekly GE Capital analyst meetings with the analysts' supervisors and Itunumi Savage, an operational manager in Commercial Finance.  These meetings would concern updates on the status of the various portfolios.  Among the types of items reported at these meetings, Confidential Witness 7 recalled that a customer's failure to respond to a call from GE Capital inquiring about why a loan payment was three weeks late was among the topics that had been discussed.

406.     Confidential Witness 8 described reporting relationships within Energy Financial Services.  Confidential Witness 8 explained that, like each division within GE Capital, Energy

Financial Services had its own CEO (Alex Urquhart) as well as a CFO and Chief Risk Officer. Under these c-level officers were three "managing directors" who passed information up from various subordinate supervisors in the group. Confidential Witness 8 recalls meeting with CEO Urquhart and other top managers within the group at various meetings, including "all hands" meetings when "the rights and wrongs of each account, as well as compliance issues" were discussed. Confidential Witness 8 further stated that decisions on how business units would account for loans would be made by CEO Urquhart, although "big decisions went to the Board of GE."

407. In addition to the "up the chain" financial reporting described above, personnel from GE Corporate attended periodic meetings with GE Capital staff throughout the Class Period in connection with asset reviews and impairment analyses. Confidential Witness 1 described attending quarterly meetings (sometimes telephonically) with GE Capital and GE Corporate personnel during the Class Period and recalls that at these "big" meetings attended by people from the various GE Capital business units, risk management, asset management, and the Corporate controller's office. At those meetings, Confidential Witness 1 recalls discussions of specific assets and portfolios, and that the Corporate Controller listened to all sides before determining the accounting treatment that the Company would use in connection with those assets. Confidential Witness 1 recalls there being "long faces" among the participants at these meetings During the Class Period given that assets needed to be written down.

408. In connection with the "up the chain" reporting described herein, financial decisions might be made at the departmental level before being passed up to Corporate, but that Corporate had the final decision on such matters, as confirmed by Confidential Witnesses 1.

Confidential Witnesses 1 believed that decisions with respect to some asset write-downs went all the way to the CEO and CFO of the Company.

### 5. Defendants' Motivation to Hit EPS Estimates

409.    As noted herein, GE engaged in a pattern of earnings manipulation throughout the Class Period to overstate the Company's period income by inadequately reserving for known or reasonably ascertainable loan losses at GE Capital.  Defendants were, due to certain significant reputational and other pressures, motivated to ensure that GE consistently met or exceeded its stated earnings per share ("EPS") targets, or targets set by investment analysts.  With one minor exception, when the company managed to miss projected earnings by a penny after accounting for a preferred dividend, the Company either met or exceeded EPS expectations throughout the Class Period, despite declining performance at GE Capital as described herein.

410.    For Q3 2008, which ended on September 30, 2008, GE had projected that would earn between $0.43 and $0.48 per share, with a First Call consensus estimate of $0.45 per share based on 12 analysts' projections.  As noted herein, on October 10, 2008, GE announced its reported earnings for Q3 2008.  On that date, the Company announced earnings of $0.45 per share, at the center of the Company's projected range – and right on the consensus estimate.

411.    For Q4 2008, which ended on December 31, 2008, GE had projected that it would earn between $0.36 and $0.42 per share, with a First Call consensus estimate of $0.37 per share based on 10 analysts' projections.  As noted herein, on January 23, 2009, GE announced its reported earnings for Q3 2008.  On that date, the Company announced earnings of $0.37 per share (in the words of Defendant Sherin, "[w]e delivered the EPS we said. . . ."), excluding the effect of a preferred dividend that had the effect of adjusting EPS to $0.36 or share, within the Company's projections – and effectively right on the consensus estimate.

412.     On December 16, 2008, about two weeks prior to reporting its Q4 2008 earnings –

earnings that would be at the low end of the Company's estimated EPS range, and also (after

adjustment) a penny below consensus – the Company announced that it would no longer provide

quarterly earnings estimates.

413.     For Q1 2009, which ended on March 31, 2009, GE had a First Call consensus

estimate of $0.21 per share based on 13 analysts' projections.  On April 17, 2009, GE announced

its reported earnings for Q1 2009.  On that date, the Company announced earnings of $0.26 per

share, $0.05 *above* the consensus estimate.

