# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

)

)

**In re General Electric Co. Sec. Litig.** )  **Civ. No. 09-CIV-1951 (RJH)**

)  ECF CASE

_____)

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE SECOND CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................v

I.     PRELIMINARY STATEMENT ......................................................................1

II.    SUMMARY OF THE ALLEGATIONS ..........................................................6

       A.    The Economic Environment In The Fall Of 2008 ................................6

       B.    GE Raises $15 Billion In Equity Offerings While Maintaining
             That GE Is Unaffected By The Global Credit Crisis ............................8

       C.    GE Continued To Guarantee The $1.24 Per Share Dividend
             And Its AAA Credit Rating ...............................................................11

       D.    The Undisclosed Facts Reveal That GE Capital Was In Far
             Worse Financial Condition Than Portrayed By Defendants..............15

             1.    GE Capital Had Trouble Selling Commercial Paper
                   And Funding Itself *Before* Broader Commercial Paper
                   Markets Collapsed In Mid-September 2008 ..............................15

             2.    GE Capital's Lending Business Was At a Standstill
                   Throughout The Class Period ...................................................17

       E.    GE Admits The Distressed Condition Of GE Capital ........................20

III.   ARGUMENT .............................................................................................23

       A.    The SCC Pleads Viable Claims For Violations Of The
             Exchange Act ...................................................................................24

             1.    The SCC Alleges Facts Giving Rise To A Strong Inference
                   Of Scienter As To Each Exchange Act Defendant ...................24

                   a.    Defendants Knew Or Recklessly Disregarded
                         That GE Capital's Portfolio Contained
                         $220 Billion In Non-Investment Grade
                         And Subprime Assets........................................................27

                   b.    The SCC Alleges Scienter Concerning The
                         Exchange Act Defendants' Statements
                         Regarding Commercial Paper ...........................................29

c. Statements Regarding The Dividend, AAA Rating And The $5 Billion In GE Capital Earnings Were Made With Scienter ........................................................34

d. The Exchange Act Defendants' Access To Information Contradicting Their Public Statements Supports A Strong Inference Of Scienter ...........................................36

e. Temporal Proximity Of The Exchange Act Defendants' Contradictory Statements And Admissions Support A Strong Inference Of Scienter ...........................................40

f. Confidential Witnesses Support A Strong Inference Of Scienter ....................................................................43

g. Reckless Violations of GAAP Contribute To A Strong Inference Of The Exchange Act Defendants' Scienter....................47

h. Defendants' Arguments In Support Of A Competing Inference Under *Tellabs* Are Not Persuasive...................48

2. The SCC Sufficiently Sets For Defendants' Materially False And Misleading Statements ........................................................50

a. Statements Concerning The AAA Rating Are Actionable ..............55

b. Statements Concerning The Dividend Are Actionable....................58

c. GE Capital's Exposure To Hundreds Of Billions Of Dollars Of Low-Grade Debt Was A Present Fact That Was Required To Be Disclosed ................................................63

d. Statements Concerning GE Capital's Commercial Paper Programs are Actionable........................................................67

e. Statements Relating To The October Offering Are Actionable ....................................................................70

f. Statements Made By Defendants Neal, Bornstein And Cary Are Actionable ................................................70

3. The SCC Properly Pleads Claims For GE's GAAP Violations And Improper Loan Loss Reserves............................................................72

a. Nonearning Receivables And Loan Loss Reserves ........................72

|   |   | b. | Reclassifying Assets To Avoid Taking Losses | 79 |
|   |   | c. | GAAP Required GE To Disclose The Break-Down Of The Portfolio | 81 |
|   | 4. | | The SCC Properly Pleads Loss Causation | 83 |
|   | 5. | | The SCC States Valid Claims Under § 20(a) of The Exchange Act | 87 |
| B. | | | Lead Plaintiff's Claims Under The Securities Act Should Be Sustained | 88 |
|   | 1. | | The Securities Act Claims Do No Sound In Fraud | 88 |
|   | 2. | | The SCC Adequately Alleges That The Offering Documents Contained Untrue Statements Of Material Fact And Omitted Material Facts | 91 |
|   |   | a. | Untrue And Misleading Statements And Omissions Regarding GE Capital's Exposure To Subprime And Junk Grade Debt | 93 |
|   |   | b. | Untrue And Misleading Statements And Omissions Regarding The AAA Rating And The Dividend | 96 |
|   |   |   | i. The Statements Were Untrue And Misleading When Made | 96 |
|   |   |   | ii. The Statements Are Not Forward-Looking | 97 |
|   |   |   | iii. Even If The Statements Are Forward-Looking, They Are Not Protected | 99 |
|   |   |   | iv. The Statements Are Not Opinions | 102 |
|   |   | c. | Untrue And Misleading Statements And Omissions Regarding the Value of GE Capital's Assets and Loan Loss Reserves | 103 |
|   |   | d. | Untrue And Misleading Statements And Omissions Regarding The Collapse Of GE Capital's Business | 107 |
|   |   | e. | Untrue And Misleading Statements And Omissions Related To GE's Access To The Commercial Paper Markets | 108 |

3.   Defendants Have Not Demonstrated Negative Causation
As To The Commercial Paper Allegations ...............................................111

4.   The Allegations Regarding Commercial Paper Are Timely ...................115

5.   Lead Plaintiff Has Standing Under § 12(a)(2) .........................................117

6.   The SCC States A Claim For Control Person Liability ..........................118

IV.   <u>CONCLUSION</u> ........................................................................................................118

## CASES

*Acito v. IMCERA Group*,
  47 F.3d 47 (2d Cir. 1995) ......................................................................... 58

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987)...................................................................... 112

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007).................................................... 102

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008).................................................. 106

*Backman v. Polaroid*,
  910 F.2d 10 (1st Cir. 1990)........................................................................ 94

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007).................................................................................... 24

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ..................................................................... 28

*Billhofer v. Flamel Techs. S.A.*,
  1:07-cv-09920 (CSH)
  2009 U.S. Dist. LEXIS 97287 (S.D.N.Y. Oct. 1, 2009) .......................... 38

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  No. 07 Civ. 10528,
  2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 12, 2010) ........................ 113

*Briarwood Invs. Inc. v. Care Inv. Trust Inc.*,
  No. 07 Civ. 8159 (LLS),
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ........................................... 112

*Burstyn v. Worldwide Xceed Group, Inc. Sec. Litig.*,
  No. 01 Civ. 1125,
  2002 U.S. Dist. LEXIS 18555 (S.D.N.Y. Sept. 30, 2002)....................... 85

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 298 (S.D.N.Y. 2007).................................................... 76

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002).............................................................. passim

*Campo v. Sears Holdings Corp.*,
   No. 09-3589-cv.,
   2010 WL 1292329 (2d Cir. Apr. 6, 2010) .............................................. 44

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)..................................................... 25

*City of Omaha Civilian Employees' Ret. Sys. v. CBS Corp.*,
   08-Civ. 10816,
   2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010) ........................................ 75

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006)................................... 28, 40, 68, 83

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
   562 F. Supp. 2d 511 (S.D.N.Y. 2008)..................................................... 87

*DeMaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003)............................................................. 54, 93

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).................................................................... 67

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ................................................. 84, 85, 86, 115

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)................................................................................ 91

*Fait v. Regions Fin. Corp.*,
   No. 09 Civ. 3161,
   2010 WL 1883487 (S.D.N.Y. May 10, 2010) ........................................ 79

*Fannon v. Guidant Corp.*,
   583 F. 3d 995 (7th Cir. 2009) ................................................................. 51

*Fidel v. AK Steel Holding Corp.*,
   No. C-1-00-320,
   2002 WL 31545952 (S.D. Ohio Sept. 19, 2002) .................................... 98

*Freudenberg v. E\*Trade Fin. Corp.*,
   No. 07 Civ. 8538,
   2010 WL 1904314 (S.D.N.Y. May 11, 2010) ................................... passim

*Fulton County Empl. Ret. Sys.v. MGIC Inv. Corp.*,
  No. 08-C-0458,
  2010 WL 601364 (E.D. Wis. Feb. 18, 2010) ............................................................. 67

*Furher v. Ericsson LM Tel. Co.*,
  363 Fed. Appx. 763,
  No. 09-0134-cv,
  2009 U.S. App. LEXIS 22135 (2d Cir. Oct. 8, 2009)................................................ 45

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008),
    aff'd, 347 Fed. Appx. 665 (2d Cir. 2009) ................................................... *passim*

*Gargiulo v. Isolagen, Inc.*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007) .................................................................... 102

*Glazer v. Formica Corp.*,
  964 F.3d 149 (2nd Cir. 1992)........................................................................ 54,94

*Griffin v. PaineWebber*,
  No. 99 Civ. 2292,
  2001 WL 740764 (S.D.N.Y. June 29, 2001) ......................................................... 117

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995)................................................................................................ 91

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)..................................................................... 43

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008)..................................................................... 24

*Hinerfeld v. United Auto Group*,
  No. 97 Civ. 3533,
  1998 WL 397852 (S.D.N.Y. July 15, 1998) ......................................................... 105

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  No. 07-61542-Civ,
  2009 WL 3261941 (S.D. Fla. May 12, 2009) ......................................................... 37

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998).......................................................................... 56, 100

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
  No. 09-1751-cv,
  2010 WL 889294 (2d Cir. Mar. 12, 2010) .............................................................. 98

*In re Adelphia Commc'ns Corp. Sec. Litig.*,
  No. 03 Civ. 7301, No. 03 MD 1529 (LMM),
  2007 WL 26159280 (S.D.N.Y. Sept. 10, 2007)......................................................... 118

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)..................................................................... 51

*In re American Express Co. Sec. Litig.*,
  02 CIV. 5533 (WHP),
  2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sept. 26, 2008)........................................ 46

*In re AOL Time Warner, Inc., Sec. & ERISA Litig.*,
  381 F. Supp. 2d. 192 (S.D.N.Y. 2004)................................................................... 99

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................. 28, 45, 66, 90

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).............................................................. 63, 90

*In re Bristol Myers Squibb*,
  No 00-1990,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) ............................................................ 86

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009).................................................................. 114

*In re Brittania Bulk Holdings Inc. Sec. Litig.*,
  No. 08 Civ. 9554 (DLC),
  2009 WL 3353045 (S.D.N.Y. Oct. 19, 2009) ............................................... 111, 112

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)............................................................................... 74

*In re Cambrex Corp. Sec. Litig.*,
  No. 03-CV-4896,
  2005 WL 2840336 (D.N.J. Oct. 27, 2005)........................................................... 102

*In re CIT Group, Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004)............................................................ 78, 105

*In re Citigroup Inc. Bond Litig.*,
  08 Civ. 9522,
  2010 U.S. Dist. LEXIS 69257 (S.D.N.Y. July 12, 2010) ................................. passim

*In re Citigroup Inc. S'holder Derivative Litig.*,
No. 07 Civ. 9841,
2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) ........................................................ 51

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................... 40, 49, 85

*In re Countrywide Fin. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................... 45, 78, 79

*In re Downey Sec. Litig.*,
No. 08-3261-JFW,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................................ 76

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .............................................................................. 112

*In re Friedman's Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ca. 2005) ................................................................. 90

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................................. 112

*In re Giant Interactive Group, Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009) ................................................................. 112

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................... 74

*In re Globalstar Sec. Litig.*,
No. 01 Civ. 1748, (SHS),
2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 12, 2003) ................................... 37, 43

*In re Guidant Corp. Sec. Litig.*,
536 F. Supp. 2d 913 (S.D. Ind. 2008) ................................................................... 51

*In re IAC/InterActive Corp.  Sec. Litig.*,
478 F. Supp. 2d 574, (S.D.N.Y. 2007) ...................................................... 58, 61, 101

*In re IAC/InterActiveCorp.  Sec. Litig.*,
695 F. Supp. 2d 109 (S.D.N.Y. 2010) ...................................................... 89, 95, 109

*In re IBM Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) ...................................................................... passim

*In re Initial Pub. Offering Sec Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004)................................................................ 100, 106

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................ 75, 81, 87

*In re JPMorgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................ 28

*In re Keyspan Corp.*,
  01-cv-5852,
  2003 WL 21981806 (E.D.N.Y. July 30, 2003)...................................................... 73

*In re Loewen Group Inc. Secs. Litig.*,
  No. 98-6740,
  2004 U.S. Dist. LEXIS 16601 (E.D. Pa Aug. 18, 2004)...................................... 116

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
  No. 01-CV-4388,
  2004 WL 376442, 2004 U.S. Dist. LEXIS 3059 (S.D.N.Y. Feb. 27, 2004)................ 48, 78, 79

*In re MCI Worldcom Sec. Litig.,*
  93 F. Supp. 2d 276 (E.D.N.Y. 2000) ................................................................ 84

*In re Merrill Lynch & Co. Research Reports Sec. Litig,*
  568 F. Supp. 2d 349 (S.D.N.Y. 2008)................................................................ 84

*In re MoneyGram Int'l Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009)................................................................ 49

*In re Morgan Stanley Info. Fund Sec. Litig.,*
  592 F.3d 347 (2d Cir. 2010)........................................................................ 93, 109

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ............................................................ 86, 114

*In re NationsMart Corp. Sec. Litig.*,
  130 F.3d 309 (8th Cir. 1997) ........................................................................ 118

*In re New Century,*
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................... 49, 85, 105

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009)................................................................ 89

*In re Openwave Sys. Sec. Litig.*
  528 F. Supp. 2d 236 (S.D.N.Y. 2007).................................................................. 85

*In re Oxford Health Plans Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................. 60, 98

*In re Pall Corp.*,
  07-CV-3359 (JS)(ARL),
  2009 U.S. Dist. LEXIS 110209 (E.D.N.Y. Nov. 24, 2009)................................... 44

*In re Pall Corp.*,
  07-cv-3359(JS)(ARL),
  2009 U.S. Dist. LEXIS 88240 (E.D.N.Y. Sept. 21, 2009).................................. 44

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005).................................................................. 86

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005).................................................................. 87

*In re Prestige Brands Holding, Inc.*
  05 cv 06924
  2006 U.S. Dist. LEXIS (S.D.N.Y. July 10, 2006) ................................................ 90

*In re PSS World Medical, Inc. Sec. Litig.*,
  250 F. Supp. 2d 1335 (M.D. Fla. 2002)............................................................... 98

*In re Quintel Entm't Inc. Sec. Litig.*,
  72 F. Supp. 2d 283 (S.D.N.Y. 1999)................................................................... 77

*In re Radian Sec. Litig.*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009) .................................................................. 78

*In re Refco, Inc.Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................... 73, 89, 90

*In re Reliance Sec. Litig.*,
  91 F. Supp. 2d 706 (D. Del. 2000).................................................................. 76, 81

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004).................................................................. 117

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).................................................................................. 24

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................ 43, 47, 117

*In re Sina Corp. Sec. Litig.*,
    05 Civ. 2154,
    2006 U.S. Dist. LEXIS 71089 (S.D.N.Y. Sept. 25, 2006)...................................... 101

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)................................................................................ 111

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ...................................................................................... 59

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)................................................................ 24, 31

*In re USF&G Corp. Sec. Litig.*,
    No. B-90-2928,
    1993 WL 740188 (D. Md. Feb. 11, 1993) ............................................................. 103

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................................. *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
    605 F. Supp. 2d 586 (S.D.N.Y. 2009)............................................ 69, 86, 114, 115

*In re Vivendi Universal, S.A. Sec. Litig.*,
    Nos. 02-5571, 03-2175,
    2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 21, 2004) (R. Holwell, J.)............... 101

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).......................................................................... 117, 118

*In re Winstar Commc'ns*,
    01cv3014,
    2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006)........................................ 28

*In re WorldCom Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................... 54

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005)............................................................... 54, 93

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)............................................................................. 40, 41

xii

*Irvine v. ImClone Sys.*,
    02 Civ. 109 (RO), 02 Civ. 7499 (RO)
    2003 U.S. Dist. LEXIS 9342 (S.D.N.Y. June 3, 2003) ........................................ 102

*Jones v. Corus Bankshares, Inc.*,
    No. 09 C 1538,
    2010 WL 1338070 (N.D. Ill. April 6, 2010) ............................................................ 48

*King County v. IKB Deutsche Industriebank AG*,
    No. 09 Civ. 8387 (SAS),
    2010 WL 1702196 (S.D.N.Y. Apr. 26, 2010) .......................................................... 84

*Landmen Partners Inc. v. The Blackstone Group, L.P.*,
    659 F. Supp. 2d 532 (S.D.N.Y. 2009) ............................................................... 66, 91

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................ 43, 60

*Lasker v. NewYork State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ...................................................................................... 103

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .............................................................................. passim

*Levine v. AtriCure, Inc.*,
    594 F. Supp. 2d 471 (S.D.N.Y. 2009) ................................................................... 112

*Leykin v. AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) ..................................................................... 83

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................................ 102

*Marsh Group v. Prime Retail*,
    46 Fed. Appx. 140 (4th Cir. 2002) .......................................................................... 98

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) ....................................................................... 66

*Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008) ..................................................................................... 41

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) ..................................................................... 85

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................................ 102

*Nolte v. Capital One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) .................................................................................. 63

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................... passim

*Nursing Home Pension Fund v. Oracle Corp.*,
  No 01-00988,
  2006 U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006) ................................... 114

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996)......................................................................................... 93

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004)................................................................... 56, 98, 100

*Pinter v. Dahl*,
  486 U.S. 622, (1988) ...................................................................................... 91, 117

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010).............................................................. passim

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................... 38, 39, 112

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................................ 88, 90

*Sawant v. Ramsey*,
  570 F. Supp. 2d 336 (D. Conn. 2008) ................................................................. 102

*Schoenhaut v. American Sensors*,
  986 F. Supp. 785 (S.D.N.Y. 1997)...................................................................... 117

*Shaev v. Hampel*,
  No. 99 Civ. 10578(RMB),
  2002 WL 31413805 (S.D.N.Y. Oct. 25, 2002) ................................................... 105

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992)................................................................................... 78

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)............................................................ 91

*Shields v. Citytrust Bancorp*,
  25 F.3d 1124 (2d Cir. 1994)............................................................ 48

*Slayton v. American Express Co.*,
  604 F.3d 758 (2d Cir. 2010)........................................................... 100

*South Ferry LP, # 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .......................................................... 41

*Steinberg v. Ericsson LM Tel. Co.*,
  07 CV. 9615 (RPP),
  2008 U.S. Dist. LEXIS 99727 (S.D.N.Y. Dec. 10, 2008), ...................... 45

*Steinberg v. PRT Group, Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)............................................... 45, 88

*Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009).............................................. 76

*Stevelman v. Alias Research, Inc.*,
  174 F.3d 79 (2d Cir. 1999)........................................................... 116

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  No. 05 CIV. 1898 (SAS),
  2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)....................................... 45

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)........................................................... 25

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010),
    *reaffirmed* 08 Civ. 10637,
    2010 U.S. Dist. LEXIS 28, 39 (S.D.N.Y. Mar. 25, 2010) .......................... 67, 105

*Varghese v. China Shenghuo Pharm. Holdings*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009)............................................... 47

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)................................................................... 79

*Waters v. General Elec. Co.*,
  08-CV-8484 (RJS) (S.D.N.Y.).......................................................... 70

*West Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
   344 Fed. Appx. 717 (2d Cir. 2009) ........................................................................... 72

*Whalen v. Hibernia Foods PLC*,
   No. 04 Civ. 3182,
   2005 U.S. Dist. LEXIS 15489 (S.D.N.Y. Aug. 1, 2005) .............................. 44, 45, 47

*Xerion Partners I LLC v. Resurgence Asset Mgmt. LLC*,
   474 F. Supp. 2d 505 (S.D.N.Y. 2007) ....................................................................... 42

## **STATUTES**

15 U.S.C. § 77k (a) ................................................................................................... 88, 90

15 U.S.C. § 77l(a)(2) ...................................................................................................... 88

15 U.S.C. § 77o .............................................................................................................. 118

15 U.S.C. § 78k ........................................................................................................ 64, 94

15 U.S.C. § 78u ............................................................................................................. 102

15 U.S.C. § 78u-4(b) ..................................................................................................... 24

15 U.S.C. § 78u-4(b)(2) ................................................................................................ 24

15 U.S.C. §§ 77o ............................................................................................................ 87

44 U.S.C. § 1507 ............................................................................................................ 33

## **OTHER AUTHORITIES**

*Bloomberg Business,*
   April 16, 2010, ......................................................................................................... 17

Temporary Liquidity Guarantee Program,
   73 Fed. Reg. 72,244, *et seq.* (Nov. 26, 2008) ......................................................... 33

The Federal Register Act, 44 U.S.C. § 1507 .............................................................. 33

WALL STREET JOURNAL .................................................................................................. 4

HENRY M. PAULSON, JR., ON THE BRINK: INSIDE THE RACE TO STOP THE COLLAPSE OF
   THE GLOBAL FINANCIAL SYSTEM (2010) ........................................... 17, 70, 115, 116

17 C.F.R. § 210.4-01 .................................................................................................. 103

## **RULES**

Fed. R. Civ. P. 8(a)(2) ................................................................................................ 83

Fed. R. Civ. P. 15(a)(2) ............................................................................................. 118

Fed. R. Civ. P. 15(c) ................................................................................................. 115

Lead Plaintiff, the State Universities Retirement System ("SURS") of Illinois ("Lead Plaintiff" or "Plaintiff") respectfully submits this memorandum in opposition to all motions to dismiss the Second Consolidated Class Action Complaint ("SCC").[1]  The SCC asserts claims on behalf of purchasers of General Electric Co. ("GE" or "Company") common stock from September 25, 2008 through March 19, 2009 ("Class Period").  The SCC's claims arise under the Securities Exchange Act of 1934 ("Exchange Act")[2] and, separately, the Securities Act of 1933 ("Securities Act").[3]  For the reasons set forth below, all motions to dismiss should be denied.

## I.  PRELIMINARY STATEMENT

In September 2008, America's financial markets were in crisis.  In that month, the federal government seized control of Fannie Mae and Freddie Mac, placing them both into conservatorship.  Lehman Brothers, Inc. filed for bankruptcy, the federal government lent AIG $85 billion to avoid collapse and Merrill Lynch was sold in a fire sale to Bank of America.  The stock markets plunged, and Congress eventually passed a $700 billion rescue package for America's troubled financial institutions.

The root cause of this crisis was that financial institutions had over-issued debt to homeowners and commercial borrowers with low-grade credit.  Exposure to "subprime" and "non-investment grade" or "junk" assets plagued financial services companies and investor concern about such "toxic assets" on the books of these companies was palpable.  Acronyms such as "CDOs," "Synthetic CDOs," and "SIVs" became synonymous with the low-quality loans

---

[1] Citations to "¶__" herein refer to paragraphs in the SCC.

[2] The Exchange Act claims are brought against Defendants GE, Jeffrey Immelt ("Immelt"), Keith Sherin ("Sherin"), Michael Neal ("Neal"), Jeffrey S. Bornstein ("Bornstein") and William H. Cary ("Cary") (collectively, "Exchange Act Defendants").

[3] The Securities Act claims are brought against Defendants GE, Immelt and Sherin, the Director Defendants (as defined in ¶44) and the Underwriter Defendants (as defined in ¶71) (collectively, "Securities Act Defendants").

that backed those products – loans that were souring by billions of dollars, causing banks and investment banks to write-off hundreds of billions of dollars of bad debt and incur unprecedented losses.

In late September 2008, however, GE was only one of six U.S. industrial companies with a AAA credit rating.  GE informed investors in late September 2008 that its massive GE Capital financial services unit was unlike the banks and investment banks that were suffering from the subprime crisis and widespread credit crunch.  Immelt, GE's Chief Executive Officer ("CEO") and Sherin, GE's Chief Financial Officer ("CFO"), repeatedly told investors that GE Capital's assets – which GE claimed to be worth approximately $695 billion at the time – were safe, secure and did not suffer from any of the infections plaguing other financial services companies.  Immelt referenced the more than $500 billion in write-offs by banks and investment banks and told investors that "we haven't had exposure to any of these things."  Sherin specifically made reference to "SIVs," "CDOs" and "synthetic CDOs," denying GE's exposure to such assets and drawing further contrasts by saying "[w]e've got a conservative model," clearly conveying to investors that GE Capital did not suffer from exposure to the subprime and related problems infecting the nation's other financial services companies.

Throughout the Class Period, however, GE Capital's assets included over $220 billion of loans to creditors who GE itself defined as non-investment grade or subprime.  GE concealed this material information from investors and actively misled the Class about the true state of GE's financial condition.

GE also sought to conceal its precarious financial condition by assuring investors that GE was having no trouble selling its commercial paper ("CP").  This was in stark contrast to the truth.  On September 8, 2008, Immelt privately telephoned then-Secretary of the Treasury Henry

M. Paulson, Jr. ("Paulson") and told him "troubling news" that "stunned" Paulson: GE Capital was having trouble selling its CP.  On September 15, 2008, Immelt traveled to Washington to meet privately with Paulson.  Again Immelt told Paulson of GE's continued troubles in the CP market and resulting difficulties funding itself.  While Immelt was privately telling Paulson GE was having grave difficulties selling its CP, GE's statements to investors were the opposite.

Additionally, Immelt repeatedly assured investors that the "Board approved" dividend of $1.24 per share for 2009 was protected, even telling investors that they could "count on it."  The reality, however, was that the massive amount of subprime and non-investment grade credit at GE Capital, and the Company's difficulties funding itself in the private commercial paper market, made these guarantees false and materially misleading when made.  Immelt and Sherin both repeatedly told investors that GE operated as a AAA-rated company and would continue to be one, yet failed to disclose to investors the massive non-investment grade credit woes at GE Capital and related liquidity problems, thus rendering such statements materially misleading.

Immelt and Sherin also repeatedly told investors that GE Capital would earn $5 billion in 2009.  The $5 billion earnings projection was no accident, as the rating agencies were not downgrading GE from AAA because of the statement that GE Capital would earn $5 billion in 2009.  Making the $5 billion earnings statement misleading, however, was the fact that business was at a standstill at GE Capital and its massive exposure to subprime and non-investment grade debt would cause loan loss reserves and write-downs to spike.

In early October 2008, GE sold $12 billion of common stock to investors ("Offering") without disclosing the massive subprime, non-investment grade credit on GE Capital's books and its related liquidity problems.  Defendants affirmatively misled investors about the safety and quality of GE Capital and its portfolios.  Defendants further misled investors about GE's

ability to pay the $1.24 per share dividend throughout 2009, maintain its AAA rating and sell its commercial paper.

The truth about GE Capital slowly emerged.  Despite having repeatedly assured investors that the $1.24 per share dividend was safe, that investors could "count on it,' and after Immelt said on January 23, 2009 that he wished he "could end all the speculation" since GE *would pay* the $1.24 dividend, GE slashed the "Board Approved" $1.24 per share dividend from $.31 per share per quarter to $.10 per share per quarter on February 27, 2009.  GE's stock fell by $2.41 per share, or 26%, after the news of the dividend cut was revealed.  In explaining the cut, despite having repeatedly touted that GE had more than sufficient cash on hand to pay the dividend and operate as a AAA-rated company, the Company said it needed to cut the dividend to preserve cash.

Days after announcing the dividend cut, Immelt sent a letter to investors in which he admitted that GE's reputation was tarnished because it wasn't the "safe and secure" company that it had previously represented itself to be.  Immelt conceded that GE Capital's loan loss reserves were too low, that GE had to become "realistic" about those losses and that the Company had had too much exposure to commercial and U.K. real estate.

On March 19, 2009, GE held a six-hour investor conference during which it finally came clean about its true exposure to subprime and other non-investment grade assets ("March 19 Investor Conference").  As the WALL STREET JOURNAL succinctly put it in an article on March 20, 2009, GE revealed that "[l]arge amounts of GE Capital's loans are to borrowers with junk, or sub-investment-grade, ratings."  In reaction, GE's stock fell 8%.  Immelt also conceded, in July 2009, that GE Capital had not been worth what the Company had represented.

Defendants' motions to dismiss are based on the faulty premise that a company can

choose to conceal material information when it speaks about a subject.  Here, since GE chose to speak, repeatedly, about its exposure, or lack of exposure, to junk assets, it was obligated to provide *all* material information on that subject.  *See In re Citigroup Inc. Bond Litig.*, 08 Civ. 9522, 2010 U.S. Dist. LEXIS 69257, at *60 (S.D.N.Y. July 12, 2010) ("Citigroup Bond Litig.") (failure to disclose exposure to subprime debt found actionable as defendant "has a duty to disclose any additional material fact necessary to make the statements [already contained] therein not misleading") (internal quotation omitted).  Here, there can be no dispute that GE misled investors about its exposure to massive amounts of junk debt and investments.

Defendants quibble with the allegations concerning GE's commercial paper by contending that the commercial paper markets were really not that bad so GE did not mislead anyone.  Their claim that Immelt's statements to Paulson were entirely consistent with their public disclosures is spurious.  Moreover, Defendants' attempts to seek refuge in the Private Securities Litigation Reform Act of 1995's ("PSLRA") safe harbor are unavailing as the statements at issue are not forward-looking and not protected by the safe harbor.  Defendants' contentions that the SCC does not plead loss causation because GE's stock had already declined from the start of the Class Period to the first corrective disclosure are disingenuous.  GE's stock price fell *in response* to a corrective disclosure, thus satisfying loss causation.  The Securities Act Defendants have the burden to establish that the stock fell for reasons other than a corrective disclosure, and they have not met their burden here.  Finally, as discussed herein, the SCC more than adequately pleads scienter.  As such, the motions to dismiss should be denied in their entirety.

## II. SUMMARY OF THE ALLEGATIONS

### A.    The Economic Environment In The Fall Of 2008

In September 2008, the global economy was still reeling from the "subprime crisis" that

began in approximately 2007.  ¶¶3-4.  This is a point on which Lead Plaintiff and Defendants all

agree.  GE Br. at  10-11; UW Br. at 1.[4]  This crisis and the related market meltdown involving

asset-backed securities were caused by widespread fear about exposure to subprime consumer

and other non-investment grade "junk" debt.  ¶¶ 3, 7-8.  The crisis left major companies crippled,

and shattered investor confidence in financial institutions.  ¶3-4.  Companies with substantial

exposure to subprime consumer and/or non-investment grade commercial debt found themselves

in serious jeopardy and warned of possible credit rating downgrades.  ¶7.

