UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x

IN RE GENERAL ELECTRIC CO.                    09 Civ. 1951 (RJH)
SECURITIES LITIGATION

**MEMORANDUM OPINION
AND ORDER**

----------------------------------------------------------- x

Richard J. Holwell, *District Judge*:

Lead Plaintiff State Universities Retirement System of Illinois ("plaintiff") brings this suit pursuant to Sections 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  Plaintiff alleges that General Electric ("GE") failed to disclose information regarding GE's health and the health of GE Capital, its wholly owned subsidiary, from September 25, 2008 to March 19, 2009 ("the Class Period"), at the height of the recent financial crisis.  Plaintiff argues that GE's Chief Executive Officer ("CEO"), Jeffrey Immelt ("Immelt"), and Chief Financial Officer ("CFO"), Keith Sherin ("Sherin"), made materially misleading statements during the Class Period and in connection with GE's October 7, 2008 stock offering ("the October Offering").  According to plaintiff, during a time when the financial markets were crumbling and companies across the United States were scrambling to disclose their holdings in subprime loans, GE withheld information regarding its substantial holdings in subprime and non-investment grade loans and touted GE as safe in comparison to its competitors, despite the fact that GE was also feeling the impact of the financial crisis.  Plaintiff also alleges that GE Capital's CEO Michael Neal ("Neal"), CFO Jeffery Bornstein ("Bornstein"), and Chief Operating Officer ("COO") William Cary ("Cary") made materially misleading statements regarding GE and GE Capital's financial health.  In addition, plaintiff brings suit against the various companies that underwrote the October Offering ("the underwriter defendants").

Defendants now move to dismiss the Second Amended Class Action Complaint ("SAC") pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following allegations are drawn from the SAC. They are assumed to be true for the purposes of this motion. Despite the fact that the exposition of the facts below is quite lengthy, it is impossible to summarize all of plaintiff's factual allegations in narrative form, and some factual allegations will be discussed as relevant in the discussion section.

GE is one of the largest corporations in America. GE Capital, a wholly owned subsidiary of GE, is a financial services company. Broadly speaking, plaintiff alleges that GE concealed information about its financial health from the investing public in the wake of the economic collapse beginning in September 2008. Plaintiff claims that GE concealed: its difficulty issuing commercial paper; the quality of many of its investments; the fact that many of its assets were overvalued; its inability to pay the full dividend promised; the fact that business at GE Capital was drying up; and the precariousness of its AAA rating. In October 2008, GE announced an offering of stock, allegedly to shore up the company at a time when the company was severely imperiled. According to plaintiff, GE failed to disclose the foregoing financial information and made material misstatements that concealed this information both in the materials for the October 2008 offering (the "Offering Documents" or "Offering Materials") and on an ongoing basis throughout the Class Period. The financial conditions GE allegedly concealed are as follows:

First, GE was allegedly having great difficulty issuing commercial paper around September 2008. Immelt had private conversations with Treasury Secretary Henry Paulson regarding GE's ability to issue commercial paper that contradicted the rosy picture of GE's commercial paper program that Immelt presented to the public. Plaintiff draws its description of these telephone conversations from Paulson's book, *On the Brink.* According to Paulson, Immelt

called him on September 8, 2008, and again on September 14, 2008, and informed him that GE "was finding it very difficult to sell its commercial paper for any term longer than overnight." (SAC ¶ 10A-B.)  Paulson concluded based on these conversations that GE was having difficulty funding itself.  (*Id.*)  Paulson also reported that Immelt called him on October 13, 2008, to lobby him to allow GE to participate in the Temporary Loan Guarantee Program ("TLGP").  (*Id.*, ¶ 10d.)  The initial plan for the TLGP was that it would guarantee the short-term unsecured loans of banks.  (*Id.*)  Immelt expressed his concern to Paulson that the program as it was then conceived would place GE at a competitive disadvantage to the banks because investors would prefer to lend money to entities whose loans were guaranteed by the government.  (*Id.*)  In response to this conversation, Paulson worked to alter the terms of the TLGP so that GE Capital could also participate, and the FDIC eventually changed the program to incorporate this change. (*Id.*)

The plaintiff alleges that GE's problems rolling out commercial paper continued through the fall of 2008.  According to one of plaintiff's confidential witnesses ("CW"), CW 6, the commercial paper markets were "frozen" as of September 25, 2008.  (*Id.*, ¶ 138b.)  In addition, GE eventually participated in another government program, the Commercial Paper Funding Facility ("CPFF").  (*Id.*, ¶10g.)  Plaintiff argues that if GE had been able to purchase commercial paper easily on the open market, it would have had no need to participate in the CPFF program.

Second, GE disclosed on March 19, 2009, that GE Capital's portfolio contained a number of lower quality investments.  Specifically, GE revealed that "approximately 42% of GE Capital's $183 billion in total consumer loans were made to non-prime borrowers" (*id.*, ¶ 299) and high percentages of its commercial loans were made to companies with junk level credit ratings (*id.*, ¶ 302).  Plaintiff argues that GE Capital's portfolio was shaky throughout the Class Period and that GE had an obligation to disclose this information well before the actual date of disclosure.

Third, plaintiff alleges that both in the run up to and in the wake of the financial crisis, GE Capital experienced a drop-off in business.  Plaintiff has gathered the accounts of various

confidential witnesses from different parts of GE Capital in support of this allegation. CWs 8, 12, and 14 describe how GE Capital was having difficulty making new deals in the fall of 2008, stating that business fell off dramatically. (*Id.*, ¶ 73.) CWs 9 and 11 also state that GE Capital's financial problems were already brewing earlier in the year. (*Id.*)

Fourth, plaintiff alleges that GE did not disclose that its AAA rating was imperiled. According to a January 2009 research note by UBS Investment Research, both Moody's and Standard & Poor's stated that GE's ability to meet its projected earnings of $5 billion for 2009 weighed heavily in their determination of whether GE would retain its AAA rating. (*Id.*, ¶ 414.) Plaintiff argues that GE should have known that its earnings projections were unrealistic, so these reports should have made GE aware that it was likely to lose its rating. For much the same reason, plaintiff alleges that GE made material misstatements when it "guaranteed" payment of the company's 2009 dividend. (*Id.*, ¶ 220.)

Towards the end of the Class Period, GE revealed that it was experiencing financial strain. On February 27, 2009, GE announced that it would be forced to cut its dividend significantly. (*Id.*, ¶ 279.) Whereas it had planned on issuing a $.31 quarterly dividend per outstanding share of common stock for 2009, Immelt announced that GE would be cutting its dividend to $.10 per share. (*Id.*) On March 12, 2009, GE lost its AAA rating. (*Id.*, ¶ 293.) And on March 19, 2009, GE disclosed to the world that its portfolio contained a number of lower quality loans and corporate bonds. (*Id.*, ¶¶ 299-304.) Throughout its complaint, plaintiff alleges that GE should have disclosed the dangers it faced sooner.

**False Statements in the October Offering Prospectus**

On October 1, 2008, Immelt announced that GE would be offering at least $12 billion of common stock to the public and selling an additional $3 billion of preferred stock to Berkshire Hathaway, Inc. (SAC, ¶ 77.) On October 2, 2008, GE filed a prospectus for the October Offering. (*Id.*, ¶ 81.) The issuance was conducted pursuant a shelf registration statement, a registration statement that GE keeps on file with the SEC to expedite the issuance of additional securities. (*Id.*) GE filed a supplement to this registration statement on October 2, 2008. (*Id.*)

In addition, the Offering Materials include a number of documents that the supplement incorporated by reference.  (*Id.*, ¶ 82.)  Plaintiff alleges that these materials contained a number of material omissions and misstatements.

In the Offering Materials, GE stated that it had $695 billion in assets.  (*Id.*, ¶ 85.) According to plaintiff, this number was inflated.  (*Id.*)  Plaintiff identified through its own investigation several former GE employees who indicated that GE regularly failed to write down troubled assets to their true market value.  (*Id.*, ¶ 86.)  These individuals, identified as confidential witnesses 1, 13, and 15, stated that GE would recategorize assets from "available for sale," meaning the assets were being held for the short-term and needed to be marked to market regularly, to "held to maturity," which did not.  (*Id.*, ¶¶ 86-94.)  This shifting of assets was in violation of Generally Accepted Accounting Principles ("GAAP").  (*Id.*)  Because the assets were not regularly marked to market as they should have been, GE was listing them at higher values than they should have been listed, overstating the value of its assets in the process. Furthermore, before recategorizing assets as held-to-maturity, GAAP required that GE mark the assets to market.  GE allegedly did not comply with this requirement.

Plaintiff also alleges that GE had insufficient loan loss reserves and that the amounts GE was holding in reserve were incorporated into the Offering Materials.  Whereas the average reserve among what plaintiff characterizes as "comparable companies" was 2.36% of outstanding loans, GE Capital's reserves were only 1.43%.  (*Id.*, ¶ 105.)  Plaintiff alleges that these loan loss reserves were insufficient because GE Capital had a number of risky loans on its books.  (*Id.*, ¶ 109.)

Plaintiff claims that GE likewise failed to disclose crucial financial information in its Offering Materials.  For example, GE did not disclose the high percentage of loans that were of poor quality.  (*Id.*, ¶ 95.)  On March 19, 2009, GE disclosed that 42% of GE Capital's $183 billion of consumer loans were to sub-prime borrowers and that a high percentage of its corporate debt was non-investment grade or "junk" status.  (*Id.*, ¶¶ 95-99.)  Also, several of plaintiff's confidential witnesses detail that business at GE Capital was "drying up" during this

period, and GE did not disclose this information to the public.  (*Id.*, ¶¶ 112-13.)  Given these financial difficulties, GE should have, but did not disclose that it was in imminent danger of a ratings downgrade and was going to have difficulty paying out its quarterly dividends for the year 2009.  (*Id.*, ¶¶ 114-15.)

Plaintiff also alleges that GE concealed its true reasons for making an offering by stating the offering "enhances our flexibility and allows us to execute on our liquidity plan even faster.  Second, it gives us the opportunity to play offense in this market should conditions allow."  (*Id.*, ¶ 116; *see also id.* ¶ 121.)  Plaintiff alleges that this statement was misleading because GE was making the offering to shore up its financial viability.

GE made several statements regarding its AAA rating that plaintiff alleges are materially misleading.  Most of these statements fell into two categories.  In one group of statements, GE described its "commitment to its AAA rating."  (*Id.*, ¶¶ 117, 124.)  In the other, GE described its AAA rating as a marker of quality.  (*See id.* ¶ 128 ("We run the company for the long term and are taking the actions expected from a Triple-A-rated company."); *id.*, ¶ 136 ("GE, GECS and GE Capital have distinct business characteristics that the major debt rating agencies evaluate both quantitatively and qualitatively.")).  Finally, GE indicated in its Offering Documents that "Moody's Investor Services commented that our revised operational and financial strategies for GE Capital 'are supportive of' our and GE Capital's 'AAA' long-term and 'Prime-1' short-term ratings with a stable outlook."  (*Id.*, ¶ 120.)

GE attempted to reassure investors about its access to the commercial paper markets in its Offering Materials.  It stated in its preliminary prospectus of October 1, 2008 that "GE Capital has continued to issue commercial paper."  (*Id.*, ¶ 117a.)  It stated in a September 25, 2008 Form 8-K that "demand remains strong" for GE Capital's commercial paper.  (*Id.*, ¶ 125.)  And it stated in FY 2005, 2006, and 2007 Form 10-K's and in its FY 2004 Form 10-K/A (which were incorporated by reference into the Offering Materials) that "[a] large portion of GE Capital's borrowings . . . was issued in active commercial paper markets that we believe will continue to be a reliable source of short-term financing."  (*Id.*, ¶ 138a (ellipsis in complaint).)