414.     UBS Investment Research noted in a January 2009 research note that GE had an

excellent reason for inflating its earnings guidance with respect to earnings projected for GE

Capital – the Rating Agencies were requiring GE to earn $5 billion through GE Capital to

maintain the Company's AAA rating.  As UBS wrote: "[b]oth Moody's and Standard & Poor's

have specifically cited this [2009 earnings guidance of $5 billion] as one of the key criteria for

GE to retain its 'AAA' rating."  As discussed otherwise herein, maintaining the AAA credit

rating was crucial for GE: if its credit rating, or GE Capital's credit rating, was cut, it could

trigger various debt instruments, guarantees and covenants, which would require GE to post

additional capital or collateral.   This could force a potentially disastrous cascade of forced

liquidations.  Accordingly the EPS projections – as well as other statements the Company made

with respect to GE Capital earning $5 billion in FY 2009 – were of crucial importance to the

Company's maintaining its AAA credit ratings.

415.     Given the allegations of reserve manipulation to inflate GE's period earnings

described herein, as well as the fact that the Company had a recurring shortfall in the difference

between nonearning assets and the allowance for loan losses, the fact that GE met its own stated

EPS targets and/or met or exceeded consensus estimates throughout the Class Period is highly

probative of defendants' scienter.

6. Post Class Period Admissions

416. On June 25, 2009, Defendant Immelt appeared as a guest on the Charlie Rose

show, a nationally-aired PBS television interview program. In that interview, Defendant Immelt

discussed GE's recent financial difficulties including, among other things: the decline in GE's

stock price; financial difficulties at GE Capital; and GE's decision to cut its dividend. Over the

course of the nearly hour-long interview, Defendant Immelt made a series of frank and damning

admissions.

417. With respect to the valuation of GE Capital, Defendant Immelt admitted that GE

Capital's assets had been grossly overvalued in the past and that GE's current financial

difficulties including its dividend cut and loss of its AAA credit rating were the result of write-

downs and losses at GE Capital. Immelt stated:

> It's all about financial services. You know, at our peak, our financial
> service business was worth . . . just GE Capital was probably worth 150-
> 200 billion dollars . . . [GE Capital was] about 50% of our revenues, this
> is going back to 1999-2000. Today it's probably worth 10 or 20 billion
> dollars, something like that. Now, maybe it wasn't worth 200 billion, but
> it's not worth 20. . . . Was GE Capital worth $150 billion, I don't know.
> But it's not worth $10 billion.

418. Admitting that GE Capital was in a considerably weaker position than the

Company had previously disclosed and therefore not likely to be a driving force of revenue

generation for GE going forward, Immelt stated that GE needs to re-convince investors that its

financial service business is nonetheless sustainable and valuable. Immelt admitted that financial

services "never will" contribute to GE's overall revenue picture to the same degree that it had

previously. "It's just being practical [to assume less of a driving role on the part of GE Capital],"

Immelt stated.

419.     Immelt also discussed why, in his view, GE's stock price had been taking a beating.  Immelt attributed the stock price decline to investor uncertainty as to the role of GE Capital going forward, following the company's admissions in the March 19, 2009 GE Capital investor presentation, suggesting that it "is a story of how should a financial service company should be valued when you're in this kind of turbulence in financial services . . . in financial services, it's transparency and it's time."

420.     In addition, Immelt also stated that, with respect to the October Offering, GE was trying to take the issue of capitalization and cash off the table for GE at the time.  By securing the $3 billion investment from Berkshire Hathaway along with the October Offering, GE was able to go to the market and "raise the most money."  The Company was able to do this by showing the market that an influential investor like Warren Buffet had confidence in GE, therefore bolstering general investor confidence in the Company.

421.     With respect to GE's decision to cut its dividend, Immelt admitted that he went back on his word to investors with respect to maintaining the dividend.  Immelt acknowledged that the dividend cut was a hard thing for GE's investors, and stated that he "hated the sense that he'd let people and our investors down."

> Immelt also described how he had consulted former GE CEO Jack Welch about this decision prior to deciding that GE would cut its dividend.  Immelt noted that Welch ultimately supported Immelt's decision to cut the dividend.  According to Immelt, Welch told him that it would be better to "go back on your word [on paying the dividend] and be a smart guy, or be a consistent dumb guy."  Immelt further admitted that part of the problem with negative shareholder reaction to the dividend cut was that he had previously staked out a strong public position stating that GE would not cut its dividend, and also that part of the reaction was due to the "history and tradition of the company."