On September 7, 2008, the federal government placed mortgage finance companies

Fannie Mae and Freddie Mac into conservatorship.  ¶4.  One week later, several venerable

financial institutions were caught in the crunch: Merrill Lynch was bought by Bank of America

for relative pennies and two major U.S. financial institutions with substantial subprime and

"junk" debt exposure were forced to accept a multi-billion dollar government bailout package

(AIG) and declare bankruptcy (Lehman Brothers).  *Id.*  Following Lehman's collapse, banks

across the globe experienced massive withdrawals in a panic that dried up money market funds,

crippling markets for commercial paper, including whatever private market may have been left

for GE's commercial paper at the time.  ¶¶5, 10b, 73, 181(c), 399.  Nonetheless, on September

14, 2008, GE issued a letter to investors touting GE's commercial paper programs and assuring

---

[4] Citations to "GE Br." herein refer to the Memorandum Of Law In Support Of Defendants
General Electric Company, Immelt, Sherin, Neal, Bornstein, Cary, And The Director
Defendants' Motion To Dismiss The Second Consolidated Class Action Complaint.  Citations to
"UW Br." herein refer to the Memorandum Of Law In Support Of The Underwriter Defendants'
Motion To Dismiss The Second Consolidated Class Action Complaint.

investors that the Company's ability to sell commercial paper "remain[ed] robust" at that time. ¶10a.

Private commercial paper markets became frozen by early October 2008 and the Federal Reserve announced the creation of a special purpose entity, the Commercial Paper Funding Facility ("CPFF"), that would purchase the commercial paper of certain corporate issuers, including GE, starting later that month.  ¶6a.  To further bolster struggling markets for corporate debt issued by financial institutions and liquidity in the banking system, the Federal Deposit Insurance Corporation ("FDIC") announced on October 14, 2008 that it would create a temporary program in which the government would guarantee the debt issued by certain eligible financial institutions, the Temporary Liquidity Guarantee Program ("TLGP").  ¶6b.  GE expressed public support for the CPFF and, after initially denying any need to use the program on October 10, 2008 (¶¶193a-193d), stated on October 24, 2008 that it would sell commercial paper to the CPFF as a "test" of the program and to provide an expression of support for the Fed's initiative, not because GE needed the program to meet its funding needs.  ¶¶196a-196f.  In contrast to its claim that it did not need the program to fund itself, GE was among the first and largest users of the CPFF on the day that the facility opened.  ¶10g.

During this time of extreme concern and uncertainty, investors became acutely interested in knowing the truth about the quality of assets held by financial services companies and were depending on those companies to make full and complete disclosures about the nature, quality, and amount of their assets.  ¶8.  Also in this uncertain environment, investors were increasingly focused on financial services companies' credit ratings as further assurance about institutions' exposure to risks associated with subprime consumer or "junk" commercial debt.  *Id.*

**B.      GE Raises $15 Billion In Equity Offerings While Maintaining That GE Is Unaffected By The Global Credit Crisis**

Against the backdrop of the subprime financial crisis, GE and its senior management repeatedly assured investors that GE Capital was different from the troubled financial institutions that were caught in the meltdown – that GE Capital, and by extension GE, was "safe and secure." ¶¶9, 11, 75, 127, 168-70.  Immelt, during a September 25, 2008 investor conference call, in discussing the economic landscape, told investors that "[t]hrough this cycle where banks, investment banks, have written off more than $500 billion, we haven't had exposure to any of these things." ¶178.  On this same call, Sherin informed investors that GE Capital had a "great portfolio; our measurements and delinquencies and asset quality are all very strong." ¶171. Sherin touted GE's AAA credit rating, stating that "[GE Capital] can enter into investments at low risk levels, low loan-to-values, and senior secured positions at high returns" and otherwise "earn[] high margins on conservatively underwritten business." ¶¶127, 170.  He further assured investors that "[w]e have a fantastic real estate portfolio.  It's very high quality.  The delinquencies on the book are 0.27% of assets, so it's performing very well." ¶172.  Later on that call, in response to a question as to whether GE was considering any new equity offerings, Immelt specifically stated that "we just don't see it right now." ¶¶76, 177.  Following these positive assessments, GE's stock price rose sharply, gaining $2.02 per share to close at $25.68, 8.5% higher than its opening price. ¶180.

Six days after that investor conference, on October 1, 2008, GE announced that it would, in fact, raise $12 billion in capital through the Offering and raise an additional $3 billion through a sale of preferred stock to Berkshire Hathaway, Inc. ("Berkshire Hathaway Investment"). ¶¶77, 183.  GE's stock price fell over 9.5% on the date of this announcement. ¶183.  The Offering

closed on October 7, 2008 with the Company having sold 547.83 million shares of common stock at $22.25 per share.  ¶¶82-83.

Defendants touted the Offering as a positive for GE without disclosing the massive amount of low-grade debt on GE Capital's books or that GE had been experiencing difficulties funding itself with commercial paper since early September 2008.  ¶122.  Immelt, in explaining why the Company was undertaking the Offering said that it: "does two things for GE investors. First, it enhances our flexibility and allows us to execute on our liquidity plan even faster. Second, it gives us the opportunity to play offense in this market should conditions allow." ¶116.  The Offering Prospectus stated that "[t]he net proceeds will provide us with additional flexibility to strengthen GE Capital or participate in other market opportunities."  ¶121.

In the registration statement, prospectus, and documents incorporated by reference therein (the "Offering Documents"), Defendants misled investors with regard to GE Capital's exposure to subprime credit.  For example, GE's second quarter 2008 10-Q ("Q2 2008 10-Q"), which was incorporated by reference, ¶82, purported to warn investors that "[a]t June 30, 2008, of the [residential mortgage-backed securities] we had approximately $1.7 billion of exposure to residential subprime credit . . .".  *See* Q2 2008 10-Q at 40, attached as Exhibit 1 to the Declaration of Jeffrey C. Block ("Block Decl."), filed herewith.  This was false and fundamentally misleading as GE Capital had approximately $220 billion in exposure to subprime and non-investment grade credit – the kind of assets that were at the heart of the financial crisis – with more than $16.5 billion in exposure to residential subprime mortgages in the U.K. alone.[5]

---

[5] The $220 billion amount of GE Capital's subprime and non-investment grade assets referenced herein is derived from GE's admissions in a slide presentation prepared and issued by the Company in connection with the March 19 Investor Conference ("Presentation") set forth in ¶¶96-97 (supporting Lead Plaintiff's Securities Act claims) and ¶¶299, 301 (supporting Lead Plaintiff's Exchange Act Claims).  A full copy of the Presentation is attached as Ex. 2 to the

¶¶ 96-97, 299, 301.  Moreover, GE further implied having limited exposure to subprime and "junk" debt by stating in its Q2 2008 10-Q that GE Capital's "[i]nvestment securities comprise mainly investment-grade debt securities."  ¶130.  The Company subsequently admitted, however, that more than 30% of its $20 billion investments in debt securities was non-investment grade, including more than $1.1 billion in debt issued by Fannie Mae, Freddie Mac and Wells Fargo. ¶¶98, 302.

After the Offering closed, on October 10, 2008, GE issued its earnings release for Q3 2008, in which Immelt stated: "GE [Capital] continues to outperform our financial services peers.  We are improving our margins and focusing these businesses on the right products and markets. . . .We have taken a number of steps to protect investors from the downside risk in financial services."  ¶184.  On an investor conference call that day, Sherin conceded that "everyone wants to know . . . what's the potential for future loss impact" at GE Capital.  ¶189. Rather than reveal to investors the truth about the composition of GE Capital's loan portfolios – that *more than half* of its loans outstanding and nearly one third of its total assets, approximately $220 billion, consisted of non-investment grade and subprime credit – Sherin touted the overall strength of GE Capital's loan portfolios, describing how GE Capital had "taken proactive actions and we have dramatically improved our liquidity situation . . . [and] our portfolio remains robust. We've got a great portfolio."  ¶187.  Sherin expressed similar sentiments about GE Capital's real estate business, describing it as having over $89 billion in assets, adding further that "the portfolio quality remains strong."  ¶186.

Sherin further sought to distance GE Capital from institutions caught in the subprime crisis by stating that GE Capital held no investments in "SIVs or CDOs or other very highly

Block Decl.  It is important to note that in the Presentation, GE labeled and characterized its assets as non-investment grade and non-prime.

structured transactions." ¶211.  He misleadingly suggested that because GE Capital held none of those *derivative* instruments it was somehow not exposed to the underlying risks associated with the risky subprime consumer and/or non-investment grade commercial debt by such investment vehicles.  ¶189.  Following Immelt's and Sherin's positive assessments of GE Capital, GE's stock price shot up, gaining $2.49 to close at $21.50, a gain of over 13%.  ¶195.

On December 2, 2008, GE held a financial services investor meeting and issued a press release stating that GE "was taking steps to reduce risk at GE Capital."  ¶204.  In the press release, Sherin stated: "we are outperforming our peers and we have strong franchises to build upon for long-term growth."  ¶205.  At that same meeting, Bornstein, GE Capital's CFO, addressed GE Capital's rising loan losses, stating that GE Capital had "enjoyed a fairly benign loss environment."  ¶211.  Bornstein further echoed Sherin's misleading October 10, 2008 statements stating that certain securitizations "don't include SIVs or CDOs or other very highly structured transactions."  *Id*.  These assurances propelled GE's stock price $2.11 higher to a close of $17.61 per share, a steep 13.6% gain.  ¶217.

### C.   GE Continued To Guarantee The $1.24 Per Share Dividend And Its AAA Credit Rating

Throughout the Class Period, Immelt and Sherin repeatedly touted GE's AAA credit rating as further assurance to investors, describing it as a characteristic that "distinguishes GE." ¶¶128, 168.  At the time, GE was one of only six U.S. industrial companies with a AAA credit rating.  ¶184.  Immelt described the AAA rating's "significant[ ] competitive advantage" that allowed GE Capital to pursue selective and conservative lending and "earn[] high margins on conservatively underwritten business."  ¶¶168, 170.  Given that advantage, Immelt spoke strongly in terms of GE being "committed" to maintaining its AAA rating, further stating on

September 25, 2008 that maintaining the AAA rating was a "key priority" for GE and noting that the AAA rating had been "confirmed by the rating agencies." ¶¶117, 175.

At the same time that Defendants were assuring investors about the AAA rating, GE and Immelt repeatedly spoke to the security of GE's $.31 per share quarterly dividend, with the Company announcing on September 25, 2008 that the Board of Directors had "approved management's plan to maintain our quarterly dividend of $0.31 per share, totaling $1.24 per share annually, *through the end of 2009*." ¶¶118, 166. Also on that day, Immelt issued the following guarantee to investors during a conference call: "Lastly, the GE dividend *is secure* for investors. The Board has approved management's plan to maintain the current dividend *through '09* even in these relatively uncertain economic times at $1.24 a share." ¶169 (emphasis added). GE and Immelt repeated this guarantee throughout the Class Period. During an investor call on October 10, 2008, Immelt told investors: "We're going to return $13.5 billion to investors in 2009 through dividends. We really believe that the dividend is safe, and we're making great plans to protect that." ¶190.

On November 13, 2008, GE issued a statement on its website specifically reassuring investors that the dividend was safe and dismissing negative "speculation in the media and among analysts." ¶201. GE repeated that the Board approved the $1.24 per share dividend "through the end of 2009," and added, "that plan is unchanged." *Id*. The Company also touted its expected cash flows as being "greater than the amount needed to fund the dividend" and GE's access to governmental commercial paper assistance programs enacted in the wake of the subprime crisis as providing "additional levels of security for our investors" for the 2009 dividend. *Id*. GE's stock rose nearly 3.5% on this news, closing at $16.86 per share. ¶202. Immelt repeated the guarantee of the dividend on December 16, 2008, stating, "What can you

12

count on?  *You can count on a great dividend, $1.24 board approved . . . .*"  ¶220 (emphasis

added).  These statements drove GE's stock $0.97 higher on December 16, 2008 to close at

$17.92, a gain of over 5.7%.  ¶230.

Immelt reiterated the full 2009 dividend guarantee, stating on January 23, 2009, in the

face of increasing investor uncertainty, "*I wish my words could end the speculation.  The facts of

what we've done here, I think, should let investors know that we've got the cash, and we've got

the operating model that's going to secure the dividend in this environment*."  ¶248 (emphasis

added).

With regard to maintaining the AAA rating, in approximately December 2008, GE

learned that the rating agencies were taking a close look at GE Capital's 2009 projections and

that the agencies might strip GE of its AAA credit rating if GE Capital did not earn at least $5

billion in FY 2009.  ¶¶10, 218(a), 292, 414.

Immelt nonetheless assured investors on January 23, 2009 that GE had "always run the

company to be AAA . . . that's the philosophy with which we run the company."  ¶249.  Just four

days later, on January 27, 2009, GE issued a press release announcing that Moody's rating

agency was taking a closer look at GE Capital to determine whether GE's AAA credit rating

would be downgraded.  ¶253.  In that statement, GE assured investors that its "objective is to

maintain our Triple-A rating but we do not anticipate any major operational impacts should that

change."  *Id.*  Two weeks after this announcement, on February 10, 2009, Sherin, at a Barclay's

investor conference, said that GE was "running the Company like a AAA and we are going to

continue to be conservative and focus on being safe and secure."  ¶269.  Until it slashed GE

Capital's FY 2009 earnings guidance to between $2.0 - $2.5 billion at the March 19, 2009

Investor Conference (¶¶295-96), which came a week after Standard & Poor's ("S&P")

downgraded GE's credit rating (¶293), GE had consistently reported GE Capital's projected

2009 earnings at *exactly* $5 billion since December 2008.  ¶¶206, 221, 229, 233, 247, 266, 270.

Immelt and Sherin also repeatedly assured investors that GE had more than sufficient

cash flow to cover the dividend.  Sherin told investors on the September 25, 2008 call that

"we're going to have over $23 billion of cash from our net income and our working capital

management programs and some small amounts of dispositions.  And that gives us the financial

strength to protect our dividend to shareholders."  ¶174.  During the investor call on October 10,

2008, Sherin said: "We do not need the cash that we raise to pay the dividend in any way. . . .

We've obviously looked at our Industrial cash flow.  We do get some cash flow out of [GE

Capital] it's not zero.  We feel like we're in a position to protect that dividend even in a very

tough environment."  ¶192.  At the December 16, 2008 Annual Outlook Meeting, Immelt walked

investors through the amount of cash GE had on hand and the amount the Company generated to

further assure shareholders: "[The] dividend is important.  It's a culturally important part of the

company.  I think important to our investor base today.  It's affordable."  ¶¶221-25.  In fact,

during the call with investors on January 23, 2009, Immelt again emphasized that GE's cash flow

was more than sufficient for the Company to pay the full dividend:

> The cash flow was actually stronger so our cash position is actually improved today
> versus even where we were in December.  The overall capital inside the company
> cash inside the company is almost $50 billion. . . .We're not straining in order to pay
> [the dividend].  In other words, we've got lots of cash and lots of free cash flow and
> lots of capital inside the company and it's been the judgment that this [paying the
> dividend] has been the most investor friendly use of this capital.

¶243.  Immelt ended the call: "go[ing] back to a point which I think was part of [an analyst's]

question that we think given the strong operating performance of the company and the

framework and the strong capital position that we still believe that supporting the dividend

and doing it without straining . . . is the best use of capital . . . ."  ¶245.

14

In contrast to all of the earlier guarantees about GE maintaining the dividend and having more than sufficient cash to cover it, on February 27, 2009 GE revealed that it would slash its quarterly dividend in the final two quarters of 2009, from $.31 per share to $.10 per share.  ¶279. It cited the need to preserve cash as to why it was cutting the dividend.  *Id.*  On this news, GE's stock price dropped by 6.5% on February 27, 2009, losing $.59 per share to close at $8.51.  ¶281.

> ### D. The Undisclosed Facts Reveal That GE Capital Was In Far Worse Financial Condition Than Portrayed By Defendants
>
> #### 1. GE Capital Had Trouble Selling Commercial Paper And Funding Itself *Before* Broader Commercial Paper Markets Collapsed In Mid-September 2008

On September 8, 2008, the day after the federal government placed Fannie Mae and Freddie Mac into conservatorship – and a week before tightening in broader commercial paper markets began to occur – Immelt placed a telephone call to then-Secretary of the Treasury Paulson to deliver what Paulson describes as "troubling news" about GE.  ¶¶4-5, 10b.  Immelt privately revealed to Paulson that GE was having problems selling its commercial paper.  ¶10b. While Paulson believed that GE Capital "had faltered along with the rest of the [financial services] industry," he was "stunned" by the notion that the Company, "an American business icon" and "one of the few with a triple-A credit rating . . . couldn't sell its paper . . ." at the time. *Id.*  A week later, and the day after GE's Vice President for Corporate Investor Communications had touted GE's "robust" ability to sell commercial paper to investors, Immelt traveled to Washington to meet with Secretary Paulson at the Treasury Department on September 15, 2008. *Id.*  At that meeting, Immelt further confided in Paulson about GE's financial difficulties, including the Company's problems funding itself with commercial paper. *Id.*  Paulson recalls his concern: "The fact that the single best issuer [GE] in this $1.8 trillion [commercial paper] market was having trouble with its funding was startling.  If mighty GE was having trouble rolling its

commercial paper over, so were hundreds of other industrial companies . . . ."  *Id.*  Paulson

communicated his private understanding of GE's financial position to President Bush, the

Federal Reserve Chairman, and the Securities and Exchange Commission ("SEC") Chairman

during a September 18, 2008 meeting, stating: "Companies are taking drastic measures to

preserve their finances – not just the big banks but also companies like General Electric . . . ."

¶10c.

By late October 2008, GE's difficulties selling commercial paper in the private market

had become so acute that it became among the first, and biggest, users of the Fed's CPFF when

the government's commercial paper purchaser went online on October 27, 2008.  ¶10g.  The

Company regarded that source of government funding as insufficient to meet its funding needs,

however, as GE lobbied Secretary Paulson to secure GE Capital's acceptance into the TLGP in

October 2008.  ¶¶6b, 10d.  Immelt again conferred with Paulson on October 13 and 16, 2008

about TLGP, asking Paulson to intervene with the FDIC to have that agency change TLGP's

eligibility requirements so that debt issued by GE Capital (a nonbank that was initially ineligible

for TLGP assistance) could be guaranteed by the government.  ¶10d.  Paulson recalls that as a

result of GE's efforts, he "worked hard" to intervene behind the scenes with FDIC chief Sheila

Bair to have the FDIC create a loophole in TLGP's eligibility criteria that allowed GE Capital to

participate in the program despite not being a regulated bank.  *Id.*  While all the data on GE's

sales of commercial paper to the CPFF is not publicly available, in the month-and-a-half between

November 12, 2008 and December 31, 2008, GE raised an incredible $35 billion by issuing

TLGP-guaranteed debt.  ¶10g.  As explained below in § III(A)(1)(b), unlike private market

commercial paper sales, participation in the federal assistance programs was not cost-free for

program participants and GE paid considerable sums to participate in these emergency programs for struggling institutions.

On April 16, 2010, *Bloomberg Business News* reported that the SEC had launched an investigation of GE by contacting the Company to "request[] information about [GE's] September 2008 statements" concerning GE's sales of commercial paper in light of the information detailed by former Secretary Paulson in his book, ON THE BRINK, released on February 1, 2010. ¶10h.

### 2.    GE Capital's Lending Business Was At a Standstill Throughout The Class Period

According to numerous former GE and GE Capital employees, GE Capital's business had effectively ground to a halt during the latter half of 2008. ¶¶73, 388-99. Not surprisingly, given that the country was in a recession and credit markets were freezing up, ¶¶3-5, GE Capital, a financing company, was similarly affected. For example, Confidential Witness ("CW") 8 stated that, up until September 2008, GE Capital's Energy Financial Services Group was performing very well, but when the credit markets began to fall apart in September, 2008, business "more or less halted." ¶¶73, 112, 181(c), 397. CW 9 echoed a similar theme in GE Capital's Corporate Financial Services Department, stating that deal volume "fell off a cliff" in early to mid-2008 and that following the collapse of Lehman Brothers, GE Capital "was hung" because it had no deals in the pipeline. ¶¶73, 112, 181(c), 393. CW 11 explained how the Commercial Finance division at GE Capital involving Media, Communications and Entertainment collapsed after the demise of Bear Stearns in March 2008. ¶¶73, 112, 181(c), 398. "[L]iterally overnight we did not have new business. It was like a domino and things did not get better." ¶¶73, 398. CW 12, who worked in the North American Real Estate division at GE Capital, said that real estate investment activity and financing arrangements had fallen by 25-30% in the first eight months of

17

2008.  ¶¶73, 112, 181(c), 181(f), 397.  Then, starting in September 2008, "transactions were at a

halt and deals were not getting done.  Nobody was willing to buy and banks weren't lending."

¶¶73, 181(f), 397.  CW 14, who provided assistance to GE Capital's CEO, said that in the Fall of

2008 GE Capital stopped making new deals.  ¶¶73, 112, 181(c).  This former employee said that

it was discussed within the Company that borrowers were beginning to default on their loans as

the economy soured.  ¶73.

Former employees also describe how GE Capital was experiencing an increase in

distressed loans on its books in the latter half of 2008.  *Id.*  CW 5 said that in August and

September 2008, customers of the Commercial Division Finance Group ("CDFG") were

struggling given that loans made in connection with consumer products like RVs and boats –

"dispensable items [that] were greatly effected by the economy" – were seeing "the effects of a

worsening economy."  ¶¶73, 385.  CW 5 described that the CDFG's customers were "second-

and third-tier manufacturers" whose struggles were adversely "affect[ing] GE Capital's

performance."  ¶73.  This is consistent with GE's own reports as the Company consistently saw

an increase in nonearning receivables throughout 2008 and into 2009.  ¶342.

CWs 1, 13 and 15 also each described that GE Capital would avoid taking write-downs or losses
on poorly performing assets by moving those assets from short-term to long-term accounts.
¶¶73, 181(g), 390-92.  CW 15 said that "GE manages its earnings very well."  ¶73.  This witness
explained that GE would "shift its equity position to long term on the balance sheet" to avoid
writing down the value of the asset or take a loss.  ¶¶73, 391.  CW 15 stated that a committee of
senior GE Capital Management would decide to move assets around on the balance sheet to
avoid write-downs or losses and, at times, Immelt was involved in the decision- making process
with respect to larger transactions.  Henry M. Paulson, Jr., On The Brink: Inside the Race to Stop
the Collapse of the Global Financial System (2010).

CW 13 similarly described that in the Real Estate division, "'GE Capital did not write

down bad real estate deals, but would take the asset and shift it to an investment to hold' to avoid

taking a write-down."  ¶¶73, 392.  CW 13 described this process as being used so that the

Company could "'hide assets until the market turned around' by making a 'switch on the balance sheet'" – shifting deals to the long term in the hope that the value would increase, and by doing so, avoid losses to the Company." *Id.* CW 1 stated that given the lack of a market for certain of those real estate assets, the Company would move certain assets from being "available for sale" to held longer-term as "investments" so as to avoid having to mark those assets to market (and therefore requiring the Company to record losses associated with those assets). ¶¶73, 86, 390.

CW 1 also stated that "[o]ver the past three years, the market has been so depressed that there are assets currently held by GE that are not worth what they once were." ¶¶73, 389. This witness said that "anyone would say that." ¶389. Consistent with CW 1's observation, Immelt subsequently admitted that GE Capital had not been worth what it had been reported to be worth (¶417) and Sherin acknowledged, on March 5, 2009, that 98% of GE Capital's assets were reported at their historical costs and not then-current values (¶287).

The former employees described specific reporting systems by which GE Capital and GE senior management would track all problematic loans and investments at GE Capital. ¶¶73, 377-87, 391, 400-08. Central among the extensive data that GE Capital collected, analyzed and circulated were details about the status of its lending activities, including reports of loan delinquencies that were prepared on a monthly, and sometimes daily, basis. ¶¶73, 380-87. GE Capital also relied on "Portfolio Groups" that met regularly and prepared "Portfolio Quarterly Reports" addressing the status of loans in their portfolios and making recommendations regarding asset write-downs and nonperforming loans. ¶¶73, 383-84, 403. GE Capital held other monthly and quarterly meetings to review loan impairments and discuss recommendations on related loan loss reserves that were attended by personnel from GE Capital and GE "Corporate," including GE's Corporate Controller. ¶¶73, 407.

Immelt, Sherin, Bornstein, Neal (Vice Chairman of GE and CEO of GE Capital), and

Cary (Chief Operating Officer ("COO") of GE Capital) (collectively "Officer Defendants"), as

the senior-most executives at GE and GE Capital, all received and/or had access to internal

reports and data fully describing GE Capital's financial, business and accounting situation.  ¶¶73,

391, 401-02, 404, 408.  In addition, the Company's top executives, including Immelt and Sherin,

were often personally involved in sensitive financial and accounting decisions involving GE

Capital, including determinations of asset write-downs.  ¶¶73, 391, 408.

### E.    GE Admits The Distressed Condition Of GE Capital

In a letter to GE shareholders dated February 6, 2009, but not disclosed until GE

disseminated its 2008 Annual Report on March 2, 2009 (the "Immelt Shareholders Letter"),

Immelt acknowledged that GE's reputation had been "tarnished because [GE wasn't] the 'safe

and reliable' growth company" it was held out to be.  ¶283.  Immelt also admitted that GE

Capital would fall from "below 50%" to "30% of our [total GE] earnings" and that GE Capital

had ended up with "too much exposure to commercial real estate and U.K. mortgages."  ¶284.

GE's stock price fell sharply in response, losing nearly 10.7% of its value.  ¶285.

Ten days later, on March 12, 2009, GE announced that S&P had stripped the Company of

its AAA credit rating.  ¶¶13, 115, 293.  In that same announcement, GE stated it would be

providing a detailed update regarding GE Capital at a special investor meeting to be held in one

week.  ¶293.

The full truth of GE Capital's financial condition was finally revealed during the six-hour

March 19 Investor Conference.  ¶294.  In connection with the meeting, the Company circulated

the 176-slide Presentation that detailed topics such as GE Capital's financial and operational

position, substantially reduced FY 2009 projections and the results of different "stress test"

scenarios on GE Capital.  *Id*.  Over the course of the March 19 Investor Conference, top

management from GE and GE Capital, including Immelt, Sherin, Neal, Bornstein and Cary, revealed to investors for the first time that GE Capital was in much worse financial condition than was previously disclosed:

- GE Capital's estimated 2009 profits had been slashed by more than half from its recent December 2008 estimate of $5 billion to approximately $2.0 - $2.5 billion under a "base" economic estimate (¶¶295-96);

- Under an "adverse" scenario based on Federal Reserve estimates, GE Capital could earn *zero* profit in 2009 (¶296);

- GE Capital's lending portfolio was subject to considerable risk of substantial loss due to the poor quality of many borrowers in GE Capital's commercial and consumer lines of business (¶297);

- GE Capital's earnings were facing increasing pressure from nonearning assets stemming from pervasive problems in GE Capital's deeply distressed loan portfolios (¶298); and

- GE Capital was required to increase its loss reserves in numerous asset categories (¶295).

At the March 19 Investor Conference and in the Presentation, GE also revealed, for the first time, detailed information about the troubling credit risk characteristics of GE Capital's borrowers – substantial and material portions of which were corporate borrowers with non-investment grade or "junk" credit ratings and consumer borrowers with subprime credit scores. ¶¶96, 299-301. With respect to GE Capital's consumer lending, the Company admitted that an alarming 42% of its $183 billion total consumer loan portfolio – $76.86 billion – involved loans to borrowers with subprime credit. ¶¶96, 299; Presentation at slide 29. The Company also admitted, with respect to GE Capital's consumer lending, that:

- 74% of the Company's $22 billion in U.K. mortgages – the largest proportion of GE Capital's mortgage portfolio – were made to subprime borrowers, and 56% of those loans were booked during 2006 and 2007 (¶¶96, 299; Presentation at slide 118);

- Nearly half, 46%, of the Company's $30.4 billion private label credit card business involved individuals with subprime credit (¶¶96, 299; Presentation at slide 112);

- 39% of GE Capital's $21.5 billion consumer sales financing portfolio involved subprime borrowers (¶¶96, 299; Presentation at slide 113); and

- 37% of GE Capital's $22 billion global banking portfolio involves loans to non-prime, non-investment grade or "junk" status borrowers (¶¶96, 299; Presentation at slide 131).

GE revealed an even more dire situation in its $230 billion commercial lending portfolios, disclosing for the first time that:

- 81% of the $55 billion (or $44.55 billion) in GE Capital equipment loans in the Americas were made to borrowers with non-investment grade or "junk" credit ratings, and 40% of all of GE Capital's equipment loans were made to borrowers rated B+ or lower (¶¶97, 301; Presentation at slide 87);

- 93% of the $38 billion (or $35.34 billion) in GE Capital's leveraged loans were made to borrowers with non-investment grade or "junk" credit ratings and 76% of leveraged loans were made to borrowers that were rated below B+, with 28% of these loans made to borrowers with credit ratings below B- (¶¶97, 301; Presentation at slide 88);

- 95% of GE Capital's $13 billion (or $12.35 billion) franchise finance portfolio involved loans made to non-investment grade or "junk" status borrowers, and 37% of borrowers were rated B+ or below (¶¶97, 301; Presentation at slide 89);

- 85% of GE Capital's $13 billion (or $11.05 billion) global aircraft portfolio (which were loans made in connection with corporate jets) involved credit extended to customers with "junk" credit ratings, a shocking 72% with credit ratings below BB- (¶¶97, 301; Presentation at slide 83);

- 89% of GE Capital's $18 billion (or $16.02 billion) in equipment loans in the European Union were made to borrowers with non-investment grade or "junk" credit ratings, and 38% of all of these loans were made to borrowers rated B+ and below (¶¶97, 301; Presentation at slide 90);

- 81% of GE Capital's $20 billion (or $16.2 billion) in equipment loans made in the Asia Pacific region were made to borrowers with non-investment grade or "junk" credit ratings, and 22% of all of these loans were made to borrowers rated B+ and below (¶¶97, 301; Presentation at slide 91); and

- 95% of GE Capital's $10 billion (or $9.5 billion) in asset-based lending in the U.S. was made to borrowers with non-investment grade or "junk" credit ratings, with 86% of these loans made to borrowers rated B+ and below, and 42% made to borrowers with credit ratings of B- or below (¶¶97, 301; Presentation at slide 92).