GE indicated to investors that it was planning on issuing a dividend of $1.24 per share for the course of 2009. (*Id.*, ¶ 126 ("Board approves plan to maintain $.31 per share quarterly dividend, totally $1.24 per share annually, through 2009.").) GE further stated that "[b]ased on past performance and current expectations, in combination with the financial flexibility that comes with a strong balance sheet and the highest credit ratings, we believe that we are in a sound position to grow dividends . . . ." (*Id.*, ¶ 135.)  Plaintiff alleges these statements were false.

Plaintiff also takes issue with a GE's characterization of its economic health.  GE claimed in its 10-Q for the second quarter of 2008 that GE Capital's "investment securities comprise mainly investment-grade debt securities." (*Id.*, ¶ 130; *see also id.*, ¶ 137.)  GE also stated it had "performed well during the recent market volatility" and would "continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business." (*Id.*, ¶ 127.)  In 2007, GE described itself as having "disciplined risk management" and "continued strong credit quality." (*Id.*, ¶ 133.)  Plaintiff argues that all of these statements and omissions constituted material misstatements.

**Alleged Exchange Act Violations**

Plaintiff alleges that GE continued to make much the same types of misstatements throughout the Class Period, which runs from September 25, 2008, until March 19, 2008.  During this time period, plaintiff alleges that GE made misleading statements or omissions regarding the following:  its ability to fund itself through commercial paper, the status of its AAA rating, the quality of its loan portfolio, its ability to maintain its dividend, and the projected profits for GE Capital in 2009.  Plaintiff also alleges that GE violated GAAP by improperly re-characterizing its assets from short-term to long-term and by maintaining inadequate loan loss reserves.

### A. *<u>Commercial Paper</u>*

The Class Period begins several weeks after Immelt's alleged conversations with Paulson regarding GE's difficulties in obtaining commercial paper.  Plaintiff alleges that GE's difficulties continued at least through the beginning of the Class Period, relying upon the statement of CW 6, who reports that commercial paper markets were "frozen" as of September 25, 2008.  (*Id.*, ¶ 138(b).)  Publicly, GE stated that it was not having difficulty issuing commercial paper.  These allegedly false statements began on the first day of the Class Period, September 25, 2008.  During a conference call to discuss GE's Q3 2008 earnings release, Immelt stated,

> We have great CP [Commercial Paper] programs.  We go direct to investors, so we're not going through brokers.  We run the program in 11 currencies.  About two-thirds of the CP business is in the U.S., the rest is global; it's spread across many countries.  We have no issues funding ourselves.  Even in the last 10 days where you've had some significant disruptive days, we continue to see a flight in quality.

(*Id.*, ¶ 171a.)  Similarly, Sherin stated, "We've got a commercial paper program that's broad and deep. . . . And if you look at our 61-day maturities, you really don't have any near term pressure of any magnitude."  (*Id.*, ¶ 171b.)

Soon thereafter, on October 8, 2008, Immelt appeared on Jim Cramer's CNBC television program to discuss commercial paper.  (*Id.*, ¶ 183a.)  According to plaintiff, "Immelt touted GE's AAA credit rating as putting GE 'first in line' as a borrower."  (*Id.*)  The same day, GE issued a Form 8-K updating a prior filing and stating that GE Capital relied upon "active unsecured commercial paper markets that we believe will continue to be a reliable source of short-term financing."  (*Id.*, ¶ 183b.)

Two days later, on October 10, 2008, GE hosted a conference call to discuss the Company's Q3 2008 earnings.  Immelt informed investors, "We've had no problems with our own CP . . . ."  (*Id.*, ¶ 187a.)  Sherin stated, "[W]e've got a great broad CP market.  We haven't had any trouble funding ourselves. . . . We continue to fund ourselves at very low rates without

any issues . . . ."  (*Id.*, ¶ 193c.)  He also went on to downplay GE's reasons for participating in

government-backed commercial paper programs:  "We don't plan on using any of those, but if

we were to do it in order I would say that the Fed facility is a great liquidity facility for our

customers."  (*Id.*)  Immelt added that, "even with all of this volatility, we have never had issues

in the CP market rolling our paper."  (*Id.*, ¶ 193d.)

On October 20, 2008, the CPFF began taking applications to use its facility.  On October

24, 2008, GE, through spokesman Russell Wilkerson, stated that it  would "test" using the

facility as an expression of support for the Fed's program.  (*Id.*, ¶ 196a.)  GE made similar

statements in a October 24, 2008 Web-based publication.  It stated, "We believe having access to

the CPFF and demonstrating that it works well will encourage investors to buy more term

commercial paper."  (*Id.*, ¶ 196c.)  The publications went on to disclose:

> Despite difficult conditions in the commercial paper market during the last five
> weeks, we have met our CP funding needs every day, including issuing term
> paper, and our pricing has been very close to historical spreads.  However,
> investors who are concerned about their own ability to access liquidity have
> shortened their investment horizon and that has resulted in our weighted average
> maturity shortening.  We believe the CPFF . . . facilit[y] will provide investors
> with confidence to purchase more longer-term CP again.

(*Id.*, ¶ 196e.)  Later, on October 27, 2008, GE made a similar statement, saying, "We plan to use

the facility primarily to support our commercial paper investors who need liquidity and to

manage our maturity profile."  (*Id.*, ¶ 198a.)  Plaintiff alleges that these statements were

misleading because they failed to disclose that using the CPFF was, in fact, a necessity for GE to

continue to sell its commercial paper.  (*Id.*, ¶ 196g.)

## B. *AAA Rating*

At the beginning of the Class Period, GE had the distinction of being one of the few

AAA-rated industrial companies in the United States.  GE regularly reminded investors of this

fact in its press briefings.  GE repeatedly spoke of its "commitment to its Triple-A credit rating."

(*Id.*, ¶¶ 167, 168, 205, 234; *see also id.*, ¶¶ 175, 178, 183a.)  It told investors that its AAA rating

gave it a competitive advantage over other companies because, for example, the AAA rating lowered GE's borrowing costs.  (*Id.*, ¶¶ 170, 175, 223.)  It also made repeated statements to investors along the lines of how it "ran GE to be a AAA company."  (*Id.*, ¶¶ 168, 175, 191, 193, 205, 227, 232, 240, 245, 249.)

At several points, GE was asked to comment on the likelihood that it would be able to maintain its AAA rating as the economic crisis wore on.  On December 16, 2008, during GE's annual outlook meeting, Immelt responded to one such question by saying, "I frequently get the question, what do you favor more the AAA or the dividend?  I always give the answer both.  I always say the way we allocate capital is to make sure we've got plenty of capital to do both." (*Id.*, ¶ 226.)  Similarly, on January 23, 2009, Immelt appeared on CNBC and answered another question regarding GE's ability to maintain both its rating and its dividend.  (*Id.*, ¶ 248.)  He responded, "I hate the fact that there's so much speculation around the dividend and AAA.  I wish my words could end the speculation.  The facts of what we've done here, I think, should let investors know we've got the cash, and we've got the operating model that's going to secure the dividend in this environment."  (*Id.*, ¶ 248.)  Plaintiff alleges that these and other statements touting GE's AAA credit rating were false and misleading in light of the continuing deterioration of GE Capital's business.  (*Id.*, ¶ 181.)

In early 2009, signs began to surface that GE would not be able to maintain its AAA credit rating.  During January of 2009, a UBS Investment Research report disclosed that both Moody's and S&P had cited GE's ability to meet its earnings guidance of $5 billion as being crucial to its being able to maintain its AAA rating.  (*Id.*, ¶ 292.)  On January 27, 2009, GE informed the public in a press release that Moody's had stated that it had placed GE and GE Capital's long-term AAA ratings on review for possible downgrade.  (*Id.*, ¶ 253.)  It reassured investors, "Our objective is to maintain our Triple-A rating but we do not anticipate any major operational impacts should that change."  (*Id.*)  On February 5, 2009, Immelt told *Bloomburg* that "GE had the earnings power and cash to justify the payout [of its dividend] and its highest-possible AAA credit ratings, now under review."  (*Id.*, ¶ 260.)  On February 10, 2009, Sherin

spoke at a Barclay's conference and stated, "[W]e are running the Company like a AAA and we are going to continue to be conservative and focus on being safe and secure . . . ." (*Id.*, ¶ 269.) And on March 2, 2009, GE released a letter to shareholders signed by Immelt and dated February 6, 2009.  Immelt stated, "[W]e will continue to run the Company with the disciplines of a 'Triple A,' including adequate capital, low leverage, solid earnings, and conservative funding." (*Id.*)

On March 12, 2009, GE issued a press release stating that S&P had downgraded its rating from AAA to AA+.  (*Id.*, ¶ 293.)

### C.  *Statements about the Quality of GE Capital's Portfolio*

At the beginning of the Class Period, GE Capital accounted for a significant portion of GE's business.  The economic crisis hit financial institutions especially hard, and GE made numerous statements regarding GE Capital's financial health and more specifically about the quality of GE's investments.

On September 25, 2008, GE released its Q3 2008 earnings.  That same day, Immelt stated in a press release:  "While the financial services markets remain challenging and require us to adapt quickly to the rapidly changing environment, we will continue to run GE Capital to be safe and secure, while earning high margins on conservatively underwritten business." (*Id.*, ¶ 168.) GE also hosted a conference call that day.  On the call, Immelt stated,

> Our GE Capital and Financial Service business model remains strong.  We've got great cost base.  We're a senior secured and diversified lender.  We're match funded.  We've never been a trader or market maker. . . . We expect to see higher losses in loss provisions and lower gains as the economy evolves.

(*Id.*, ¶ 169.)  Sherin stated during the same conference call that its AAA rating gave it an advantage in the lending market, specifically, "[Y]ou can enter into investments at low risk levels, low loan-to-values, and senior secured positions at high returns."  (*Id.*, ¶ 170.)

Sherin made more specific statements during the same conference call regarding the quality of GE Capital's portfolio.  He stated, "We've got a great portfolio; our measurements and delinquencies and asset quality are all strong."  (*Id.*, ¶ 171.)  He further stated, "We have a

fantastic real estate portfolio.  It's very high quality.  The delinquencies on the book are .27% of assets, so it's performing very well."  (*Id.*, ¶ 172.)

On October 10, 2008, GE issued a further Q3 earnings release.  In that release, Immelt stated, "We have taken a number of steps to protect investors from the downside risk in financial services. . . . The Company is well positioned to perform in a very difficult environment, and our Board has approved a plan to sustain the GE dividend through 2009."  (*Id.*, ¶ 184.)  GE also hosted a conference call that same day.  During the conference call, Sherin described GE Capital's real estate business as "strong" and "driven by the investments we've been making in senior secured debt at high returns."  (*Id.*, ¶ 186.)  He also stated that GE Capital's portfolio "remains robust," continuing, "We've got a great portfolio.  We've stuck to our risk management, but we are going to see a credit cycle here.  We're going to see higher delinquencies, we're already seeing those.  As we have higher delinquencies we're going to put up more loss provisions."  (*Id.*, ¶ 187.)