### E.     Loss Causation/Economic Loss

422.     During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the

Company's common stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. At all times relevant, the Exchange Act Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiff and other Class members. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of GE's business, operations and financial condition. Throughout the Class Period, the Exchange Act Defendants publicly issued materially false and misleading statements and omitted material facts, causing GE's common stock price to be artificially inflated. Lead Plaintiff and other Class members purchased GE's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

423.    As detailed above, as the truth about GE's financial situation was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. That decline in GE's common stock price was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct. The economic loss, *i.e.,* damages, suffered by the Lead Plaintiff and other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct was revealed.

424.     The truth about GE and GE Capital's financial condition was revealed to the market in a series of disclosures.  Each disclosure only partially revealed the truth and GE continued to misrepresent GE and GE Capital's true financial health and portfolio until the end of the Class Period.

425.     On January 23, 2009, before the market open, GE released its fourth quarter 2008 and full year 2008 earnings results, reporting that its fourth quarter profits dropped by 46% and that GE Capital's quarterly profits dropped by a third.  During GE's fourth quarter 2008 earnings call held that same day, CFO Sherin stated that "[o]verall, we expect both the commercial and the consumer delinquencies to get worse in 2009".  CEO Immelt further announced that the forecast for credit losses at GE Capital was increased from $9 billion to $10 billion.  On this news, GE's stock price fell by $1.45, dropping from $13.48 per share on January 22, 2009 to $12.03 per share on January 23, 2009, a decline of 10.75%.

426.     In a February 27, 2009 press release after the market open, GE shocked the market when it announced that it was cutting its quarterly dividend by nearly 70% to $0.10 from $0.31 per outstanding share of the Company's common stock, effective for the second half of 2009.  Following this news, the Company's stock fell sharply from $9.10 on February 26, 2009 to $8.51 per share on February 27, 2009, a loss of $.59 share, or 6.5%.  GE's stock price continued to plunge during the next trading day, falling from $8.51 per share on February 27, 2009 to $7.60 per share on March 2, 2009, a loss of $.91 per share, or over 10%.

427.     Late on March 2, 2009, GE released its Annual Report and CEO Immelt's February 6, 2009 letter to shareholders.  In the letter, Immelt acknowledged that GE's reputation as a growth company was "tarnished" and stated that 2009 would be even more difficult.  He further admitted as to GE Capital: "[d]id we end up with too much exposure in certain areas

during the credit bubble?  Maybe, a few.  Today, I wish we had less exposure to commercial real estate and U.K. mortgages."  In the wake of his letter, the Company's stock price continued to fall, closing at $7.01 per share on March 3, 2009 and closing at $6.69 per share on March 4, 2009.

428.     Finally, on March 19, 2009, GE held an all day investor conference specifically to provide what it characterized as a "detailed review" of GE Capital.  GE revealed that, under the Federal Reserve's stress testing, the 2009 profit estimate for GE Capital decreased by more than half, from $5 billion to $2 – $2.5 billion under the "base" scenario, and that GE Capital would not make any profit under the "adverse" scenario.  GE further revealed that large amounts of GE Capital's loans were to subprime and "junk" grade borrowers and that it needed to increase loan loss reserves.  On this news, GE's stock price fell from $10.32 per share on March 18, 2009 to $10.13 per share on March 19, 2009 and continued to fall the next day as the market digested the news, closing at $9.54 per share on March 20, 2009.

429.     Based on the disclosures above, the price of GE's common stock declined, eliminating the inflation in the price of those securities.  That decline in value caused Lead Plaintiff and the Class economic harm.

IX.     **CAUSES OF ACTION UNDER THE EXCHANGE ACT**

**COUNT IV**
**(Against GE and Defendants Immelt, Sherin, Neal, Bornstein and Cary)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

430.     Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

431.     This Count is asserted against GE and Immelt, Sherin, Neal, Bornstein and Cary and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

432.     During the Class Period, GE and Immelt, Sherin, Neal, Bornstein and Cary singly and in concert, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and course of business which operated as fraud and deceit upon Lead Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Lead Plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce Lead Plaintiff and the other members of the Class to purchase GE's common stock during the Class Period at artificially inflated prices.