Thus, with $76.86 billion in subprime consumer loans and at least $145 billion in non-investment grade commercial loans as detailed above, GE Capital's assets included approximately $220 billion in subprime and non-investment grade credit. ¶¶96-97, 299, 301. This amount represented *more than half* of GE Capital's total outstanding loans recorded as

financing receivables, (¶¶131, 340-41) and nearly one-third of GE Capital's total assets, (¶85). Beyond that amount, the Company also admitted that 30% of the $20 billion ($6 billion) in U.S. corporate debt held on GE Capital's books consisted of non-investment grade, or "junk" status corporate debt securities, $1.1 billion of which involved investments in Fannie Mae, Freddie Mac, and Wells Fargo.  ¶¶98, 302; Presentation at slide 162.

GE Capital's total asset base remained largely static between June 30, 2008 and March 19, 2009.  GE's disclosures in the March 19 presentation (56% of the U.K. subprime mortgages were issued in 2006 and 2007, ¶¶96, 299; Presentation at slide 126 (83% of such mortgages were issued prior to 2008)), reveal that GE Capital's subprime and non-investment grade assets were on its books as of the start of the Class Period.[6]

As the market digested the news revealed at the March 19 Investor Conference, GE's stock price fell on that day, closing at $10.13 per share.  ¶308.  This represented a decline of 1.8% from the prior day's close, a 7.9% drop from the opening price on March 19, and a 10.1% drop from the intra-day high of $11.35 per share.  *Id*.  On March 20, 2009, GE's stock closed at $9.54 per share, having fallen over 7.5% from the closing price on March 18, 2009.  *Id*.

### III. ARGUMENT

The SCC separately and distinctly alleges Securities Act violations in one section and Exchange Act violations in another section.  Lead Plaintiff will, accordingly, respond to the motions to dismiss the Exchange Act and the Securities Act claims separately.

---

[6] Defendants argue that, since the economy worsened between September 2008 and March 2009, it is no surprise that GE Capital's performance worsened.  This argument misses the mark as it does not excuse Defendants' concealing this massive exposure to junk credit that clearly was on GE Capital's books in September 2008.

**A.      The SCC Pleads Viable Claims For Violations Of The Exchange Act**

To state a claim for relief under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Lead Plaintiff "must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Freudenberg v. E\*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at \*5 (S.D.N.Y. May 11, 2010) (citing *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008)).  In addition, the claims are subject to the pleading standards set forth in the PSLRA and Fed. R. Civ. P. 9(b), requiring allegations of fraud to be stated with particularity.  15 U.S.C. § 78u-4(b); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 335-36 (S.D.N.Y. 2007).  *See also E\*Trade*, 2010 WL 1904314, at \*5 (noting further that the heightened pleading standard under the PSLRA and *Tellabs v. Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007), "applies only to the element of scienter").  Here, the SCC sufficiently meets these standards.  The SCC must also plead claims that are "plausible" on their face.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 547 (2007).

**1.      The SCC Alleges Facts Giving Rise To A Strong Inference Of Scienter As To Each Exchange Act Defendant**

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), but is "not require[d] [to] plea[d] detailed evidentiary matter in securities litigation."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-74 (2d Cir. 2001).  "The requisite state of mind in 10b-5 claims is 'intent to deceive, manipulate, or defraud.'"  *E\*Trade*, 2010 WL 1904314, at \*22 (citing *Tellabs*, 551 U.S. at 319).  In *Tellabs*, the Supreme Court addressed the PSLRA's scienter pleading requirements and held that a court's job is to "accept all factual allegations in the [SCC] as true" and then

determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

*Tellabs*, 551 U.S. at 322-23 (emphasis in original).  Moreover, a court may take into account

plausible opposing inferences, but only those that may be "rationally drawn *from the facts*

*alleged*."  *Id*. at 314 (emphasis added).  The Court further emphasized that "[t]he inference that

the defendant acted with scienter need not be irrefutable ... or even [be] 'most plausible of

competing inferences,'" *Id.* at 324 (citation omitted), but rather need only be "*at least as likely as*

any plausible opposing inference."  *Id.* at 328 (emphasis in original).  In other words, with

allegations of scienter, any "tie . . . goes to the plaintiff."  *City of Brockton Ret. Sys. v. Shaw*

*Group Inc*., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).  *See also E\*Trade*, 2010 WL 1904314, at

\*22 (quoting *City of Brockton*).[7]

Lead Plaintiff is not required to employ certain "magic words" to plead scienter, *Novak v.*

*Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  There are numerous ways by which a plaintiff can

satisfy scienter:

> The Second Circuit has provided at least five non-exclusive examples of how a
> plaintiff may adequately plead scienter-namely, allegations that the defendants:
> "(1) benefited in a concrete and personal way from the purported fraud; (2)
> engaged in deliberately illegal behavior; (3) knew facts or had access to
> information suggesting that their public statements were not accurate; or (4) failed
> to check information they had a duty to monitor," *Novak v. Kasaks*, 216 F.3d 300,
> 311 (2d Cir.2000) . . . or (5) "ignored obvious signs of fraud." *Id*. at 308.

---

[7] When the defendant is a corporate entity, this means that the pleaded facts must create a strong
inference "that someone whose intent could be imputed to the corporation acted with the
requisite scienter," meaning that it is possible to raise the required inference "with regard to a
corporate defendant without doing so with regard to a specific individual defendant." *Teamsters*
*Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)
("Dynex").  *Makor Issues & Rights, Ltd. v. Tellabs Inc*, 513 F. 3d 702, 710 (7th Cir. 2008)
("Tellabs II") (corporate scienter independent of individual defendant's scienter); *In re MBIA,*
*Inc. Sec. Litig.*, No. 08-CV-264, 2010 WL 1253925, No. 08-CV-264, at \*19 (S.D.N.Y. Mar. 31,
2010) (finding scienter against defendant corporation based on knowledge and actions of non-
defendant corporate officers).

*E*Trade*, 2010 WL 1904314, at *22.

The overarching theme of this action is that GE and the Officer Defendants misrepresented the financial strength and condition of GE Capital during a period of an unprecedented financial crisis.  During a period when the global economy was reeling from the effects of troubled and risky debt and investments to less-than-investment-grade borrowers, GE concealed from investors its massive exposure to those troubled assets.  Both Immelt and Sherin went to great lengths to paint GE as different from those other troubled financial institutions when, in fact, almost one-third of GE Capital's $695 billion portfolio was infected by the very same non-prime debt; a fact that was intentionally concealed by GE and the Officer Defendants. The Exchange Act Defendants do not dispute that the Officer Defendants had access to these facts.

Instead, they contend they were under no obligation to disclose them, despite clear case law to the contrary that when an executive chooses to speak about a subject, they must make full and complete disclosure.  Moreover, in a further effort to deceive investors, GE publicly proclaimed that its commercial paper program was "robust" while privately pleading with then-Secretary Paulson to expand the government debt guarantee program to back GE Capital's commercial paper due to GE's problems selling its paper and funding itself.  Plus, while Immelt and Sherin were publicly guaranteeing the dividend payment throughout 2009 – with Immelt even declaring: "What can you count on?  You can count on a great dividend, $1.24 board approved . . ." – privately, they knew that GE Capital's portfolio was overflowing with junk debt, that business at GE Capital had dried up and that GE needed the October Offering and the backing of the government to sell its commercial paper to provide it with enough liquidity to operate, making their guarantees about GE paying the dividend false and materially misleading

26

when made.  This is a classic case of securities fraud, as Defendants' public statements were belied by what they knew privately.

### a. Defendants Knew Or Recklessly Disregarded That GE Capital's Portfolio Contained $220 Billion In Non-Investment Grade And Subprime Assets

Tellingly, the Exchange Act Defendants make no argument that the SCC fails to plead scienter with regard to GE's misleading investors concerning its massive exposure to non-investment grade assets.[8]  First, since these Defendants chose to speak about a particular topic – the credit quality of GE Capital's portfolio and exposure to subprime -they were obligated to inform themselves of the true facts before they spoke publicly about this topic.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008) ("*BMS*") (stating that once one elects to speak about a particular matter, "Rule 10b-5 mandates that [such] speech must be truthful, accurate, and complete.").  *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues. Once [the company chose to discuss a topic] it had a duty to be both accurate and complete.") (internal citations omitted); *In re MBIA, Inc. Sec. Litig.*, No. 08-CV-264, 2010 WL 1253925, at *9 (S.D.N.Y. Mar. 31, 2010) (noting duty to make additional disclosures is triggered once a party "chooses to discuss material issues," citing *Caiola*).

Second, since GE Capital is GE's largest segment and made up nearly 50% of GE's income and 80% of its assets (¶9), and since the Exchange Act Defendants chose to speak about GE Capital and its portfolio and earnings, they can be presumed to know information about the Company's core business. *See E*Trade*, 2010 WL 1904314, at *25, 27 (finding strong inference

---

[8] The Exchange Act Defendants' response to these allegations is that they were under no obligation to disclose this information.  As we discuss below, this position is completely without merit.

of scienter where misstatements concerned financial services company's "core operations" and positively citing cases for the proposition that inference of scienter is attributable to "senior officers," a "CEO" defendant, and "principal managers" when misstatements concern core operations); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) ("When information is at the core of a company's business, it may be properly ascribable to senior officers"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) ("*Abbey Nat'l*") ("key officers should have been intimately informed" about write-down, as it concerned a core operation); *In re Winstar Commc'ns*, 01cv3014, 2006 U.S. Dist. LEXIS 7618, at *22-23 (S.D.N.Y. Feb. 24, 2006) ("High level corporate officers who signed SEC filings ... have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.").[9]

Here, the Exchange Act Defendants made numerous statements about the quality and conservative nature of GE Capital's portfolio.  *See, e.g.*, ¶168 ("we will continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business"), ¶171 ("We've got a great portfolio; our measurements and delinquencies and asset quality are all very strong."), ¶178 (in discussing massive write offs by banks, "we haven't had

---

[9] *See also Tellabs II*, 513 F.3d 702, 709 ("[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key products] knew that they were false is very hard to credit."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988-89 (9th Cir. 2008) (CEO's and CFO's responsibilities made it "hard to believe that they would not have known about stop-work orders," and it was "absurd to suggest that top management was unaware of them.") (citation omitted).

28

exposure to any of these things"); ¶178 (GE Capital has a "great portfolio; our measurements and delinquencies and asset quality are all very strong"), ¶172 ("We have a fantastic real estate portfolio.  It is very high quality.") ¶189 ("Our risk management policies outline delegations of authority and concentration limits for every asset class and every investment we make. We have got very broad spread of risk . . . Our diversification and risk management has served us well . . . we've got a conservative model . . . Our underwriting has been strong"), ¶208 (describing GE Capital as "Safe + conservative in economic environment"); ¶229 ("[o]ur financial services businesses, while slowed by the current financial crisis, are strong, global, middle market franchises with a conservative originate-to-hold model . . ."); ¶283 (""We will continue to run the Company with the disciplines of a 'Triple A,' including adequate capital, low leverage, solid earnings, and conservative funding.").  Such statements required the Exchange Act Defendants to be "accurate and complete" in their disclosures about GE Capital's asset portfolios.  *See BMS*, 586 F. Supp. 2d at 159-60; *Caiola*, 295 F.3d at 331; *MBIA*, 2010 WL 1253925, at *9.

### b.   The SCC Alleges Scienter Concerning The Exchange Act Defendants' Statements Regarding Commercial Paper

The Exchange Act Defendants' contention that Immelt's private statements to Paulson regarding GE's problems selling its commercial paper "are consistent" with Defendants' public statements is baseless.

On September 8, 2008, Immelt telephoned Paulson telling him "troubling news": GE was having problems selling its CP.  Six days later, on September 14, 2008, GE sent a letter to investors proclaiming that its ability to sell CP "remain[s] robust."  ¶10a.  The next day, September 15, 2008, Immelt met with Paulson, in person in Washington, D.C., and Immelt explained GE's CP troubles to Paulson.  As the then-Secretary of the Treasury wrote:

Now, here was Jeff [Immelt] telling me that GE was finding it very difficult to sell its commercial paper for any term longer than overnight.  The fact that the single-best issuer

29

in this $1.8 trillion market was having trouble with its funding was startling.  If mighty GE was having trouble rolling its commercial paper over, so were hundreds of other industrial companies, from Coca-Cola to Proctor & Gamble to Starbucks . . . "Jeff," I remember saying, "we have got to put out this fire."

¶10b.  In contrast, on September 25, 2008, during an investor conference call, Immelt said, in discussing GE's liquidity: "We have great CP programs . . . .  We have had *no issues* funding ourselves."  ¶171a.  (emphasis added).  Sherin followed up: "We've got a commercial paper program that's broad and deep.  . . . [Y]ou really don't have any near term pressure of any magnitude."  ¶171b.

GE, in an 8-K filed on October 8, 2008, disclosed, among other things, that "[a] large portion of GECS borrowings ($10.1 billion and $93.8 billion at the end of 2007 and 2006, respectively,) *was issued in active unsecured commercial paper markets that we believe will continue to be a reliable source of short-term financing.*"  ¶183b (emphasis added).  During an October 10, 2008 earnings conference call, Immelt assured investors with regard to GE's CP program saying: "We've had no problems with our own CP . . ." (¶187a) and also that "we have *never had issues* in the CP market rolling our paper" (¶193d) (emphasis added).  During the same call, Sherin said: "If you look at steps that are available to you, number one we've got a great broad CP market.  *We haven't had any trouble funding ourselves*.  . . . [T]he actions that the Fed put in place actually gives the CP market even more confidence about us and we've seen that.  *We continue to fund ourselves at very low rates without any issues.*"  ¶193c (emphasis added).  In talking about the government's plan to backstop the commercial paper market, Sherin said "*We don't plan on using any of those*, but if we were to do it in order, I would say that the Fed facility is a great liquidity facility for our customers."  *Id.*

In contrast to these disclosures, Immelt contacted Paulson on October 13, 2008 and expressed concern that GE was "being left behind" because it was ineligible to participate in the

TLGP.  ¶10d.  Paulson wrote that Immelt told him that "I'm worried about my company and our ability to roll over paper in the face of this [TLGP]."  *Id*.  Immelt again visited Paulson in Washington, D.C. on October 16, 2008 to "make the case that the FDIC should guarantee GE Capital's debt issues."  *Id*.  Immelt complained to Paulson that investors would not want to buy GE's CP when they could buy government-backed CP.  "We are the ones out there making the loans that the banks aren't, and *we need help*," Immelt told Paulson.  *Id.*  (emphasis added.) Paulson then "worked hard" to have GE Capital brought in under the TLGP "to help GE meet its liquidity needs."  *Id*.  On October 23, 2008 the FDIC amended the eligibility requirements to permit GE Capital to issue CP backed by the FDIC.  *Id*.  GE sent a letter to investors on November 12, 2008 touting its ability to sell its CP and noting that "we have continued to issue our commercial paper without disruption."  *Id*.  *See E*Trade*, 2010 WL 1904314, at *24 (finding scienter when defendants' private statements showed knowledge of facts that conflicted with their public statements); *Tower Auto.*, 483 F. Supp. 2d at 342 (finding scienter where "Defendants had access to facts contrary to the alleged statement.")

The Exchange Act Defendants' attempt to dismiss these allegations by claiming that because Immelt held a conversation with Paulson about GE's commercial paper problems on September 15, 2008, the day after Lehman Brothers went bankrupt, this somehow alters the information Immelt was relaying to Paulson.  They claim that such a conversation was understandable during this time period in which the commercial paper market had liquidity problems.  While the Exchange Act Defendants may be correct that given the market collapse one might expect the commercial paper markets to not be functioning properly, the point here is that GE and the Officer Defendants did not admit this fact to its investors; *they said the opposite*, that GE was having "no problems" with commercial paper and Immelt saying GE "never had

issues" rolling its CP.  Plus, the fact that the September 15, 2008 conversation occurred after the Lehman bankruptcy does not account for what Immelt told Paulson *seven days earlier*, on September 8, 2008 - that GE was having trouble selling its commercial paper or Immelt's conversations in October 2008.

Next, the Exchange Act Defendants' contention that the commercial paper markets began to stabilize and operate "smoothly" in late September 2008 and early October 2008 after the government began to assist commercial paper markets undermines their defense.  If the markets were back to operating normally as Defendants claim, then why would GE need to participate in the CPFF and TLGP – and why would the government have created those programs at all?

The facts belie the Exchange Act Defendants' spin.  Despite the fact that GE was eligible to sell up to $98 billion of its commercial paper to the CPFF, Immelt still pressed Paulson for GE to be permitted to participate in the TLGP.  GE was one of the first and largest users of CPFF and also issued approximately $35 billion worth of government guaranteed debt within a month and a half of becoming eligible for TLGP, ultimately issuing $74 billion in government guaranteed debt under the program by the end of Q1 2009.

Plus if the commercial paper markets began to work again in late September and early October 2008, and if the market for GE's commercial paper had similarly rebounded, then there would have been no need for GE to participate in the government programs.  After all, the CPFF charged a 10 basis point (0.10%) "facility fee" just to register for the program.  *See* Danilow Ex. 50 (describing facility fee).  In addition, GE was responsible for a 100 basis point (1%) "unsecured credit charge" on the unsecured commercial paper that it sold to the CPFF.[10]  Like

---

[10] All CPFF borrowers paid the Fed a return on paper purchased by the facility at rates set by a pricing system based on an index rate plus additional "spreads" of 300 basis points (3%) for asset-backed commercial paper and 100 basis points (1%) for unsecured commercial paper.  *See*

the CPFF, the TLGP also charged fees, called "assessments," to institutions participating in the

program based on the amounts and maturities of debt sold with a government guarantee.  *See*

Temporary Liquidity Guarantee Program, 73 Fed. Reg. 72,244, *et seq.* (Nov. 26, 2008), attached

as Ex. 3 to the Block Decl.[11]  For institutions like GE Capital that were not an "insured

depository intuition," the FDIC imposed an additional 10 basis point (0.1%) assessment rate in

the fee calculation.  *Id.* at 72,270.  As a result of these assessments applying automatically under

TLGP, the FDIC permitted eligible institutions wishing to avoid having to pay the fees to opt-out

of the guarantee program entirely, and thousands of institutions elected to do so.[12]  GE Capital

was not among the opt-outs.  Although TLGP's ultimate cost to GE depends on the actual

maturities of the debt it issued under the program, assuming that all of the $74 billion in debt that

GE Capital issued with TLGP guarantees as of Q1 2009 involved three-month commercial paper,

GE's participation in the program would have cost it no less than $111 million.[13]  Debt issued

with longer maturities would have incurred even greater FDIC assessment costs.

---

Danilow Ex. 50.  The additional "unsecured credit surcharge" was assessed on all non-guaranteed unsecured paper sold to the facility.  *Id.*  While TLGP guarantees would eliminate an issuer's requirement to pay the surcharge, GE was not TLGP-eligible until after November 12, 2008, meaning that GE's early and large commercial paper sales to CPFF that began on October 27, 2008 were subject to the additional 1% surcharge.  *See id.* (discussing unsecured credit surcharge); ¶¶10d, 10g, 200a.

[11] The Federal Register Act, 44 U.S.C. § 1507, requires that the contents of the *Federal Register* be judicially noticed.  According to the program's regulations, TLGP assessments were calculated by multiplying the amount of debt, times the term (in years), times an "assessment rate" that depended on the debt's maturity.  *See* Block Decl. Ex. 3 at 72,270.  Assessment rates ranged from 50 basis points (0.5%) for maturities of 180 days or less, to 75 basis points (0.75%) for maturities of 181-364 days, to 100 basis points (1%) for maturities of 365 days or greater.  *Id.*

[12] *See* TLGP Opt Out Lists, http://www.fdic.gov/regulations/resources/tlgp/optout.html, linked from the Temporary Liquidity Guarantee Program index provided at Danilow Ex. 51.

[13] Using the formula set forth in the TLGP regulations, 73 Fed. Reg. at 72, 2270: $74,000,000,000 in government guaranteed debt (¶10g) * .25 years * .006 assessment rate = $111 million.

The Exchange Act Defendants' attempts to rely on their boilerplate disclosures, GE Br. at 33, are without merit.  These disclosures do nothing to alert investors to what GE actually knew at the time – that it was having troubling selling its commercial paper and needed to use the CPFF and be included in the TLGP to sell its commercial paper.  ¶¶5, 10b, 73, 171a-171b, 181(c), 181(f), 193a, 193c, 194, 393, 421a.

Moreover Defendants' citation to the increase in Vanguard's holdings of GE's CP is irrelevant.  This citation does nothing to specify whether Vanguard did, or did not, roll its GE CP after September 8, 2008.  It also fails to address that GE could not sell its CP without government backing.  It also begs the question as to whether Vanguard only increased its holdings of GE CP *because* of the government backing.

Lastly, the argument that scienter is undercut by the fact that the SCC contains no allegations that GE was experiencing liquidity problems, so the SCC's allegations about GE's commercial paper do not support scienter, is off base.  The issue is whether the Exchange Act Defendants' public statements were contradicted by their own internal information.  Here, where GE privately knew that it "need[ed] help" and was having trouble selling its commercial paper, this was directly contrary to the Exchange Act Defendants' public statements, such as that GE's commercial paper program "remain[s] robust" and that "we continue to fund ourselves . . . without any issues."

### c.   Statements Regarding The Dividend, AAA Rating And The $5 Billion in GE Capital Earnings Were Made With Scienter

The SCC sufficiently establishes conscious misbehavior or recklessness with regard to the false and misleading statements concerning (1) the dividend guarantee, (2) GE's AAA rating, and (3) GE Capital's ability to earn $5 billion in 2009.  Each of the Exchange Act Defendants' knew of the massive amount of junk and subprime debt at GE Capital and the related liquidity

problems that the Company faced as a result of GE's severe difficulties selling its commercial paper without governmental assistance.

When GE cut its dividend, it cited the need to preserve cash.  ¶279.  ("This decision will preserve approximately $9 billion for the Company on an annualized basis.")  A few days later, on March 2, 2009, Immelt admitted that GE needed to increase loan loss reserves and that the Company was overexposed to commercial real estate and U.K. mortgages.  ¶¶283-284.  The requisite strong inference of scienter can be inferred from the fact that GE cut the dividend to preserve cash because GE Capital was not turning a profit, GE Capital had to increase reserves and write-downs due to losses stemming from its non-investment grade debt and GE had trouble funding itself and had to seek government assistance to sell its CP.

Similarly, the requisite scienter exists as to the Exchange Act Defendants' statements that they operated GE like a AAA-rated company and that they would keep GE's AAA rating.  Each of the Exchange Act Defendants either knew, or was reckless in not knowing, that the massive, undisclosed amount of junk and subprime debt at GE Capital put GE's AAA rating in serious jeopardy and that GE Capital's difficulties selling commercial paper in private markets demonstrated a liquidity problem that would inevitably lead to a ratings downgrade.  Lead Plaintiff does not charge the Exchange Act Defendants with having to know, in some distant time in the future, that the rating agencies might cut GE's credit rating.  Rather, Lead Plaintiff asserts that the Exchange Act Defendants knew the huge amount of junk and subprime credit that was lurking on GE Capital's books would undeniably affect GE's AAA rating.   Had the Exchange Act Defendants properly revealed this massive amount of junk debt on GE' Capital's books, it would have permitted investors to make their own assessments of the likelihood that GE would retain its AAA rating.

Finally, the Exchange Act Defendants' statements that GE Capital would earn $5 billion in 2009 were false and made with knowledge since business at GE Capital had dried up in the Fall of 2008 and GE Capital's exposure to $220 billion in non-investment grade assets would require large write-downs and loan loss reserve increases. Indeed, it is no coincidence that until the March 19 Investor Conference – *i.e., after* its first rating downgrade – GE continually touted GE Capital's ability to earn *exactly* $5 billion in 2009 because that was the exact revenue figure on which the rating agencies specifically conditioned GE's AAA rating. ¶¶10, 292, 414.

The SCC also establishes how, in an effort to conceal the full scope of losses at GE Capital and inflate period earnings, GE's loan loss reserves were woefully insufficient when measured against historical levels and GE's known nonearning financing receivables. ¶¶338-343. Furthermore, the SCC is replete with information from former GE Capital employees that during 2008 and throughout the Class Period, business at GE Capital was drying up or had ceased altogether. ¶¶73, 112, 393, 395-98. Many of the fifteen CWs described these and other directly interrelated difficulties at GE Capital, noting that GE Capital's business: "more or less halted" and deal volume "fell off a cliff," ¶¶73, 112, 181(c), 393. "[D]eals were not getting done," ¶¶73, 181(f), 397, "[n]obody was willing to buy and banks weren't lending," ¶¶73, 181(f), GE Corporate Financial Services was offering credit to companies that were "distraught," and it was not unusual for energy company borrowers to have trouble repaying GE Capital, ¶¶73, 396. All of this was "greatly affect[ing] GE Capital's performance." ¶¶73, 112, 385, 393, 397.

### d.   The Exchange Act Defendants' Access To Information Contradicting Their Public Statements Supports A Strong Inference Of Scienter

The SCC also sets forth how the Exchange Act Defendants had access to detailed and extensive internally generated reports and financial information (descriptions of the content and frequency of which were provided by the CWs) demonstrating increasing delinquencies in GE

Capital Commercial Finance and GE Money/Consumer Loan portfolios, increasing volumes and percentages of nonearning assets among GE Capital's financing receivables, the declining credit quality of GE Capital's borrowers, increasing defaults in the non-U.S. mortgage portfolio, and the volume of asset write-downs.  ¶¶73, 329-42, 378-87, 391, 400-08.  These internal reports and materials were routinely and readily available to the Officer Defendants and closely tracked loan performance and asset data, describing what assets were in GE Capital's portfolios and how those assets were performing.  ¶¶73, 378, 381-384, 389-399, 400-408.

These reports alone are sufficient to demonstrate that the Exchange Act Defendants acted with scienter.  *See, e.g., In re Globalstar Sec. Litig.*, No. 01 Civ. 1748, (SHS), 2003 U.S. Dist. LEXIS 22496, at *20 (S.D.N.Y. Dec. 12, 2003) (scienter sufficiently pled when a complaint alleged that defendants were updated on a regular basis about the facts upon which the falsity is alleged); *MBIA*, 2010 WL 1253925, at *20 (finding scienter against corporation where non-defendant corporate officers were aware of data on RMBS exposure that, when omitted, made defendant's statements materially inaccurate); *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61542-Civ, 2009 WL 3261941, at *3, n.6 (S.D. Fla. May 12, 2009) (finding scienter against CFO given that his job included monitoring loan loss reserves, meaning that he knew or was reckless in not knowing that those reserves were materially understated).

In response, the Exchange Act Defendants cite to *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("*Dynex*") and *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("*CIBC*") for the proposition that "for each and every challenged statement," Lead Plaintiff "must specifically identify the reports or statements that are contradictory to the statements made."  GE Br. at 26 (internal quotation marks omitted).

Defendants' citations are immensely overbroad because neither case stands for such a vast and sweeping standard.

For instance, unlike here – where the SCC alleges specific categories of detailed data regularly compiled by and shared within GE and GE Capital regarding GE Capital's lending activity, status of financing receivables, and other assets, *see* ¶¶73, 377-87, 391, 400-08 – the *Dynex* court simply held that the plaintiffs in that case had not raised an inference of scienter because their "broad reference to *raw data lacks even an allegation that [the] data had been collected into reports* that demonstrated that loan origination practices were undermining the collaterals' performance." 531 F.3d at 196 (emphasis added).[14] Similarly, the *CIBC* court held that, unlike the SCC's extensive allegations of contradictory information and corroborating accounts of former GE Capital employees, the complaint in that action "makes *no reference* to internal CIBC documents or confidential sources discrediting Defendants' assertions . . . .'" *CIBC*, 694 F. Supp. 2d at 299 (emphasis added).[15]

---

[14]*In re Dynex Capital, Inc.*, Fed. Sec. L. Rep., 05 Civ. 1997, 2009 U.S. Dist. LEXIS 96527, at *50-51 (S.D.N.Y. Oct. 19, 2009) ("*Dynex II*") ("neither the Circuit's decision in *Dynex* nor any other binding precedent requires that the contradictory facts must be summarized in a single report that explicitly states the direct opposite of the misleading statement. To the contrary, a strong inference of scienter is alleged by 'specific allegations of various reasonably available facts ... that should have put the officers on notice' that their public statements were false.") (citing *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009); *Billhofer v. Flamel Techs. S.A.*, 663 F. Supp. 2d 288, 302 (S.D.N.Y. 2009) ("Complaint clearly alleges facts that are more than sufficient to support an inference that *Flamel* knew *something* about the CASPER study results at *some point* during the 'Class Period.'") (emphasis in original).

[15] With respect to the timing of Defendants' knowledge, *CIBC* suggests that allegations of a relevant time frame suffice, stating in passing that the complaint there failed to specify "any dates *or time frame* in which Defendants were put on notice of contradictory information." *CIBC*, 694 F. Supp. 2d at 300 (emphasis added). The SCC, in contrast, alleges how Defendants were on notice of GE's exposure to hundreds of billions of dollars of subprime and non-investment grade debt and its imperiled financial condition as of and during the Class Period.

Here, Lead Plaintiff identifies internal reports and related contemporaneous facts described by former GE Capital employees of which the Exchange Act Defendants were or should have been aware prior to and during the Class Period and specifically alleges when Immelt admitted to Secretary Paulson GE's severe difficulties selling commercial paper and the Company's resulting liquidity problems. Thus, the SCC is consistent with the relevant standards in both *Dynex* and *CIBC*. *Dynex*, 531 F.3d at 196; *CIBC,* 694 F. Supp. 2d at 298-300 .

Defendants' reliance on *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 522-23 (S.D.N.Y.), *aff'd*, 157 Fed. Appx. 398 (2d Cir. 2005), is similarly misplaced. GE Br. at 27-28, n.40. In *Fadem*, a pre-*Tellabs* case, the court simply held that it could not "accept that the existence of an internal communication network, *in and of itself*, sufficiently supports a theory of scienter based upon reckless conduct in the context of specific information at a specific time." *Fadem,* 352 F. Supp. 2d at 523 (emphasis added).[16] Lastly, the Exchange Act Defendants overstate the holding of *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("*SafeNet*"), as requiring Lead Plaintiff to "distinguish between the mental states of the Exchange Act Defendants," GE Br. at 27, n.39.[17] This Circuit has no such requirement. Regardless, at a minimum, all of this negative information should have served as

---

[16] Unlike *Fadem*, the SCC *does* allege "what information was actually passed through these channels" and what information "was conveyed" to the Exchange Act Defendants. *Id. at* 522-23. *See, e.g.,* ¶¶73, 377-408.