On December 2, 2008, GE issued a press release to announce an "updated strategic framework" for GE.  Sherin stated in the press release:

> We are operating in an extremely difficult environment, but we are outperforming our peers and we have strong franchises to build upon for long-term growth.  We are a mid-market finance company differentiated by an originate-to-hold approach, product and geographic diversification, deep experience in risk assessment and collateral management, and senior secured positions for many of our receivables.

(*Id.*, ¶ 205.)

The same day, GE held a financial services investor meeting.  During the meeting, Cary, GE Capital's Chief Operating Officer, stated, "Lastly, while we think we've planned prudently, we have a funding hedge of about $10 billion in our back pocket to manage any disruptions we might see in the marketplace.  We feel pretty good about our plans around both collections and our forecast for new volume."  (*Id.*, ¶ 213.)

During the same meeting, Immelt stated, "I just want to do a deep dive on real estate debt portfolio. The left-hand side of the chart basically talks about the way we've structured the debt,

low loan to value, high structured debt financing, well underwritten, great spread of risk. Through these cycles, we never lost any of our risk disciplines, any of our underwriting disciplines." (*Id.*, ¶ 224.)

On December 16, 2008, GE issued a press release in which Immelt stated, "Our financial services business, while slowed by the current financial crisis, are strong, global, middle market franchises with a conservative originate-to-hold model backed by senior secured collateral." (*Id.*, ¶ 229.)

According to plaintiff, the foregoing and related "rosy assessments" masked the fact that "GE Capital was in dire financial straits in terms of not generating "new business and revenues" and was "significantly exposed to substantial losses related to risky assets in its loan portfolio . . . ." (*Id.*, ¶¶ 180, 181, 196.)

Negative information began to emerge regarding the quality of GE Capital's portfolio as the Class Period came to a close. On March 5, 2009, Sherin appeared on CNBC's television program, "Squawk Box," and allegedly admitted that the fair value of 98% of GE Capital's assets was unknown to investors. (*Id.*, ¶ 287.) On March 19, 2009, GE held a six-hour long investment meeting to discuss the financial condition of GE Capital. (*Id.*, ¶ 294.) The company disclosed that 42% of GE Capital's consumer loans were made to subprime borrowers, including 74% of GE Capital's U.K. mortgages, the largest portion of GE Capital's loan portfolio. (*Id.*, ¶ 299.) In addition, with respect to GE Capital's $230 billion commercial lending and leasing portfolio, in plaintiff's words,

> (a) 81% of the $55 billion in GE Capital equipment loans in the Americas were made to borrowers with non-investment grade, or "junk" credit ratings. 40% of all of GE Capital's equipment loans were made to borrowers rated B+ or lower;
>
> (b) 93% of the $38 billion in GE Capital's leveraged loans were made to borrowers with non-investment grade, or "junk" credit ratings. 76% leveraged loans were made to borrowers that were rated below B+, and 28% of these loans were made to borrowers with credit ratings below B-;

(c) 95% of GE Capital's $13 billion franchise finance portfolio involves loans made to non-investment grade or "junk" status borrowers, and 37% of borrowers were rated B+ or below;

(d) 85% of GE Capital's $13 billion global aircraft portfolio (lending in connection with corporate jets) involves credit extended to customers with "junk" credit ratings. A shocking 72% of these customers have credit ratings below BB-;

(e) 89% of GE Capital's $18 billion in equipment loans in the European Union were made to borrowers with non- investment grade, or "junk" credit ratings. 38% of all of these loans were made to borrowers rated B+ and below;

(f) 81% of GE Capital's $20 billion in equipment loans made in the Asia Pacific region were made to borrowers with non-investment grade, or "junk" credit ratings. 22% of all of these loans were made to borrowers rated B+ and below; and

(g) 95% of GE Capital's $10 billion in asset-based lending in the United States was made to borrowers with non-investment grade, or "junk" credit ratings. 86% of these loans were made to borrowers that were rated B+ and below, and 42% of these loans were made to borrowers with credit ratings of B- or below.

(*Id.*, ¶ 301.)  Together, these asset categories totaled $167 billion of GE Capital's $230 billion commercial lending and leasing portfolio.  GE's share price opened at $10.32 on March 19, 2009.  (*Id.*, ¶ 308.)  On March 20, 2009, the stock closed at $9.54 per share, a 7.6% drop.  (*Id.*)

### D. *Dividend*

During the Class Period, GE made various statements promoting its planned $1.24 dividend ($.31 per quarter) for the year 2009.  The majority of these statements boil down to GE's off-stated intention to maintain its dividend at this rate through 2009.  (*See, e.g.*, *id.* ¶ 169 ("Lastly, the GE dividend is secure for investors.  The Board has approved management's plan to maintain the current dividend through '09 even in these relatively uncertain economic times at $1.24 a share."); *see also id.* ¶¶ 174, 197, 201, 207, 208, 214, 228, 232, 234, 240, 275.)  The dividend was also described as "safe" (*e.g.*, *id.*, ¶ 190) and "protected" (*e.g.*, *id.*, ¶ 192).

In addition, GE through its officers made several more specific statements.  On December 16, 2008, Immelt proclaimed, "What can you count on?  You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $.31 a share in the first

quarter." (*Id.*, ¶ 220.)  He also stated, "We're running the company really focused on cash.  And so we have about a $3 billion coverage on the dividend. . . . And so the company really operationally is very well grounded to cover the dividend handily and to be in good shape as we think about next year." (*Id.*, ¶ 221.)  He further stated, "I frequently get the question, what do you favor more the AAA or the dividend?  I always give the answer both.  I always say the way we allocate capital is to make sure we've got plenty of capital to do both." (*Id.*, ¶ 226.)

On January 23, 2009, during a conference call to discuss the Q4 2008 and FY 2008 results, Immelt stated, "[W]e think given the strong operating performance of the company and the framework and the strong capital position that we still believe that supporting the dividend and doing it without straining, doing it just by controlling our own destiny and executing with excellence that is the best use of capital and capital allocation." (*Id.*, ¶ 245.)  During a CNBC interview the same day, Immelt stated, "I hate the fact that there's so much speculation around the dividend and the AAA.  I wish my words could end the speculation.  The facts of what we've done here, I think, should let investors know that we've got the cash, and we've got the operating model that's going to secure the dividend in this environment." (*Id.*, ¶ 248; *see also id.*, ¶ 249.)

Plaintiff alleges that Immelt's repeated assurance that the $0.31 quarterly dividend would continue were false and misleading as defendants knew that G.E. Capital was in financial distress and could not be a source to fund the dividend.

On February 6, 2009, GE announced that it would pay $.31 per share for the second quarter of 2009.  But Immelt scaled back his rhetoric regarding the dividend, saying merely, "The Board and I believe it is in the best interests of the Company's shareholders to continue to pay an attractive dividend." (*Id.*, ¶ 257.)

On February 27, 2009, GE reversed field announcing that it was cutting its quarterly dividend for the second half of 2009 to $.10 per share.  (*Id.*, ¶ 279.)  When GE announced that it was cutting its dividend, its share price fell from $9.10 on February 26, 2009 to $8.51 on February 27, 2009, a loss of $.59 per share or 6.5%.  (*Id.*, ¶ 281.)  GE's share price fell further

the next trading day to $7.60 per share on March 2, 2009, a loss of $.91 per share, or about 10.7%. (*Id*.)  Trading volume on both days was extremely high.  (*Id*.)

**E.  *GE Capital's 2009 Earnings***

Toward the end of 2008, GE began to predict what GE Capital's earnings would be for 2009.  On December 2, 2008, Neal stated in a press release, "We have established a framework for GE Capital to earn approximately $5 billion in 2009.  From there, we believe the business is positioned to sustain solid, 10% earnings growth in the future." (*Id*., ¶ 206.)  Immelt stated during the December 16, 2008 Annual Outlook Meeting also predicted that GE Capital would earn $5 billion in 2009 (*id*., ¶ 221), and he repeated this prediction during a press release issued the same day (*id*., ¶ 229).  On January 23, 2009, Immelt again stated that GE Capital would earn $5 billion in a press release (*id*., ¶ 233), and he made the same prediction during an interview on CNBC (*id*., ¶ 247).  On February 10, 2009, Sherin appeared on behalf of GE at a Barclay's conference and again predicted that GE Capital would earn $5 billion in 2009.  (*Id*., ¶¶ 266, 270.)  Approximately one month later, on March 19, 2009, GE cut its profit estimate from $5 billion for GE Capital to approximately $2 to $2.5 billion.  (*Id*., ¶ 295.)

Plaintiff attacks these public statements as false and misleading in light of the reports of its confidential witnesses ("CW").  CW 8 is a former GE Capital Vice President of Risk Underwriting who worked in the Energy Financial Services group.  (*Id*., ¶ 73.)  CW 8 reports that Energy Financial Services "had record profits" until September 2008, when business "more or less halted."  (*Id*.)  CW 9, a former Senior Vice President for Operations in the Commercial Lending group, reported that deal volume "fell off a cliff" at GE Capital in early-to-mid 2008.  CW 11, a former Assistant Vice President in Commercial Finance in the Media, Communications, and Entertainment division, reported that following the collapse of Bear Sterns in spring of 2008, "literally overnight we did not have new business.  It was like a domino and things did not get better."  (*Id*.)  CW 12, a former Senior Underwriter in the North American Equity Divison at GE Real Estate, states that starting in September 2008, "transactions [at GE] were at a halt, and deals weren't getting done.  Nobody was willing to buy and banks weren't

lending." (*Id.*) CW 14 held various administrative positions in GE Capital. (*Id.*) CW 14 heard discussions beginning in the fall of 2008 to the effect that GE Capital had stopped making new deals. (*Id.*) Plaintiff contends that given this fall off in business at GE Capital, it was unrealistic to project $5 billion in profits for 2009. Plaintiff also notes that a January 2009 UBS Investment Research note reported that both Moody's and S&P had cited GE Capital's earnings guidance as crucial to GE in maintaining its AAA rating and suggests that GE Capital was overstating its projected earnings in an effort to stave off a downgrade. (*Id.*, ¶ 292.)

### F. _Inadequate Loan Loss Reserves_

Plaintiff claims that during a period of extreme economic turmoil, GE did not adequately provide for loan loss reserves. In support of this claim, plaintiff alleges that beginning in the first quarter of 2008, GE's delinquencies as a percentage of total receivables steadily began to rise. GE defined delinquent debts as those that were 30 days or more past due. (*Id.*, ¶ 326.) Between 2005 and 2007, consumer delinquencies were consistently 5–5.5% of total consumer receivables. (*Id.*, ¶ 327.) By the first quarter of 2009, this number had jumped to 8.2%. (*Id.*) Similarly, on the commercial side, delinquencies ranged between 1.22–1.35% of total assets between 2005 and 2007. (*Id.*) This number steadily increased beginning in 2008, reaching 2.84% for the first quarter of 2009. (*Id.*) The percentage of nonearning receivables, debts that are "90 days are more past due (or for which collection has otherwise become doubtful)" (*Id.*, ¶ 326), also steadily increased. Over the same period, nonearning receivables as a percentage of total receivables rose from being steadily in the 1.4–1.5% range to 3.58% of financing receivables. (*Id.*, ¶¶ 333-34.)

Loan loss reserves as a percentage of total financing receivables declined between 2005 and 2007 from 1.574% to 0.980%. (*Id.*, ¶ 340.) This figure jumped during the fourth quarter of 2008 to 1.403% and rose to 1.805% for the second quarter of 2009. (*Id.*, ¶ 341.) Plaintiff alleges, however, that these increases were insufficient because GE still had considerable shortfalls between its loan loss reserves and its nonearning receivables. For example, in the first quarter of 2009, GE had a shortfall of $4.39 billion between its nonearning receivables and its loan loss reserves.