433.     Throughout the Class Period, GE acted through Immelt, Sherin, Neal, Bornstein and Cary, whom it portrayed and represented to the financial press and public as its valid representatives.  The willfulness, motive, knowledge and recklessness of Immelt, Sherin, Neal, Bornstein and Cary are therefore imputed to GE, which is primarily liable for the securities law violations of Immelt, Sherin and Neal.

434.     As a result of the failure to disclose material facts, the information GE, Immelt, Sherin, Neal, Bornstein and Cary disseminated to the investing public was materially false and misleading as set forth above, and the market price of GE's common stock was artificially inflated during the Class Period.  In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Lead Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of GE's common stock in purchasing shares of the Company.  Had Lead Plaintiff and the other members of the Class known the truth,

they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

435. Lead Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

436. By reason of the foregoing, GE and Immelt, Sherin, Neal, Bornstein and Cary directly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of GE's common stock during the Class Period.

## COUNT V
### (Against Defendants Immelt and Sherin)
### Violations of Section 20(a) of the Exchange Act

437. Lead Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

438. Immelt and Sherin, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

439. Immelt and Sherin have the power and influence and exercised same to cause GE to engage in the illegal conduct and practices complained of herein.

440. By reason of the conduct alleged in Count I of this Complaint, Immelt and Sherin are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Lead Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of GE's common stock during the Class Period.

# X.     CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

441.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of

Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who acquired GE

common stock from September 25, 2008 through and including March 19, 2009, including all

persons who purchased or otherwise acquired GE common stock pursuant or traceable to the

Registration Statement and Prospectus for the October Offering, and who were damaged thereby

("Class").  Excluded from the Class are the Defendants, the Company's officers and directors,

affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity

in which any of the Defendants has a controlling interest or of which the Company is a parent or

subsidiary.

442.     The members of the Class are located in geographically diverse areas and are so

numerous that joinder of all members is impracticable.  Throughout the Class Period, the

Company had more than 10 billion shares of its common stock outstanding, which were actively

traded on the NYSE, and approximately 550 million shares of common stock were sold pursuant

to the October Offering.  Although the exact number of Class members is unknown at this time

and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are

thousands of members of the Class who traded Company common stock during the Class Period.

443.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws based upon
the facts alleged herein;

(b)     Whether the Exchange Act Defendants acted knowingly or
recklessly in making materially misleading statements and/or
omissions during the Class Period;

(c)     Whether the market prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(d)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

444.     Lead Plaintiff's claims are typical of the claims of the members of the Class as Lead Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

445.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

446.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

447.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the market doctrine in that:

(a)     Defendants failed to disclose material facts during the Class Period;

(b)     GE's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(c)     GE made available periodic public reports about its financial results and condition;

(d)     GE regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     GE was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace;

(f)     the misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g)     Lead Plaintiff and members of the Class purchased their Company stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

448.    Based upon the foregoing, Lead Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's common stock.

449.    As a result of the foregoing, the market for GE's common stock promptly digested current information regarding GE from all publicly-available sources and reflected such information in the price of GE's common stock. Under those circumstances, all purchasers of GE's common stock during the Class Period suffered similar injury through their purchase of GE's common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.     NO SAFE HARBOR

450.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply

to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of GE who knew that those statements were false, misleading or omitted necessary information when they were made.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE**,** Lead Plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Determining this action to be a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)    Awarding Lead Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Lead Plaintiff's attorneys and experts;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e) Granting such other and further relief as the Court may deem just and proper.

Dated: October 2, 2009

**LOWEY DANNENBERG COHEN & HART, P.C.**

Barbara Hart (BH-3231)
David Harrison (DH-3834)
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310
Telephone: 914-733-7239
Fax: 914-997-0035

*Liaison Counsel for Lead Plaintiff State Universities Retirement System of Illinois*

**BERMAN DEVALERIO**

Jeffrey C. Block (JCB-0387)
Kristin J. Moody
Steven Buttacavoli
Katherine Skubecz
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Fax: (617) 542-1194
Email: jblock@bermandevalerio.com

Joseph J. Tabacco, Jr. (JJT-1994)
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermandevalerio.com

*Lead Counsel for Lead Plaintiff State Universities Retirement System of Illinois*

162