[17] In *SafeNet*, the court found that plaintiffs had not adequately alleged scienter of the company's compensation committee members in an options backdating scheme given the absence of allegations of "red flags" that would have put those defendants on notice that the company was improperly accounting for stock options. 645 F. Supp. 2d at 234. *SafeNet*'s reference to how the complaint there "d[id] not even attempt to distinguish between the mental states of the four individuals" was made without reference to authority and relates *only* to the fact that, unlike here where each of the Officer Defendants held his position at GE or GE Capital at all relevant times, members of SafeNet's compensation committee significantly "joined the Board of Directors and Compensation Committee at different times." *Id.*

"red flags" to the Exchange Act Defendants about the Company's poor financial health.  ¶¶76-77, 171b, 176-77, 193a-193d, 241-44,

Moreover, Immelt's and Sherin's misrepresentations in the face of specific questions from analysts also support a strong inference of scienter.  One example was Immelt's response to an analysts' question on October 10, 2008 about the government's CPFF backstop program.  Immelt said that "we have never had issues in the CP market rolling our paper.  ¶193d.  *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("Given the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that [defendant's] behavior reached this threshold of recklessness.").  *See also Scholastic*, 252 F.3d at 77 ("[T]he most egregious allegations involve Scholastic's response to inquiries from Merrill Lynch in early February 1997 … [when] Scholastic knew the return rate for January 1997 had increased 150 percent from the year before.  Yet, by telling Merrill Lynch that return rates remained at normal levels of 20 percent, defendants acted in ways that could be found to be reckless.").[18]

### e. Temporal Proximity Of The Exchange Act Defendants' Contradictory Statements And Admissions Support A Strong Inference Of Scienter

The temporal proximity between the Exchange Act Defendants' positive statements and adverse disclosures, as well as immediate post- (and pre-) Class Period admissions, support a

---

[18] *See also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1181 n. 63 (C.D. Cal. 2008) ("Analysts' questions had markedly shifted from fairly general questions about loan quality and valuations to specific questions about why loan loss reserves were not changing at the same pace as Countrywide's growth and insider trading.").  Here, the Officer Defendants were asked similar questions by analysts.  ¶¶241-42, 244.  *See also MBIA*, 2010 WL 1253925, at *19 (officers' disclosure of detailed information about asset portfolio on conference calls found to support scienter regarding knowledge of portfolio contents); *Abbey Nat'l*, 423 F. Supp. 2d at 361 (indicia of scienter included statements by CEO and others regarding company's extensive structure for risk monitoring).

strong inference of scienter.  *See Avaya*, 564 F.3d at 272-73 (temporal proximity of CFO's

denials to the company's end of quarter adverse disclosure strengthened inference of scienter and

should be taken into account under a holistic *Tellabs* analysis because "the federal courts

certainly need not close their eyes to circumstances that are probative of scienter viewed with a

practical and common-sense perspective.") (quoting *South Ferry LP, # 2 v. Killinger,* 542 F.3d

776, 784 (9th Cir. 2008)); *Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.,* 523 F.3d

75, 91 (1st Cir. 2008) (short amount of time between COO's remarks that problem with product

was fixed and a recall one week later was "strong evidence" of scienter).   For instance, on

January 23, 2009, Immelt appeared on CNBC and stated, with respect to the GE dividend,

"[W]e've got the cash, and we've got the operating model that's going to secure the dividend in

this environment."  ¶248.  During a conference call with investors that same day Immelt said that

"cash flow was actually stronger so our cash position is actually improved today...  We're not

straining in order to pay [the dividend].  In other words, we've got lots of cash and lots of free

cash flow and lots of Capital inside the company..." ¶243.  On February 10, 2009, Sherin

reiterated that "[w]e have put together a plan that said we are going to keep the dividend [at] . . .

$1.24 per share for the year. . . ."  ¶269.

  *Seventeen days later*, on February 27, 2009, GE stated through a press release that it

"today authorized a plan to reduce the Company's quarterly dividend to $0.10 from $0.31 per

outstanding share of the Company's common stock, effective for the second half of 2009.  This

decision will preserve approximately $9 billion for the Company on an annualized basis."  ¶279.

Thus, GE went from having "lots of cash" and not "straining to pay the dividend" to needing to

preserve the cash and cut the dividend just a few short weeks later.

On February 10, 2009, Sherin, on behalf of GE, presented at the Barclays Capital Industrial Select Conference, and *still* continued to assert that GE was in "a much safer, more secure place." ¶¶263-64.  With respect to GE Capital, Sherin stated, "from a reserve perspective, we are absolutely adequately reserved." ¶268.[19]

In Immelt's February 6, 2009 letter (which was disseminated on March 2, 2009) he admitted that GE was not the "safe and secure" place it was previously represented to be, that GE's loan loss reserves were too low, that GE had to get "realistic" about those reserves and that the Company had too much exposure to commercial and U.K. real estate. ¶284.

At the March 19 Investor Conference, GE admitted that it faced increasing pressure on earnings from nonearning assets, and that the source of this pressure was the result of pervasive problems with GE Capital's deeply distressed portfolio.  ¶298.  The Company finally disclosed that GE Capital's deeply distressed portfolio contained approximately $220 billion in credit to subprime and non-investment grade borrowers.  ¶¶299, 301.  Finally, during his June 25, 2009 appearance on the "The Charlie Rose Show," Immelt admitted that GE Capital had simply not been worth what it had been reported to be worth. ¶416-17.[20]

Lead Plaintiff may use out-of-Class Period admissions and information to support inferences of the Exchange Act Defendants' scienter, and the Exchange Act Defendants' attempts to dismiss such allegations are unavailing.  The Second Circuit has explicitly

---

[19] Unlike the facts of *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007), upon which Defendants rely, GE Br. at 28, 33, where the statements contrary to the alleged misrepresentations occurred five months later; in this case, many of the misrepresentations were "corrected" days or weeks after they were made.  Furthermore, unlike in *Xerion*, Lead Plaintiff here *has* identified specific reports that indicate Defendants' statements were contemporaneously false.

[20] This was corroborated by CW 15 who said that, as of the fall 2008, "GE Capital's assets were not worth what they have been reported over the past several years, 'anyone would say that.'" ¶¶87, 389.

recognized that "our cases have relied on post-class period data to confirm what a defendant should have known during the class period." *Scholastic,* 252 F.3d at 72 (holding "the same logic applies" to pre-class period information). *See also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) ("*Vivendi I*") (finding that post-class period articles may establish awareness of falsity of class period statements, as the opposite result would reward defendant for successful concealment); *E*Trade*, 2010 WL 1904314 at, *10 (citing *Vivendi I*).[21]

### f.   Confidential Witnesses Support A Strong Inference Of Scienter

The SCC's scienter allegations are supported by information obtained from fifteen CWs, all of whom are specifically described by their positions and terms of employment at GE and/or GE Capital ¶73.  These accounts of former GE employees corroborate other information alleged in the SCC and contribute to the strong inference of the Exchange Act Defendants' scienter.  The CWs provide a compelling, consistent description of GE's and GE Capital's true and deficient financial health as of and during the Class Period – at the same time the Officer Defendants were knowingly or recklessly painting a false picture for the investment community that GE was a prudent, conservative company that was largely immune to the effects of the subprime crisis.

---

[21] *See also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) ("[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter.") (citation omitted); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("[T]he fact that there was a large, $112 million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings also provides some circumstantial evidence of scienter."); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-Class Period [statements] to confirm what a defendant should have known") (citation omitted); *Globalstar*, 2003 U.S. Dist. LEXIS 22496, at *20-21 (factual allegations that, directly following class period, defendants announced that company's growth rate was "unacceptably slow," and company had only 21,300 subscribers, "support plaintiffs' belief that defendants knew that they were materially misrepresenting the effect of gateway rollouts on potential revenues and subscription rates during the Class Period.").

The Exchange Act Defendants contend the CWs are virtually irrelevant, dismissively referring to those former employees' descriptions of GE and GE Capital's condition – set forth in over six pages of introductory descriptive information (¶73) and in numerous other paragraphs throughout the SCC – as lacking particularity.[22]  GE Br. at 37-40.  In addition, the Exchange Act Defendants attack the anonymity of the CWs to further diminish the significance of their clear and compelling accounts.  In the Second Circuit, a complaint need only identify confidential sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314; *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 U.S. Dist. LEXIS 15489, at *13 (S.D.N.Y. Aug. 1, 2005).  Consistent with Second Circuit requirements, the SCC here provides specific job titles, the divisions in which the sources worked, dates of employment and, in most cases, what specific duties were performed.[23]  Accordingly, Lead Plaintiff has alleged sufficient information supporting the CWs' knowledge of the facts they provided.

---

[22] The Exchange Act Defendants try to make much of the fact that 5 of the 15 CWs were not alleged to have been employed by GE or GE Capital during the Class Period.  GE Br. at 23.  However, this argument has been repeatedly rejected, and should be again.  *See In re Pall Corp.*, 07-cv-3359(JS)(ARL), 2009 U.S. Dist. LEXIS 88240, at *18-21 (E.D.N.Y. Sept. 21, 2009) and *In re Pall Corp.*, 07-CV-3359 (JS)(ARL), 2009 U.S. Dist. LEXIS 110209, at *8 (E.D.N.Y. Nov. 24, 2009) (information from confidential informants supported inference of scienter, even where some of the confidential informants were not employed during class period); *Dynex II*, 2009 U.S. Dist. LEXIS 96527, at *25-26 ("Defendants also seek to discredit Plaintiffs' anonymous sources by noting that many of them were employed by a Dynex affiliate prior to the Class Period .... These arguments are unavailing.").  Such witnesses here describe GE and GE Capital's condition as of the Class Period.

[23] The Exchange Act Defendants fundamentally misstate the "holding" of the Second Circuit's unpublished summary order in *Campo v. Sears Holdings Corp.*, No. 09-3589-cv., 2010 WL 1292329, at *3 n.4 (2d Cir. Apr. 6, 2010) and quote clear *dicta* from within a footnote, addressing a waived argument, to suggest that the anonymity of confidential witnesses "frustrates" the required *Tellabs* analysis and must be discounted.  No such rule exists. Moreover, plaintiffs' claims in *Campo* were not dismissed because of the anonymity of the confidential witnesses, but because *deposition testimony of those witnesses* (ordered by the District Court) failed to overcome defendants' competing inferences of *scienter* given that their

Contrary to the Exchange Act Defendants' characterization, the SCC contains specific allegations that many of the CWs held high-ranking positions at GE Capital from 1985 through June 2009.  ¶73.[24]  Moreover, these former employees are from various GE Capital divisions, different geographical locations, had different seniority levels, and provide consistent accounts of events across relevant time periods.  Such consistency demonstrates the CWs' reliability and provides strong support for scienter.  *See, e.g., In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) ("*Countrywide Derivative Litig.*") (sources from various offices, geographic regions, and different levels of corporate hierarchy at a large company that provided consistent accounts over different time periods support strong inference of scienter).  *See also Atlas Air*, 324 F. Supp. 2d at 493 (crediting "statements of plaintiffs' confidential sources [taken] as a whole" on a motion to dismiss); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 CIV. 1898 (SAS), 2005 WL 2148919, at *13 (S.D.N.Y. Sept. 6, 2005); *Whalen*, 2005 U.S. Dist. LEXIS 15489, at *13-14.

Additionally, confidential witnesses need not have direct contact with defendants, so long as the complaint alleges with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.[25]  *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008

---

sworn testimony did not confirm the complaint's allegations, which merely "[r]el[ied] heavily on the personal knowledge of confidential witnesses."  *Id.* at *3.

[24] These witnesses include an accountant and financial analyst, a senior vice president, a senior profile manager, underwriters, a portfolio/commercial loan analyst in Commercial Finance at GE Capital, a vice president of risk underwriting, a senior vice president for Operations, an assistant vice president in Commercial Financing, and a regional commercial real estate manager.  ¶73.

[25] The Exchange Act Defendants overreach with their citation to *Steinberg v. Ericsson LM Tel. Co.*, 07 CV. 9615 (RPP), 2008 U.S. Dist. LEXIS 99727 (S.D.N.Y. Dec. 10, 2008), aff'd sub nom. *Furher v. Ericsson LM Tel. Co.,* 363 Fed. Appx. 763, No. 09-0134-cv, 2009 U.S. App. LEXIS 22135 (2d Cir. Oct. 8, 2009).  *Steinberg* did not turn on plaintiff's confidential sources having no contacts with defendants, but that the complaint *identified no adverse information*

("*Tellabs II*").[26]  Significantly here, the SCC does not solely rely on the CWs' allegations alone. Rather, consistent with *Tellabs II*, the confidential witnesses' allegations add to the other indicia of scienter in the SCC including defendants own admissions, which *collectively* raise a strong inference of the Exchange Act Defendants' scienter.[27]

The Exchange Act Defendants single out CW 6, a former underwriter who worked in GE Capital's transportation finance group throughout the entire Class Period.  ¶73.  CW 6, who was employed at all relevant times in a capacity directly related to GE Capital's core business, lending, undeniably obtained direct, personal knowledge of matters concerning GE Capital's essential operations and performance through his position.  *Id*.  Furthermore, the SCC alleges that CW 6 obtained further information through attendance at specific meetings led by high-level credit personnel from GE and GE Capital and "internal corporate communications sent to employees from Defendant Immelt"  *Id.*  These facts plainly establish CW 6's competence.  The Exchange Act Defendants further attack the SCC's allegations relating to CW 6's account that "commercial paper markets were 'frozen' as of September 25, 2008."  ¶¶138b, 181(c), 183d,

---

other than stating, "generically, that it was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings, and committees thereof, and via reports'" and "'internal non-public reports' provided to Defendants."  *Id*. at *39-40.  Further, unlike the plaintiff in *In re American Express Co. Sec. Litig.*, 02 CIV. 5533 (WHP), 2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sept. 26, 2008), *aff'd on other grounds sub nom. Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010), the detailed allegations in the SCC concerning reports that were distributed to the Exchange Act Defendants, many prepared by the CWs themselves, *do* allege what the Exchange Act Defendants "knew or should have known during the Class Period."  *Id*. at *21-22.

[26] Like CW 9 here, one of the confidential sources in *Tellabs II* alleged that "sales ... were dropping off a cliff while the company pretended that demand was strong."  *Id.* at 712.

[27] In light of the SCC's extensive allegations regarding GE's asset reclassification shenanigans, how they were effectuated to avoid taking write-downs, and why they violated GAAP, ¶¶91-92, 358-364, the Exchange Act Defendants' distorted argument that CWs 12 and 15 "suggest" that GE complied with GAAP (GE Br. at 70-71, n.115), is meritless.

196b, 196g, 399.  As a GE Capital employee directly working in a lending capacity, CW 6 would undoubtedly understand the condition of commercial paper markets given the vital relationship that commercial paper had to GE Capital's lending programs and the Company's overall funding.  *See Novak*, 216 F.3d at 314 (noting that identification of CWs need only "support the *probability* that a person in the position occupied by the source would possess the information alleged") (emphasis added).  Moreover, allegations regarding CW 6's observations regarding the collapse of broader commercial paper markets as of the start of the Class Period are entirely corroborated in the SCC by other sources. *See* § III(A)(1)(e), *supra*.

> ### g.  Reckless Violations of GAAP Contribute To A Strong Inference Of The Exchange Act Defendants' Scienter

Contrary to the Exchange Act Defendants' assertions, GE Br. at 8, 36, the SCC does not allege GAAP violations standing alone, but in tandem with many other facts that support a strong inference of the Exchange Act Defendants' scienter.  *See Varghese v. China Shenghuo Pharm. Holdings,* 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("[A]lthough GAAP violations do not independently sustain an inference of scienter, they may contribute to that inference."); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393 (S.D.N.Y. 2007) ("[W]here such allegations [of GAAP violations] are coupled with evidence of corresponding fraudulent intent," they may give rise to a strong inference of scienter.).

The Exchange Act Defendants are simply wrong in asserting that, with respect to GAAP violations the SCC must set forth "requisite facts" that include "when and how each Exchange Act Defendant knew" of the GAAP violations, and how those GAAP violations "rendered a specific challenged statement false or misleading."  GE Br at 22.  *See Whalen v. Hibernia Foods*, 2005 U.S. Dist. LEXIS 15489, at *6-7 (rejecting defendants' argument that plaintiffs' allegations were not specific enough to show "how and when" the defendant acquired knowledge of an

alleged fraud and stating, "[t]o plead with particularity does not require at this stage that Plaintiff spell out the very moment [defendant] should have known about the alleged fraud or that [defendant] had actual knowledge of the scope or particulars of the scheme.").  Defendants' reliance upon *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1129-1130 (2d Cir. 1994), is inapplicable given that, unlike *Shields,* "[t]his is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements."  *Scottish Re*, 524 F. Supp. 2d at 394 (distinguishing *Shields*).[28]  *See also E\*Trade*, 2010 WL 1904314, at *14-15, 26-27 (finding scienter where complaint alleged defendants' maintenance of "inadequate reserves"); *Jones v. Corus Bankshares, Inc.*, No. 09 C 1538, 2010 WL 1338070, at *8-9 (N.D. Ill. April 6, 2010) (finding scienter where complaint alleged improper loan loss reserve methodology); *BankAtlantic*, 2009 WL 32661941, at *3 (finding scienter in connection with inappropriate loan loss reserves).

### h.  Defendants' Arguments In Support Of A Competing Inference Under *Tellabs* Are Not Persuasive

The Exchange Act Defendants ask the Court to draw the inference that they were the unwitting victims of the global financial crisis, the impact of which, particularly on GE, they could not comprehend.  Not only is such an inference *not* supported by the facts alleged, *Tellabs*,

---

[28] Defendants' citation to *In re Loral Space & Communc'ns Sec. Litig.*, 2004 U.S. Dist. LEXIS 3059 (S.D.N.Y. Feb. 27, 2004), GE Br. at 37, n.62, is also misplaced.  *Loral*, the Exchange Act Defendants neglect to note, stated that plaintiffs there failed to allege "any *internal reports* that suggested the failure to take an impairment charge earlier" in violation of GAAP.  *Loral Space,* 01 Civ. 4388(JGK) 2004 WL 376442, at *17. Here, the SCC alleges many internal reports pointing to GE's incorrect applications of GAAP including:  the value given the assets in GE Capital's portfolio were no longer appropriate; increasing delinquencies in GE Capital's commercial and consumer portfolios; the increased risk exposure of GE Capital's loan portfolio; and the improper reclassification of assets.  ¶¶73, 377, 378, 379, 381, 387, 402, 403, 404.  The SCC also alleges that during the Class Period, GE Capital's loan loss reserves were below historical levels resulting in increasing shortfalls between the reserve and actual nonearning assets.  ¶ 162(c).  *See also* § III(A)(3), *infra*.

551 U.S. at 314, the argument interjects a factual dispute that is improper at this stage and adds nothing to the Exchange Act Defendants' motion.  *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (rejecting claim that mortgage lender and securitizer were "taken by surprise when the [housing] market took an unexpected turn for the worse"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 n. 53 (C.D. Cal. 2008) ("*Countrywide Sec. Litig.*")("[J]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930's, the Court cannot use that fact to infer anything in particular about a business operating at the time.") (citation omitted).

Here, there can be no dispute that the Exchange Act Defendants knew that more than half of GE Capital's loans and nearly one third of its total assets consisted of the type of high-risk assets that were at the root of the financial crisis, and that these Defendants deliberately misled investors by concealing the existence and amount of these non-investment grade and subprime assets.  *See In re MoneyGram Int'l Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 978 (D. Minn. 2009) ("concealment of specific information related to the Portfolio's subprime exposure and contents" may mislead investors); *E*Trade*, 2010 WL 1904314, at *8 (misrepresentations about asset quality "misled investors regarding the nature of E*Trade's loans and exposure to subprime mortgage risk—i.e. *the fundamental nature of its most important business segment*.") (emphasis added).  This is not a case about Defendants not properly predicting that the overall economy would worsen; it is a case about Defendants concealing, and misleading investors about, GE Capital's exposure to the very type of troubled debt that led to the downfall of numerous other financial institutions.  The Exchange Act Defendants did not have to predict anything, they just had to disclose the hard facts about GE Capital to let investors make their own informed decisions.

Moreover, the totality of facts alleged plainly support a strong inference under *Tellabs* that the Exchange Act Defendants either knew or recklessly disregarded that their statements regarding the financial health of GE and GE Capital, the need for and purpose of the Offering, the Company's ability to pay its quarterly dividend in FY 2009, the composition of GE Capital's asset base, and GE's AAA credit rating, were all materially false or misleading.  Indeed, similar scienter allegations have been held sufficient.  *See Abbey Nat'l*, 423 F. Supp. 2d at 360-362 (holding that the same categories of facts alleged herein – statements from confidential sources; admissions in response to specific questions about defendants' portfolio; repeated remarks about extensive structure for risk monitoring and denials of any problems in the books; press coverage of other corporate failures that left defendant company exposed to risk; large financial corrections that concern core operations; and allegations of GAAP violations – were sufficient to support an inference of scienter).

### 3.  The SCC Sufficiently Sets Forth Defendants' Materially False And Misleading Statements

The Exchange Act Defendants mistakenly assert that "Plaintiff fails to identify a single actionable misstatement or omission."  GE Br. at 43.  They incorrectly postulate that all the SCC does is set forth "a series of block quotes from SEC filings, press releases, and media interviews of GE senior management during the Class Period."  GE Br. at 42-43.

Perusal of the SCC unquestionably reveals the disingenuousness of Defendants' argument.  For example, ¶181 spans six pages in explaining why the specific statements made in ¶¶167-179 were materially false and misleading.  Each specific statement is identified – such as statements as to GE's earnings, the Offering, the dividend, the AAA rating, GE's commercial paper programs, and GE Capital's loan portfolio – and allegations are expressly made as to why each such statement was materially false and/or misleading when made.

50

Indeed, throughout the SCC, each time a series of false or misleading statements is identified, Lead Plaintiff spends considerable effort identifying each statement and alleging why each such statement is materially false and/or misleading.  *See* ¶¶181, 183d, 196, 196b, 196g, 200d, 218, 231, 246, 252, 256.[29]  Moreover, given that the key underpinning of Lead Plaintiff's claims is the Exchange Act Defendants' omission of material information – $220 billion of non-investment grade credit at GE Capital – a purported failure to identify a specific misrepresentation is no flaw.  *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008) ("any lack of specificity that exists in the Complaint may be aided by the fact that, rather than claiming that disputed statements were affirmatively false, Plaintiffs primarily assert that Defendants' statements were rendered misleading by the *omission* of [material] information") (emphasis in original), aff'd sub nom. *Fannon v. Guidant Corp.,* 583 F. 3d 995 (7th Cir. 2009).

The Exchange Act Defendants misplace their reliance on *In re Citigroup Inc. S'holder Derivative Litig.*, No. 07 Civ. 9841, 2009 WL 2610746, at *10 & n.19 (S.D.N.Y. Aug. 25, 2009) and *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005).  In *Citigroup*, Judge Stein found that "some of the complaint's allegations do not even identify specific statements . . . and other allegations set out lengthy quotations without specifying which of the *scores of statements contained in the quotations* plaintiffs allege to be fraudulent."  *Citigroup*, 2009 WL 2610746, at *10 (emphasis added).  More significantly, the *Citigroup* complaint "ma[de] *almost no attempt to identify individual statements* and specify why information about [allegedly

---

[29] While the Exchange Act Defendants argue, on the one hand, that the SCC does not identify what statements are false, on the other hand, they spend considerable effort arguing why statements about the dividend cut, the AAA rating and GE's earnings were not false or misleading when made, belying their contention that the SCC does not identify "a single actionable misstatement or omission."

concealed risks that were required to be disclosed under Rule 10b-5]" and its "*only bow in the direction of specificity* is a claim that the statements were misleading because they were 'positive' or 'championed Citi's financial health.'" *Id.* (emphasis added).  Judge Stein, however, just a few weeks ago denied a motion to dismiss in the Citigroup bondholder litigation, finding that, like GE, the failure to disclose Citigroup's exposure to subprime debt constituted an actionable misrepresentation. *See Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257, at *76-79.  Similarly, in *Alcatel*, the complaint was described as having merely cited various press releases and analyst statements, with repeated, nearly identical, lists of reasons why the quotations were false.  The court concluded, "Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, *or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.  Alcatel*, 382 F. Supp. 2d at 534 (emphasis added).  The SCC here in no way suffers from such basic defects.

The Exchange Act Defendants isolate specific misrepresentations and assert that, standing alone, none of the statements were false or misleading when made.  This piecemeal type approach is, of course, impermissible as the Court is obligated to view the entirety of the SCC's allegations "holistically." *Tellabs*, 551 U.S. at 326.

The SCC charges that, beginning in September 2008, a period of almost unprecedented calamity in the World's financial markets, GE sought to distinguish itself as a safe, secure and reliable financial services company. ¶¶11, 75, 127, 168, 205, 208, 215, 233, 263, 266, 269.  At a time when financial services companies were imploding for having underwritten billions of dollars of non-investment grade and subprime debt, GE sought to distinguish itself as a company that did not suffer from such exposure. ¶¶10, 127, 168-69, 189, 211.  The Exchange Act

Defendants misled investors by providing a steady barrage of positive, assuring statements about GE and GE Capital, all the while withholding from disclosure the material fact that roughly a third of GE Capital's total assets and more than half of its loan portfolios, or $220 billion, involved credit to non-investment grade or subprime borrowers.  *See Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257, at *56-59 (failure to disclose full subprime exposure an actionable omission); *E*Trade*, 2010 WL 1904314, at *8 (misrepresentations about "exposure to subprime mortgage risk" are actionable); *MoneyGram*, 626 F. Supp. 2d at 978 ("concealment of specific information related to the Portfolio's subprime exposure and contents" may mislead investors).

Had the Exchange Act Defendants made full and complete disclosure of these facts, investors would not have been misled by their statements.  Similarly, the Exchange Act Defendants concealed the fact that as of September 8, 2008, GE was having trouble selling its commercial paper in private markets and thus funding itself, and that GE required government assistance to sell more than $74 billion worth of its commercial paper.  ¶¶6b, 10a-10g, 421a. Had the Exchange Act Defendants disclosed this fact or had not repeatedly assured investors that the Company was having no problems funding itself in private markets (¶¶171a-171b, 193a-193d, 196a, 196c, 196e-196f, 198a, 200a-200d), investors would not have been further misled by the Exchange Act Defendants' statements.

Thus, viewing all the statements together, rather than in isolation, the clear picture emerges that the Exchange Act Defendants materially misled investors as to the financial strength of GE and GE Capital, the safety and security of the GE dividend, and GE's ability to maintain its AAA rating during the subprime crisis.  After all, as Sherin conceded on October 10, 2008, "everyone wants to know . . . what's the potential for future loss impact" at GE Capital. ¶189.  Yet, the Exchange Act Defendants concealed from investors these very facts.

Determining falsity does not require an analysis of whether "particular statements, taken separately, were literally true, but [rather] whether *defendants' representations, taken together and in context, would have misled a reasonable investor* about the nature of the securities." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 491 (S.D.N.Y. 2005) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)) (emphasis added).  Moreover, statements that may otherwise be literally true can nonetheless form the basis of liability if there are material omissions related to the content of those statements that would render those, or other statements, materially misleading.  *See E*Trade* 2010 WL 1904314, at *6; *BMS*, 586 F. Supp. 2d at 159-60. Once the Exchange Act Defendants elected to speak about the particular matters alleged in the SCC to have been misleading, "Rule 10b-5 mandate[d] that [such] speech must be truthful, accurate, and complete."  *Id*.  *See also Caiola ,* 295 F. 3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues.  Once [the company chose to discuss a particular topic] it had a duty to be both accurate and complete.") (internal citations omitted); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (concluding that § 10(b) and "Rule 10b-5 impose[] . . . a duty to disclose only when silence would make other statements misleading or false") (internal quotations and citations omitted).  The requirement to be complete and accurate goes beyond requiring disclosure of matters that may be merely "interesting" and requires disclosure of material facts necessary to give investors the necessary assurance "that what[ever information] was revealed would not be so incomplete as to mislead."  *BMS*, 586 F. Supp. 2d at 160 (citation omitted); *In re WorldCom Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) ("When a person speaks, but chooses to omit information, the liability for that omission will be judged by its materiality.").

### a.  Statements Concerning The AAA Rating Are Actionable

The Exchange Act Defendants' contentions that the statements concerning the AAA rating are not actionable are incorrect.  In addition to ignoring the significance of GE concealing GE Capital's $220 billion in junk and subprime debt and GE's inability to fund itself with commercial paper in the private market as of September 8, 2008, Defendants mistakenly argue that the misleading statements about GE running itself as a AAA company are merely fraud by hindsight "because Plaintiff alleges no facts sufficient to show that the Exchange Act Defendants knew or should have known that any of the statements concerning the AAA rating were false or misleading when made."  GE Br. at 44.

First, the Exchange Act Defendants misled investors by claiming GE Capital was run with the commitment to maintain a AAA rating when they failed to reveal that more than half of GE Capital's loans, and approximately a third of GE Capital's total assets consisted of non-investment grade and subprime borrowers.  Second, the Exchange Act Defendants knowingly or recklessly disregarded that due to this exposure to subprime and junk grade debt, GE was at a high risk for a downgrade given that the rating agencies were scrutinizing, and downgrading, financial services companies with such exposure, and had specifically conditioned GE's AAA rating on GE Capital's ability to earn $5 billion in 2009.  Additionally, the Exchange Act Defendants misled investors when they failed to disclose that since September 8, 2008 GE had been, unlike a AAA-rated company, having trouble selling its commercial paper in private markets and, that since October 27, 2008, it was relying on government programs to be able to meet its commercial paper funding needs.

The Exchange Act Defendants' attempts to assert that they specifically cautioned investors through "explicit disclosures" that GE "could not guarantee maintaining the AAA

rating" are spurious.  GE Br. at 45.  Defendants point to boilerplate disclosures contained in the

Offering prospectus supplement regarding "difficult conditions in the financial services markets

that have materially and adversely affected the business and results of operations of GE Capital,"

including that:

> "In light of the difficulties in the financial services industry and the difficult financial markets, however, there can be no assurance that we will successfully complete these steps or, in the event of further deterioration in the financial markets, that completion of these steps and any others we might take in response, will be sufficient to allow us to maintain our 'Triple A' ratings.  Failure to do so could adversely affect our cost of funds and related margins, liquidity, competitive position[s] and access to capital markets."