G. *Reclassification of Assets*

Two of plaintiff's confidential witnesses, CW 13 and CW 15, report that GE shifted the way that it accounted for certain non-performing loans in order to avoid writing them down.  CW 13 worked as a Senior Underwriter and Asset Manager for commercial mortgage-backed securities within the Real Estate Group at GE Capital from October 2005 through September 2008.  (*Id.*, ¶ 73.)  CW 13 "stated that GE Capital did not write down bad real estate deals, but would 'take the asset and shift it to an investment to hold' to avoid taking a write-down.  Confidential Witness 13 described this process as being used so that the Company could 'hide assets until the market turned around' by making a 'switch on the balance shift'—shifting deals to the long term in the hope that the value would increase, and by doing so, avoid losses to the company."  (*Id.*)

During the Class Period, CW 15 worked as a Regional Commercial Real Estate Manager at GE Commercial Finance within GE Capital.  According to CW 15, "[b]eginning in mid-2007 and continuing into 2008, in circumstances when GE would learn that its equity stake and/or periodic payments were at risk, GE would 'shift its equity position to long term on the balance sheet' if it could not sell its stake or otherwise refinance it to avoid writing the asset down to fair value and taking a loss."  (*Id.*)  CW 15 states that a committee of senior GE managers made the final decisions on all loan transactions, including moving equity investments to long term on the balance sheet.  (*Id.*)  According to CW 15, Immelt himself was involved in decision making for larger transactions.  (*Id.*)  Plaintiff alleges that these actions violated Statements of Financial Accounting Standards ("SFAS") 65 and 115, which govern how companies account for changes in the fair market value of loans.

H. *Internal Reporting at GE*

Plaintiff's confidential witnesses describe internal reporting within GE that kept GE Corporate in the loop.  CW 1, who held various accounting positions within GE Capital in Commercial Finance, described a template whereby GE departments would "report their financial results to Corporate, including financial results and supporting schedules, information

on bad debts, loan reserves, and write-downs." (*Id.*, ¶ 401.) CW 1 states that management at GE Corporate would regularly review this information and ask follow-up questions. (*Id.*) CW 1 also stated that GE Corporate got involved in certain types of decisions, such as the accounting treatment of assets that needed to be written down and larger financial decisions. (*Id.*) CW 4, a senior Vice President at GE Capital who left in 2008, states that "underwriting results, loan impairments, and opinions about loan loss reserves" were reported "up the chain" to GE Corporate. (*Id.*, ¶ 404.) CW 14, who held various administrative positions within GE Capital, including providing "backup support" to the CEO of GE Capital, also states that quarterly reports and accompanying PowerPoint presentations were prepared by Finance personnel at GE Capital and "reported up to senior management at GE Corporate each quarter during the Class Period." (*Id.*, ¶ 402.)

## STANDARD OF REVIEW

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154 (2d Cir. 2006). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, ---, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556).

A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards. First, the complaint must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.

2007).  Second, the complaint must meet the pleading requirements of the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud

complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief'

that a statement is misleading was 'formed'; and that they 'state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind.'" *Dura

Pharm., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).


### DISCUSSION

### I.  Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal "[t]o use or

employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance . . . ."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder,

makes it unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading."  17 C.F.R.

§ 240.10b-5.  In order to state a claim for relief under § 10(b) and Rule 10b-5, plaintiff "must

plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5)

economic loss; and (6) loss causation."  *Heller v. Goldin Restructuring Fund, L.P.,* 590 F. Supp.

2d 603, 613 (S.D.N.Y. 2008).  Defendants argue that plaintiff has failed to satisfy material

falsity, scienter, and loss causation.  The Court shall discuss each of these elements in turn.

### A.  *Material Misrepresentations or Omissions*

A plaintiff may bring a claim pursuant to Section 10(b) and Rule 10b-5 based on either

affirmative misstatements or omissions of material fact. "A securities fraud complaint based on

misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." *ATSI Commc'ns,* 493 F.3d at 99 (citing *Novak v. Kasaks,* 216 F.3d

300, 306 (2d Cir. 2000)).  A securities fraud complaint based on omissions must allege that "'the corporation is subject to a duty to disclose the omitted facts.'"  *In re Optionable Sec. Litig.,* 577 F.Supp.2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993).  A corporation is "'not required to disclose a fact merely because a reasonable investor would very much like to know that fact.'"  *Id.* (quoting *In re Time Warner,* 9 F.3d at 267).  Nevertheless, a "duty to disclose 'arises when disclosure is necessary to make prior statements not misleading.'"  *Beleson v. Schwartz,* 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009) (quoting *In re Time Warner,* 9 F.3d at 268).

In addition, the alleged misstatement or omission must have been material.  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000). "Because materiality is a mixed question of law and fact, in the context of a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir. 2009) (hereinafter "*ECA*") (alteration in original) (internal quotation marks omitted).

Certain types of statements are generally not materially misleading.  "Puffery" is one such type.  Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law. *See id.* at 206.  However, the mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–94 (1991) (holding that statement that merger would give shareholders "high value for their shares" could be deemed material, and noting that "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of

which renders them misleading"); *Novak*, 216 F.3d at 315 (statements that inventory situation was "in good shape" or "under control" made while defendants "allegedly knew the contrary was true," were actionable).

In addition, the PSLRA creates a safe harbor which provides special protection for alleged misstatements that are "forward-looking" in nature. *See* 15 U.S.C. § 77z-2(c)(1)(B)(ii). The PSLRA defines forward-looking statements to include, *inter alia*, statements containing "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" statements of the "plans and objectives of management for future operations . . .";  and statements of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)–(C). The safe harbor shields written forward-looking statements from liability if any one of the following criteria is met: (1) the statement was "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (2) the statement was immaterial; or (3) the statement, if made by a business entity, was not made or approved by an executive who had "actual knowledge" that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1); *Slayton v. Am. Express Co.*, 604 F.3d 758, 765–66 (2d Cir. 2010). However, the safe harbor, and the closely related "bespeaks caution" doctrine, do not apply to statements of present or historical facts. *See P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004) (stating that the "bespeaks caution" doctrine does not protect misrepresentations of present or historical facts).

Plaintiff alleges that GE made materially misleading statements regarding its ability to issue commercial paper, maintain its AAA rating, and maintain its dividend, and regarding GE Capital's ability to earn $5 billion in 2009. Plaintiff also alleges that GE violated GAAP by recategorizing its assets to avoid marking them to market and by maintaining insufficient loan loss reserves. The Court will address each category of allegations in turn.

1. ***Commercial Paper***

Plaintiff alleges that during the fall of 2008, GE was experiencing difficulty issuing its commercial paper, while telling the public the opposite.  In support of this allegation, plaintiff contrasts the private conversations between Paulson and Immelt on September 8 and September 14 with the company's contemporaneous public statements that it was having no difficulty funding itself and had never had such difficulties.  In Immelt's conversations with Paulson, he reportedly disclosed that GE was having difficulty issuing commercial paper for terms longer than overnight.  The allegation of CW6, that the commercial paper markets were "frozen" as of September 25, 2008, also supports this claim.

Defendants argue that plaintiff's complaint is deficient because these allegations do not support an inference either that GE actually failed to meet its funding needs or that any difficulties that GE faced continued into the Class Period.  Defendants suggest that in alleging that GE was having difficulty funding itself because it was issuing commercial paper on overnight terms, plaintiff is "making several illogical and unsupported leaps . . . ."  (GE Mem. 29.)  GE is correct that the allegations in the complaint do not support a claim that GE was unable to roll its commercial paper on any terms.  But what allegedly "stunned" the Secretary of the Treasury was Immelt's report of the *difficulty* the Company was experiencing in funding itself—GE was only able to borrow money overnight.  If this information was of importance to Paulson (*see* GE Ex. 3 at 227–28), it was likely to be of interest to a reasonable investor.  Yet at various times Immelt and Sherin issued several categorical denials that GE was having any difficulty whatsoever in funding itself.  (*E.g.*, SAC ¶¶ 171a, 187a, 193c.)  Accordingly, the SAC adequately alleges that GE made material misrepresentations regarding its access to commercial paper markets.

Defendants also argue that plaintiff has not demonstrated that any difficulties Immelt disclosed to Paulson in early to mid-September continued into the Class Period.  (GE Mem. 29–32.)  They argue that because of government intervention, the commercial paper markets stabilized significantly.  (*Id*. 31.)  But the data defendants rely upon in making this claim reveal

only that more commercial paper was issued in late September; defendants concede that the commercial paper being purchased on the private market had shorter maturities and higher interest rates.  (*Id.* 32.)  Furthermore, GE itself disclosed on October 24, 2008, that it was participating in the CPFF because it hoped to issue commercial paper with longer maturities. (SAC, ¶ 196e.)  Defendants may show after discovery that GE was no longer experiencing difficulty by the time the Class Period began on September 25, 2008, and that its public statements were accurate.  However, those issues are better addressed at the close of discovery.

### 2. *Quality of the Loan Portfolio*

Plaintiff alleges that GE made material misrepresentations when it praised the quality of its loan portfolio and made material omissions by failing to disclose its many subprime and non-investment grade holdings.  "[U]pon choosing to speak, one must speak truthfully about material issues" and has "a duty to be both truthful and accurate."  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).  It should be noted, of course, that this obligation does not constitute a free-standing duty to disclose any and all related material whenever a company speaks on a given topic, but rather "'a duty to disclose only when silence would make other statements misleading or false.'"  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).

In many parts of the complaint, plaintiff appears to allege that merely by disclosing factual information about some aspects of GE Capital's assets and general financial health, it was also obligated to reveal that many of GE Capital's borrowers were risky.  In so arguing, plaintiff often fails to identify specific statements that are rendered false or misleading by GE's omission. For example, plaintiff alleges that Immelt stated, "We are a senior secured and diversified lender."  (*Id.*, ¶ 169.)  Plaintiff does not dispute the truth of the statement itself, nor does it explain why the statement is made false by GE's alleged omission.  Plaintiff seems to suggest that in making this and other similar statements, Immelt was also obligated to disclose that GE had made loans to uncreditworthy borrowers.  But the fact that GE extended credit to subprime and junk borrowers does not render the fact that GE was a senior secured lender misleading.  A

corporation is "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d at 692 (internal quotation marks omitted).

Although this criticism applies to many of the statements plaintiff alleges to be misleading, it does not apply to all.  Plaintiff has identified several statements that do implicate the quality of loan portfolio, including Sherin's various descriptions of GE's loan portfolio as "fantastic," "great," "robust," "strong," and "really high quality."  (*Id.*, ¶¶ 171, 172, 186, 187.) Similarly, Immelt informed investors that "[t]hrough these cycles, we never lost any of our risk disciplines, any of our underwriting disciplines."  (*Id.*, ¶ 224.)  Courts confronted with similar statements have scrutinized the surrounding context to determine what companies intended to convey to investors.  *Hill v. State St. Corp.*, 09 Civ. 12146, 2011 WL 3420439, at *16–*18 (D. Mass. Aug. 3, 2011) (determining that when State Street praised certain investments as "high quality" it could plausibly be read as a (misleading) representation as to "the relative safety of investing in State Street stock"); *Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 375–76 (S.D.N.Y. 2010) (determining based on the statements' context that when State Street described certain assets as "high quality," it intended to convey that they had a high credit rating, not that they would suffer no losses).  In context, Sherin's use of descriptors such as "very high quality" are more akin to those used in *Hill* than those at issue in *Yu*.