GE Br. at 14.

These purported risk disclosures in no way provided investors with meaningful

cautionary language that would warn investors that GE was not able to maintain its AAA rating.

In fact, the same risk disclosures could apply to every company in America in the latter part of

2008.  Risk disclosures are not considered meaningful if the actual, undisclosed risks faced by

the Company are omitted from the risk disclosure and they cannot shield defendants from

liability where, as here, they omitted material facts which made those statements false and

misleading.[30]  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) "[i]t

would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the

same time disclaim those misrepresented facts with cautionary language."); *Hunt v. Alliance N.*

*Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir. 1998) (applying the bespeaks caution

doctrine and finding that "cautionary language ... must relate directly to that by which plaintiffs

claim to have been misled.").

---

[30] In making this argument, the Exchange Act Defendants do not claim that their statements about the AAA rating were forward looking statements under the PSLRA or the related "bespeaks caution" doctrine.  GE Br. at 43-46.

Had GE disclosed that it might not maintain its AAA rating because of the multi-billion dollar junk and subprime debt held at GE Capital and the Company's inability to fund itself using private commercial paper markets – information that, as described in § III(A)(1), was readily available to each of the Exchange Act Defendants then, these arguments based on purported risk disclosures might pass muster. However, such is not the case here.

The final two arguments advanced by the Exchange Act Defendants are equally baseless. First, they contend that since S&P issued an announcement on January 12, 2009 that it could "reexamine" GE's AAA rating "if" certain events were to occur, Immelt's statements on January 23, 2009 concerning GE maintaining its AAA rating cannot be actionable since investors were already put on notice of a downgrade by S&P. GE Br. at 45, n.77. S&P stated, however, that "if" certain events occur at GE, it "would reexamine our credit opinions." S&P specifically cited that for it to reexamine its credit opinion, a combination of events would have to occur including "[GE Capital's] earnings are much weaker than the $5 billion that GE expects . . . and GE's being unsuccessful in managing working capital or asset sales in 2009." *Id.* The announcement by S&P is irrelevant since it merely states that *if* certain adverse events were to occur in the future, S&P *might* downgrade GE.

Second, the Exchange Act Defendants argue that the SCC fails to state a claim regarding the January 27, 2009 press release because its allegations – that if the GE credit rating were downgraded, it would have an adverse impact on GE – is precisely the type of information that most investors already know. *See* GE Br. at 45-46. This distorts the SCC's allegations. In its January 27, 2009 press release, GE represented that "Our objective is to maintain our Triple-A rating, *but we do not anticipate any major operational impacts should that change*." ¶253 (emphasis added). The Exchange Act Defendants contend, notwithstanding what they put in

their own press release, that investors should have known better – that a downgrade would have an adverse operational impact on GE.  However, the actual disclosure made by GE on January 27, 2009 directly contradicts GE's prior disclosures about the advantages of maintaining its AAA rating (¶¶9, 136, 168, 170, 187, 223), so investors would be misled by GE's new, and contradictory, disclosure.[31]

### b.  Statements Concerning The Dividend Are Actionable

The Exchange Act Defendants' arguments that the SCC's allegations concerning their statements about GE's full 2009 dividend are: (1) forward looking statements of opinion; (2) unsupported by well-pled facts; (3) accompanied by proper cautionary risk disclosures; and (4) unsupported as GE had the cash on hand to pay the dividend, are each without merit.

The Exchange Act Defendants rely, almost exclusively, on the Second Circuit's decision in *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107-109 (2d Cir. 1998) for the proposition that statements concerning the dividend are not actionable.  *IBM* is readily distinguishable.  There, the Second Circuit affirmed the grant of summary judgment in a case where the plaintiff challenged a handful of forward-looking statements made by IBM's CFO and Director of Investor Relations about whether IBM would continue to pay quarterly dividends beyond FY 1992.  *Id.* at 104-05.  As background, IBM suffered significant losses in 1991 and was having operating difficulties in 1992.  *Id*. at 105.  During the third quarter of 1992, IBM's CFO told investors on an analyst conference call in October 1992 that: "We have no plans nor need to do

---

[31] The Exchange Act Defendants' reliance on *In re IAC/InterActiveCorp Sec. Litig*., 478 F. Supp. 2d 574, 594 (S.D.N.Y. 2007) ("*IAC*"), is misplaced.  There, the defendant corporation made "regular, meaningful, and specific warnings" that contained "explicit warning[s]" regarding the *precise* tax collection issue claimed to have been omitted.  *Id.*  Here, no such disclosures were made by GE, and the disclosure of GE Capital's exposure to $220 billion in low-grade credit and the Company's difficulties issuing its commercial paper in private markets *unquestionably* would have "significantly altered the total mix of information made available."  *Id.* (quoting *Acito v. IMCERA Group*, 47 F.3d 47, 52)(2d Cir. 1995).

anything about the dividend.  Our results in the third quarter although below our expectations in

terms of cash flow are not a major hit to us. . . . [Cash flow is] sufficient to cover the dividend *in*

*1992*." *Id*. at 105 (emphasis added).  During the same call, the Director of Investor Relations

said "we're not – despite your anxiety – concerned about being able to cover the dividend for

quite a foreseeable time." *Id*.  Approximately two months later, on December 15, 1992, IBM

announced that it was "unsure of its ability to maintain the dividend at current levels." *Id*. at

106.  IBM's stock price fell and a class action was filed.  *Id*.  Although IBM paid the full

dividend, $1.21 per share in 1992, in July 1993, it formally cut the dividend.  *Id*. at 105-06.

In affirming dismissal, the Second Circuit held that the statements at issue were not

actionable since they "were predictions or opinions, and not guarantees." *Id*. at 107.  The court

cautioned, however, that "[s]tatements that are opinions or projections are not *per se* inactionable

under the securities laws." *Id*. (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 266 (2d Cir.

1993)).  "Statements regarding projections of future performance may be actionable under

Section 10(b) or Rule 10b-5 *if they are worded as guarantees* or *are supported by specific*

*statements of fact . . .* or if the speaker does not genuinely *or reasonably* believe them." *Id*. at

107 (emphasis added)(internal citations omitted).  The Second Circuit pointed to the fact that it

was IBM's Board, and not its officers, who decide whether to declare a dividend in the future.

*Id*.  The Court of Appeals also noted that IBM did, in fact, pay the entire dividend in 1992 just as

the CFO said it would.  *Id*. at 107-08.  The Court held that "[i]t would be unreasonable, as a

matter of law, for an investor to rely on these projections as long-term guarantees because these

statements contain sufficient cautionary language to indicate that they were only short-term

predictions." *Id*. at 108.  The Second Circuit further noted that the statements were "phrased as a

loose prediction *and in no way promises to maintain the dividend* at any stated level." *Id*. at 109

(emphasis added).  Finally, the Court noted that "there is nothing in the record to suggest that the speakers were aware of any facts undermining the accuracy of [their] statements."  *Id.*

In contrast to the statements at issue in *IBM*, Immelt's and Sherin's statements here regarding the dividend are tantamount to guarantees: "the GE dividend *is secure for investors.*[32] *The Board has approved* management's plan to maintain the current dividend *through '09* even in these relatively uncertain economic times at $1.24 per share" (¶169); "[The] Board of Directors has approved management's plan to maintain GE's quarterly dividend of $0.31 per share, totaling $1.24 per share annually, through the end of 2009.  That plan is unchanged" (¶201); "We are reaffirming our plan to maintain a $1.24 per share dividend in 2009" (¶207).  In this context, a guarantee need only "imply certainty."  *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (citing *IBM*, 163 F.3d at 107; *Novak*, 216 F.3d at 315; and *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999)).

The statements at issue here are that the Board, not management, approved a plan to pay the entire dividend throughout 2009, which was a "promise[…] to maintain the dividend at [a] stated level."  *IBM*, 163 F.3d at 109.  Moreover, unlike in *IBM*, the statements here are plainly phrased as guarantees: "What can you count on?  *You can count on a great dividend, $1.24 board approved* at the last board meeting last Friday, []in 2009."  ¶220.  Additionally, Lead Plaintiff has alleged facts – the $220 billion in undisclosed junk and subprime debt and GE's inability to fund itself with commercial paper in private markets – which these Defendants were aware would "undermin[e] the accuracy of [their] statements."  *IBM*, 163 F.3d at 109.  Finally, the Exchange Act Defendants *concede* that statements of the Board's approval of the $1.24

---

[32] In *IBM*, the Court did not consider whether the statement made by the CFO that "obviously the dividend is safe" was actionable because it was made prior to the start of the class period.  *IBM*, 163 F.3d at 105.

dividend for all of 2009 were "accurate statements of historical fact," GE Br. at 48 n.84, further distinguishing this case from *IBM*.[33]

The contention that allegations regarding the dividend are not well-pled because Lead Plaintiff does not "allege any facts showing that the Exchange Act Defendants knew, at the time of the challenged statements, that GE would be unable to maintain" the dividend is easily disposed of.  As discussed in § III(A)(1), *supra*, the SCC alleges that the Exchange Act Defendants either knew, or recklessly disregarded, that the serious financial problems at GE Capital, from the lack of business (¶¶73, 112, 393, 397-98), to the $220 billion in junk and subprime debt (¶¶96-97, 299, 301-02), to GE's difficulties funding itself with commercial paper (¶¶10a-10g, 421a) would prevent GE from paying the dividend, as guaranteed, throughout all of 2009.

The Exchange Act Defendants' attempt to establish that GE made appropriate risk disclosures concerning payment of the dividend falls flat.  These Defendants rely on the boilerplate risk disclosure that "in the event of material future deteriorations in business conditions, the board may determine to reduce or eliminate our common stock dividend."  GE Br. at 47.  This purported risk disclosure could apply to every company in the world that paid a dividend and in no way alerted investors to the real risks as to why GE would not be positioned to pay its dividend.

Finally, Defendants' contention that the SCC charges that GE did not have sufficient cash to pay the dividend not only misrepresents what is actually pled, but highlights why the

---

[33] The Exchange Act Defendants' reliance in *IAC*, 478 F. Supp. 2d at 594 for the proposition that "accurate statements of historical fact" is overreaching.  Unlike *IAC*, where the complaint failed to allege "why plaintiffs believe that the statements were fraudulent," *id*., the SCC here alleges how the Exchange Act Defendants knew or were reckless in not knowing that GE was not capable of paying its full $1.24 "for all of 2009" at the time it assured investors to the contrary.

statements regarding the dividend were misleading when made.  First, the Exchange Act Defendants mislead when they assert that "Plaintiffs' [sic] [make] far-fetched allegation[s]" by claiming that "frozen CP markets made GECC unable to fund itself and deprived GE of cash necessary to pay the dividend."  GE Br. at 47.  What the SCC actually alleges is that Immelt's statement about *GE Capital's* "strong position . . . protect[ing] our investor dividend" was "false and misleading given that, as alleged herein and described above, GE *Capital* was in dire financial straits in terms of not generating new business and revenues, and therefore could not be a source of cash to fund the quarterly dividend."  ¶181(i) (emphasis added).

Second, highlighting GE's strong cash position actually supports the allegations that GE reduced the dividend because of problems at GE Capital and the need for increased write-downs due to the $220 billion in undisclosed junk and subprime debt.  As discussed herein, Immelt and Sherin repeatedly highlighted that GE had more than sufficient cash to pay the dividend.  GE announced, however, on February 27, 2009 that it was cutting the dividend in order to "preserve approximately $9 billion for the Company on an annualized basis."  ¶279.  Clearly, despite touting how much cash GE had on hand, and how much cash it generated, GE needed to preserve its cash because of large losses looming at GE Capital.  This is further confirmed by analysts' comments after the dividend cut, "GE's reserve levels and eventual 'mark to market' losses continue to be the greatest debate" ¶282.  Immelt admitted in the Immelt Shareholder Letter that "we have lowered costs, [and] *increased [loan] loss reserves . . .*".  ¶283 (emphasis added).  He continued that "[w]e are prepared for a very rough economy [but] have [recently] been realistic about our loss estimates."  *Id.*  Clearly, GE decided to finally become realistic about rising loan losses – stemming from its undisclosed $220 billion in junk and subprime debt – which forced the Company to have to reduce the size of its dividend, despite having billions of dollars of cash

on hand.  Moreover, Immelt's admissions to Paulson that as of mid-September 2008 – before the

broader slowdown in commercial paper markets – the Company was "having trouble with its

funding" (¶¶10b, 421a) and Immelt's pleading with Paulson in mid-October 2008 for inclusion

into the TLGP debt guarantee program because GE "need[ed] help"(¶10d) demonstrate that GE

was incapable of funding itself and securing the necessary cash to support its dividend using

private commercial paper markets.

**c.   GE Capital's Exposure To Hundreds Of Billions Of Dollars Of Low-Grade Debt Was A Present Fact That Was Required To Be Disclosed**

Incredulously, the Exchange Act Defendants contend that "GE had no duty to disclose"

GE Capital's exposure to $220 billion in subprime and non-investment grade debt during the

height of the subprime crisis, further contending that Lead Plaintiff is engaging in "fraud by

hindsight," *i.e.*, that just because GE disclosed on March 19, 2009 that GE Capital had over $220

billion in junk and subprime debt on its books did not mean that it had to disclose these facts

earlier.  GE Br. at 52-54.  These related arguments are wholly specious.

As discussed in § III(A)(1)(a), GE was required to disclose facts relating to its $220

billion exposure to subprime and below investment grade debt at GE Capital.  Such disclosure

was required since the Exchange Act Defendants chose to make statements about the purported

credit quality of GE Capital's assets and loan portfolios; thus, their statements had to be

complete so as to not mislead.[34]  As Judge Stein recently held in *In re Citigroup Bond Litig*., in

---

[34] The Exchange Act Defendants' reliance on the Fourth Circuit's opinion in *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) is fundamentally misplaced.  Unlike here, where the particular definitions and amounts of the $220 billion in subprime and non-investment grade assets at issue were provided by GE itself, *see supra*, n.5,  *Nolte* quoted proposed banking regulations (inapplicable to a non-bank like GE Capital) for the notion that the meaning of "subprime" was not uniform, but was "institution-specific."  390 F.3d at 317.  Similarly, *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) is of little relevance here given that the SCC does allege how the Exchange Act Defendants' failure to

63

response to a similar argument that Citigroup was not required to disclose its overall exposure to subprime debt:

> That argument overlooks both the statutory language and well-established case law which make clear that once an entity opts to include information in its registration statement – here, its maximum exposure to VIEs along with its prediction that "actual losses are not expected to be material" – it has a duty to disclose any additional material fact "necessary to make the statements [already contained therein] not misleading." 15 U.S.C. § 78k; *see also Caiola v. Citibank, N.A.,* 295 F. 3d 312, 331 (2d Cir. 2002)("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully and accurately.")

*Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257, at *60.

Here, GE chose to speak about its subprime exposure in its Q3 2008 10-Q, stating: "At September 30, 2008, we had approximately $1.5 billion of exposure to residential subprime credit . . . ." GE Br. at 15 (quoting GE's Q3 10-Q at 41-42).[35]  In reality, however, 42% of all of GE Capital's $183 billion in consumer loans – nearly *$77 billion* (51 times the amount of GE Capital's subprime investment exposure) – were to subprime borrowers, with over $16 billion in exposure to subprime mortgages in the U.K. alone.  ¶299.  Since GE, Immelt, Sherin, Cary and Neal chose to speak about this subject, they were required to make full and complete disclosure. *See E*Trade*, 2010 WL 1904314, at *8-9 (during subprime crisis, concealing "exposure to subprime and mortgage risk" was misleading to investors); *MBIA,* 2010 WL 1253925, at *1,

---

disclose GE Capital's $220 billion in exposure to low-grade debt was material to investors in the midst of the subprime crisis.

[35] This purported disclosure failed to reveal that GE Capital was exposed to over $220 billion in subprime and non-investment grade credit, including over $16.5 billion in subprime mortgages in the U.K. alone.  This disclosure was so misleading that the Exchange Act Defendants themselves cited it on page 35 of their previously-filed memorandum of law (Docket No. 92) to deny that GE had concealed the full amount of subprime exposure at GE Capital, stating: "Plaintiff's theory that Defendants somehow engaged in a 'scheme' to conceal that 'significant portions of GE Capital's lending were made to sub-prime or other low-credit quality consumer borrowers,' . . . is also belied  by GE's specific disclosure of the amount of GE Capital's subprime exposure, both before and during the Class Period."

(finding company's failure to disclose *separately* the amount of its exposure to certain derivatives comprised of RMBS misled investors as to its exposure to RMBS risks at a time when "investors and credit agencies were increasingly concerned with the potential effects of residential mortgage defaults . . . ."); *MoneyGram,* 626 F. Supp. 2d at 978 (during subprime crisis, "concealment of specific information related to the Portfolio's subprime exposure and contents" misleading to a reasonable investor).

Second, the Exchange Act Defendants' contention that Lead Plaintiff merely pleads fraud by hindsight is absurd.  GE Br. at 52-53.  As the Second Circuit held in *Novak*, "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  216 F.3d at 309.  The reality of the massive amount of junk and subprime debt held by GE Capital was undeniably known by or "reasonably available" to defendants during the Class Period, and was unquestionably material to investors.  Plus, there can be no dispute that GE Capital held virtually all these assets prior to the commencement of the Class Period.[36]  As such, GE should have disclosed facts relating to the massive volume of junk and subprime debt at GE Capital – hard facts that were in existence at the commencement

---

[36] On June 30, 2008 GE reported that GE Capital's assets were $695 billion.  ¶¶85, 130.  At the March 19 Investor Conference, GE reiterated that at YE 2008 GE Capital's assets were carried at $637 billion.  ¶294 (March 19 Investor Conference); Presentation at slides 9, 28.  At year-end 2008, GE Capital's total loans outstanding had shrunk to $377.78 billion from $428.4 billion as of the start of the Class Period (¶¶340-341, tables showing financing receivables), and new lending activity had ground to a halt (*e.g.*, ¶73).  It is therefore completely implausible to suggest that in the last fiscal quarter of 2008, between September 30, 2008 and December 31, 2008, GE Capital made over $220 billion in new loans to borrowers with subprime or non-investment grade credit, or that these assets somehow appeared on GE Capital's books when the Company disclosed the credit quality of its borrowers on March 19, 2009.  Further, as indicated in the Presentation, the Company's disclosures at the March 19 Investor Conference provided details of what was on GE Capital's books as of year-end 2008, two and a half months prior to the date of disclosure.  *See MBIA*, 2010 WL 1253925, at *19 (when a summary chart of assets concealed the existence of a particular asset category within aggregate assets, scienter found when defendants updated the chart to reveal existence of that asset during the class period).

of the Class Period – by September 25, 2008, or, at the latest, as of the Offering in early October

2008.  *See Atlas Air*, 324 F. Supp. 2d. at 494-95 (rejecting fraud by hindsight claim where

allegations that "the company failed to take into account information that was available to it" at

the time it issued its incorrect financial results); *E\*Trade*, 2010 WL 1904314, at \*18 ("It is not

'fraud by hindsight' when statements related to a loan's existing quality and risks were false and

misleading when made."); *Tower Auto.*, 483 F. Supp. 2d at 342 (finding scienter where

"Defendants had access to facts contrary to the alleged statement").[37]

Third, the Exchange Act Defendants also take the wholly untenable position that GE

Capital's exposure to $220 billion worth of subprime and non-investment grade debt was not

material to investors.  GE Br. at 54.[38]  Not only would revealing these facts, which were entirely

absent from GE's disclosures, significantly have "affected the total mix of information" available

to investors about GE Capital's true risk profile, *see*, *e.g.*, *MBIA*, 2010 WL 1253925, at \*10, 14

(internal quotation and citations omitted), the fact that over half of GE Capital's outstanding

loans and nearly one-third of its total assets involved borrowers with non-prime credit was

undeniably material.  *See Landmen Partners, Inc. v. Blackstone Group L.P.*, 659 F. Supp. 2d

532, 541-42 (S.D.N.Y. 2009) (noting that only *5%* is a typical "benchmark" for starting the

---

[37] The Exchange Act Defendants' argument that Sherin's statements regarding GE's lack of exposure to SIVs, CDOs, and CDSs are not contradicted by facts in the SCC (GE Br. at 55) entirely misses the point of those allegations.  During the subprime crisis, acronyms like SIV, CDO, or CDS described derivative instruments that became synonymous with the subprime assets underlying those derivatives themselves.  *See* ¶196(b).  Accordingly, Sherin's statements that GE held no such *derivative* assets was fundamentally misleading as it concealed the fact that GE Capital held $220 billion in subprime and junk grade debt of the kind that investors were particularly concerned about at the time (¶8).

[38] The standard for dismissal on the grounds of purported immateriality is high.  "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (citation omitted)..

analysis of materiality) (citing *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009)).  The purported disclosures to which the Exchange Act Defendants refer (GE Br. at 54) are completely unrelated to the specific risks relating to GE Capital's $220 billion in low-grade debt exposure as alleged in the SCC.[39]

The Exchange Act Defendants' argument that "valuations of sub-prime assets – are opinions" (GE Br. at 53) is also specious.  The central allegation of the SCC is not that GE failed to appropriately disclose the proper value of the subprime and non-investment grade assets held on GE Capital's books, but that the Exchange Act Defendants *failed to reveal these assets' existence at all* until the March 19 Investor Conference.  Thus, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010), *reaffirmed* 08 Civ. 10637, 2010 U.S. Dist. LEXIS 28, 39 (S.D.N.Y. Mar. 25, 2010) and *CIBC*, 694 F. Supp. 2d at 300-01, are wholly irrelevant.

### d.  Statements Concerning GE Capital's Commercial Paper Programs are Actionable

The Exchange Act Defendants contend that the SCC fails to meet either Fed. R. Civ. P. 8 or 9(b) and fails to allege actionable statements because "Plaintiff fails to plead any facts showing that GE was unable to meet its short-term funding needs due to a disruption in the CP

---

[39] The Exchange Act Defendants' reliance on *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597, 612-13 (S.D.N.Y. 2008), aff'd, 347 Fed. Appx. 665 (2d Cir. 2009), and *Fulton County Empl. Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364, *17 (E.D. Wis. Feb. 18, 2010), GE Br. at 54, n.91, is misplaced.  Unlike *Garber*, the Exchange Act Defendants never "disclosed the very risks allegedly concealed" regarding GE Capital's subprime exposure until the March 19 Investor Conference.  GE Br. at 54, n.91 (characterizing *Garber*, 537 F. Supp. 2d at 612-13).  Similarly, unlike *MGIC*, 2010 WL 601364, at *17 (where defendant corporation disclosed, among other things, its available cash, that an affiliate was "subject to increasing margin calls" and that "liquidity was a concern," defendant did not have to further disclose "the precise dollar amount of the margin calls"), GE did not make *any* disclosure that GE Capital held material amounts of subprime and non-investment grade debt (other than $1.5 billion in subprime-exposed investments) until the March 19 Investor Conference.

market . . ." (GE Br. at 55) is misplaced.  During a period of severe market disruption, GE was publicly assuring its investors that it had "no trouble" rolling its CP, but was privately pleading with the government for help.  This addresses the significant and material fact concerning GE's liquidity and ability to fund itself.  The fact that GE was able to persuade the government to provide a backstop, thereby avoiding a major financial catastrophe at GE, in no way diminishes the fact that investors were kept in the dark as to GE's true state of affairs.

Contrary to the Exchange Act Defendants' assertions, Immelt's and Sherin's statements touting GE's CP programs on September 25, 2008 were not mere "corporate optimism and puffery" (GE Br. at 56, 60 n.99).  They were statements misrepresenting then-existing facts that were made in the context of a commercial paper market meltdown during the crisis (*see*, *e.g.*, ¶¶4-6b).  *See E*Trade*, 2010 WL 1904314, at *16-18 (finding misrepresentations of present facts may not be "puffery"); *Abbey Nat'l*, 423 F. Supp. 2d at 359-60 ("[T]hese were not mere rosy predictions.  Instead, they were directed at *Abbey*'s then-existing financial condition and made at a time when defendants were aware or should have been aware of contradictory information.").  Similarly, the Exchange Act Defendants' partially quoted statements from October 8 and 10, 2008 are not mere "expressions of opinion" but fundamental misrepresentations of then-present facts known to the Exchange Act Defendants about GE's commercial paper programs.  *See Corus*, 2010 WL 1338070, at*10 ("[A] statement is not protected from the securities laws merely because it speaks to matters of opinion and hope.  . . . [S]tatements of opinion will be actionable if it is possible defendants said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante.") (citations and

quotation omitted). Here, the Exchange Act Defendants' false assurances about GE Capital's CP

programs in the midst of a market wide freeze certainly misrepresented then current facts.[40]

Lastly, the Exchange Act Defendants' attack on the SCC's allegations that GE's AAA

credit rating was, in part, tied to its ability to fund itself with commercial paper is fundamentally

flawed. *See In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009)

("*Vivendi III*") (concluding that credit rating downgrade revealed defendants' concealment of

company's liquidity problems). Not only does the SCC allege Immelt's admissions with respect

to GE's inability to fund itself with commercial paper as of early September 2008, it strains

credulity to suggest that the SCC has not alleged that "such funding difficulties bore any relation

to GE's AAA rating." GE Br. at 56. *See* ¶181(d) (alleging that Exchange Act Defendants'

statements relating to GE's AAA rating were false and misleading given that "the Company was,

as alleged herein, aware that . . . there were *increasing capitalization, cash, and liquidity*

*concerns at GE Capital* and that those circumstances resulted in there being grave threats to

GE's AAA credit rating.") (emphasis added). Moreover, the Exchange Act Defendants'

reference to the rating agencies' September 25, 2008 reaffirmation of GE's credit rating

(inappropriately taken from outside the SCC) further underscores Lead Plaintiff's essential

---

[40] That GE was "unable to fund itself" is plainly evident from Paulson's account of Immelt's
private admissions on September 15, 2008. *See* ¶10b; Danilow Ex. 4 at 228 ("The fact that the
single-biggest issuer in this $1.8 trillion market *was having trouble with its funding* was
startling."). Moreover, Paulson succinctly describes the link between difficulties selling
commercial paper (which Immelt first admitted about GE on September 8, 2010) and
corporations funding themselves: "Companies use these [commercial paper] borrowings to
*conduct their day-to-day business operations*, financing their inventories and meeting their
payrolls, among other things. . . . *When their access to short-term financing is in question,*
*companies have to curtail normal business operations*." Danilow Ex. 4 at 228 (emphasis added).

argument on this issue; that GE's concealing the substance of Immelt's admissions to Paulson misled markets, including the rating agencies.[41]

### e.   Statements Relating To The October Offering Are Actionable

The Exchange Act Defendants contend that Lead Plaintiff cannot pursue claims for Immelt's false statements made on September 25, 2008 during a call with analysts.  During the call, Immelt was asked if the "idea of any new equity [is] still off the table," and Immelt replied, "we just don't see it right now."  ¶¶76, 177.  Of course, six days later GE announced the $12 billion Offering and the $3 billion Berkshire Hathaway Investment.  ¶¶77, 177.  Although the Exchange Act Defendants assert that this allegation fails to meet the PSLRA and Rule 9(b) pleading requirements, without offering any reason why, they chiefly focus on another action involving this statement, *Waters v. General Elec. Co.*, 08-CV-8484 (RJS) (S.D.N.Y.)  The Exchange Act Defendants maintain that, because *Waters* was first filed, this statement cannot be considered in this case because it is alleged in *Waters*.  As these Defendants concede, their motion to dismiss in *Waters* is *sub judice* before Judge Sullivan.  Lead Plaintiff submits that if Judge Sullivan sustains the complaint in *Waters*, then Lead Plaintiff will not seek to recover damages for the class in this action, which are attributable only to the corrective disclosure made on October 1, 2009.  Regardless of that outcome, the Court may still consider the statement and its misleading effects as part of the entire scienter mix in this action.

### f.   Statements Made By Defendants Neal, Bornstein And Cary Are Actionable

The Exchange Act Defendants erroneously contend that none of the statements made by

---

[41] The Exchange Act Defendants' citation to *Garber*, 537 F. Supp. 2d at 611 on this point makes absolutely no sense, as the information alleged to have been withheld here was the subject of Immelt's private admissions to Paulson and was *not publicly known* until the publication of ON THE BRINK on February 1, 2010.

Neal, Bornstein and Cary are actionable.  For example, they claim that Neal's statement that GE Capital would earn $5 billion in 2009 was not false because there are no facts showing that Neal knew or should have known that GE Capital would not meet its earnings targets.  They further claim that the rating agencies had previously disclosed that to maintain the AAA rating, GE Capital would have to earn $5 billion.  As alleged in the SCC, however, Neal was the Chairman and CEO of GE Capital at all relevant times.  ¶24.  For the reasons set forth in § III(A)(1), Neal received specific contrary information about GE Capital's true financial condition and was undoubtedly aware that GE Capital's business had ground to a halt as of the start of the Class Period.  This renders his statements false and misleading, even if they were couched in the language of opinion.[42]  Furthermore, Neal's December 2, 2008 statements regarding GE Capital's loan loss reserves were neither mere statements of opinion and optimism nor mere "accurate statements of historical fact."

The argument put forth as to why Bornstein's statements are not actionable – that all Lead Plaintiff does is point to the March 19, 2009 disclosure – demonstrates the fundamental flaw in the Exchange Act Defendants' entire motion.  The fact is that GE Capital's portfolio consisted of $220 billion in non-investment grade and subprime debt *prior to the start of the Class Period*, and Neal, Bornstein and Cary – the three highest-ranking officers at GE Capital – chose to withhold this material information from GE's investors and therefore mislead them as to the safety and stability of GE Capital in the midst of the subprime crisis.

---

[42] The Exchange Act Defendants make a virtually identical argument with respect to the SCC's allegations against Cary (GE Br. at 61), which fails for the same reasons as for Neal.  Similarly, the contention that Sherin's September 25, 2008 statements about GE's commercial paper programs were mere "corporate optimism and puffery" (GE Br. at 60, n. 99) is specious.  *See* note 62, *supra*.

### 3.  The SCC Properly Pleads Claims For GE's GAAP
###     Violations And Improper Loan Loss Reserves

The Exchange Act Defendants launch two separate but related arguments as to why the

allegations that GE violated GAAP failed to establish proper loan loss reserves and failed to take

proper charges for their "nonearning receivables" are not actionable.  GE Br. at 49-52, 65-72.