In March 2009, GE released detailed information revealing that 42% of GE Capital's $183 billion in consumer loans were made to non-prime borrowers, and at least $145 billion of its $230 billion commercial lending and leasing portfolio consisted of loans to non-investment grade companies.  Plaintiff plausibly alleges that these disclosures suggest that GE's loan portfolio was not as high quality as billed.  *Cf. Hill*, 2011 WL 3420439, at *22 ("Had the investors known more details about the [mortgaged-backed securities] in the portfolios . . . , they may have been able to consider the meaning of 'high quality' with a more discerning ear.").

GE argues that it had no independent duty to "break out" details concerning its subprime exposure.  As an abstract proposition that may be so.  But once a company chooses to speak—as

GE insistently did with respect to the "high quality" of GE Capital's portfolio—"it has a duty to disclose any additional material fact 'necessary to make the statements [already contained therein] not misleading.'"  *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 590 (S.D.N.Y. 2010) (brackets in original) (quoting 15 U.S.C. § 78k).  If, as plaintiff alleges, defendant's qualitative statements as to the strength of GE Capital's portfolio were misleading, then they are actionable under the securities laws.  *See Novak*, 216 F.3d at 315 (holding that a qualitative statement that inventory was "in good shape" while defendants knew the contrary was actionable); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3rd Cir. 1992) ("[W]here a defendant affirmatively characterizes management practices as 'adequate, conservative,' . . . and the like, the subject is 'in play.'"); *see also Va. Bankshares*, 501 U.S. at 1093 ("It is no answer to argue, as [defendants] do, that the . . .  statements on which liability was predicated . . . focused . . . on the indefinite and unverifiable term 'high' value . . . .  The objection ignores the fact that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading . . . .").[1]

### 3.  *The 2009 Dividend*

Beginning in the second half of 2008, GE made repeated statements that its $1.24 dividend was "safe" and "secure" through 2009.  The most categorical assurance was made by Immelt on December 16, 2008 when he stated:  "What can you count on?  You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $0.31 a share in the first quarter."  (SAC ¶ 220.)  Plaintiff claims this was an actionable misstatement; defendants claim that it was an inactionable prediction or opinion.  Both rely almost exclusively on the Second Circuit's opinion in *In re IBM Corp. Securities Litigation*, 163 F.3d 102 (1998), to support their positions.

---

[1] Defendants contend that their qualitative statements were not material when read in the context of the specific warnings made regarding the risk of loss in its portfolios.  (GE Br. at 54.)  This argument is unpersuasive at the motion to dismiss stage.

Indeed, there is something for everyone in the *IBM* opinion.  Defendants are correct that the court therein dismissed the shareholders' claim that IBM's statement that it had no plan to cut its dividend was not misleading as they were merely "expressions of optimism or projections about the future."  *Id.* at 107.  There are important distinctions between *IBM* and the present case, however, that warrant the Court's consideration.  Procedurally, *IBM* was decided on summary judgment after plaintiffs had taken discovery regarding the disclosures at issue.  Factually, the disclosures at issue here are not the sort of wishy-washy statements at issue in *IBM*.  There, the company made mildly optimistic statements such as, "I will say again what I said before.  I have no real plan, no desire, and I see no need to cut the dividend."  *Id.*  This reference to the absence of a plan in *IBM* is a far cry from Immelt's "What can you count on?" hard-sell to shareholders.[2]  This distinction is important, as the Second Circuit, while affirming summary judgment for IBM, underscored that "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *Id.* (citations omitted).  Here, plaintiff plausibly alleges that a reasonable investor would consider Immelt's statement, made at the December 2008 financial services investor meeting, to be tantamount to a guarantee.  Plaintiff reasonably contends that Immelt's statements are misrepresentations of present facts (". . . a great dividend, $1.24 board approved . . .") and not subject to the safe harbor provisions for forward-looking statements found in the PSLRA.

Assuming, *arguendo*, that Immelt's statements are subject to the more restrictive standards governing forward-looking statements, the Court must look beyond *IBM* to test the adequacy of the SAC.  While the Court in *IBM* did not have occasion to consider the forward-

---

[2] While IBM's management at one point made a less conditional statement ("obviously the dividend is safe"), that statement was made outside the *IBM* class period and the court declined to consider it.  *See IBM*, 163 F.3d at 107.

looking statement provisions of the PSLRA,[3] that statute provides a safe harbor for forward-looking statements, such as dividend projections, unless plaintiff proves that the statement was made with actual knowledge that it was false or misleading.

The Second Circuit has provided guidance regarding the meaning of "actual knowledge" for forward-looking statements. In *Slayton v. American Express Co.*, the Second Circuit held that a forward-looking statement contains "three implicit factual assertions—(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." 604 F.3d at 774 (internal quotation marks omitted). If the speaker has actual knowledge that one of these implicit factual assertions is not true, then the speaker has actual knowledge of the falsity of the forward-looking statement. *Id*.

Plaintiff alleges that Immelt's statements—whether viewed as present-tense guarantees or a forward-looking projections—were false and misleading when made in light of the sudden evaporation of GE Capital's deal flow, the extent of its subprime exposure, and the company's continuing liquidity problems. Taking these underlying allegations as true, the SAC plausibly asserts that GE's statements regarding its 2009 dividend were materially false. If the statements are viewed solely as a prediction of future events, plaintiff must also show that GE had actual knowledge of falsity under the *Slayton* test, an issue the Court will examine in the scienter section below.

### 4. *Reclassification of Assets*

Plaintiff alleges that GE reclassified certain assets on its balance sheet in order to avoid writing these investments down when they began to become delinquent. According to plaintiff, SFAS 115 requires that companies classify investments as either "held-to-maturity," meaning that the company does not intend to sell the investment before its maturity, and "available-for-

---

[3] Enacted in 1995, the PSLRA did not apply to pending private actions. *See* 15 U.S.C. § 78u–4 Historical and Statutory Notes ("This section shall not affect or apply to any private action . . . commenced before and pending on Dec. 22, 1995 . . . ."). The *IBM* cases had been pending since 1992. *See In re IBM*, 954 F. Supp. 81, 83 (S.D.N.Y. 1997).

sale," meaning the company does not intend to hold it and may sell it. (SAC, ¶ 358.) Companies must mark available-for-sale securities to market when they become impaired, but need not do so for held-to-maturity securities. (*Id.*) It is improper for a company to reclassify an investment in order to avoid writing it down, in part because when a company reclassifies an investment as held-to-maturity, it must mark the asset to market before transferring it. (*Id.*, ¶ 361.) SFAS 65 imposes similar requirements for loans. (*Id.*, ¶ 362.) Plaintiff alleges, based on the statements of CW 13 and CW 15, that GE would shift assets from available-to-sale into held-to-maturity without writing them down in order to avoid reporting losses.

Defendants contend that the accounts of these confidential witnesses are unreliable. First, they argue that plaintiff has not alleged sufficient facts to make it likely that an individual holding the positions these witnesses held would have access to the alleged information. The Second Circuit has held that "even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Plaintiff has described in detail the positions that CW 13 and CW 15 held, as well as the dates when they worked for GE. Both worked as managers within the real estate group, so it is probable that a person in such a position would have information regarding GE's practices with regards to troubled loans. *Cf. Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637–38 (S.D.N.Y. 2010) (crediting the statement of a confidential witness—a "senior derivatives analyst"—who stated that "'everyone' knew about problems with unconfirmed trades").

Defendants next argue that the allegations are insufficient because neither witness has knowledge of GE's practices during the Class Period itself. The practice alleged seems to violate GAAP in at least two ways, however. First, GE allegedly made the initial decision to shift the impaired asset into a long-term position, and then it continued to hold that asset on GE's books at its unimpaired value without marking it to market. Defendants are correct that the CWs cannot verify that GE continued to shift assets on its balance sheet to avoid writing down assets during

the Class Period.  But is reasonable to infer that GE continued to carry the shifted assets at the higher value during the Class Period, even if it actually re-characterized the assets before the Class Period began.

Finally, defendants argue that plaintiff has not properly alleged a GAAP violation because plaintiff has not alleged either that in transferring assets to a long-term position, GE did not intend to hold them to maturity, or that GE did not mark them down before transferring them.  Though the complaint could perhaps be more artfully worded in places, plaintiff does make both of these allegations.  CW 13 specifically states that GE moved its assets with the intent of "hid[ing] assets until the market turned around."  (¶ 73.)  The implication of this statement is that the reclassification was but temporary and that GE would switch the assets back to an available-for-sale designation if and when the assets were no longer troubled.  Furthermore, both CW 13 and CW 15 state that the purpose of these transactions was to avoid taking a loss on the assets.  Defendants split hairs when they complain that plaintiff fails to allege that GE did not write the assets down before it transferred them.  Plaintiff has adequately alleged that GE violated GAAP with respect to these transactions.

### 5.  *Loan Loss Reserves*

Plaintiff's allegations regarding the inadequacy of GE's financial statement disclosure of loan loss reserves are less plausible.  To support the allegation of "woeful" insufficiency, plaintiff relies primarily on the uncontested fact that GE allowances for loan losses were less than GE Capital's "non-earning" receivables—that is, receivables that were 90 days or more past due or for which collection had otherwise become doubtful.  (SAC ¶¶ 325, 326.)  From this fact plaintiff infers that GE violated GAAP since Statement of Financial Accounting Nos. 5 and 14 require present-period accrual for known or reasonably ascertainable probable loss contingencies—apparently, in plaintiff's view, equal to one hundred percent of total non-earning receivables.  (P. Mem. at 75; SAC ¶ 342.)  If that is plaintiff's theory, it fails; SFAS 14 on its face does not require any such coverage, but rather provides that a company should estimate any amounts likely to be collected on impaired loans and then reserve for the difference between

those amounts and the carrying value of the loans.  GE contends, and plaintiff does not dispute, that it was the senior secured lender for the majority of its loans.  As such, it is reasonable to conclude that some percentage of the value of non-earning loans would be recouped by seizing the underlying collateral.  Whether that amount is greater or lesser than GE's reserves cannot plausibly be inferred simply from the gap between GE's total non-earning receivables and those reserves.

Plaintiff further argues that GE's loan loss reserves were inadequate because they were below the industry average.  (SAC, ¶ 306.)  Of course, if the character of GE's loan portfolio was significantly different from other companies in the industry (especially if the majority of its loans were senior secured loans), GE's practice of having lower loan loss reserves was not necessarily unreasonable.  In any event, plaintiff has not alleged any facts that would suggest that GE had the same loan loss experience as other financial institutions.

Plaintiff also relies on allegations that GE's reserves were lower than its historical reserve levels, and that this fact, in the context of the deepening recession, raises the plausible inference that the Company was under-accounting contingent losses in order to increase its earnings. (D. Mem. at 74.)  The historical data set forth in the SAC, however, does not point in an obvious direction.  Thus, while non-earning receivables almost doubled during the Class Period (from 1.5% of total financing receivables to 2.1%), loan loss reserves increased by a comparable amount (from 0.98% of total financing receivables to 1.805%).  While it may be that GE's loan loss reserves were misstated, plaintiff has not alleged facts to plausibly claim with sufficient particularity that this was the case.  The Court notes that discovery on plaintiff's surviving claims, for example, the dividend claim, would likely encompass evidence related to the accuracy of GE's loan less reserve statements.