These arguments are entirely insufficient to support dismissal.[43]

#### a.   Nonearning Receivables And Loan Loss Reserves

The SCC properly alleges that GE's loan loss reserves were inadequate during the Class

Period and that the Exchange Act Defendants either knew or recklessly disregarded this.  ¶¶163,

181(b), 246(a), 324, 327-347.  As alleged, GE reported in its SEC filings its stated loan loss

reserves and the amount of GE Capital's nonearning financing receivables.  As the SCC

explains, GE "defined financing receivables in 'delinquency' as 'those that are 30 days or more

past due' and 'nonearning' financing receivables as 'those that are 90 days or more past due (or

for which collection has otherwise become doubtful)." ¶326.

At the end of its Q3 2008, GE reported that its allowance for loan losses was $4.6 billion.

¶342.  However, GE had $7.6 billion of financing receivables, which it categorized as

"nonearning," meaning the receivables were either 90 days past due or for which collection had

otherwise become doubtful.  *Id*.  Thus, common sense dictates that if there are $7.6 billion in

financing receivables that are 90 days late in paying, or that it is doubtful that payment will ever

be made, a prudent reserve would at least cover the amounts that were in doubt.  *Id*.  At year end

---

[43] The Exchange Act Defendants' reliance on *West Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed. Appx. 717, 720 (2d Cir. 2009) is misplaced.  There, the Second Circuit found that in connection with claims against the defendant corporations' *independent auditor*, the complaint failed to allege the *auditor's* scienter as it had only alleged "numerous allegations of carelessness" and that it was a more compelling inference that defendant company had concealed its fraud from the auditor.  *Id.*  This is unlike the SCC's allegations.

2008, GE's loan loss reserve was set at $5.3 billion, but nonearning financing receivables were $8 billion – a $2.7 billion shortfall.  For Q1 2009, the loan loss reserve was $5.7 billion, but nonearning financing receivables were at $10.049 billion – a $4.349 billion shortfall.  Finally, for Q2 2009, the loan loss reserve was $6.607 billion but nonearning financing receivables were at $13.103 billion – a $6.496 billion shortfall.  *Id.*

As established, not only were GE's loan loss reserves woefully insufficient to cover known nonearning financing receivables that were late in paying or for which collection was doubtful, the loan loss reserves were woefully inadequate to cover other potential losses – such as those financing receivables that may be more than 30 days past due.  Given the time period that this occurred – in the midst of a world-wide recession with vast numbers of businesses going bankrupt and consumers defaulting on their loans – it was reckless for GE to have such inadequate loan loss reserves.

The Exchange Act Defendants' response is that Lead Plaintiff's interpretation of GAAP is wrong.  GE Br. at 66-68.  They assert that, under GAAP, even though a loan is admittedly delinquent, the full amount of the loan need not be reserved for.  Of course, the question of whose interpretation of GAAP is correct cannot be decided on a motion to dismiss.  When considering allegations of GAAP violations in this context, courts in the Second Circuit are not to delve into the factual issue of whether a complaint's "interpretation" of GAAP is a "correct" one, but rather are to leave this question to be appropriately determined upon further development of the record.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007) (at the motion to dismiss stage, plaintiffs' allegations that certain accounting practices were not generally accepted must be taken as true); *In re Keyspan Corp.*, 01-cv-5852, 2003 WL 21981806, at *15 n. 5 (E.D.N.Y. July 30, 2003) ("whether defendants violated GAAP

73

is 'best resolved by expert testimony and thus should not be addressed on a motion to dismiss'")
(*citing In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997)); *In re
Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) (allegations that
defendants' accounting practices were unacceptable under GAAP were to be taken as true,
notwithstanding defendants' argument otherwise).[44]

Moreover, even assuming, arguendo, that the Exchange Act Defendants' interpretation of
GAAP is correct, the loan loss reserves were still woefully inadequate as compared to GE's
historical reserve levels, particularly in a period of a sustained world-wide recession.  *See
E*Trade*, 2010 WL 1904314, at *15 (concluding that reserve levels that were kept at historically
flat and/or declining levels in terms of their proportion of receivables during the subprime crisis
was material misrepresentation); *Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257, at *68
("Accordingly, the complaint plausibly alleges that Citigroup's loan loss reserves failed to
accurately account for losses likely to incur, and, as such materially misled investors about the
company's financial health."); *Corus*, 2010 WL 1338070, at *9 (noting allegations of "red flags"
in connection with reserves as including increasing defaults and "non-current loans" and "dire
sales levels").  As the charts in ¶¶340-341 demonstrate, the percentage of GE's loan loss reserve
as compared to its total amount of financing receivables steadily decreased from 2005 through
Q2 2008, with levels as of the start of the Class Period falling to their lowest point (0.98%),
substantially *lower* than prior periods *before the subprime crisis*.  At the same time, throughout
2007 and into 2008, GE's loan loss reserves were steadily falling behind the amount of its

---

[44] As stated in *Global Crossing*, "Whether or not the [defendants'] practice of accounting . . .
was ever acceptable under the applicable provisions of GAAP cannot be determined in advance
of the development of the record.  Eventual evidence on industry practice or expert testimony are
likely to shed light on this question, but at the current procedural phase, the plaintiffs' assertion
that they were *not* generally accepted must be taken as true."  *Id.* (emphasis in original).

nonearning financing receivables.  ¶¶333-34, 340-41.  By Q3 2008 the shortfall amount hit its

highest level to date and, on a percentage basis, was the highest percentage shortfall in the

previous three years.  ¶342 (at 138).

Clearly, as the amount of nonearning financing receivables steadily grew, GE's loan loss

reserves failed to keep pace with known nonperforming loans and unquestionably did not take

into account other debt which may not have met a pure 90-day definition of nonearning, was still

subject to loss.  Thus, GE's loan loss reserves during the Class Period were inadequate and

rendered GE's financial statements materially misleading.

The Exchange Act Defendants mistakenly contend that the SCC alleges no facts to

support "when an impairment charge should have been taken and which specific losses known to

GE should have resulted in an impairment charge."  GE Br. at 50-51, 68.  As to the former, the

SCC does allege GE's loan loss reserves were deficient by at least $3 billion in Q3 2008, by $2.7

billion at year-end 2008, and by $4.39 billion in Q1 2009.  ¶342.[45]  The SCC thus does provide

the timing and amounts describing how GE's loan loss reserve was under-reserved.[46]

As to the latter point, the SCC is not required to provide the type of evidentiary detail

demanded by the Exchange Act Defendants.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F.

Supp. 2d 281, 328, 358 (S.D.N.Y. 2003) ("*IPO*") ("…the Second Circuit is clear:  [The PSLRA]

---

[45] The Exchange Act Defendants' reliance on *City of Omaha Civilian Employees' Ret. Sys. v. CBS Corp.*, 08-Civ. 10816, 2010 WL 1029290, at *9 (S.D.N.Y. Mar. 16, 2010), GE Br. at 51, is misplaced.  Unlike that case where plaintiffs had not alleged a "triggering event" for defendants to undertake an impairment test of CBS's goodwill, *id.* at *9, the SCC here alleges that the Exchange Act Defendants were aware of numerous "red flags" that put them on notice of the deterioration of GE Capital's portfolios as of and throughout the Class Period.  *Cf. Corus*, 2010 WL 1338070, at *9.

[46] The Exchange Act Defendants' contention that dismissal is further required because GE was not required to measure itself against industry-standard metrics is misplaced.  The fact that GE's overall reserves were, during a period of a world-wide recession, significantly below those of other comparable companies, lends further support to the fact that GE knowingly, or recklessly, under reserved for losses.

does not require that plaintiffs plead with particularity every single fact upon which their beliefs

concerning false or misleading statements are based.  Rather, plaintiffs need only plead with

particularly *sufficient* facts to support those beliefs.  What facts and what level of particularity

are sufficient to support a plaintiff's beliefs will vary from case to case . . . . The critical

threshold is that the allegations must be made in a way that satisfies the court that plaintiff's

charge of fraud is not 'unwarranted.'") (citation omitted).  *See also In re Reliance Sec. Litig.*, 91

F. Supp. 2d 706, 724-25 (D. Del. 2000) (denying motion to dismiss where plaintiff alleged sharp

increases in loan losses at the same time that loan loss reserves declined as a percentage of

financing receivables, and defendants had contrary, material undisclosed information about

declining loan portfolios that was inconsistent with defendants' public statements).[47]  The

Exchange Act Defendants misplace their reliance on *Caiafa v. Sea Containers Ltd.*, 525 F. Supp.

2d 398, 410-411 (S.D.N.Y. 2007), aff'd 331 Fed. Appx. 14 (2d Cir. 2009); *In re Downey Sec.

Litig.*, No. 08-3261-JFW, 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009)); and *City of

Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*, 655 F. Supp. 2d 262

(S.D.N.Y. 2009).[48]

---

[47] The *Reliance* court further noted in the context of resolving scienter, "[t]he court is
mindful…that the present posture of the case is a motion to dismiss.  Plaintiffs have not had the
benefit of discovery to determine the role that each of the defendants played in the Company and
the level of knowledge that they may have had regarding the alleged deficiency in its loan loss
reserves.  . . .  To impose a stricter standard at the pleading stage would make virtually
impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation,
institution, bank or the like that did not involve specifically greedy comments from an authorized
corporate individual."  *Id.* at 725 (citation omitted).

[48] In *Downey*, the court found that the sprawling, 944-page, 41 exhibit, disconnected second
amended complaint often failed to specify which statements were attributable to which
defendants, 2009 WL 2767670, at *4, and contained "not a single actionable misrepresentation"
in the entire document, *Id.* at *4 n.1.  Whereas in *Downey*, the complaint alleged only that the
company's financial metrics rendered its reserves inadequate, here the SCC specifies data
contradicting the Exchange Act Defendants' statements about the adequacy of GE Capital's loan
loss reserves and relevant GAAP provisions that were violated.  Similarly, the complaint in

In this context, Lead Plaintiff's allegations are more than sufficient to survive a motion to dismiss. *See In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 293, 295 (S.D.N.Y. 1999) (denying motion to dismiss where complaint alleged reckless misconduct in connection with defendants' application of GAAP to a "chargeback" reserve that caused the company to issue false and misleading financial statements).[49]

The Exchange Act Defendants' other meritless contention is that claims regarding loan loss reserves should be dismissed because setting reserves involves "issues of judgment" and "discretion." GE Br. at 65-66 (citing *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01-

---

*Caifia* contained no allegations to support assertions that material problems existed at the time that rendered defendants' statements false and misleading. Critically, the District Court in *Caiafa* noted that allegations concerning asset write-downs were either "contingent" (couched in language such as "may have been") or failed to specify the timing of those write-downs in relation to the class period. 525 F. Supp. 2d at 411 n.10. Indeed, the Second Circuit, in affirming the District Court's dismissal, described the complaint as containing mere "cursory allegations that defendants failed to record accurately on the company's balance sheet the value of certain assets and [GAAP violations]." *Caiafa v. Sea Containers Ltd.*, 331 Fed. Appx. 14, 16 (2d Cir. 2009). Likewise, the complaint in *Vodafone* failed to allege sufficient facts supporting plaintiff's claims that the company failed to record appropriate impairments. *Vodafone*, 655 F. Supp. 2d at 269-70. The complaint in *Vodafone* notably did not allege that the need for impairment charges was apparent to management at the time, that management was aware of contemporaneous facts of "clear and unmistakable loss[es]" indicating a need for such charges, and omitted facts that plaintiffs identified in the complaint as "definitive" factors in its theory of fraud. *Id.* Such defects do not apply to the SCC here.

[49] *Quintel* is particularly instructive, given that like here, "[t]he Complaint explains why the reports were false and misleading by stating with particularity each provision of GAAP that defendants allegedly violated," 72 F. Supp. 2d at 293, and that "defendants are alleged to have recklessly disregarded obvious signs that the financial reports were misleading [including evidence of increased customer "chargebacks" and notice that key business was being scaled back]". *Id.* at 295. The SCC here specifically alleges that, with respect to its loan loss reserves making its financial statements false and misleading, GE violated SFAS 5, SFAS 114, and SAB 102. ¶¶344-357. Furthermore, the SCC's allegations that GE recklessly disregarded obvious data showing escalating loan delinquencies and nonearning assets, particularly in light of the decline in the overall economy and CW descriptions of GE Capital's business being at a virtual standstill, is highly analogous to *Quintel* where the company ignored similar obvious data showing escalating customer "chargebacks" that would have formed the basis of an accrual against that company's revenues. *See Quintel*, 72 F. Supp. 2d at 287 ("The reserve for chargebacks was estimated based on chargeback history updated on a monthly basis.")

CV-4388, 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004) and *Countrywide Derivative Litig.*,

554 F. Supp. 2d at 1044).[50]  "Defendants' argument that 'loan loss allowances and securities

impairments were projections about future performance'… misstates GAAP and SEC disclosure

requirements, which provide that 'allowances for loan losses should be based on past events and

current economic conditions.'"  *E*Trade*, 2010 WL 1904314, at *21 (citation omitted).  While

discretion and judgment are inherent in many interpretations and applications of GAAP, there is

no *per se* rule that application of such GAAP provisions are not actionable.  *See also Shapiro v.

UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("[t]here is nothing unique about

representations and omissions regarding loan loss reserves that removes them from the purview

of the antifraud provisions of the federal securities laws….a reasonable investor would be

influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true

financial status by deliberately misstating its level of non-performing loans, failing to provide

adequate reserves, and indulging its problem loan customers.").

    Allegations that a defendant violated a discretionary or judgmental application of GAAP

may be sufficient when, as here, the SCC alleges that defendants were reckless or unreasonable

in exercising their discretion.  *See In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690

(S.D.N.Y. 2004) ("statements about [a] defendant['s] belief in the adequacy of loan loss reserves

could be actionable if it is alleged that defendants did not actually believe that loan loss reserves

---

[50] The Exchange Act Defendants' reliance on and quotation of *In re Radian Sec. Litig.*, 612 F.
Supp. 2d 594, 615 (E.D. Pa. 2009) is fundamentally misplaced GE Br. at 66, n.108.  Contrary to
the Exchange Act Defendants' assertion, *Radian* does not address defendants' setting loan loss
reserves *at all*.  Rather, that case concerns the timing of defendant company's taking an
impairment charge in connection with its investment in a joint venture.  *See Radian*, 612 F. Supp.
2d at 613.  Crucially, the allegations in *Radian* that the company should have recorded its
impairment charge in a prior quarter were significantly undercut by the company's auditor's
certification, filed in connection with a restated Form 10-Q for the relevant quarter, in which the
auditor agreed that no further restatements were necessary in that quarter.  *Id.* at 615.

were adequate, or *if defendants had no reasonable factual basis for their belief*") (emphasis

added) (*citing Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092-1093 (1991)).[51]

Moreover, the Exchange Act Defendants' assertions regarding loan loss reserves being

inactionable statements of opinion (GE Br. at 51) over-reaches.[52]   To the contrary, courts can

and do find that inadequate loan loss reserves are actionable when combined with indicia that

defendants knew or should have known that those reserves were insufficient under the

circumstances.  *See E*Trade*, 2010 WL 1904314 at *26-27; *Citigroup Bond Litig.*, No. 2010

U.S. Dist. LEXIS 69257, at *67-69; *Corus*, 2010 WL 1338070, at *8-9; *BankAtlantic*, 2009 WL

3261941 at *3.

### b.  Reclassifying Assets To Avoid Taking Losses

The Exchange Act Defendants erroneously contend that the SCC lacks the requisite

---

[51] In addition, the Exchange Act Defendants' misplace their reliance on *Loral* as the court there dismissed the action for failure to plead *"the necessary inference of fraud."*  *Loral*, 2004 WL 376442, at *17 (emphasis added).  The SCC sufficiently alleges such inferences.  Similarly, the Exchange Act Defendants' reliance on *Countrywide Derivative Litig.* is also misplaced as the court there held that "[p]laintiffs have not pled a violation of GAAP with sufficient particularity to provide *independent evidence of scienter*." 554 F. Supp. 2d at 1070 (emphasis added).  The SCC here clearly alleges numerous bases of scienter beyond just GAAP violations.  *See* §III(A)(1), *supra*.

[52] The Exchange Act Defendants reliance on *Fait v. Regions Fin. Corp.*, No. 09 Civ. 3161, 2010 WL 1883487 (S.D.N.Y. May 10, 2010) is fundamentally misplaced.  Notably, *Fait* concludes that, unlike the SCC, the complaint there (alleging only claims under the Securities Act) contained merely "conclusory allegations" that defendant's reserves were "'woefully inadequate' and did not comply with GAAP."  *Id.* at *5.  Allegations that defendants knew or were aware of objective criteria that reserves were insufficient have been held to be sufficient to defeat a motion to dismiss1.  *See, e.g.*, *E*Trade* 2010 WL 1904314, at *26; *Corus*, 2010 WL 1338070 at *9; *BankAtlantic*, 2009 WL 3261941 at *3; *Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257, at *67-69.  Similarly, the Exchange Act Defendants overstate the conclusions in *CIBC*, 694 F. Supp. 2d at 300, where, unlike here with the SCC, the court found that allegations regarding asset valuation model calculations were insufficient because the complaint there "offer[ed] no specific facts on which to infer an intent to deceive through the [statement].  Nor does Plaintiff identify any obligation requiring Defendants to make complete disclosure of all CIBC's mortgage-backed holdings."

particularity regarding defendants' "managing GE's earnings" by improperly reclassifying assets to avoid taking write-downs and losses on those assets.

CW 15, a former GE and GE Capital employee from 1997 through March 2009, specifically stated that "GE manages its earnings very well."  ¶73.  This witness stated:

> [b]eginning in mid-2007 and continuing into 2008, in circumstances when GE would learn that its equity stake and/or periodic equity payments were at risk, GE would 'shift its equity position to long term on the balance sheet' if it could not sell its stake or otherwise refinance it to avoid writing the asset down to fair value and taking a loss. . . .[T]his practice would only be done for assets that were having problems, for the purpose of improving the Company's equity position.

*Id*.  CW 15 further stated that GE would "move acquired assets to long-term status if their value decreased so as to avoid taking a loss in the then-current quarter."  *Id*.

Similarly, CW 13, a Senior Underwriter and Asset Manager from October 2005 through September 2008, said that "GE Capital did not write down bad real estate deals, but would 'take the asset and shift it to an investment to hold' to avoid taking a write-down."  ¶¶73, 392.  The SCC expressly alleges that the practice of reclassifying an asset to avoid taking a loss or a write-down is a violation of GAAP.  ¶361.

Further, GE, under the stewardship of Immelt and Sherin, is no stranger to accounting manipulations to manage earnings.  In August 2009, GE paid $50 million to settle charges brought by the SEC that the Company, over the course of several years, distorted its true financial condition and misled investors by using numerous improper accounting techniques to increase its reported earnings and/or revenues and to avoid reporting negative financial results.  ¶12.

In response to these allegations, the Exchange Act Defendants incorrectly assert that: (1) the practice of reclassifying assets to avoid taking a write-down or a loss does not violate GAAP; and (2) the SCC fails to specify the details of the assets that were transferred.  As to the former

point, Defendants misstate applicable GAAP.  Under SFAS 115 and SFAS 65, if an entity

initially designates an asset as a short-term investment, it may only reclassify that asset in limited

circumstances, and may *not* reclassify it simply to avoid taking a write-down or a loss.  ¶¶359,

361-62.  This is, however, precisely what GE Capital did when it would "hide [distressed real

estate] assets until the market turned around by making a switch on the balance sheet" (¶¶73,

181(g), 363, 392) and, when learning of risk to its real estate equity investments, "shift its equity

position[s] to long term on the balance sheet" if it could not sell or refinance its stake to avoid

writing assets down to fair value and taking a loss, ¶¶73, 390-92.  Regardless, differences over

GAAP interpretations present factual questions that may not support dismissal at this stage.  *See*

§ III(A)(3)(i), *supra*.

    As to the latter point, the SCC need not set forth details for each transferred asset.  *See*

*IPO*, 241 F. Supp. 2d at 358 (citing *Novak*, 216 F.3d at 313-14); *In re Dynex Capital, Inc.*, Fed.

Sec. L. Rep., 05 Civ. 1897, 2009 U.S. Dist. LEXIS 96527, at *51 (S.D.N.Y. Oct. 19, 2009)

(*Dynex II*) (finding a strong inference of scienter where, as here, there were allegations of

reasonably available contemporaneous information "that should have put the officers on notice

that their public statements were false") (citation omitted).  *See also Reliance,* 91 F. Supp. 2d at

719-21 (declining to dismiss § 10(b) claims where allegations of inadequate reserves and false

and misleading statements concerning those reserves were supported by allegations of

defendants' knowledge of data showing contrary information).

### c.   GAAP Required GE To Disclose The Break-Down Of The Portfolio

    The Exchange Act Defendants' claims that they had no duty to disclose "the breakdown

of GE Capital's lending by credit quality," GE Br. at 71, is baseless.  As discussed throughout

this memorandum, GE was obligated to disclose its massive subprime and non-investment grade

credit exposure pursuant to the requirements triggered when it sold stock to investors in the

Offering, and also because it chose to speak about the credit quality of the GE Capital loan

portfolios and related expected losses, particularly in the midst of the subprime crisis.

Defendants were thus required to provide all facts about its loan portfolios so as to make the

statements it made not materially misleading.

The Exchange Act Defendants' assertion that GE "voluntarily" disclosed the break-down

of the GE Capital portfolio on March 19, 2009 and that it was not required to ever disclose this

information, turns the concept of full disclosure and not speaking in half-truths on its head.  *See*

*Vivendi I*, 381 F. Supp. 2d at 181 (post-class period statements can be used to establish

awareness of falsity of class period statements; the opposite would reward defendants' successful

concealment).  That GE chose to sell stock to the public and chose to speak about GE Capital's

portfolio required it to disclose this information.

Further, the Exchange Act Defendants' attempt to argue that they were not required to

"provide disclosure at the level of granularity demanded in the Complaint" is spurious.  GE Br.

at 71.  The SCC alleges that GE should have revealed the make-up of the GE Capital portfolio –

the $220 billion in junk and subprime debt – in September 2008 rather than waiting until March

19, 2009.  *See, e.g.*, ¶181.

Finally, the Exchange Act Defendants' assertions that they were not required to disclose

concentrations of subprime and non-investment grade debt under GAAP is a red herring.  Lead

Plaintiff does not solely rely on GAAP as a basis for why this information was required to have

been disclosed.  Plus, this turns on a disagreement as to what GAAP requires and is, again,

improper to decide on a motion to dismiss.

### 4.   The SCC Properly Pleads Loss Causation

The SCC unquestionably pleads loss causation.  In *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336 (2005), the Supreme Court held that to adequately plead loss causation, a plaintiff need

only follow the liberal notice pleading requirements of Fed. R. Civ. P. 8(a)(2) requiring merely

"a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* at

346.  A plaintiff must provide defendant with "some indication of the loss and the causal

connection that the plaintiff has in mind."  *Id.* at 347.  The purpose of this rule is to provide

defendants with "fair notice" of the basis for a plaintiff's claim.  *Id.* at 346.  These "pleading

rules are not meant to impose a great burden upon a plaintiff."  *Id.* at 347.

The SCC here more than adequately does this.  It charges that on January 23, 2009, GE

began to partially correct its prior disclosures by, among other things, revealing increased credit

losses at GE Capital.  In response, GE's stock price fell 10.75%.  ¶425.  The SCC further charges

that GE's stock price fell 6.5% on February 27, 2009 when GE revealed it was cutting its

dividend (¶426), and it continued to fall through March 3, 2009 – after Immelt's Shareholder

Letter was released – falling from $8.51 per share to close at $6.69 per share on March 4, 2009.

¶427.  Finally, on March 19 and 20, 2009, after GE's Investor Conference, GE's stock price fell

another 7.5%.  ¶428.  By alleging stock price declines after the corrective disclosures, Lead

Plaintiff has readily pled loss causation.  *See, e.g., Abbey Nat'l,* 423 F. Supp. 2d 362-63 (loss

causation properly pled where plaintiffs alleged stock price drop immediately following

defendants' announcement).[53]

---

[53] The cases relied on by the Exchange Act Defendants are inapposite.  *See Lentell v. Merrill
Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) ("[t]here [was] no allegation that the market
reacted negatively to a corrective disclosure regarding the falsity of [defendant's statements] and
no allegation that [defendant] misstated or omitted risks that did lead to the loss."); *Leykin v.
AT&T Corp.*, 423 F. Supp. 2d 229, 246-49 (S.D.N.Y. 2006) (Defendants statements during the

The Exchange Act Defendants erroneously contend that the SCC must "disentangle the effects of the alleged fraud from the general marketwide decline."[54]  GE Br. at 63.  Lead Plaintiff, however, is not required to do this at the pleading stage.  *See In re MCI Worldcom, Inc. Sec. Litig.,* 93 F. Supp. 2d 276, 285-86 (E.D.N.Y. 2000); *King County v. IKB Deutsche Industriebank AG,* No. 09 Civ. 8387 (SAS), 2010 WL 1702196, at *4-5 (S.D.N.Y. Apr. 26, 2010) (applying *Dura* and *Lentell* to reject argument that complaint must allege "facts sufficient to *exclude* other non-fraud explanations").  Indeed, courts in the Southern District have repeatedly held that whether an overall market or industry downturn or the "general fall in the price of stocks" is an intervening event is *an issue for trial* and is not to be decided on a motion to dismiss.  *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 616 (S.D.N.Y. 2008), aff'd, 347 Fed. Appx. 665 (2d Cir. 2009) (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003)) ("[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").[55]  Additionally, the Exchange Act Defendants' reliance on declines in value of the

---

Class Period did not reveal any falsity and plaintiffs themselves conceded that the public did not become aware of the relevant facts until after the Class Period ended), aff'd, 216 Fed. Appx. 14 (2d Cir. 2007), *cert. denied*. 552 U.S. 1097 (2008).  Moreover, these disclosures were not, as the Exchange Act Defendants claim merely "bad news" about GE (GE Br. at 64), but were corrective disclosures that revealed the truth of the Exchange Act Defendants' prior false statements and material omissions and/or materializations of previously undisclosed risks.

[54] The further argument that the SCC must ascribe a portion of the loss to the alleged misstatements likewise fails.  GE Br. at 62, n.100.  The Exchange Act Defendants' reliance on *In re Merrill Lynch & Co. Research Reports Sec. Litig,* 568 F. Supp. 2d 349 (S.D.N.Y. 2008); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007); and *Lentell*, 396 F.3d 161 is misplaced.  These cases all dealt with situations where the risks that eventually lead to a stock price decline had been fully and frankly disclosed within the Class Period.  Here, "no such specific and unambiguous 'indicia of risk' appeared on the face of the disclosures made by defendants" and, as such, apportionment is not necessary.  *Abbey Nat'l*, 423 F. Supp. 2d. at 362.

[55] *See Lentell*, 396 F.3d at 174 (citing same).  *See also King County*, 2010 WL 1702196, at *5

S&P Index and the Dow Jones Industrial Index on certain dates during the Class Period is

inappropriate and irrelevant at this time. Whether GE's stock declined because of the corrections

of the prior misstatements or because of market forces unrelated to the Exchange Act

Defendants' disclosures is not resolvable on a motion to dismiss. *See Emergent Capital Inv.*

*Mgmt. LLC v. Stonepath Group, Inc.*, 343 F. 3d 189, 197 (2d Cir. 2003).

The Exchange Act Defendants' assertion that, because GE's stock declined prior to the

January 23, 2009 disclosure, Lead Plaintiff has not pleaded loss causation is also wrong. GE Br.

at 63. A drop in share price prior to a corrective disclosure does not negate the fact that, as noted

above, GE's share price dropped significantly in response to a series of partial disclosures. It is

no bar to recovery if GE's stock price declined prior to the corrective disclosures. *See Abbey*

*Nat'l*, 423 F. Supp. 2d. at 362 (rejecting argument that "loss cannot be shown where [] share

price had been steadily declining throughout the Class Period and long before the []

Announcement"); *New Century*, 588 F. Supp. 2d at 1237 (holding loss causation was adequately

alleged where there was a decline in price prior to disclosures); *In re Openwave Sys. Sec. Litig.*

528 F. Supp. 2d 236, 243, 248 (S.D.N.Y. 2007) (finding the complaint adequately pled loss

causation even where the stock price fluctuated wildly during the class period).

---

("[N]either *Lentell* nor *Dura* burden plaintiffs with pleading that *no other possible* event could
have cause plaintiffs' losses . . . *Lentell* does not say that the existence of a market-wide
phenomenon necessarily *eliminates* a plausible causal connection between plaintiff's losses and
defendants' alleged fraud.") (emphasis in original); *Burstyn v. Worldwide Xceed Group, Inc.*, No.
01 Civ. 1125, 2002 U.S. Dist. LEXIS 18555, at *19-20 (S.D.N.Y. Sept. 30, 2002) ("While a trier
of fact might blame market forces rather than accounting violations for that decline, the
allegations in the Complaint are sufficient to carry plaintiffs' claims through this motion to
dismiss."); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467-68 (S.D.N.Y. 2008) ("The existence of
intervening events that break the chain of causation, such as a general fall in the price of stocks
in a certain sector, is a 'matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to
dismiss.'") (citation omitted); *Countrywide Sec. Litig.*, 588 F. Supp. 2d at 1174. ("It is true, the
dramatic market shifts will raise complicated questions on damages. It will be the fact-finder's
job to determine which losses were proximately caused by Countrywide's misrepresentations
and which are due to extrinsic or insufficiently linked forces.").

Lastly, the Exchange Act Defendants' contention that the SCC does not sufficiently allege loss causation in connection with misrepresentations of the condition of GE's CP programs is meritless.[56]  GE Br. 64-65.  A specific '"corrective disclosure' is not required under this Court's *post-Dura* case law.'"  *E*Trade,* 2010 WL 1904314, at *27 (citing *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) (analyzing Second Circuit cases and holding that "a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss").  Likewise, neither the Supreme Court nor any other court has required that a corrective disclosure be a "mirror image" tantamount to a confession of fraud.  *E*Trade*, 2010 WL 1904314, at *28.[57]  Moreover, loss causation is sufficiently alleged '"if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."'  *Id.* at *27 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)).  *See also Emergent Capital,* 343 F.3d at 198-99 (cited with approval in *Dura,* 544 U.S. at 344-45) (finding that the complaint adequately alleged loss causation because the undisclosed risk was foreseeable in conjunction with the curative disclosures).  As the SCC alleges how GE's ability to sell commercial paper was directly linked to its liquidity and cash position, ability to fund itself, and ability to finance GE Capital's lending activity, the SCC has more than sufficiently met this standard.  *See Vivendi III*, 605 F. Supp. 2d at 598 ("A ratings downgrade reveals the risk of deteriorating liquidity . . . if the company had previously concealed its liquidity condition . . . by

---

[56] As the Underwriter Defendants raise a substantially similar issue, UW Br. at 31-32, *see* §III(B)(3), *infra*, for further discussion.