### 6. *GE Capital's 2009 Earnings Projections*

On December 2, 2008 GE disclosed its earnings forecast of $5 billion for GE Capital in 2009.  Made in the middle of the financial market meltdown, this represented a 42% decrease from prior year earnings.  Nevertheless, plaintiff alleges that GE's earnings projection of $5

billion for GE Capital was false and misleading because (a) G.E. Capital's business was at a "standstill," and (b) due to its massive subprime and non-investment grade exposure, loan loss reserves were going to spike in 2009. (P. Mem. at 3.) Plaintiff further alleges that the $5 billion projection was announced in an ultimately futile effort to persuade the rating agencies to maintain GE's AAA rating. (SAC ¶ 218a.)

The Court's analysis of plaintiff's loan loss reserve claim to some extent presages its view of plaintiff's earnings projection claim. Since the Court is not persuaded that the SAC alleges specific facts that plausibly state a claim that reserves were inadequate, this aspect of plaintiff's attack on the 2009 projections is necessarily wanting. This is particularly so inasmuch as GE's 2009 projections, unlike its reserve statements, are indisputably forward-looking statements. In order for these statements to be actionable, then, plaintiff must properly allege that the speakers had actual knowledge of falsity. As noted, under *Slayton*, a forward-looking statement is made with actual knowledge of falsity if, *inter alia*, a company has actual knowledge of "undisclosed facts tending to seriously undermine the accuracy" of the projection. 604 F.3d at 774. Plaintiff alleges that these projections were false because GE Capital's business had slowed significantly following the financial crisis and its delinquencies were rising. Plaintiff seeks to support this obviously conclusory allegation by relying on the statements of certain confidential witnesses who aver that business in certain segments of GE Capital in which they worked had "dried up" or "fallen off a cliff" at various points in 2008. While informative, these statements do not fill the gap created by the lack of any more specific allegations as to the nature and significance of the identified business segments to GE Capital's earnings, or whether the information provided remained current at the time the GE Capital 2009 projections were made in late 2008. Nevertheless, the Court again notes that the issue of vitality of the 2009 projections seems inextricably linked with plaintiff's dividend claim and that discovery as to the latter may (or may not) shed light on the former.

7. *AAA*

Plaintiff alleges that GE repeatedly touted its AAA rating despite knowing that the rating was imperiled. GE regularly made statements to the effect that it was committed to its AAA rating. (*Id.*, ¶¶ 167, 168, 205, 234; *see also id.*, ¶¶ 175, 178, 183a.) Such statements, however, are roughly equivalent to saying that GE wanted to keep its AAA rating. The mere fact that GE wished to maintain its credit rating does not suggest to the reasonable investor that it would be able to do so, especially since GE's credit rating was determined by third parties. Similarly, when GE told investors that its AAA rating gave it a competitive advantage over lower-rated companies, it was merely stating a fact. Plaintiff thus has failed to demonstrate falsity with respect to these statements. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F. 3d 55, 58 (2d Cir. 1996) (holding that statements regarding a company's "commitment to maintaining" its level of profitability "are not considered seriously by the marketplace and investors in assessing a potential investment").

Plaintiff claims that Immelt's statements suggesting that GE had the operating capital to maintain both its dividend and its AAA rating, made on December 16, 2008, and January 23, 2009, were both false. On December 16, 2008, Immelt stated, in response to questions about whether GE would be able to maintain its dividend in the current economic climate, "I frequently get the question, what do you favor more the AAA or the dividend? I always give the answer both. I always say the way we allocate capital is to make sure we've got plenty of capital to do both." Plaintiff argues that these statements were false because GE should have known that it was facing serious financial trouble and did not have the ability to allocate sufficient capital to cover both its dividend and its AAA rating. But plaintiff overlooks the fact that S&P affirmed GE's AAA rating in December 2008. And Immelt's jawboning about what the rating agencies ought to do or how good GE should look to the rating agencies is a significant step removed from direct representations to shareholders about GE's ability to sell commercial paper, the quality of GE's Capital's loan portfolio, or the security of the 2009 dividend.

Plaintiff also alleges that GE's January 27, 2009 statement that it did not "anticipate any major operational impacts should that [GE's AAA rating] change," was false and misleading. Plaintiff contends that this statement contradicts earlier disclosures pointing out that GE's AAA rating lowered the cost of funds and facilitated access to a variety of lenders.  (SAC ¶ 136.)  But that argument assumes that a modest increase in borrowing rate or a slight decline in the number of potential lenders amounts to a "major operational impact."  It further assumes that GE was attempting to pull the wool over shareholders' eyes with regard to an issue—the relationship between credit rating and borrowing cost—with respect to which any reasonable investor would be informed.

### 8. *Statements Made by Neal, Bornstein, and Cary*

Plaintiff alleges that Neal, Bornstein, and Cary—all corporate officers of GE Capital—made material misstatements.  These statements are few, and all occurred during the December 2, 2008 Financial Services Investor Meeting.

Michael Neal, the CEO of GE Capital, is alleged to have falsely predicted that GE Capital would earn $5 billion in 2009.  (SAC, ¶ 206.)  For the reasons described above, this claim is not actionable.  He also stated, "GE Capital is and has been a strong financial services franchise. We've been a great source of liquidity this year, including the third and fourth quarter."  (*Id*., ¶ 209.)  Although plaintiff has alleged that GE Capital was struggling financially, plaintiff has not made any allegations concerning GE Capital's contribution to GE's liquidity.  Plaintiff has therefore not properly alleged that this statement was materially misleading.  Neal also stated, "So we believe we have the company well positioned and positioned appropriately for what's going to be a difficult cycle.  Reserves are 2x what they were in 2007, substantial resources are involved with many being shifted from offense to defense, adverse credit impact is well understood and incremental."  (*Id*., ¶ 212.)  As discussed above, plaintiff has not adequately alleged that GE's loan loss reserves were inadequate, so plaintiff has not adequately alleged that Neal's statements that these reserves made GE Capital "well positioned" were materially misleading.  Finally, Neal explained the type of information GE was sending to the ratings

agencies to support its AAA rating, and Neal stated that GE was relying upon "book leverage metrics." (*Id.*, ¶ 216.) Plaintiff has not adequately explained what "book leverage metrics" are, let alone why the statement that GE Capital was using them was false.

Jeffrey Bornstein, the CFO of GE Capital, is alleged to have stated, "The UK Mortgage business is 4% of our portfolio and in 2008 home prices fell 17% and we're assuming another 15% decline in 2009. That results in an expectation of about $600 million of losses in 2009, up approximately 90% from 2008." (*Id.*, ¶ 210.) Plaintiff alleges that this statement was false because Bornstein should have revealed that 74% of the UK housing portfolio was subprime. (*Id.*, ¶ 218(b).) But plaintiff has not disputed the substantive accuracy of the statement or explained why Bornstein was required to disclose that the underlying mortgages were made to subprime borrowers in order to make this statement not misleading. Plaintiff has not plausibly alleged that this statement was materially misleading.

Finally, plaintiff alleges that William Cary, GE Capital's COO, misleadingly stated, "We feel pretty good about our plans around both collections and our forecast for new volume." (*Id.*, ¶ 213.) It is not clear what this statement means or under what circumstances Cary would feel bad about GE Capital's plans. This sort of vague statement of optimism is not an actionable misstatement. *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007).

**B. *Scienter***

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)) (internal quotation marks omitted). A complaint may establish an inference of scienter in a Section 10(b) or Rule 10b-5 action by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99. To allege a "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak,* 216 F.3d at 307–08.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).  "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior . . . ." *Novak,* 216 F.3d at 308.  Strong circumstantial evidence of reckless conduct also gives rise to an inference of scienter, so long as the complaint alleges "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit,* 264 F.3d at 142 (quoting *In re Carter-Wallace, Inc., Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (internal quotation marks omitted).  "'[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quoting *Novak,* 216 F.3d at 308).

To plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,* 531 F.3d 190, 195 (2d Cir. 2008).  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Id.* However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.*

Under the heightened pleading requirements of the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court provided guidance regarding how to analyze this "strong inference."  The Court instructed courts to apply a three-step analysis:

> *First* . . . , courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .  *Second*, courts must consider the complaint in its entirety, as well as sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss . . . .  The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard. . . .  *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must taking into account plausible opposing inferences. . . .  The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative:  How likely is it that one conclusion, as compared to others, follows from the underlying facts?

551 U.S. at 322–23 (emphases in original).

Prior to *Tellabs*, the Second Circuit had determined whether plaintiff had sufficiently alleged facts giving rise to a strong inference of scienter by applying several rules of thumb.  For example, pursuant to the "core operations" doctrine, scienter could be assumed for high-level executives if the allegations of fraud pertained to an aspect of the defendant company's business that were "significant" for the company.  *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  The Second Circuit has also cautioned that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309.  Not surprisingly, the plaintiff cites the core operations doctrine to suggest that its complaint should survive a motion to dismiss, whereas defendants argue that plaintiff's failure to identify specific reports to which they had access demands the opposite result.

To the extent that the parties urge that any one of these rules, in isolation, is dispositive, their arguments appear to be in tension with the Supreme Court's clear direction that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  As the Second Circuit acknowledged in *Slayton*, "[i]n determining whether a strong inference exists, the allegations are not to be reviewed independently in isolation, but the facts alleged must be 'taken collectively.'"  604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324).

1. **_Sherin_**

Plaintiffs have adequately alleged that Sherin knowingly made materially misleading statements when he touted the quality of GE Capital's portfolio during the Class Period, even though the portfolio contained many loans to subprime consumer borrowers and companies with junk-level bond ratings.  Plaintiff notes that GE Capital provided 50% of GE's revenues in 2008 and held 80% of its assets.  As such, plaintiff argues, it can be inferred that Sherin kept tabs of business conditions at GE Capital.  *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (factoring into scienter the fact that a troubled division was responsible for nearly a third of the company's total profit, and concluding that key officers should have been intimately informed with its operations).  Defendants respond that the core operations doctrine is no longer good law.  (GE Mem. 33 (citing *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 n.209 (S.D.N.Y. 2006).)  Perhaps so—*see Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 n.39 (S.D.N.Y. 2011)—but in employing a holistic analysis, surely an inference of knowledge may be appropriate, even if not determinative, where it would be "absurd to suggest that management was without knowledge of the matter," *Zucco Partners, LLC v. DiGimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) (internal quotation marks omitted).  Plaintiff also argues Sherin should have known that GE Capital had made a number of loans to lower-quality buyers based on internal GE Capital documents that were made available to him.  The flaw in plaintiff's allegations of internal reporting is that they are very vague when describing what specific data about the loan portfolio was passed on to GE Corporate.  In order to survive motion to dismiss, plaintiff must allege that Sherin knew or recklessly disregarded the fact that GE had made many loans to subprime consumer borrowers and companies with junk-level bond ratings.  CW 4 states that GE Capital regularly reported "underwriting results" to GE Corporate, but it is not clear what would be encompassed in these reports.  It seems entirely plausible that data regarding the creditworthiness of borrowers would be included in "underwriting results," but plaintiff has hardly been specific as to this point.  Similarly, CW 1 reports that GE Capital passed along "information on bad

debts." While the credit or bond rating of the borrower might have been included in this category, the Court cannot know for certain. These allegations only weakly support an inference of scienter.