[57] *See also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity); *In re Bristol Myers Squibb*, No 00-1990, 2005 WL 2007004, at *20 (D.N.J. Aug. 17, 2005) (case law does *not* "stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").

making false or misleading statements, these events may be sufficiently related to the fraud to qualify as materializations of the risk").

### 5.   The SCC States Valid Claims Under § 20(a) of the Exchange Act

The SCC properly states claims for § 20(a) control person liability against Immelt and Sherin by alleging both a primary violation of the Exchange Act and that these defendants controlled the primary violator.  *See, e.g.* 15 U.S.C. §§ 77o, 78t(a); *In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472, 517 n. 219 (S.D.N.Y. 2005).  Immelt and Sherin, conceding that they are "control persons," contend that the SCC does not allege their culpable participation.  Contrary to the defendants' assertion, the law in this Circuit is unsettled as to whether culpable participation is an element of a plaintiff's *prima facie* case under § 20(a).  *See, e.g., IPO*, 241 F. Supp. 2d at 298 (holding that while culpable participation in the underlying fraud must be proven *at trial*, "a plaintiff must allege only that a defendant controlled a person or entity who violated [§] 10(b)" to state a § 20(a) claim); *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 558 (S.D.N.Y. 2008) (lack of culpability is an affirmative defense that must be proved by the controlling person), aff'd without op., 292 Fed. Appx. 133 (2d Cir. 2008).

Nonetheless, even if culpable participation is a requisite element of Lead Plaintiff's *prima facie* case, the SCC adequately alleges culpable participation by Immelt and Sherin.  Their sole argument is that the SCC does not adequately allege their scienter.[58]  However, as discussed above in § III(A)(1), *supra*, the SCC sufficiently alleges a strong inference of Immelt's and Sherin's scienter.  Indeed, the SCC contains detailed allegations that they knew or should have known of the fraudulent conduct alleged therein and their motion should be denied.

---

[58] Contrary to the Exchange Act Defendants' assertions, GE may be found to have acted with the requisite scienter even if the SCC fails to sufficiently allege the scienter of any of the Exchange Act Defendants.  *See* n.7, *supra*.

**B.      Lead Plaintiff's Claims Under The Securities Act Should Be Sustained**

The SCC properly pleads violations of §§ 11, 12(a)(2) and 15 of the Securities Act

against the Securities Act Defendants.  To state a claim under § 11 of the Securities Act, Lead

Plaintiff must allege that: (1) each defendant is a signer of a registration statement, director of the

issuer, or underwriter for the offering; (2) Lead Plaintiff purchased the registered securities; and

(3) any part of the registration statement for the offering contained an untrue statement of a

material fact, or omitted to state a material fact necessary to make the statements therein not

misleading.  *See* 15 U.S.C. § 77k(a); *Garber*, 537 F. Supp. 2d at 610.  To state a claim under §

12(a)(2) of the Securities Act, Lead Plaintiff must allege that: (1) Defendants sold or offered a

security; (2) by means of a prospectus; (3) that included an untrue statement of material fact or

omitted a material fact necessary to make such statements not misleading.  *See* 15 U.S.C. §

77l(a)(2); *Id.*  Under both §§ 11 and 12(a)(2), a duty to disclose omitted information arises when

the omission or misrepresentation is material, meaning that there is "a substantial likelihood that

a reasonably prudent investor would consider it important in making a decision."  *Id.* (citing

*Steinberg v. PRT Group, Inc.,* 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000)).

**1.      The Securities Act Claims Do Not Sound In Fraud**

The Second Circuit has acknowledged that "fraud is not an element or a requisite to a

claim under Section 11 or Section 12(a)(2)."  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.

2004).  Accordingly, Rule 9(b)'s standards apply to §§ 11 and 12(a)(2) claims only "insofar as

the claims are premised on allegations of fraud."  *Id.*  Thus, where, as here, a plaintiff's

Securities Act claims clearly sound in negligence and strict liability, the claims are governed by

Rule 8(a).  *See, e.g., Garber*, 537 F. Supp. 2d at 612 (finding that Securities Act claims that

"clearly sound in negligence" are "subject only to the pleading requirements of Rule 8(a)")

88

(citation omitted); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 290 (S.D.N.Y. 2009) (same).

Lead Plaintiff's Securities Act claims are specifically alleged in terms of strict liability and negligence and the SCC explicitly states that "the Securities Act claims are not based on any allegation that any Securities Act Defendant engaged in fraud or any other deliberate or intentional misconduct" and "expressly disclaims any reference to or reliance upon allegations of fraud in connection with the Securities Act claims." ¶74. *See also Garber*, 537 F. Supp. 2d at 612 ("Because plaintiffs have specifically disclaimed any component of fraud in their [§§] 11 and 12(a)(2) claims, there are no 'averments of fraud'" and "the pleading requirements of Rule 8(a)" apply.) (citation omitted).

Moreover, contrary to the Securities Act Defendants' suggestion, Lead Plaintiff is not merely relying on a "boilerplate disclaimer" to "excuse [it] from satisfying Rule 9(b)." GE Br. at 73. Indeed, the SCC is "carefully structured" to draw a clear distinction between the Securities Act claims and the fraud claims. *See e.g., Citigroup Bond Litig.* 2010 U.S. Dist. LEXIS 69257, at *49-50; *Refco*, 503 F. Supp. 2d at 632. The Securities Act claims are found only in the first half of the SCC; the Exchange Act claims are found in the second half of the SCC.[59] *See, In re IAC/InterActiveCorp. Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010) (R. Holwell, J.) (*IAC II*) (finding Securities Act claims "do not sound in fraud" where "'plaintiffs drafted two-part complaint[], each portion sufficient to stand alone for its respective pleading purposes, though essentially duplicating and overlapping large components of the other.'") (citation

---

[59] *See also* ¶141 ("This [§ 11] Count is not based on and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 11 claim").

omitted); *NovaGold*, 629 F. Supp. 2d at 290 (rejecting argument that allegations sounded in fraud where "Plaintiff sets off its Securities Act claims in a separate section of the complaint, prefaced with the statement that they sound in 'strict liability and negligence'" and charged defendants with conduct consistent with negligence).[60]

The Securities Act Defendants further contend that the Securities Act claims sound in fraud because the allegations are "classically associated with fraud," including that information was "concealed," investors were "misled," and Defendants' conduct was "improper". GE Br. at 74. These allegations merely mirror the statutory language of the Securities Act,[61] and courts in this Circuit have rejected such arguments. *See, e.g., Citigroup Bond Litig.,* 2010 U.S. Dist. LEXIS 69257, at *49-50; *Refco*, 503 F. Supp. 2d at 631-32; *In re Prestige Brands Holding, Inc.*, 05 cv 06924, 2006 U.S. Dist. LEXIS 46667, at *8 (S.D.N.Y. July 10, 2006).

Finally, even if the Securities Act claims sounded in fraud, which they do not, application of Rule 9(b) would merely mean that the elements of those claims would need to be pleaded with particularity; it would not require pleading new elements that are not required to state a Securities Act claim. *See In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1367 (N.D. Ga. 2005) ("Rule 9(b) . . . does not require scienter to plead § 11 and 12 claims"); *Atlas Air*, 324 F. Supp. 2d at 503 (even under Rule 9(b), plaintiffs need only plead with particularity that the

---

[60] The present case is easily distinguishable from the cases relied upon by the Securities Act Defendants. *See, e.g., Sea Containers*, 331 Fed. Appx. at 16-17 (no attempt had been made by plaintiffs to differentiate their Securities Act claims from their fraud claims); *Rombach*, 355 F.3d at 172 (plaintiffs did not assert any claim of negligence and no effort was made "to show any other basis for the claims" other than fraud); *AXIS Capital Holdings*, 456 F. Supp. 2d at 598 (Securities Act claims were "all inextricably intertwined with the allegations underlying plaintiffs' fraud claims").

[61] *See* 15 U.S.C. § 77k(a) (providing a claim where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact…necessary to make the statements therein not misleading").

registration statement was false). [62]   Rule 9(b) requires only that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak*, 216 F.3d at 306 (citation omitted).   The SCC satisfies this standard with respect to each material omission and untrue and misleading statement.

> **2.      The SCC Adequately Alleges That The Offering Documents Contained Untrue Statements Of Material Fact And Omitted Material Facts**

The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Pinter v. Dahl*, 486 U.S. 622, 646, (1988) (the very purpose of the Securities Act is "to promote full and fair disclosure of information to the public in the sales of securities"). Indeed, "the primary innovation of the [Securities] Act was the creation of federal duties – for the most part, registration and disclosure obligations – in connection with public offerings." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571(1995).  "The obligations that attend the preparation of [offering materials] embody nothing *if not an affirmative duty to disclose a broad range of material information*. . . .   Indeed, *in the context of a public offering, there is a strong affirmative duty of disclosure*."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir. 1996) (superseded by statute on other grounds) (citation omitted and emphasis added); *see also Garber*, 537 F. Supp. 2d at 613.  The Offering Documents here, however, failed to contain a full disclosure of material information and contained a multitude of untrue and misleading statements and omissions.

---

[62] Further, the Securities Act Defendants' reliance on *Landmen Partners*, 659 F. Supp. 2d at 539 is misplaced as that case is limited to the specific scenario where a plaintiff alleges liability under the Securities Act due to a violation of Item 303 of SEC Regulation S-K ("Item 303"), which requires an issuer to disclose "*known trends*" or "*uncertainties*."  *See Id.*.

As alleged in the SCC, at the time of the Offering and a period of almost unprecedented economic crisis,[63] the Offering Documents portrayed GE Capital as a safe, secure and reliable financial services company.  ¶¶11, 75, 127, 136-37.  Additionally, when financial services companies were imploding for having underwritten billions of dollars of non-investment grade and subprime debt, the Offering Documents distinguished GE as a company which did not suffer from such exposure and had a conservative portfolio.  ¶¶10, 127, 133-34.  Likewise, the Offering Documents repeatedly touted GE's commitment to its AAA rating and its guaranteed payment of a $0.31 quarterly dividend through 2009.  ¶¶ 117, 119, 120, 124, 128, 136.  In truth, however, and although the Securities Act Defendants strain to downplay this central issue in the case – at the time of the Offering, GE Capital held $220 billion in non-investment grade and subprime debt.  ¶¶73, 84-87, 95-99, 103-112, 115, 122.  Further, business was at a virtual halt at GE Capital and GE was having serous liquidity issues –  including experiencing difficulties selling its commercial paper.  ¶¶10a-f, 73, 112, 112a, 113.  Yet, the Offering Documents failed to disclose this crucial information that was of utmost importance to investors at the time of the Offering.  ¶¶8, 101, 110-11, 113, 122.

Altogether ignoring these facts, the Securities Act Defendants address the untrue and misleading statements and omissions contained in the Offering Documents as if each existed in isolation, without ever addressing the fundamentally interconnected relationship between GE's massive exposure to subprime debt, liquidity issues and inability to sell its commercial paper, GE Capital's financial health, and GE's ability to maintain its AAA rating and pay the dividend it guaranteed.  Such an approach is fundamentally flawed and fails to overcome the well-pled

---

[63] The Securities Act Defendants falsely assert that the SCC "ignores" the economic crisis, UW Br. at 3, when, in truth, the SCC fully acknowledges the crisis and, indeed demonstrates that the undisclosed information was even more important to investors given the then-present economic crisis.  *See, e.g.* ¶¶ 3-9, 75, 85, 95.

allegations.  *In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 365-66 (2d Cir. 2010)

("Sections 11 and 12(a)(2) both call for the disclosure of information that is necessary to avoid

rendering misleading the representations in registration statements and prospectuses . . . .When

analyzing offering materials for compliance  with the securities laws, we review the documents

holistically and in their entirety. The literal truth of an isolated statement is insufficient; the

proper inquiry requires an examination of defendants' representations, taken together and in

context.") (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) and

quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003); *IAC*, 695 F. Supp. 2d at 117

("The central issue . . . . is not whether particular statements, taken separately, were literally true,

but whether *defendants' representations, taken together and in context, would have misled a

reasonable investor* about the nature of the [investment].") (emphasis added)(citations omitted).

Further, notwithstanding the fact that the allegations must be viewed together, each of the

Securities Act Defendants' isolated arguments regarding various categories of untrue and

misleading statements and omissions fail.

> ### a.   Untrue And Misleading Statements And Omissions Regarding GE Capital's Exposure To Subprime And Junk Grade Debt

As detailed in the SCC, GE Capital's portfolio included approximately $220 billion in

non-investment and subprime grade credit that was not disclosed in the Offering Documents.

¶¶96-98.  The Securities Act Defendants do not – and cannot – dispute the existence of this junk

debt.   Instead, they argue that they did not have a duty to disclose this massive amount of risky

debt.  *See* UW Br. at 20.  However, because the Securities Act Defendants chose to make

statements in the Offering Documents about GE Capital's portfolio and financial strength, they

were obligated to disclose the existence of the $220 billion in junk debt.[64]

As the Second Circuit recently stated, "when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *Morgan Stanley*, 592 F.3d at 366 (citing *Glazer*, 964 F.3d at 157.[65]  Indeed, as previously noted, Judge Stein recently rejected such an argument and found that allegations regarding undisclosed exposure to subprime debt were actionable.  *Citigroup Bond Litig.*, 2010 U.S. Dist. LEXIS 69257.  There, the Court held, "both the statutory language and well-established case law which make clear that once an entity opts to include information in its registration statement . . . it has a duty to disclose any additional material fact 'necessary to make the statements [already contained] therein not misleading.'" *Id.* at 60  ("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully" and accurately) (citing 15 U.S.C. § 78k and *Caiola*, 295 F.3d at 331); *see also E*Trade*, 2010 WL 1904314, at *8 ("concealment of specific information related to the Portfolio's subprime exposure and contents may mislead an investor") (citations omitted).[66]  By

---

[64] Contrary to the Securities Act Defendants' assertions, Lead Plaintiff has never asserted that the $220 billion of junk debt should have been disclosed in the Offering *just because* it was later disclosed.  *See* UW Br. at 22.

[65] Ignoring this clear statement by the Second Circuit, the Securities Act Defendants cite to *Morgan Stanley Information Fund* for their position that they were not required to disclose the existence of the massive debt.  *See* UW Br. at 23.   The facts of that case are in no way analogous to the present case.  There, plaintiffs alleged that because the offering documents made the mandatory requirements about "principal risks" they should have also disclosed alleged risks associated with alleged conflicts of interests.  *See Morgan Stanley*, 592 F.3d at 366.  In response, the Court held that "the [o]ffering [d]ocuments' disclosures did not trigger a generalized duty requiring defendants to disclose the *entire corpus of the knowledge* regarding MS&Co" and that the mandatory risk disclosures did not give rise to a duty to disclose "commonly understood risks associated with securities research."  *Id.* (emphasis added).

[66] The Securities Act Defendants' additional authority likewise does not hold otherwise.  Indeed, *Backman v. Polaroid*, 910 F.2d 10, 16 (1st Cir. 1990), specifically states that disclosures of

failing to disclose GE Capital's massive exposure to junk debt, the Offering Documents were in no way "complete and accurate" and the statements therein were rendered materially untrue and misleading.

Indeed, the Offering Documents stated, "we will continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business."   ¶ 127; *see also* ¶¶133, 134.  This was patently untrue given GE Capital's $220 billion in junk debt.  Further, the Offering Documents expressly misstated GE Capital's exposure to subprime debt.  In the Q2 2008 10-Q, GE stated that "[a]t June 30, 2008, of the [residential mortgage-backed securities] amount, we had approximately $1.7 billion of exposure to subprime credit."  *See* Q2 2008 10-Q at 40.  This was untrue as GE Capital had over $220 billion of exposure to subprime credit, with more than $16.5 billion of subprime debt in U.K. mortgages alone.  ¶96.  Moreover, the Q2 2008 10-Q also noted that GE Capital's "[i]nvestment securities comprise mainly investment-grade debt securities."  ¶130.  GE subsequently admitted, however, that more than 30% of its $20 billion investments in U.S. corporate debt was non-investment grade, including more than $1.1 billion in debt issued by Fannie Mae, Freddie Mac and Wells Fargo.  ¶¶98, 302.[67]

The Securities Act Defendants' futile argument also ignores the fundamental allegations in the SCC that the failure to disclose the $220 billion in junk debt also rendered the statements

---

certain facts are required to be revealed if they are "needed so that what was revealed would not be so incomplete as to mislead." *Id.*

[67] The Securities Act Defendants' focus on the word "mainly" to argue that the statement is literally true is improper.  *See, e.g., IAC II*, 695 F. Supp. 2d at 117 ("[T]he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether *defendants' representations, taken together and in context, would have misled a reasonable investor* about the nature of the [investment].") (citation omitted and emphasis added); *Morgan Stanley Information Fund*, 592 F.3d at 366 ("The literal truth of an isolated statement is insufficient; *the proper inquiry requires an examination of defendants' representations, taken together and in context*.") (citation omitted and emphasis added).

in the Offering Documents such as those regarding GE's commitment to its AAA rating and ability to pay the dividend untrue and misleading. ¶¶ 115, 122, 129, 132, 138.  Given this massive amount of risky debt, both were in imminent jeopardy and GE's statements to the contrary were materially untrue and misleading.[68]

### b.  Untrue And Misleading Statements And Omissions Regarding The AAA Rating And The Dividend

#### i.  <u>The Statements Were Untrue And Misleading When Made</u>

The Offering Documents contained numerous actionable statements regarding GE's commitment to its AAA rating and payment of its $0.31 quarterly dividend. ¶¶ 117, 119, 120, 124, 128, 136.  These statements were materially untrue and misleading when made given, *inter alia*, the liquidity problems at GE (including the difficulty it was having selling its commercial paper), the distressed condition of GE Capital, and that approximately 50% of its loan portfolio consisted of loans to junk and subprime borrowers.  As such, GE's AAA rating and its quarterly dividend were in serious jeopardy at the time the statements were made, particularly in the then-current economic environment, rendering the statements untrue and misleading when made.  ¶73, 84-87, 95-99, 103-112, 115, 122, 129, 132, 138.

---

[68] Further, SFAS 107, which requires disclosure of "significant concentrations of credit risks," *also* required disclosure of the exposure to $220 billion of subprime debt and the Securities Act Defendants' assertions otherwise fail.  To begin with, the Securities Act Defendants raise factual issues with respect to the interpretation of SFAS 107 that are inappropriate on a motion to dismiss.  *See* UW Br. 21-22; *see also Refco*, 503 F. Supp. 2d at 657-658 (holding that at the motion to dismiss stage, allegations of GAAP violations must be taken as true).  Additionally, contrary to the Securities Act Defendants' assertion, the concentration of credit risk is not a "hodge podge" of debt, but debt that was identified as non-investment grade and non-prime and delineated *by GE* during the March 19 Investor Conference.  ¶¶96-98; *see also* PowerPoint Presentation, Ex. 2 to Block Decl.  As such, the Securities Act Defendants' arguments that they were not required to disclose this concentration credit risk under SFAS 107 also fails.

ii.  <u>The Statements Are Not Forward-Looking</u>

The Securities Act Defendants primarily argue that the statements regarding GE's AAA rating and its quarterly dividend are forward-looking and thus protected by the PSLRA safe harbor and "bespeaks caution" doctrine.  This argument fails.  The statements at issue are clearly statements of present or historical fact.

For example, GE stated that it "*reaffirmed its longstanding commitment* to its Triple-A rating," ¶124 and "We *remain fully committed* to the Triple-A credit rating, *which distinguishes GE.*" ¶ 128 (emphasis added).  Likewise, the statements regarding GE's dividends are clear statements of present and historical fact, guaranteeing payment of the dividend: "As announced on September 25, our Board of Directors *has approved* management's plan to maintain our quarterly dividend of $0.31 per share, totaling $1.24 per share annually, t*hrough the end of 2009.*" ¶118 (emphasis added).  This point was, in fact, conceded by Securities Act Defendants GE, Immelt and Sherin in their response to the Exchange Act allegations where they admitted that statements regarding the Board's approval of the dividend involved "accurate statements of historical fact."  GE Br. at 48, n.84.  Indeed, the statements were *"worded as guarantees* [and] *supported by specific statements of fact.*"  *IBM*, 163 F.3d at 107.  Thus, the statements regarding the dividends here are nothing like the statements  in *IBM*, as discussed in § III(A)(3)(b), above.  Here, the statements regarding the dividend were supported by specific statements of fact, the Board's *approval* of the dividend "*through the end of 2009*" *and* carried with it a certainty and guarantee that the full $0.31 per share dividend would be paid in each quarter throughout 2009.  *IBM*, 163 F.3d at 109.  This "promise[…] to maintain the dividend at [a] stated level" constitutes an effective guarantee by the Company.  *See id; see also Lapin,* 506 F. Supp. 2d at 239 (explaining that a statement need only "imply certainty" to be considered a guarantee) (citing

97

*IBM*, 163 F.3d at 107; *Novak*, 216 F.3d at 315; and *Oxford Health Plans*, 187 F.R.D. at 141).[69]

Further, these statements were not forward-looking as they were statements of present intent and were *virtually impossible at the time the statements were made*.  *See, e.g., Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, No. 09-1751-cv, 2010 WL 889294, at *3 (2d Cir. Mar. 12, 2010) (statement that "management believes it cured the metric deficiency" was not forward-looking where defendant's "exceedingly low sales meant that compliance with the original metrics was a *virtual impossibility*") (emphasis added); *Daum*, 355 F.3d at 96-98 (2d Cir. 2004) (allegation that no IPO was being planned was a present or historical fact, not a forward-looking statement); *In re PSS World Medical, Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1349-51 (M.D. Fla. 2002) (statement regarding planned merger that failed to disclose risk of merger's failure due to undisclosed financial condition of company was not forward-looking); *Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *19 (S.D. Ohio Sept. 19, 2002) (statement that company had "made contingency plans for potential labor problems . . . to prevent any impact on customers" was not forward-looking when issues with workers were much more serious than disclosed and would have a substantial impact).  Given the undisclosed liquidity problems at GE and the distressed financial condition and $220 billion in subprime debt at GE Capital, GE's stated commitment to its AAA rating and guarantee of its quarterly dividend were misleading and untrue when the statements were made.  Indeed, GE's liquidity issues, including its undisclosed difficulties selling its commercial paper, rendered payment of the dividend through 2009 a "virtual impossibility."[70]

---

[69] Further, in *IBM*, unlike here, at the time the statements were made, there was no plan to cut the dividend, no need to cut the dividend, and the dividend was not in fact cut during the relevant time period.  *See IBM*, 163 F.3d 105.

[70] *Marsh Group v. Prime Retail*, 46 Fed. Appx. 140 (4th Cir. 2002), relied on by the Securities Act Defendants, is inapposite as the statements in that case were "not guarantees or statements of

As the statements are not forward-looking, neither the bespeaks caution doctrine nor the PSLRA's safe harbor apply to these statements.[71]

### iii. Even If The Statements Are Forward-Looking, They Are Not Protected

Further, even if the statements concerning GE's AAA credit rating or its dividend payment through 2009 were forward-looking, the proffered cautionary language cited by the Securities Act Defendants does not insulate those statements from liability.

The only language the Securities Act Defendants point to that even addresses the AAA rating or the dividend – that the ability to maintain the AAA rating may be impacted by "further deterioration in the financial markets," and that the dividend "could be reduced or eliminated in the event of material future deterioration in business conditions" (UW Br. at 14) – in no way provided investors with meaningful cautionary language that would warn an investor that GE *would likely not* maintain its AAA rating or its quarterly dividend. Indeed, the same risk disclosures could apply to every company in America in late 2008. Further, the so-called "disclosure" omits the undisclosed risks faced by GE, namely that GE was unable to maintain its AAA credit rating or its quarterly dividend due to the undisclosed liquidity problems at GE (including the difficulty it was having selling its commercial paper) and the distressed financial condition and junk debt at GE Capital. Risk disclosures are not considered meaningful if the actual, undisclosed risks faced by the Company are omitted from the risk disclosure and if they do not "precisely address the substance of the specific [untrue and misleading] statement or

---

present intent to pay the dividends," nor did the company announce that the dividend payment had already been Board-approved.

[71] Further, it "is well recognized that when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re AOL Time Warner, Inc., Sec. & ERISA Litig.*, 381 F. Supp. 2d. 192, 221 (S.D.N.Y. 2004) (internal quotations and citation omitted).

omission that is challenged." *Nortel Networks*, 238 F. Supp. 2d at 629 (citation omitted). *See also Vivendi I*, 381 F. Supp. 2d at 183; *In re Initial Pub. Offering Sec Litig.*, 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004) ("*IPO II*"); *Daum*, 355 F.3d at 96-97 ("[i]t would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *Hunt*, 159 F.3d at 729 (applying the "bespeak caution" doctrine and finding that "cautionary language ... must relate directly to that by which plaintiffs claim to have been misled.").[72]  As such, even if the statements were forward-looking, the proffered language does not protect these statements under either the bespeaks caution doctrine or the PSLRA's safe harbor.

Relying on the recently decided *Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010) the Securities Act Defendants also assert that, even absent meaningful cautionary language, the PSLRA safe harbor protects forward-looking statements unless they were made with "actual knowledge" of their falsity. *See* UW Br. at 14.[73]  *Slayton* reads the two prongs of the safe harbor in the disjunctive, broadening defendants' ability to rely on it by holding that the statute provides three separate means by which a forward-looking statement may be protected: (1) if it is accompanied by meaningful cautionary language; (2) if it is immaterial; or (3) if plaintiff fails to plead actual knowledge of falsity. *See Slayton*, 604 F.3d 758.  However, Lead Plaintiff respectfully disagrees with this reading and the holding in *Slayton*, the only Second

---

[72] The other language relied on by the Securities Act Defendants is insufficient for these reasons and also does not even address the AAA rating or the dividend. *See* UW Br. at 14.

[73] It appears that the Securities Act Defendants are relying on the PSLRA safe harbor and *Slayton* primarily in defense of the untrue and misleading statements regarding the AAA rating and dividend.  However, to the extent that the Securities Act Defendants intend to rely on the PSLRA safe harbor and *Slayton* for other statements, the reasoning herein applies to those statements as well.

Circuit case to reach this conclusion.[74]  Indeed, such a reading eliminates the need for cautionary language since a plaintiff can only state a claim for a forward-looking statement if the speaker had actual knowledge of its falsity.

Instead, as the Southern District of New York has held, "[t]he PSLRA's safe harbor *protects only* those forward looking statements that are 'identified' as such and 'accompanied by meaningful cautionary statements.'"  *E*Trade*, 2010 WL 1940314, at *20 (citation omitted and emphasis added).  If forward-looking statements are not accompanied by meaningful cautionary statements, the safe harbor does not apply and the Court's evaluation ends; however, if forward-looking statements are accompanied by meaningful cautionary statements, *only then* does the Court move to the "actual knowledge" prong of the safe harbor to determine whether such statements are protected.  *See In re IAC/InterActive Corp.  Sec. Litig.*, 478 F. Supp. 2d 574, (S.D.N.Y. 2007) (R. Holwell, J.) ("The PSLRA provides safe harbor protection to a forward-looking statement if it is 'accompanied by meaningful cautionary statements'. . .'The only exception to this rule is that there may be liability where (1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts'") (citation omitted); *see also In re Vivendi Universal, S.A. Sec. Litig.*, Nos. 02-5571, 03-2175, 2004 U.S. Dist. LEXIS 7015, at *24 (S.D.N.Y. April 21, 2004) (R. Holwell, J.) (*Vivendi II*) (the cautionary language did "not suffice to place [the statements] within the ambit of the safe harbor," following the lead case that found the preferred cautionary language "boilerplate" and "generic" without addressing the "actual knowledge" prong of the safe harbor) (citation omitted).[75]  Thus, the safe harbor does not apply unless the forward-

---

[74] Plaintiffs' petition for rehearing *en banc* of the *Slayton* decision is presently pending.

[75] *See also In re Sina Corp. Sec. Litig.*, 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089, at *29-30 (S.D.N.Y. Sept. 25, 2006) (actual knowledge is an "exception" after safe harbor is triggered by

looking statement is accompanied by meaningful cautionary language.  *See id*; *see also* 15

U.S.C. § 78u-5(c) (delineating two prongs: (A) and (B)).[76]  Under this application, as the

statements here are not accompanied by meaningful cautionary language, whether or not "actual

knowledge" is pled is irrelevant.

               iv.   <u>The Statements Are Not Opinions</u>

        Finally, as statements concerning the Company's AAA rating and its dividend are

statements of present fact and guarantees, they are not opinions.[77]  Lead Plaintiff therefore need

not allege that the statements were "knowingly false" when made.  The Securities Act

Defendants' attempt to attribute significance to the word "commitment" in GE's statement is

---

existence of meaningful cautionary language); *Irvine v. ImClone Sys.*, 02 Civ. 109 (RO), 02 Civ. 7499 (RO) 2003 U.S. Dist. LEXIS 9342, at *3-4 (S.D.N.Y. June 3, 2003) (safe harbor did not protect statements where no meaningful language existed and not reaching "actual knowledge" prong).

[76] Numerous other courts have likewise read the safe harbor in this way, finding that the PSLRA "authorize[es] the application the safe harbor *only if* forward-looking statement 'is accompanied by meaningful cautionary statements.'"  *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 244 (5th Cir. 2009) (citation omitted and emphasis added) ("Even if the plaintiff had failed to plead actual knowledge, the safe harbor provision would still not apply here, because the alleged misrepresentations are not accompanied by 'meaningful cautionary language.'"); *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 937 n.15 (9th Cir. 2003) ("even if we were to find them to be 'forward-looking,' neither statement is accompanied by the requisite 'meaningful cautionary statement'"); *Sawant v. Ramsey*, 570 F. Supp. 2d 336, 343 (D. Conn. 2008) (safe harbor did not protect statements where proffered cautionary language was "boilerplate," and not reaching actual knowledge prong); *Gargiulo v. Isolagen, Inc.,* 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007) (forward-looking statement made with meaningful cautionary language is actionable if there are sufficient allegations of actual knowledge of the falsity of the statement); *Andropolis v. Red Robin Gourmet Burgers, Inc.,* 505 F. Supp. 2d 662, 676 (D. Colo. 2007) (same); *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896, 2005 WL 2840336, at 8 (D.N.J. Oct. 27, 2005) (same).