Still, Sherin regularly made detailed reports regarding the financial health of GE Capital's loan portfolio. He was able to give detailed accounts regarding the delinquency rates in the consumer portfolio compared to the commercial portfolio, about the average size of each debt, about the average size of GE Capital's loans, about the location of GE's borrowers, and about the size of GE Capital's loan loss reserves, among other pieces of information. In order to speak so knowledgeably regarding the state of GE Capital's finances, Sherin must have educated himself regarding GE Capital's financial health, presumably both by reading GE Capital's financial reports and by performing his own due diligence. The Court also considers that Sherin was analyzing these issues against the backdrop of the global financial crisis, which was brought about in part by the liberal extension of credit to subprime borrowers. It is highly improbable that Sherin, the CFO of a company 50% of whose revenues were derived from financial services in 2008, would not inquire into whether his company was exposed to the subprime consumer borrower and its counterpart in the commercial sector.

That these allegations give rise to an inference of scienter becomes even clearer when competing inferences are taken into account. Defendants argue that the competing inference is that Sherin was blindsided by the severity of the financial crisis. Although he attempted to gather information about GE and make appropriate disclosures about its finances, he had difficulty doing so given the rapidly shifting economic environment. Defendants draw an analogy between Sherin and the defendants in *In re PXRE Group, Ltd. Securities Litigation*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009). But a close examination of the facts of *PXRE* reveals sharp differences. PXRE was a reinsurance company that insured primary insurers against catastrophic events such as hurricanes. *Id.* at 514–15. In 2005, PXRE was obligated to provide insurance for claims stemming from three large hurricanes, including Hurricane Katrina and Hurricane Rita. *Id.* at 515. Because PXRE was a reinsurance company, it had to estimate its losses for its

financial statements well before the deadline had passed for individuals to file claims.  *Id*.  The plaintiff alleged that PXRE purposely understated its losses in order to maintain its credit rating.  *Id*. at 516.  Judge Sullivan concluded that the more plausible inference regarding scienter was "that Defendants, without motive to defraud, simply failed . . . to calculate accurately the full extent of losses that were incurred by the unique phenomenon presented by the 2005 hurricane season, particularly Hurricane Katrina, one of the most devastating hurricanes ever to land on the shores of the United States."  *Id*. at 534.

PXRE, however, was facing a different situation than GE, because it was required to estimate what its future claims would be *before* those claims were due.  Sherin, in contrast, would have had to investigate the creditworthiness of borrowers for loans that GE Capital *already* had on its books.  Moreover, Sherin boasted frequently that GE Capital originated a significant portion of its loans, meaning GE Capital also conducted the underwriting for these loans.  It is generally customary to investigate the creditworthiness of one's borrowers before extending them credit.  In other words, GE Capital would have had ready access to the very information Sherin is alleged to have ignored, and if GE Capital did not have ready access to the information (because GE Capital did not seek it before extending credit), that fact alone is telling and likely something that Sherin should have disclosed.  As Judge Sweet has observed, "The 'current financial crisis' is not necessarily an absolute defense if it is alleged that defendants have misled the public as to the quality of their holdings."  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).  In addition, here, Sherin allegedly made misleading statements regarding the quality of loans GE Capital made prior to the start of the financial crisis.  Defendants have not pointed to any statements Sherin made where he cautioned the public that he did not know the creditworthiness of GE Capital's borrowers.  Accepting the factual allegations in the SAC as true, the inference that Sherin was scrambling for information and attempting to disclose it as soon as he could is no more plausible than the inference that he knowingly withheld information.  Accordingly, the pleading requirements of the PSLRA are satisfied as to Sherin.  *See Tellabs*, 551 U.S. at 322–23.

2. ___Immelt___

Immelt is alleged to have made two types of false statements.  First, he is alleged to have mislead the investing public regarding GE's ability to issue commercial paper.  Plaintiff has adequately alleged that Immelt himself made contradictory statements to Henry Paulson.  These allegations support an inference that Immelt himself had actual knowledge that GE was able to issue only overnight commercial paper and yet represented to the public that GE was having no difficulties issuing commercial paper.  Second, Immelt is alleged to have told investors that they could "count on" a $1.24 dividend in 2009, although he knew that GE Capital was experiencing falling deal volume and hiding certain delinquencies on its books.

To the extent that Immelt's dividend representations are viewed as a prediction of future events, plaintiff is required to show under the PSLRA not merely a strong inference of scienter, but also that Immelt had actual knowledge of these undisclosed facts.  *Slayton*, 609 F.3d at 773. Plaintiff alleges based on confidential witness testimony that Immelt personally participated in certain decisions regarding the reclassification of assets.  The alleged fact that GE was delaying writing down assets suggests that GE might have been doing so to avoid having to cut its dividend.  Plaintiff also alleges that Immelt had actual knowledge of GE Capital's falling deal volume.  CWs 7, 8, 9, and 11, who worked for different divisions of GE Capital all describe how deal volume fell off beginning at various times in 2008.  (SAC, ¶¶ 395, 397-99.)  CW 1 described a system whereby information regarding each department's "financial results" were inputted into an automated system and passed along to GE Capital and GE Corporate management.  (*Id*., ¶ 401.)  CW 14 stated that quarterly financial reports from GE Capital were sent to senior management at GE Corporate during the Class Period.  (*Id*., ¶ 402.)  Such financial reports would likely contain information regarding whether GE Capital was originating new loans each quarter.  *Cf. Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1251–53 (11th Cir. 2008) (concluding that knowledge that individual Home Depot stores were overstating their earnings by falsely reporting merchandise defects to manufacturers was unlikely to filter up to upper management because the fraud was spread out and difficult to detect).

One question, then, is whether Immelt reviewed these reports and thus had actual knowledge of their contents.  In the same presentation during which he made the offending statement, Immelt spoke extensively regarding GE and GE Capital's financial health.  He predicted that GE Capital would be earning $5 billion in revenue for 2009 and detailed how much money GE Capital would be contributing to GE's dividend.  (SAC, ¶ 221.)  He spoke at a level of detail regarding GE Capital's real estate profile that he characterized as a "deep dive." (*Id*., ¶ 224.)  And the slide presentation accompanying his talk stated that GE was hoping to grow its earnings by 0-5% in 2009, with GE Capital contributing $5 billion of that total.  (*Id*., ¶ 228.)  During the course of this presentation, Immelt answered questions from the audience.  (*Id*., ¶ 227.)  In preparing for such a presentation, Immelt would need to have a deep understanding of the finances GE Capital.  Whether GE Capital had been able to originate new loans during September, October, and November is a pretty basic piece of financial information.  *Cf. Mizzaro*, 544 F.3d at 1251–53 (listing mechanisms by which executives may become apprised of "simple" financial "red flags").  It is thus reasonable to infer that Immelt reviewed this information in preparing for the annual outlook meeting.  These allegations combined give rise to an inference that Immelt had actual knowledge of facts tending to call into question the accuracy of his guarantee of a $1.24 dividend for 2009.

As *Tellabs* demands, the Court must also determine whether the inference that Immelt acted with scienter is as plausible as any competing inference.  As described above, the competing inference advanced by GE is that Immelt was attempting to come to terms with the financial crisis, but had difficulty making meaningful disclosures to the public in a constantly changing environment.  This inference is no more plausible than the inference that Immelt acted with scienter.  Immelt's categorical statements that investors could "count on" a dividend and that GE was having "no difficulties" issuing commercial paper are not the sort of cautious statements one would expect of a CEO attempting to come to grips with the effects of the economic crisis on his company.  Instead, it can be argued that Immelt was attempting to convince the public that the economic crisis was not affecting GE too drastically and that they

should continue to invest in GE.  Of course, a CEO is allowed to convince the public to invest in his company, but not at the expense of providing it with accurate information about the company's financial health.  Taking the factual allegations in the SAC as true, the inference that Immelt acted with scienter is at least as compelling as the inference that he did not.

### C. *Loss Causation*

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).  "[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable."  *Id*. at 173 (citation and internal quotation marks omitted).

"If the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation is a matter of proof at trial and not to be decided on Rule 12(b)(6) motion to dismiss.  However, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases . . . ."  *Id*. at 174 (citation and internal quotation marks omitted).  To survive a motion to dismiss, however, a plaintiff must only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud—rather than other salient  factors—that proximately caused plaintiff's loss," *In re Fannie Mae 2008 Secs. Litig.*, 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010) (quoting *Lentell*, 396 F.3d at 177), or "(ii) facts that would allow a factfinder to ascribe some rough proportion of the whole loss to the defendant's fraud,'" *id.* (alterations omitted) (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158, 177 (2d Cir. 2007).

Defendants assert that plaintiff has not adequately pleaded loss causation because the stock market as a whole lost value during the Class Period.  (GE Mem. at 62–63.)  According to defendants, plaintiff must "allege facts disentangling the effect (if any) of the alleged corrective disclosures on GE's stock price from the continuing marketwide decline . . . ."  (*Id*. at 63.)  With

respect to the dividend and the quality of GE Capital's loan portfolio, plaintiff has alleged GE's stock price fell significantly immediately following its corrective disclosures.  These allegations are sufficient at the pleading stage to allege loss causation.  *In re Fannie Mae*, 742 F. Supp. 2d at 414; *Abbey Nat'l*, 423 F. Supp. 2d at 362–63.

Plaintiff argues that it has adequately alleged loss causation with respect to the other misstatements because "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."  *Lentell*, 396 F.3d at 173 (emphasis removed).  In other words, even if there was no explicit corrective disclosure regarding the falsity of a specific misstatement, the subject matter of the concealed difficulties contributed to the decline in stock value that plaintiff claims as its loss.  *Id.*  Defendants contend, however, that the commercial paper allegations do not plead loss causation as any difficulty in issuing commercial paper did not harm plaintiff and any risks concealed by Immelt's statements on this subject matter never materialized.  (D. Mem. at 46.)

Defendants take too narrow a view of zone of risk alleged here.  Judge Winter, who articulated the zone of risk theory in a dissent eventually adopted by the Second Circuit in *Lentell*, 396 F.3d at 173, explained the rationale for the "zone of risk" thusly:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir. 2000) (Winter, *J.*, dissenting).  Following Judge Winter's rationale, in order for the zone of risk theory to apply in this context, plaintiff would need to allege that a reasonable investor, believing that GE was so sound financially that (unlike the rest of the market) it was having no difficulties issuing commercial paper in September and October, would believe as a result that the possibility that GE would need to slash its dividend because of GE Capital's exposure to subprime and non-investment

grade borrowers would be "remote or highly unlikely."  This is, at least in part, the thrust of plaintiff's complaint—that GE mislead investors in the fall of 2008 by assuring the market it was "safe and secure," had no problems issuing commercial paper, and hadn't had "exposure to any of these things," *i.e.* write-offs.  The proof, of course, is in the pudding, but plaintiff has adequately alleged that misstatements regarding GE's ability to finance its operations were within the zone of risk concealed.

### D. *Control Person Liability*

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.  As set forth above, Plaintiffs have alleged primary violations of Section 10(b) by GE and have adequately alleged scienter with respect to Sherin and Immelt.  "To survive a motion to dismiss under Section 20(a) of the Exchange Act, a plaintiff need only plead facts which support a reasonable inference that defendants had the potential power to influence and direct the activities of the primary violator." *In re Adelphia Commc'ns Corp. Secs. & Derivative Litig.*, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (rejecting argument that a minority shareholder and director could not be a control person because he was not a company officer) (citation and internal quotation marks omitted); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("[C]ontrol requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." (citation and internal quotation marks omitted)).  Sherin and Immelt have not contested that they are controlling persons within the meaning of the statute.  As such, plaintiff's Section 20(a) claims against Immelt and Sherin survive.