[77] The Securities Act Defendants' assertion that Lead Plaintiff previously argued that the statements were "unreasonable" "opinions" is inaccurate and inappropriate.  Lead Plaintiff never made this argument in its prior Opposition, but argued what it does here: that the statements were untrue and misleading when made.  Further, the Securities Act Defendants repeated reference to the prior Opposition, and mischaracterization of the Opposition, is inappropriate as this Court ordered that Defendants' prior motions to dismiss were deemed "withdrawn."

nothing more than a red herring.  In the case they rely on, *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996), the Second Circuit did not attribute any significance to the word "committed" and simply agreed with the District Court that the alleged statements were merely "predictive statements of opinion and belief" concerning speculative matters such as "future earnings, sales goals, and [a] desire to achieve continued prosperity."  The Securities Act Defendants' additional authority is equally unavailing.  *See In re USF&G Corp. Sec. Litig.*, No. B-90-2928, 1993 WL 740188, at *6-7 (D. Md. Feb. 11, 1993) (a § 10(b) case holding that statements expressing vague belief that dividends were "sound business practice" and "important to investors" were mere opinions about future events and not guarantees), *aff'd*, 16 F.3d 411 (4th Cir. 1994); *IBM*, 163 F.3d at 107 (statements discussed above and stating that not opinions if they are "worded as guarantees or are supported by specific statements of fact.").

### c. Untrue And Misleading Statements And Omissions Regarding The Value of GE Capital's Assets and Loan Loss Reserves

Notably, the Securities Act Defendants do not challenge Lead Plaintiff's allegations, and, thus, concede, that both GE's valuation of its assets and its loan losses violated GAAP.  ¶¶ 88-94, 108, 122, 129, 132, 138.  Financial statements that violate GAAP are presumed to be untrue and misleading.  17 C.F.R. § 210.4-01.  Further, the SCC alleges that the $695.8 billion reported value of GE Capital's assets was untrue and misleading when made given that, *inter alia*:[78]

- GE Capital held massive amounts of sub-investment grade and subprime debt and admitted that GE Capital's value was worth significantly less than previously stated, in large part due to this low-grade debt (¶¶95-98);

- 98% of GE Capital's assets were held at inflated historical values, rather than at their substantially reduced market values (¶85) and the Company reclassified and transferred certain impaired assets to "held to maturity" positions to avoid marking

---

[78] Contrary to the Securities Act Defendants' assertion, Lead Plaintiff never "conceded" that "to allege a valuation or reserve misstatement…it must challenge the reported value of GE Capital's assets."  UW Br. at 19.

these assets to their fair market values and taking losses on those assets in violation of GAAP (¶¶73, 86-94);

- GE Capital's lending activity "fell off a cliff" or otherwise had come to a complete standstill at business units throughout GE Capital in 2008, prior to the Offering (¶¶73, 112); and

- GE later *admitted* that GE Capital's assets were overvalued (¶87).

Likewise, the SCC alleges that GE Capital's fundamentally insufficient loan loss reserves did not accurately reflect the risk associated with its lending practices, notably its lending to non-investment grade or "junk" grade borrowers.  ¶¶104-107.  These were "the very types of assets that were most likely to fail and thus most deserving of being included in any loss reserve calculation."  *Citigroup Bond Litigation,* 2010 U.S. Dist. LEXIS 69257, at *25.  GE further failed to increase its loan loss reserves in the face of obvious evidence of increasing loan delinquencies and defaults.  ¶¶73, 103-111.  By failing to record appropriate loan loss reserves and failing to properly account for acknowledged loan losses, GE overstated its financial results, including its net income, earnings, and assets, while at the same time artificially understating its expenses and provisions for loan losses.  ¶110.  This made the Company's financial statements, which were incorporated into the Offering Documents, untrue and misleading insofar as investors were not given an accurate impression of the financial condition of GE.  ¶111.  *See Citigroup Bond Litig.,* 2010 U.S. Dist. LEXIS 69257, at *67-69 (allegations regarding loan loss reserves actionable as they materially misrepresented "the scope of the risk posed by Citigroup's holdings" and "materially misled investors about the company's financial health"); *See also Shaw*, 82 F.3d at 1214 (rejecting defendants' argument that Securities Act claim based on misleading statement that a restructuring reserve was "adequate" failed to state a claim).

The arguments put forth by the Securities Act Defendants are without merit.  First, as GE's statements were statements of present and historical fact, they were not opinions that would

require Lead Plaintiff to allege "that GE did not believe" that its reserves or the stated value of its assets were appropriate as of the Offering.  *See, e.g., In re New Century*, 588 F. Supp. 2d 1238-39 (rejecting argument that misstatements of value and loan losses were judgmental and sustaining Section 11 claims for those misstatements).  In any event, the assertion that a reserve or a valuation is an opinion (UW Br. at 17) does not protect the Securities Act Defendants here given the allegations that internally generated data, GAAP guidance, historical evidence and relevant macroeconomic factors rendered the value of its assets and loan loss reserves inaccurate and misleading.[79]

Further, the Securities Act Defendants' assertion that the Company's statements concerning the reported value of GE Capital assets and its loan losses are protected by the "bespeaks caution" doctrine also fail.[80]  The Company's financial statements reporting the purported *current* and *historical* value of GE Capital's assets and its loan loss reserves are not forward-looking statements.  As Judge Sweet recently held:

---

[79] The cases relied on by the Securities Act Defendants offer no protection.  *See Fait*, 2010 WL 1883487, at *5 (complaint contained merely "conclusory allegations" that defendant's reserves were "'woefully inadequate' and did not comply with GAAP"); *CIT Group,* 349 F. Supp. 2d at 690 (complaint failed to allege *any* facts undermining the sufficiency of the loan loss reserves and  relied solely on the fact that the company increased its loan loss reserves after the fact); *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) ("no facts alleged to support an inference that [the failure to record appropriate reserves] was the result of anything but inaccurate forecasting or unforeseen circumstances").  The remaining cases relied on have absolutely nothing to do with the allegations regarding statements of asset value and loan loss reserves that the Securities Act Defendants challenge here.  *See CIBC*, 694 F. Supp. 2d at 295-96, (addressing Value-at-Risk or VaR); *Tsereteli*, 692 F. Supp. 2d at 392-93 (addressing underwriting analysis of the adequacy of collateral and related property appraisals).

[80] *Shaev v. Hampel*, No. 99 Civ. 10578(RMB), 2002 WL 31413805, at *6-7 (S.D.N.Y. Oct. 25, 2002) is wholly irrelevant.  Unlike GE Capital's asset values and loan loss reserves at issue here, the so-called valuation estimates in *Shaev* were from the Black-Scholes options pricing model and as the court notes, "The Proxy Statement explicitly warns stockholders that the Black-Scholes calculations are estimates, and that the values derived are dependent upon certain (enumerated) assumptions."  *Id.*

> Defendants' argument that 'loan loss allowances and securities impairments were projections about future performance,'… misstates GAAP and SEC disclosure requirements, which provide that '*allowances for loan losses should be based on past events and current economic conditions*…Therefore Defendants' argument that 'loan loss allowances and securities impairments were projections about future performance' fails as a matter of law.

*E*Trade*, 2010 WL 1904314, at *21, (emphasis added) (citing *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008)).  Indeed, GAAP expressly describes loan loss reserves as *present* statements of probable loan losses that are inherent in a portfolio as of the balance sheet date.[81]

Moreover, even if the statements were forward-looking, the proffered cautionary statements regarding "significant write-downs of asset values" and that there was no assurance that future losses or impairments at GE Capital "would not materially and adversely affect GE Capital's business and results of operations" (UW Br. at 20), are nothing short of generic, boilerplate statements that fail to warn of the specific, undisclosed risks about GE Capital that Lead Plaintiff claims were not disclosed, they could have been issued by *any* company, nearly verbatim, to warn of unspecified future risks.  *See, e.g., Vivendi I*, 381 F. Supp. 2d at 183; *IPO II*, 358 F. Supp. 2d at 212.  Likewise, that GE Capital was "experiencing higher loan losses related to some of its lending assets" and that loss reserves (for mortgages only) were "based on [the company's] analysis of current and historical delinquency and loan performance, as well as other management assumptions that may be inaccurate predictions of credit performance in this environment," (UW Br. At 20) does not precisely address the substance of the specific allegations raised by Lead Plaintiff.  The first disclosure is vague and does not specify which

---

[81] *See* American Institute of Certified Public Accountants Audit and Accounting Guide for Depository and Lending Institutions ("D&L AAG") at § 9.01 ("The allowance for loan losses is an accounting estimate of credit losses inherent in an institution's loan portfolio that have been incurred as of the balance-sheet date.").  *See also* ¶93.

"lending assets" were driving these loan losses, thus failing to address Lead Plaintiff's allegation that GE Capital's exposure to subprime and junk debt was dragging it down. The second disclosure is inadequate given that, on its face it does not relate to the $220 billion worth of non-investment grade and subprime loans at GE Capital, and further implies that GE Capital's reserves might prove "inaccurate" in the future, failing to address Lead Plaintiff's allegations that reserves were inadequate at the time.[82]

### d. Untrue And Misleading Statements And Omissions Regarding The Collapse Of GE Capital's Business

Contrary to the Securities Act Defendants' mischaracterization, the SCC does not allege that GE Capital's business should have been expressly labeled as "dried up." UW Br. at 25.[83] Instead, the SCC alleges that the failure to disclose that GE Capital was experiencing a near complete standstill constituted a material omission of fact that rendered the statements in the Offering Documents untrue and materially misleading. ¶122. In particular, these omissions rendered GE's statements that GE Capital was "safe and secure" and the touting of its relative strength compared to its financial services peers, inherently untrue and materially misleading. ¶127. Likewise, these omissions rendered the statements regarding GE's AAA rating and payment of its quarterly dividend materially untrue and misleading.

Further, the statements the Securities Act Defendants rely on to support their assertion that the Offering Documents did disclose this information, *i.e.,* that "difficult conditions in the financial markets have materially and adversely affected the business and results of operations at

---

[82] The Securities Act Defendants' argument that the SCC fails to identify specific assets that were overvalued and authority relied on is also without merit. Indeed, the SCC is replete with allegations that support the fact that GE Capital's assets were overvalued, including GE's *admission*, the misclassification of assets and GAAP violations, and the detailed allegations – addressing specific assets – regarding the $220 billion in subprime loans.

[83] As such, the cases relied on by the Securities Act Defendants on this point, UW Br. at 26, have no import here.

GE Capital," in *no way* disclose that, in fact, GE Capital was experiencing a halt in business. Finally, these allegations do not concern, as the Securities Act Defendants argue, prospective statements of "opinion" about future business prospects, but specifically address the then-present condition of GE Capital's business.  ¶¶73, 112, 122.

> **e.  Untrue And Misleading Statements And Omissions Related To GE's Access To The Commercial Paper Markets**

The Securities Act Defendants' attacks on the untrue and misleading statements and omissions related to GE's access to the commercial paper markets likewise fail.  As is true with the Securities Act Defendants' other arguments, the arguments related to the commercial paper allegations are fundamentally flawed as they fail to acknowledge the interrelatedness of Lead Plaintiff's allegations.  Further, even the inappropriate attacks on just four isolated statements related to GE's access to the commercial paper markets are without merit.

As alleged in the SCC, GE's cash and liquidity situation was considerably worse than was disclosed in the Offering Documents, rending the statements therein untrue and misleading. Indeed, while the Offering Documents touted GE's financial health, access to the commercial paper markets and that its "funding position was strong" and "demand remains strong" for its commercial paper, it was actually experiencing difficulties selling its CP.  ¶10a-f, 73, 75, 84, 112a, 113, 114, 115, 116, 125, 127.  As such, these statements were untrue and misleading when made.  Further, GE's statements regarding its commitment to its AAA rating and payment of its quarterly dividend were also materially untrue and misleading as GE's troubled liquidity position placed both in imminent jeopardy.  ¶¶84, 113, 114, 115, 122, 129, 132, 138, 128a.

The Securities Act Defendants argue that although GE was having trouble selling its CP, it did not *completely stop* selling its CP and, thus, statements regarding GE's "continued" issuance of CP were not technically untrue and misleading.  *See* UW Br. at 27.  However,

whether or not GE may have been able to sell some CP does nothing to render the statements it made not untrue and misleading.  The Offering Documents in no way informed investors about the difficulties GE was having selling its CP – which not only rendered its statements regarding its liquidity position and access to commercial paper markets untrue and misleading, but also rendered statements regarding its AAA rating and dividend payments untrue and misleading. *In re Morgan Stanley,* 592 F.3d at 366 ("when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'").  The Securities Act Defendants' continued focus on specific words and statements taken out of context is inappropriate as "a statement is misleading if a reasonable investor would have received a false impression from the statement."  *E*Trade*, 2010 WL 1904314, at *6 ("[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . . The purpose of the disclosure requirements is 'to inform, not to challenge the reader's critical wits.'") (citations omitted); *see also IAC II*, 695 F. Supp. 2d at 117 ("[T]he central issue . . . is not whether particular statements, taken separately, were literally true, but whether *defendants' representations, taken together and in context, would have misled a reasonable investor* about the nature of the [investment].") (emphasis added)(citations omitted).

Likewise, the assertion that Immelt's statement in the Offering Documents that "we continue to successfully meet our commercial paper needs," is inactionable because "successfully" is an expression of optimism fails.  UW Br. at 28.  That statement is untrue and misleading because GE was *not* "meet[ing] [its] commercial paper needs" and, in fact, was

speaking to Secretary Paulson about its concerns due to its trouble selling its commercial paper. ¶¶10a-f, 112a, 113.  *See E\*Trade*, 2010 WL 1904314, at \*10 (misstatements such as "we are seeing significant organic growth in cash, assets and credit" held actionable and not statements of optimism as they were alleged to misrepresent existing facts).  Further, the fact that GE's difficulty selling its CP also made its statements regarding its AAA rating untrue and misleading, is highlighted by the full statement the Securities Act Defendants' attack, which reads: "In addition, we remain committed to the Triple A rating and in the recent market volatility, we continue to successfully meet our commercial paper needs," ¶ 117, – thus, directly tying its AAA rating to its ability to sell its commercial paper.

Finally, the Securities Act Defendants challenge two statements in which GE stated that it believed "alternative sources of liquidity are sufficient to permit an orderly transition from commercial paper *in the unlikely event of impaired access to those markets* and that the commercial paper markets were a continuing "reliable source of short-term financing."  UW Br. 29-30; SCC ¶138a.  These attacks are likewise unavailing.  Tellingly, as to the first statement, the Securities Act Defendants conveniently do not include the language from the statement addressing the "*unlikely* event of impaired access" to the commercial markets.  However, at the time of the Offering and undisclosed to investors, GE's access to these markets was *already significantly impaired*, thus rendering this statement untrue and misleading.  Further, the assertion that these statements are inactionable statements of beliefs or forward-looking statements accompanied by cautionary language fails.  First, statements regarding GE's commercial paper and liquidity position are statements of then-present fact.  *See Tellabs II*, 513 F.3d at 705 (defendants were not entitled to "a safe harbor with regard to the statement's representation concerning current sales" where defendants stated that sales of their product were

"still going strong."); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 207, 212 (1st Cir. 2005) (safe harbor did not apply where defendants had asserted that the company "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs.") (citation omitted).  Indeed, while the Securities Act Defendants were touting the "reliability" of the commercial paper markets as a source of funding, in truth, GE was having difficulty selling its commercial paper and expressed these very concerns to the Treasury Secretary.  Further, even if they were forward-looking, the purported cautionary language is insufficient as its discussion of "further deterioration" in the markets was generic and boilerplate and could apply to any company that sold commercial paper.  This language also did not warn investors of the issues GE was then-currently experiencing regarding liquidity and difficulty selling its commercial paper and, therefore, cannot protect any of the statements at issue.[84]

### 3. Defendants Have Not Demonstrated Negative Causation As To The Commercial Paper Allegations

The Securities Act Defendants' assertion of the affirmative defense of negative causation as to the commercial paper allegations fail.  *See* UW Br. at 30-32.  This argument is contrary to both the law in this Circuit and the facts alleged in the SCC.

As stated in a case upon which the Securities Act Defendants rely, "[t]o be sure, the Securities Act does not require a plaintiff to plead loss causation as an element of its claim, and thus Plaintiff need not allege that the material misstatements or omissions in the Offering Documents were the source of his financial losses."  *In re Brittania Bulk Holdings Inc. Sec. Litig.*, No. 08 Civ. 9554 (DLC), 2009 WL 3353045, at *13 (S.D.N.Y. Oct. 19, 2009). "The Second Circuit has characterized a defendant's burden of showing the absence of loss causation

---

[84] Therefore, this purported "cautionary" language was also insufficient to protect statements made in the earlier SEC filings that were incorporated by reference into the Offering Documents.

in the Securities Act context as the 'heavy burden' of proving negative causation." *Id.* (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009); *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987) ("Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases.").  Here, the Securities Act Defendants have not even come close to satisfying their "heavy burden" of proving that their misrepresentations did not cause GE's share price to decline.  Furthermore, courts addressing this issue have found that whether defendants have met their burden of proving the affirmative defense of negative causation is generally inappropriate at the motion to dismiss stage.  *See, e.g., In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion").[85]  In order to succeed with an affirmative defense of negative causation at the motion to dismiss stage, the defense must appear on the face of the complaint. *See Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009); *see also* UW Br. at 56.

The SCC does not establish the Securities Act Defendants' affirmative defense of negative causation.  *See* SCC ¶¶ 424-428.  The Securities Act Defendants argue the absence of loss causation for the commercial paper allegations because the Company's share price did not decline when GE announced that "[t]he global credit markets have recently experienced unprecedented volatility, which has affected both the availability and cost of our funding sources."  UW Br. at 31 (citing GE's 3Q 2008 Form 10-Q, filed on October 30, 2008).  However, the 3Q 2008 10-Q *never* disclosed that GE was finding it "very difficult" to sell its commercial paper or that its commercial paper  market had already dried up.  In fact, the cited announcement

---

[85] *SafeNet*, 645 F. Supp. 2d at 240; *Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07 Civ. 8159 (LLS), 2009 WL 536517, at *3 (S.D.N.Y. Mar. 4, 2009); *In re Brittania*, 2009 WL 3353045, at *3-4 (citing cases); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009).

actually *reassured* investors by noting that "[GE] continue[s] to access the commercial paper markets *without interruption*, although we have been doing so at shorter average maturities than historically." *Id.* (emphasis added).[86]  As such, this "disclosure" not only failed to disclose the relevant information but actually was itself untrue and misleading.  Similarly, the Company's statement that it had "*[r]egistered* to use the [CPFF] for up to $98 billion" in order "to support [its] commercial paper investors who need liquidity and to manage our maturity profile" was also misleading given that GE's use of the CPFF was necessary for the Company to fund itself.  Thus, Defendants are flatly incorrect that these statements demonstrate negative causation.  *See, e.g., Lapin*, 506 F. Supp. 2d at 238 (denying motion to dismiss because the alleged disclosure was not "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged statements") (citation omitted).[87]

The Securities Act Defendants also contend that the SCC fails to adequately plead loss causation for the commercial paper allegations because the corrective disclosures "do not even mention commercial paper."  *See* UW Br. at 32.  However, this argument is futile because loss

---

[86]  Defendants also attempt to argue that GE's statements that it "reduced [its] commercial borrowing . . . to $88 billion at September 30, 2008" and "targeted to further reduce [GE's] commercial borrowing to $80 billion by the end of 2008," somehow disclosed the problems with the selling of its commercial paper.  UW Br. at 32.  However, these statements are not useful to Defendants because they not only fail to disclose that GE could not sell its commercial paper in any meaningful way, but, to the contrary, actually insinuated that GE had the ability to lower its pre-Class Period dependence on the commercial paper market.

[87]  The Securities Act Defendants' reliance on *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,* No. 07 Civ. 10528, 2010 U.S. Dist. LEXIS 2899, at *11 (S.D.N.Y. Jan. 12, 2010) is misplaced.  In *Blackmoss*, the court dismissed the complaint on negative causation grounds because the company's stock had traded above its IPO price even after defendants provided investors with specific "updated information concerning [the company's] CDO portfolio, *including the number of additional CDO deals that had been closed and the nature of the assets contained within them*."  *Id.* at *30 (emphasis added).  Thus, these explicit disclosures actually tracked the alleged misrepresentations, unlike the generic and falsely reassuring announcements here.

causation can exist "'if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'" *E\*Trade*, 2010 WL 1904314, at \*27 (quoting *Lentell*, 396 F.3d at 173)); *see also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity.   In fact, a "corrective disclosure" is not even required under this Court's *post-Dura* case law." *E\*Trade*, 2010 WL 1904314, at \*27 (citing *Parmalat*, 375 F. Supp. 2d at 305-06 (analyzing Second Circuit cases and holding that "a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss"); *see also, e.g., Nursing Home Pension Fund v. Oracle Corp.*, No 01-00988, 2006 U.S. Dist. LEXIS 94470, at \*35 (N.D. Cal. Dec. 20, 2006) (holding that *Dura* does not require a corrective disclosure).  A risk that was concealed by defendants which materialized and caused the decline in shareholder value is sufficient.  *See Vivendi III*, 605 F. Supp. at 598 (loss causation satisfied by allegations that the loss was caused by the materialization of defendants' concealed risks); *E\*Trade,* 2010 WL 1904314, at \*28 (same). [88]

     As alleged throughout the SCC, GE's undisclosed difficulty selling it commercial paper and liquidity issues rendered numerous statements untrue and misleading, including those touting its financial health, commitment to the AAA rating and the payment of a quarterly dividend.  As is further alleged, between January 23, 2009 and March 19, 2009, Defendants made numerous curative statements regarding GE's financial condition that caused the Company's share price to

---

[88] *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404 (S.D.N.Y. 2009) does not hold otherwise.  There, the court dismissed the complaint because the plaintiff was unable to demonstrate that any statement in the registration statement or prospectus was false or misleading when made and the so-called curative disclosure actually disproved plaintiff's allegations that the problems had begun prior to the company's initial public offering.  *Id.* at 408.

plummet.  SCC ¶¶ 424-428.  Thus, GE's corrective disclosures need not specifically reference

that many of the problems were, at least in part, related to GE's failure to effectively sell its

commercial paper because the disclosures, such as those related to the dividend cut, along with

the rating agency declines and reviews, revealed the materialization of the risks of GE's

concealed liquidity problems, including GE's difficulty selling its commercial paper.  *See*

*Vivendi III*, 605 F. Supp. at 598  ("A ratings downgrade reveals the risk of deteriorating liquidity

. . . if the company had previously concealed its liquidity condition . . . by making false or

misleading statements, these events may be sufficiently related to the fraud to qualify as

materializations of the risk"); *see also Emergent Capital*, 343 F.3d at 198-99 (cited with approval

in *Dura*, 544 U.S. at 344-45) (finding that the complaint adequately alleged loss causation

because the undisclosed risk was foreseeable in conjunction with the curative disclosures).

### 4.      The Allegations Regarding Commercial Paper Are Timely

Grasping at straws, the Securities Act Defendants argue that the new allegations related

to GE's difficulty selling its commercial paper as revealed in Secretary Paulson's book, ON THE

BRINK, are barred by the statute of limitations.  This argument is frivolous.  The statute of

limitations pursuant to Section 13 relates to *new claims, not allegations.*  The Securities Act

Defendants do not – and cannot – argue generally that the Securities Act claims are untimely.

Indeed, it is undisputed they were brought within the applicable statute of limitations.  It is also

beyond dispute that a plaintiff can add new allegations to bolster an existing, timely filed claim,

in accordance with Fed. R. Civ. P. 15(c).  The new allegations here further support Lead

Plaintiff's claims that the numerous statements and omissions were untrue and misleading.  For

example, the fact that GE was having difficulty selling its CP rendered the guarantees that GE

would continue to pay its full 2009 dividend and maintain its AAA credit rating materially

115

untrue and misleading. *See* F.R.C.P 15(c) (an amendment relates back to the date of the original pleading when it arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading); *Stevelman v. Alias Research, Inc*., 174 F.3d 79, 87 (2d Cir. 1999) ("Where no new cause of action is alleged, as here, this Court liberally grants relation back under Rule 15(c)"); *In re Loewen Group Inc. Secs. Litig.*, No. 98-6740, 2004 U.S. Dist. LEXIS 16601 at *39 (E.D. Pa Aug. 18, 2004) ("amendments found in the new complaint relate back to the original complaint and are not time-barred if they are additional reasons why the statements cited in the original complaint are false").[89] Further, as the Securities Act Defendants stipulated to allow these amendments, their contention that they are untimely is both disingenuous and frivolous. This alone is more than sufficient to end the Court's analysis of this argument.[90]

Finally, although not necessary for the resolution of this issue, Lead Plaintiff was not on "inquiry notice" regarding the allegations that rely on the facts disclosed in ON THE BRINK earlier this year – that, as of September 8, 2008, GE was having difficulties selling its commercial paper and, in the words of Secretary Paulson, GE "couldn't sell its paper." ¶10b. This was in *no way* revealed by news articles discussing that GE was experiencing "higher interest rates." UW Br. at 7, 33.[91] Likewise, the Securities Act Defendants' reliance on a statement in *Vanguard's* 10-Q, cannot put *GE* shareholders on notice, nor does the statement relied on therein – that a

---

[89] Further, under 15(c), "the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations". *Stevelman*, 174 F.3d at 86. The Securities Act Defendants cannot plausibly argue that they were not "on notice" of the matters raised in the SCC.

[90] As such, *NovaGold*, 629 F. Supp. 2d 272, is completely irrelevant. *See* UW Br. at 33.

[91] Nor would this have been revealed by an article stating that GE "experienced lower demand" as "lower demand" does not equate with a virtual halt in ability to sell its commercial paper. However, the article cited by the Securities Act Defendants does not state this but instead states that the higher interest rates "suggests demand for its debt has diminished in the marketplace for short-term investments." UW Br. at 7.

commercial paper purchaser decided not to roll over GE Capital notes – disclose that GE also could not sell its commercial paper to other purchasers.

### 5. Lead Plaintiff Has Standing Under § 12(a)(2)

The Underwriter Defendants erroneously argue that Lead Plaintiff lacks standing to bring a claim under § 12(a)(2).  *See* UW Br. at 34.  However, contrary to the Underwriter Defendants' assertion, courts do *not* require that a plaintiff identify *which* specific underwriter sold plaintiff the security or was involved in the solicitation of the purchase in order to establish that plaintiff purchased from a seller.  *See*, *e.g.*, *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) (rejecting defendants' argument that *Pinter*, 486 U.S. 622 requires a plaintiff to allege "which underwriter sold securities to each plaintiff"); *Scottish Re*, 524 F. Supp. 2d at 400 (denying underwriter defendants' motion to dismiss because the "Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings.  A reasonable inference is that plaintiffs acquired their securities from the Underwriter Defendants."); *Schoenhaut v. American Sensors*, 986 F. Supp. 785, 790 n.6 (S.D.N.Y. 1997) (holding that plaintiffs "need not specify which underwriter sold securities to each plaintiff" to satisfy § 12(a)(2) standing based on a buyer-seller relationship on a motion to dismiss).[92]

At the pleading stage, Lead Plaintiff need only allege that it purchased its securities in the Offering and that the Underwriter Defendants sold or solicited shares in the Offering.  *See, e.g., Scottish Re*, 524 F. Supp. 2d at 400 (sustaining § 12(a)(2) claims where "the Complaint

---

[92] The Underwriter Defendants' cases are inapposite.  *See Griffin v. PaineWebber*, No. 99 Civ. 2292, 2001 WL 740764, at *1-2 (S.D.N.Y. June 29, 2001) (finding plaintiff lacked standing where they stated they *had not purchased from the underwriter defendant*); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004) (plaintiffs lacked standing where they did "not allege[] they purchased shares from or were solicited by [defendants]").

adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings").[93]  The SCC provides this detail and more.  The SCC specifically alleges that Lead Plaintiff purchased GE securities in the Offering, and references its certification previously submitted to the Court which details these purchases, (¶20) from the Underwriters Defendants in their capacity as sellers (¶¶151-152).  As such, the SCC satisfies Rule 8 and Lead Plaintiff has standing to assert the § 12 claims.

### 6.  The SCC States A Claim For Control Person Liability

The sole challenge to Lead Plaintiff's § 15 control person liability claims is that Lead Plaintiff has not pleaded a primary violation of §§ 11 or 12 by a control person.  *See* GE Br. at 77.  However, as discussed above, Lead Plaintiff has adequately stated claims for the requisite primary violations and, as such, the §15 claims should be sustained.  *See In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03 Civ. 7301, No. 03 MD 1529 (LMM), 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 10, 2007); 15 U.S.C. § 77o.

## IV.  <u>CONCLUSION</u>

Defendants' motions to dismiss should be denied for the reasons stated herein.  To the extent the Court is inclined to grant the motions, Lead Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).

Dated: July 28, 2010.

---

[93] *See also Westinghouse*, 90 F.3d at 718 (general allegation that underwriter defendants sold "directly to plaintiffs and other Class members" deemed sufficient to withstand a motion to dismiss); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 319 (8th Cir. 1997) (allegations that NationsMart and underwriter defendants "offered, sold, and solicited sales of shares by means of the Prospectus" sufficient to maintain § 12(a)(2) claim).

Respectfully submitted,

**BERMAN DEVALERIO**

 /s/ Jeffrey C. Block
Jeffrey C. Block (JBC-0387)
Kathleen M. Donovan-Maher
Kristin J. Moody
Steven J. Buttacavoli
Jason Leviton
One Liberty Square
Boston, MA 02109
Tel:  (617) 542-8300
Fax:  (617) 542-1194

Joseph J. Tabacco, Jr. (JJT-1994)
One California Street, Suite 900
San Francisco, CA 94111
Tel: (415) 433-3200
Fax: (415) 433-6382

*Lead Counsel for Lead Plaintiff  State Universities
Retirement System of Illinois*

**LOWEY DANNENBERG COHEN
    & HART, P.C.**

Richard Cohen
David Harrison
White Plains Plaza
One North Broadway
White Plains, NY  10601-2310
Telephone:  914-733-7239
Fax:  914-997-0035

*Liaison Counsel for Lead Plaintiff State
Universities Retirement System of Illinois*