## II. Securities Act of 1933

### A. *Applicable Law*

Plaintiff brings Section 11 and 12(a)(2) claims against all defendants and Section 15 control person liability claims against the Individual Defendants.  Section 11 creates civil liability for false or misleading statements of material fact in registration statements.  *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 415 (S.D.N.Y. 2008) (citing 15 U.S.C. § 77k(a)).  Section 12(a)(2) creates the same liability for prospectuses and oral communications.  *Id.* at 416 (citing 15 U.S.C. § 77*l*(a)(2)).  "Claims under Sections 11 and 12 are usually evaluated in tandem, because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)(2)."  *Id.*  Similarly, a cause of action under Section 15 for control person liability requires an underlying Section 11 or Section 12 violation.  *In re CIT Grp., Inc., Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004).

To state a claim under Sections 11 and 12(a)(2), a security purchaser must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 433 n.8, 434 n.9 (S.D.N.Y. 2009).  In other words, the plaintiff must allege that a statement was either false or misleading (in light of omitted information), and that that same statement was material.  *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009), *vacated in part on other grounds by Iowa Pub. Emps.' Retirement Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010).

A false or misleading statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA*, 553 F.3d at 197 (alteration, citation, and internal quotation marks omitted).  Materiality turns on context.

"The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (citation omitted).  Thus, even if a particular statement is false or misleading, it is only actionable as material if, when read in context of the "total mix" of defendants' disclosures, it would mislead a reasonable investor.  *Id*.  This "reasonable investor" standard requires fact-specific application; it is far from a bright-line rule.  *ECA*, 553 F.3d at 197.  As such, the Second Circuit has cautioned that "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).  This is a high bar for defendants bringing a 12(b)(6) motion to satisfy.  But dismissal is nonetheless appropriate where the offering document as a whole, despite isolated inaccuracies, so clearly communicates the information alleged to have been misrepresented, hidden, or obfuscated that a reasonable investor could not have been misled as to that information's substance.  *See Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 302 (S.D.N.Y. 2000) (dismissing claims based on "isolated references, [which] even if not 'literally true,' [we]re not material in light of the entire prospectus."); *see also Halperin*, 295 F.3d at 359–61; *Lin*, 574 F. Supp. 2d at 420.

As a general rule, a plaintiff bringing claims pursuant to Section 11 need not plead scienter or otherwise comply with Rule 9 because "[f]raud is not an element or a requisite to a claim under Section 11 . . . ." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Instead, issuers are subject to "virtually absolute" liability under Section 11, while all other potential

defendants may be held liable for "mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983)).  And as such, Section 11 claims ordinarily need meet only the basic requirements of Rule 8.  Under *Rombach*, the heightened pleading requirements of Rule 9(b) apply to claims under Section 11 to the extent that the underlying allegations sound in fraud.  355 F.3d at 170.  When allegations sound in fraud, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *In re Ambac Fin. Group, Inc., Sec. Litig.*, 693 F. Supp. 2d 241, 275 (S.D.N.Y. 2010) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Plaintiffs have satisfied this standard with regard to G.E. and Messrs. Immelt and Sherin.  With regard to the Underwriter Defendants, the SAC does not allege that they acted fraudulently; rather, the SAC asserts claims sounding in negligence and strict liability.  As discussed below, certain of the allegations in the SAC are sufficient at the pleading stage to support such claims.

### B.  *Allegedly Misleading Statements*

#### 1.  *Commercial Paper*

Plaintiff attacks GE's disclosure in its September 25, 2008 8K (incorporated by reference into the Offering Documents) that "demand remains strong" for GE Capital's commercial paper debt and that "GE's funding position is strong and GE has performed well during the recent market volatility."  (SAC ¶¶ 125, 127.)  These statements were untrue and misleading, plaintiff alleges, in light of the Immelt-Paulson conversations detailed above and the company's failure to frankly inform investors of the significant difficulties GE had been having selling its commercial paper.  (P. Mem. 108-11.)  Defendants counter that there was nothing inaccurate about such

statements as GE in fact was able to issue commercial paper, and that Immelt's statement that "we successfully meet our commercial paper needs" was merely a statement of opinion as to the company's degree of success.  Further, defendants point to the warning in the prospectus that, if the financial markets worsened, "there can be no assurance" that there will be a source of commercial paper financing for GE Capital.  (UW Mem. at 27–30.)

Reading all GE's disclosures regarding commercial paper together, the Court concludes that plaintiff has plausibly alleged misstatements or omissions of material facts.  The thrust of GE's disclosures was to assure investors that there were no serious difficulties in GE Capital's access to short-term financing, while plaintiff has alleged facts, taken as true on a motion to dismiss, that undermine the accuracy of these representations.  GE's standardized warning that there were "no assurances" of continued access to the commercial paper market must be read in context with prior disclosures that describe the risk of impaired access as "unlikely" and statements that GE's funding position is "strong."  The underlying facts, of course, are disputed, but that itself weighs against dismissing plaintiff's commercial paper claims at this early stage of the litigation.

Defendants' motion is not saved on this issue by its argument that the SAC establishes an absence of loss causation.  The disclosures made by GE on October 30, 2008 do not fully disclose the severity of the short-term liquidity problems alleged in the SAC, so the absence of a price decline immediately following the disclosure hardly establishes negative causation on the face of the complaint.  Nor does the fact that the alleged corrective disclosures in early 2009 did not mention GE's difficulties in accessing the commercial paper market establish absence of causation.  As discussed above, a corrective disclosure is not required to establish loss causation provided that the subject of the alleged misrepresentations caused plaintiff's loss, that is, that the

liquidity problems were within the zone of risk concealed.  *See In re Vivendi Universal, S.A.,*

*Sec. Litig.*, 605 F.Supp. 2d 586, 598 (S.D.N.Y. 2009).

### 2. *Quality of Loan Portfolio*

The Offering Materials do not contain the same sweeping statements praising the quality

of GE's loan portfolio that rendered GE's failure to disclose its large amount of subprime debt

potentially misleading under the Exchange Act.  Nevertheless, plaintiff alleges that the blander

representation that "we will run GE Capital to be safe and secure, while earning high margins on

conservatively underwritten business" was patently untrue in light of GE Capital's $220 billion

in junk debt."  (P. Mem. at 95.)  While the line may be difficult to draw, such generalized

aspirational statements are properly characterized as inactionable statements of puffery or

opinion.  *See In re Sec. Capital Assurance Ltd.,* 729 F. Supp. 2d 569, 597–98 (S.D.N.Y. 2010).

Plaintiff also identifies several specific statements that they allege are false but, in fact,

are not.  First, plaintiff argues that GE's June 10, 2008 10-Q was misleading insofar as it stated,

"Investment securities comprise mainly investment-grade debt securities."  (Pl.'s Opp'n 95

(quoting ¶ 130).)  In March 2009, GE disclosed that approximately 30% of its debt securities

were junk grade.  The term "mainly" is ambiguous and does not convey that GE's portfolio

contained a particular amount of investment-grade debt.  Still, it appears that 70% of these

securities were investment grade.  It seems fair to say that such a portfolio is comprised "mainly"

of investment grade securities, and so GE's later disclosure does not demonstrate its earlier

disclosure to be false.  Second, plaintiff argues that GE was obligated to disclose its total

exposure to the subprime market because of another statement:  "At June 30, 2008, of the

[residential mortgage-backed securities] amount, we had approximately $1.7 billion of exposure

to subprime credit."  (*Id.* (quoting ¶ 96).)  Plaintiff argues that this statement was misleading

because GE had additional exposure to subprime credit through its own consumer loans.  (*Id.*)

The disputed statement clearly refers merely to GE's residential mortgage-backed securities.  It

does not purport to make broader statements regarding the other segments of GE's loan portfolio.

Plaintiff also argues that failure to disclose the $220 billion in junk debt rendered GE's statements in the Offering Documents regarding its commitment to the AAA rating and ability to pay its dividend untrue and misleading.  But as the Court finds below, the rating and dividend claims are inactionable for separate reasons.

### 3.  *Dividend*

Unlike Immelt's subsequent guarantee of the 2009 dividend, the Offering Documents are more conservatively drafted.   The disputed statement reads in full:  "On September 25, 2008, we announced that our board of directors had approved management's plan to maintain GE's quarterly dividend of $0.31 per share, totaling $1.24 per share annually, through the end of 2009.  However, in the event of material future deterioration in business conditions, our board may reduce or eliminate our common stock dividend."  (UW Def.'s Ex. 2 at S-7.)  This statement does not proclaim that GE's 2009 dividend is a sure thing, and it explains what conditions might cause GE to reduce or eliminate the dividend.  Thus it cannot be read as a guarantee and does not fall within the rubric of the *IBM* decision.  163 F.3d at 107.  Nor can this statement be read as an opinion not truly held since plaintiff had disclaimed scienter as a basis of its Securities Act claims.  *See Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 121–23 (S.D.N.Y.2010).

### 4.  *Reclassification/Valuation of Assets*

As described in greater detail above, plaintiff has sufficiently alleged that GE reclassified its loans as held-to-maturity instead of available-for-sale in order to avoid having to write the loans down to their market value.  It is reasonable to infer, accepting this allegation as true, that the value of the assets that GE listed in its prospectus was inflated.  Defendants argue that plaintiff failed to identify specific assets that were overvalued or the amount of overstatement.  (UW Mem. at 18–19.)  Defendants cite no cases in support of these contentions, and the Court is aware of none.  Instead, defendants cherry-pick favorable language from prior cases without providing adequate context.  Both of these cases also contain language confirming that plaintiffs have sufficiently alleged fraud if they can describe a particular practice that renders defendants' statements false.  *See Yu*, 686 F. Supp. 2d at 380 ("Plaintiffs' over-valuation claims fail because

the Complaint does not aver a single concrete fact to suggest that defendants deviated from the prescribed valuation methods."); *Rubin*, 634 F. Supp. 2d at 472 ("The Court notes that Plaintiffs do not offer any factual averments showing that any of the statements about specific practices or aspects of the risk management system were false.").

Although the GE prospectus does contain some cautionary language regarding the possibility of write-downs within GE Capital's loan portfolio, this language is not particularly specific.  The statements from which defendants quote describe how the faltering economy could hurt GE and how GE could lose money if borrowers defaulted.  (UW Def. Ex. 2 at S-3 to S-4.) These statements do not disclose that GE allegedly had shifted its assets around on the books in order to avoid writing them down.  As such, defendants did not provide adequate cautionary language regarding the valuation of GE's assets, and these statements survive a motion to dismiss.

### 5.  *AAA Rating/Loan Loss Reserves*

Defendants statements in the Offering Documents relating to GE's commitment to maintain a AAA rating and the adequacy of its loan loss reserves are infirm for the reasons set forth in the Court's analysis of plaintiff's analogous Exchange Act claims.

### 6.  *Section 15 Claims*

Defendants do not appear to contest Section 15 control person liability other than on the grounds that plaintiff has not properly pled primary violations of Sections 11 or 12.  To the extent that the Court has ruled to the contrary, plaintiff's Section 15 claims survive.

**CONCLUSION**

For the reasons stated above, defendants' motions to dismiss [ECF No. 88 and 91] are granted in part and denied in part.

SO ORDERED.

Dated:  New York, New York
        January 11, 2012

_____
Richard J. Holwell
United States District Judge