UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                         :
                                         :
IN RE: GENERAL ELECTRIC COMPANY          :    09 Civ. 1951 (DLC)
SECURITIES LITIGATION                    :
                                         :    OPINION & ORDER
                                         :
                                         :
--------------------------------------- X

APPEARANCES

For Lead Plaintiff State Universities Retirement System of
Illinois:

Richard Wolfe Cohen
Todd Seth Garber
Lowey Dannenberg Cohen & Hart, P.C.
White Plains Plaza
One North Broadway
Suite 509
White Plains, NY 10601

Daryl Devalerio-Andrews
Glen DeValerio
Jeffrey Craig Block
Kathleen Mary Donovan-Maher
Kristin J. Moody
Patrick Thomas Egan
Steven J. Buttacavoli
Berman DeValerio
One Liberty Square
Boston, MA 02109

Joseph J. Tabacco , Jr.
Berman DeValerio
425 California Street
Suite 2100
San Franciso, CA 94104

Kyle G. DeValerio
Berman DeValerio
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410

For Defendants Jeffrey R. Immelt, Brackett B. Denniston, III,
Pamela Daley, Kathryn A. Cassidy, Jamie S. Miller, John
Krenicki, John F. Lynch, John G. Rice, Keith Sherin, Michael
Neal, James I. Cash, Jr., William M. Castell, Ann M. Fudge,
Claudio X. Gonzalez, Andrea Jung, Alan G. Lafley, Robert W.
Lane, Ralph S. Larsen, Rochelle B. Lazarus, Sam Nunn, Roger S.
Penske, Robert J. Swieringa, Robert C. Wright, Douglas A.
Warner, III, Susan Hockfield, James J. Mulva, and General
Electric Company:

Greg A. Danilow
Paul Ivor Dutka
Ashish D. Gandhi
Caroline Hickey Zalka
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue, 25th Fl.
New York, NY 10153

For Defendants Goldman Sachs & Co., Banc of America Securities
LLC, Citigroup Global Markets Inc., Deutsche Bank Securities
Inc., J.P. Morgan Securities Inc., Morgan Stanley Inc., Barclays
Capital Inc., Credit Suisse Securities (USA) LLC, UBS Securities
LLC, ABN Amro Inc., Banca IMI S.P.A., BNP Paribas Securities
Corp., Daiwa Securities America Inc., HSBC Securities (USA)
Inc., Ing Financial Markets LLC, Lloyds TSB Bank PLC, Merrill
Lynch, Pierce Fenner & Smith Inc., Mitsubishi UFJ Securities
International plc, Mizuho Securities USA Inc., Santander
Investment Securities Inc., SG Americas Securities, LLC,
Blaylock Robert Van, LLC, Castleoak Securities L.P., Samuel A.
Ramirez & Co. Inc., Utendahl Capital Group, L.L.C., and The
Williams Capital Group, L.P.:

Richard D. Bernstein
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006

Mei Lin Kwan-Gett
Zheyao Li
Willkie Farr & Gallagher LLP (NY)
787 Seventh Avenue
New York, NY 10019

DENISE COTE, District Judge

        Defendants move for partial reconsideration of a January

12, 2012 Memorandum Opinion and Order (the "January Opinion")
granting in part defendants' motions to dismiss the Second
Consolidated Class Action Complaint (the "SAC"), and for
judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ.
P.  All defendants have submitted a motion for partial
reconsideration and judgment on the pleadings with respect to
claims brought pursuant to the Securities Act of 1933 (the
"Securities Act Motion").  Defendants General Electric Company
("GE") and Keith Sherin ("Sherin") have submitted a motion for
partial reconsideration and for judgment on the pleadings with
respect to claims brought pursuant to the Securities Exchange
Act of 1934 (the "Exchange Act Motion").  For the following
reasons, the Securities Act Motion is granted and the Exchange
Act Motion is denied.


BACKGROUND

    The Securities Act Motion and the Exchange Act Motion
(together, the "Joint Motions") involve the defendants'
statements on three separate topics: GE's ability to fund itself
through issuing commercial paper, GE's reclassification of
assets in violation of Generally Accepted Accounting Principles
("GAAP"), and the quality of the loan portfolio of GE Capital,
GE's financial services unit.  Although a general familiarity
with the facts in this matter is presumed, a brief synopsis of

3

facts relevant to these three topics is offered as a convenience.  These facts are taken from the SAC unless otherwise noted, and are taken to be true for purposes of this motion.  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).

I.   Commercial Paper

Following the collapse of Lehman Brothers in September 2008, the global commercial paper market declined precipitously. GE, which was mostly financed by 30-day commercial paper, experienced difficulties funding its operations.

On September 8, 2008 defendant Jeffrey Immelt ("Immelt"), CEO of GE, spoke on the telephone with former Secretary of the Treasury Henry M. Paulson ("Paulson").  Immelt told Paulson that GE was having trouble selling its commercial paper.  On September 15, Immelt traveled to Washington, D.C. and spoke further with Paulson, detailing GE's financial difficulties and in particular its problems funding itself with commercial paper.

On October 1, GE commenced a $12 billion secondary public stock offering (the "Offering").  The Offering was conducted pursuant to a shelf registration statement filed on December 5, 2005, a preliminary prospectus filed on October 1, 2008, and a prospectus supplement Form 424B2 filed and dated October 2, 2008 (collectively, the "Prospectus").  The offering documents for this stock (the "Offering Documents") included a number of

statements related to GE's ability to issue commercial paper. According to the SAC, such statements included the following:

- A statement in GE's Form 10-K/A for Fiscal Year 2004 and its Forms 10-K for Fiscal Years 2005, 2006 and 2007 that, "A large portion of [GE Capital's] borrowings . . . was issued in active commercial paper markets that we believe will continue to be a reliable source of short-term financing."

- A statement in GE's Form 10-K/A for Fiscal Year 2004 and Form 10-K for FY 2005 that, "GE Capital is the most widely held name in global commercial paper markets.  We believe that alternative sources of liquidity are sufficient to permit an orderly transition from commercial paper in the unlikely event of impaired access to those markets."

- A press release accompanying GE's September 25, 2008 Form 8-K stating that "demand remains strong for GE Capital's commercial paper debt," and that "GE's funding position is strong and GE has performed well during the recent market volatility."

- A statement by Immelt in GE's October 1, 2008 Free Writing Prospectus, which announced the Offering, that "in the recent market volatility, we continue to successfully meet our commercial paper needs."

- Statements in the Preliminary Prospectus filed on October
  1, 2008 that "GE Capital has continued to issue commercial
  paper," and that "there can be no assurance that
  [commercial paper] markets will continue to be a reliable
  source of short-term financing for GE Capital."

The SAC claims that in light of GE's difficulty issuing
commercial paper, these statements were materially false and
misleading pursuant to the Securities Act.

The SAC further alleges that events after the Offering
support a finding that the above statements were materially
false and misleading.  On October 7, 2008, the Federal Reserve
announced that it was creating a Commercial Paper Funding
Facility ("CPFF") that would purchase commercial paper as a
liquidity backstop to U.S. issuers of commercial paper.
Registration for CPFF started on October 20, and GE signed up
for it that very day.  The facility became operational on
October 27, and GE Capital became one of its largest users.

On October 14, the Federal Deposit Insurance Corporation
("FDIC") announced its plan to create a Temporary Liquidity
Guarantee Program ("TLGP"), which would guarantee debt issued by
eligible banking institutions.  Initially, GE did not qualify
for TLGP but, on October 13 and 16, Immelt secretly lobbied
Paulson to broaden TGLP eligibility so as to permit GE Capital's
participation.  As a result of these efforts, the rules for TGLP

eligibility were changed on October 23; GE Capital was accepted into the program on November 12.  By the end of 2008, GE had reportedly raised approximately $35 billion using TLGP guaranteed debt.

II.  Reclassification of Assets

The Offering Documents state that GE Capital had $695.8 billion in assets.  The SAC alleges, however, that GE accounted for assets in a manner that violated GAAP and that the Offering Documents therefore misstated the value of GE's assets in violation of the Securities Act.

Prior to the Offering, GE reclassified and transferred certain impaired assets from "available to sale" to "held to maturity" positions without marking these assets to their reduced current market value.  GE thus avoided reporting losses on these assets as required by GAAP.

The SAC describes with specificity how GE improperly reclassified troubled assets within certain departments at GE Capital.  These departments dealt primarily with commercial mortgage-backed securities, commercial real estate debt originating in the United States, and equity transactions originating in Asia.

On March 5, 2009, GE disclosed that 98% of its assets were held at inflated historical values.  On June 25, 2009, Immelt appeared as a guest on the Charlie Rose show, a PBS television

interview program.  During the interview, Immelt said that GE Capital might not have been worth its stated value prior to the financial crisis.

III.  Statements by Sherin

During the Class Period, which ran from September 25, 2008 until March 19, 2009, GE had over $220 billion in subprime consumer and "junk" grade commercial credit in its loan portfolio.  This represented approximately one-third of GE's total assets.  This fact was not disclosed until the end of the class period.

The SAC alleges that Sherin, who was GE's Chief Financial Officer, made the following false and misleading statements and omissions about the quality of GE Capital's loan portfolio during the class period:

- During a September 25, 2008 conference call, Sherin stated, "We've got a great portfolio; our measurement and delinquencies and asset quality are all very strong."  He also stated, "We have a fantastic real estate portfolio. It's very high quality.  The delinquencies on the book are 0.27% of assets, so it's performing well."

- During an analyst conference call on October 10, 2008, Sherin noted that "the portfolio quality remains strong." He stated that GE Capital's real estate business had more than $89 billion in assets "driven by the investments we've

been making in senior secured debt at high returns," and
"we've capped off our real estate business just based on
size today and we're continuing to downsize the portfolio
and we will continue to do that through 2009."  He further
explained:

> [GE has] taken proactive actions and we have
> dramatically improved our liquidity situation. .
> . . [O]ur portfolio remains robust.  We've got a
> great portfolio.  We've stuck to our risk
> management but we are going to see a credit cycle
> here.  We're going to see higher delinquencies,
> we're already seeing those.  As we have higher
> delinquencies we're going to put up more loss
> provisions.

The SAC further alleges that Sherin acted with scienter when
making these statements because, inter alia, GE Capital closely
monitored and reported on the status of loans, and this business
information was passed up to GE Corporate.

IV.  Procedural History

    Lead Plaintiff filed this action on March 3, 2009, and
filed the SAC on June 9, 2010.  Defendants filed motions to
dismiss on June 30, 2010, which became fully submitted on August
25, 2010.  The January Opinion granted these motions in part.
The surviving Exchange Act claims relate to alleged
misrepresentations or omissions involving GE's ability to sell
its commercial paper, the quality of its capital portfolio, the
size of its stock dividend, and the valuation of its assets.
The surviving Securities Act claims relate to alleged

misrepresentations or omissions involving commercial paper and the valuation of assets.

On January 26, 2012, all defendants filed a motion for partial reconsideration of the January Opinion with respect to all surviving claims brought pursuant to the Securities Act. That same day, defendants GE and Sherin filed a Motion for Partial Reconsideration of the January Opinion with respect to certain claims brought pursuant to the Exchange Act.  On February 7, 2012, this matter was reassigned to this Court. Defendants filed an Answer to the SAC on February 29.  This Court held a conference with the parties on March 6.  Pursuant to the request of the parties with respect to the Securities Act Motion and by Order of March 8, the motions for reconsideration were construed as joint motions for reconsideration and for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.  The Joint Motions became fully submitted on March 23.


DISCUSSION

A motion for reconsideration will generally be denied unless "the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  In re BDC 56 LLC, 330 F.3d 111, 123 (2d Cir. 2003) (citation omitted).  Local Rule 6.3 is narrowly construed and

strictly applied so as to avoid repetitive arguments on issues that the court has already considered fully.  The decision to grant or deny the motion is within the sound discretion of the district court.  Aczel v. Labonia, 584 F.3d 52, 61 (2d Cir. 2009).

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  In deciding a Rule 12(c) motion, the court must "apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party."  Hayden v. Paterson, 594 F.3d 150, 157 n.4 (2d Cir. 2010) (citation omitted).  "To survive a Rule 12(c) motion, [plaintiff's] 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id. at 160 (quoting Iqbal, 129 S.Ct. at 1949).  "'The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  Id. at 161 (quoting Iqbal, 129 S.Ct. at 1949).

The Joint Motions request reconsideration of three rulings in the January Opinion:

1. That the Offering Documents contained materially false statements or omissions related to GE's ability to issue

11

commercial paper, which gave rise to liability under the
Securities Act;

2. That the Offering Documents contained materially false
   statements or omissions related to the valuation of GE's
   assets, which also gave rise to liability under the
   Securities Act; and

3. That Sherin's statements about the quality of GE Capital's
   loan portfolio gave rise to liability under the Exchange
   Act.

Reconsideration of these rulings is granted.  Although the Court
of Appeals had issued Fait v. Regions Financial Corporation, 655
F.3d 105, 110 (2d Cir. 2011), on August 23, 2011, the January
Opinion did not address the impact of the Fait decision on its
analysis.  Therefore, following a general articulation of
pleading requirements, each of the three challenged rulings in
the January Opinion will be addressed in turn.

I.  The Securities Act

     Lead Plaintiff asserts three separate claims under Sections
11, 12(a)(2), and 15 of the Securities Act.  Section 11 imposes
liability for statements and omissions in a registration
statement filed in connection with the sale of securities;
Section 12(a)(2) applies to statements and omissions in a
prospectus and certain oral communications.  15 U.S.C. § 77k(a);
15 U.S.C. § 77$l$(a)(2).

Because similar pleading requirements apply to both Section 11 and Section 12(a)(2), they will be considered in tandem.  To state a prima facie claim under either Section 11 or 12(a)(2), a plaintiff need only prove that he purchased the registered securities and that the registration statement or prospectus, respectively, contained a material misstatement or omission. Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  Thus, unlike a securities fraud action brought under the Exchange Act, a plaintiff in a Section 11 or 12(a)(2) action need not plead scienter or reliance.  Id.  Finally, Section 15 extends "control person" liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" Section 11 or Section 12.  15 U.S.C. § 77o.

In their Securities Act Motion, defendants argue that neither the Registration Statement nor the Prospectus contained material misstatements or omissions that could give rise to Securities Act violations.  They argue that all of Lead Plaintiff's remaining Securities Act claims challenge misstatements that are either inactionable opinions or immaterial.

A.  Opinions

In addition to misrepresentations and omissions of material fact, statements of belief or opinion may give rise to liability under Sections 11 and 12.  A statement of belief or opinion will

13

only give rise to liability, however, if it "was both
objectively false and disbelieved . . . at the time it was
expressed."  <u>Fait</u>, 655 F.3d at 110; <u>see also</u> <u>Virginia Bankshares</u>
<u>v. Sandberg</u>, 501 U.S. 1083, 1095-96 (1991).  In other words,
statements of opinion must be both objectively and subjectively
false to be actionable under the Securities Act.

    Matters of opinion include subjective statements that
reflect "judgments as to values that [are] not objectively
determinable."  <u>Fait</u>, 655 F.3d at 109 (citation omitted).
Statements estimating the fair market value of assets are
opinions, not matters of objective fact.  <u>Id.</u> at 110.

    B. Materiality

    The Securities Act countenances that both misstatements and
omissions can give rise to liability.  For liability to attach,
however, Sections 11 and 12(a)(2) require not only that the
plaintiff identify a misstatement or omission in the
registration statement or prospectus, but also that the
plaintiff demonstrate that the misrepresentation was material.
The test for determining whether an alleged misstatement or
omission is material is "whether defendants' representations,
taken together and in context, would have misled a reasonable
investor."  <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2,
5 (2d Cir. 1996) (citation omitted).  This test has been
restated on various occasions in slightly different forms, in

part depending on whether the alleged flaw is better characterized as a misstatement or as an omission.  An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (citation omitted); see also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").  Likewise, a misstatement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted) ("ECA").  A material fact can relate to past, existing, or prospective events.  Sonesta Int'l Hotels Corp. v. Wellington Assoc., 483 F.2d 247, 251 (2d Cir. 1973).

These "reasonable investor" standards require a fact-intensive inquiry.  "[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case."  Ganino v. Citizens

Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000).  The Supreme Court
has long observed that "the ultimate determination of
materiality . . . requires delicate assessments of the
inferences a 'reasonable shareholder' would draw from a given
set of facts and the significance of those inferences to him. .
. ." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450
(1976); see also Basic Inc., 485 U.S. at 240 ("[M]ateriality
depends on the significance the reasonable investor would place
on the withheld or misrepresented information").

     Materiality is essentially a "mixed question of law and
fact," ECA, 553 F.3d at 197, and as such, it is not ordinarily a
question appropriate for resolution as a matter of law in a
motion to dismiss.  The Second Circuit has repeatedly held that
"a complaint may not properly be dismissed on the ground that
the alleged misstatements or omissions are not material unless
they are so obviously unimportant to a reasonable investor that
reasonable minds could not differ on the question of their
importance." Id. (citation omitted).

     Nevertheless, circumstances exist in which a court may
conclude that an alleged misrepresentation or omission is
immaterial as a matter of law.  One of these circumstances is
where "the alleged misrepresentations [are] sufficiently
balanced by cautionary language within the same prospectus such
that no reasonable investor would be misled about the nature and

                              16

risk of the offered security." <u>P. Stolz Family P'ship L.P. v.</u>
<u>Daum</u>, 355 F.3d 92, 96 (2d Cir. 2004).  Overall,

> [t]he touchstone of the inquiry is not whether
> isolated statements within a document were true, but
> whether defendants' representations or omissions,
> considered together and in context, would affect the
> total mix of information and thereby mislead a
> reasonable investor regarding the nature of the
> securities offered.

<u>Rombach</u>, 355 F.3d at 173 (citation omitted); <u>see also</u> <u>DeMaria v.</u>
<u>Andersen</u>, 318 F.3d 170, 180 (2d Cir. 2003).  This principle,
known as the "bespeaks caution" doctrine, is limited in its
application to "forward-looking, prospective representations,"
however, and may not be used to caution against "[h]istorical or
present fact—knowledge within the grasp of the offeror." <u>Daum</u>,
355 F.3d at 96-97; <u>see also</u> <u>Rombach</u>, 355 F.3d at 173
("Cautionary words about future risk cannot insulate from
liability the failure to disclose that the risk has
transpired.").  Moreover, the cautionary language relied upon by
the party seeking to defeat materiality must "warn[] of the
specific contingency that lies at the heart of the alleged
misrepresentation" -- that is, "must relate directly to that by
which the plaintiffs claim to have been misled." <u>Daum</u>, 355 F.3d
at 97 (citation omitted).  Bespeaks caution does not apply to
characterizations that "communicate present or historical fact
as to the measures taken" to reduce a firm's risk. <u>Iowa Pub.</u>
<u>Emps'. Ret. Sys. v. MF Global, Ltd.</u>, 620 F.3d 137, 144 (2d Cir.

2010).

In analyzing materiality, courts must consider both quantitative and qualitative factors, and this consideration "should be undertaken in an integrative manner." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011). Although there is no bright-line numerical test for the materiality of an alleged misstatement, Ganino, 228 F.3d at 164, a five percent numerical threshold may provide an appropriate starting point. ECA, 553 F.3d at 204. Thus, an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law. Id. Relevant qualitative factors may include the "significance of the misstatement in relation to the company's operations, and . . . management's expectation that the misstatement will result in a significant market reaction." Id. at 198.

II. Commercial Paper

The January Opinion improperly relied on statements that were not incorporated into the Offering Documents, and on statements that were modified and superseded by later statements. The only remaining statements in the SAC related to commercial paper were not materially misleading. As such, Lead Plaintiff cannot rely on these statements to support a Securities Act claim, and its commercial paper Securities Act

claims must be dismissed.

    A.  Unincorporated Statements

    As discussed above, the SAC claims that the statements "demand remains strong for GE Capital's commercial paper debt" and "GE's funding position is strong and GE has performed well during the recent market volatility" were incorporated by reference into the Offering Documents.  These statements were made in a press release attached to GE's September 25, 2008 Form 8-K.  Although Lead Plaintiff argues that this Form 8-K was incorporated into the Offering Documents, in fact GE's October 2, 2008 Prospectus Supplement incorporates the Form 8-K with respect to Item 8.01 only.  Item 8.01 does not include the relevant statements.  As such, these statements were not incorporated into the Offering Documents and should not have been relied upon in the January Opinion.

    Lead Plaintiff does not contest that these statements were unincorporated.  Instead, it argues that the defendants are barred from raising this argument on a motion for reconsideration, or even in a Rule 12(c) motion, because they failed to do so in their original motion to dismiss.  Because the defendants have shown that a motion for reconsideration properly lies with respect to the other representations regarding commercial paper, all the parties' current arguments will be addressed.

B.  Superseded Statements

The SAC also alleges that the Offering Documents included statements from GE's Form 10-K/A for Fiscal Year 2004 and certain of its Forms 10-K from 2005-2007 characterizing commercial paper markets as "a reliable source of short-term financing," and indicating that impaired access to those markets was "unlikely."  The January Opinion concluded, correctly, that these statements were incorporated by reference into the Offering Documents, but overlooked the fact that they were superseded by subsequent statements in the Preliminary Prospectus.  The January Opinion therefore should not have relied upon them.

SEC Rule 412(a) provides as follows:

(a) <u>Any statement</u> contained in a document incorporated
. . . by reference . . . <u>shall be deemed to be</u>
<u>modified</u> or superseded for purposes of the
registration statement or the prospectus that is part
of the registration statement <u>to the extent that a</u>
<u>statement</u> contained in the prospectus <u>that is part of</u>
<u>the registration statement</u> . . . <u>modifies or replaces</u>
<u>such statement</u>.

(b) The modifying or superseding statement may, but
need not, state that it has modified or superseded a
prior statement. . . .

(c) Any statement so modified shall not be deemed in
its unmodified form to constitute part of the
registration statement or prospectus for purpose of
the Act.  Any statement so superseded shall not be
deemed to constitute a part of the registration
statement or the prospectus for purposes of the Act.

17 CFR § 230.412(a) (emphasis supplied).  As noted above, GE's
Form 10-K/A for Fiscal Year 2004 and Forms 10-K from 2005-2007
were incorporated by reference into the Offering Documents.  The
statements from these documents characterizing commercial paper
markets as "a reliable source of short-term financing" and
indicating that impaired access to those markets was "unlikely"
are therefore beholden to SEC Rule 412 and subject to being
modified or replaced by statements contained in the prospectus.

   GE's prospectus supplement, which is part of the
registration statement, included the following language with
respect to commercial paper:

   [The Offering] will give [GE] additional flexibility
   in the event of further deterioration in the
   commercial paper and other credit markets. . . .
   [A]lthough GE Capital has continued to issue
   commercial paper, there can be no assurance that such
   markets will continue to be a reliable source of
   short-term financing for GE Capital.  If current
   levels of market disruption and volatility continue or
   worsen, or if we cannot lower our asset levels as
   planned, we would seek to repay commercial paper as it
   becomes due or to meet our other liquidity needs using
   the net proceeds of this offering and the Berkshire
   Investment, by drawing upon contractually committed
   lending agreements primarily provided by global banks
   and/or by seeking other funding sources.  However,
   under such extreme market conditions, there can be no
   assurance such agreements and other funding sources
   would be available or sufficient.

(emphasis supplied).  These statements directly modify and
replace the earlier statements from GE's 2005-2007 Forms 10-K.
Whereas the Forms 10-K from 2005-2007 characterized commercial

21

paper markets as a "reliable source of short-term financing,"
the prospectus supplement warns that there could be "no
assurance" that this would continue to be the case, in
particular if "current levels of market disruption and
volatility" were to "continue or worsen."  And whereas the Form
10-K from 2005 indicated that impaired access to those markets
was "unlikely," the prospectus supplement discusses the prospect
of "further deterioration in the commercial paper and other
credit markets," thus indicating that some deterioration had
already taken place.  The statements in GE's Forms 10-K from
2005-2007 are therefore superseded and not deemed to constitute
part of the Offering Documents.

Lead Plaintiff argues that this language from GE's
prospectus supplement is merely standardized "boilerplate" and
therefore cannot supersede the earlier statements from GE's
Forms 10-K.  The language from the prospectus supplement is not
boilerplate, however -- it specifically references ongoing
events in the financial crisis and directly modifies GE's
earlier statements on the likelihood of impaired access to
commercial paper markets and reliability of commercial paper as
a source of short-term financing.

C.  Immelt's Opinions

The January Opinion also improperly relied on the statement
by Immelt in a press release filed as part of the October 1 Free

Writing Prospectus that "in the recent market volatility, we continue to successfully meet our commercial paper needs." This is a statement of opinion, not objective fact. Pursuant to Fait, 655 F.3d at 110, a statement of opinion is not actionable unless the speaker disbelieved it at the time he expressed it. In other words, the statement must be subjectively false. Id. at 113.

The SAC does not allege that Immelt disbelieved this statement. In fact, amongst other disclaimers, the SAC expressly states that the Securities Act claims "are not based on any allegations of knowing . . . misconduct on the part of any Defendant."[1]

Lead Plaintiff argues that this disclaimer addresses scienter, not subjective falsity, and that pursuant to Fait there is a distinction between "a requirement that a plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent." Fait, 655 F.3d at 112 n.5. In other words, subjective falsity and scienter are not "one and the same." Id.

This is beside the point. As noted, in no other passage does the SAC allege that on October 1 Immelt disbelieved his

---

[1] Had the SAC premised its Security Act claims on allegations of fraud, then it would have needed to meet the heightened pleadings standards of Fed. R. Civ. P. 9(b). Rombach, 355 F.3d at 171.

statement that GE was continuing to meet its commercial paper
needs.  Moreover, if Immelt had disbelieved this statement of
opinion at the time he made it -- in other words, if he had lied
-- then he would have engaged in a form of knowing misconduct.
The SAC disclaimed all such allegations.  In light of this
disclaimer, it has not alleged subjective falsity.

    D. Inactionable Statements

    The SAC targets two additional statements on commercial
paper from the Offering Documents: "GE Capital has continued to
issue commercial paper," and "[T]here can be no assurance that
[commercial paper] markets will continue to be a reliable source
of short-term financing for GE Capital."  The January Opinion
did not rely on these statements and Lead Plaintiff has not
moved for reconsideration.  Even if it had sought
reconsideration, however, neither statement is actionable.

    The former statement is not actionable because it is not
materially misleading.  It merely states that GE was issuing
some amount of commercial paper.  The SAC does not allege that
GE had completely ceased to issue commercial paper at the time
of the Offering.

    The latter statement is not actionable because it is a
statement of opinion and, as discussed above, the SAC does not
allege subjective falsity.  A statement that a source of
financing is "reliable" involves an evaluation of the likelihood

of events that is "not objectively determinable," and that is a matter of "opinions or beliefs held." Fait, 655 F.3d at 109, 111. Moreover, the full statement in context is not misleading. This context includes an unambiguous statement, in bold and italics, that "Current levels of market volatility are unprecedented." It also includes a statement that "If current levels of market disruption and volatility continue or worsen . . . there can be no assurance [that] funding sources would be available or sufficient." These representations, "taken together and in context," would not have "misled a reasonable investor about the nature of the investment." I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir. 1991) (citation omitted).

III.  Reclassification of Assets

The January Opinion wrongly concluded that GE's alleged reclassification of assets in violation of GAAP gave rise to material misrepresentations in the Offering Documents. The SAC plausibly alleges that GE violated GAAP and that as a result of these violations, the Offering Documents misstate the value of GE Capital's assets. Although the SAC successfully makes out a claim that GE's valuation was inflated,[2] nowhere does it make a

---

[2] Defendants claim that the valuation of GE's assets was an inactionable opinion pursuant to Fait. Fait held that estimates of subjective values, such as goodwill, are matters of opinion. Fait, 655 F.3d at 110-11. Here, however, the SAC claims not

plausible allegation as to how much this valuation was inflated
and that this amount was material.

The SAC appears to rest its claim of materiality on two
bases: 1) GE's disclosure on March 5, 2009 that 98% of GE's
assets were held at inflated historical values, and 2) Immelt's
June 25, 2009 statements on the Charlie Rose show that "maybe"
GE capital was not worth its peak valuation of roughly $200
billion prior the financial crisis and "I don't know" if it was
worth $150 billion.  Immelt's speculation almost nine months
after the Offering Documents were filed is clearly insufficient
to support a claim of materiality.  In any event, neither of
these two bases is sufficiently tethered to the restated assets

---

that GE estimated the value of its assets incorrectly, but that
its valuation must be false because the company engaged in
improper accounting practices.  Thus, the truth or falsity of
this statement is not a matter of opinion, it is an objective
fact and plaintiffs need not plead subjective falsity.
　　Defendants further argue that because the accounting
prescriptions in GAAP themselves hinge on intent, any claim
based on alleged GAAP violations necessarily sounds in fraud.
Specifically, GAAP requirements as to the proper classification
of an asset depend on whether a company has the intent and
ability to hold the asset for the foreseeable future or until
maturity.  See Financial Accounting Standards Board, Statement
of Financial Accounting Standards No. 115, at ¶ 7; id. No. 65,
at ¶ 6.  Defendants argue that because Lead Plaintiff disclaims
all allegations of fraud, its reclassification of assets claim
must be dismissed.  Defendants are mistaken.  Even if the
classification of an asset is inextricably intertwined with
issues of intent, the defendants do not dispute that GAAP
required a reclassified asset to be marked to market.  It is the
alleged failure to comply with this GAAP requirement which
underlies the SAC's allegation of falsity.  Such an allegation
concerns historical facts and not a party's intent.

claim to suggest that the alleged misstatement is material.

The SAC's confidential witnesses discuss GAAP violations only within certain departments in GE and only in relation to certain types of assets -- specifically, "bad real estate deals" within GE Capital's Real Estate Group, and commercial real estate debt originating in the United States and equity transactions originating in Asia within GE Capital's Commercial Finance department.[3]  In sum, the SAC alleges only that GE failed to adjust the carrying value of some amount of its assets upon transferring them from "available to sale" to "held to maturity" positions.  Without more of a description in the SAC of the significance of these assets to GE's balance sheet, there is not "a substantial likelihood that a reasonable shareholder" would have considered this allegation "important in deciding how to act."  ECA, 553 F.3d at 197.

IV.  The Exchange Act

To state a cause of action under Section 10(b) and Rule 10b-5 of the Exchange Act, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a

---

[3] According to GE Capital's Forms 10-K from 2007 and 2008, GE's commercial mortgage-backed securities and Asian equity positions together constituted roughly 1.5% of GE Capital's assets.  At the time, GE Capital constituted roughly 50% of GE's revenues and 80% of its assets.  Any overstatement of these assets would necessarily involve substantially less than 1.5% of GE's total assets.

material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." ECA, 553 F.3d at 197 (citation omitted).  Pleading standards beyond those required by Rule 12(b)(6), Fed. R. Civ. P., apply to plaintiff's Exchange Act claims.  "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud," or, in the alternative, recklessness.  ECA, 553 F.3d at 198 (citation omitted); see also South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108-10 (2d Cir. 2009) (summarizing Second Circuit law on the element of scienter in securities fraud claims).  Section 10(b) claims therefore sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), by "stating with particularity the circumstances constituting fraud." ECA, 553 F.3d at 196.

Under Federal Rule of Civil Procedure 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).

"Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally" under Fed. R. Civ. P.
9(b), but the PSLRA requires that a plaintiff plead "with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind," that is, with
intent to deceive, manipulate or defraud.  15 U.S.C. § 78u-
4(b)(2); ECA, 553 F.3d at 198.  The "strong inference" of
scienter may be established by alleging either that defendants
had both motive and opportunity to commit fraud, or that strong
circumstantial evidence of conscious misbehavior or recklessness
exists.  ECA, 553 F.3d at 198.

In evaluating whether a plaintiff has pled facts giving
rise to a strong inference of scienter, a court considers "all
of the facts alleged, taken collectively," Tellabs, Inc. v.
Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007), but must
also "'take into account plausible opposing inferences.'"  ATSI
Commc'ns, Inc. v. Shaar Fun, Ltd., 493 F.3d 87, 99 (2d Cir.
2007) (citation omitted).  The inference of scienter must be "at
least as compelling as any opposing inference of nonfraudulent
intent."  ECA, 553 F.3d at 198 (citation omitted).

The Second Circuit has identified four types of allegations
that may be sufficient to allege scienter.  In addition to
allegations that the defendants "(1) benefited in a concrete and
personal way from the purported fraud," or "(2) engaged in
deliberately illegal behavior," they include allegations that

29

defendants "(3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." ECA, 553 F.3d at 199 (citation omitted).

If plaintiffs rely on allegations that the defendants had access to facts contradicting their public statements, plaintiffs must "specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008) (citation omitted) ("Teamsters"). A plaintiff may also rely on confidential sources to satisfy the pleading requirements of the PSLRA and Rule 9(b). Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). In such a situation, the confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Id.

V.  Statements by Sherin

For the reasons articulated in the January Opinion, plaintiffs have stated plausible Exchange Act claims against GE and Sherin based on Sherin's statements about the quality of GE's loan portfolio. Defendants argue that these claims should be dismissed pursuant to Fait because Lead Plaintiff does not plead that Sherin's statements were subjectively false. Lead

Plaintiff does not contest that the holding in <u>Fait</u>, which addressed claims brought pursuant to the 1933 Act, also applies to claims brought pursuant to the 1934 Act.  <u>See</u> <u>Fait</u>, 655 F.3d at 111-12.  Instead, Lead Plaintiff argues that Sherin's statements constituted facts, not opinions, and that in any case the SAC adequately pled that these statements were subjectively false.

Although Sherin's characterizations of GE Capital's portfolio as "fantastic," "great" "robust," "strong," and "very high quality" are prototypical opinion statements, the SAC adequately pleads subjective falsity through, <u>inter alia</u>, its claims as to Sherin's scienter.  If there were any technical failure to adequately plead subjective falsity, Lead Plaintiff would be permitted to replead.

Defendants further argue that the SAC does not adequately plead that Sherin acted with scienter because it fails to identify the reports or statements to which Sherin had access and that contained information contradicting his statements. The Second Circuit requires that such reports or statements be identified in cases where, as here, a plaintiff alleges fraudulent intent based on access to contrary information. <u>Teamsters</u>, 531 F.3d at 196.

As the January Opinion concluded, the SAC adequately pleads that Sherin acted with scienter.  The SAC has described a

plethora of reports which tracked on a regular and detailed
basis the quality of the assets to which Sherin's remarks were
directed.  It is highly implausible that GE's CFO would be
ignorant of basic facts contained in these reports about the
quality of roughly one-third of GE Capital's assets.


CONCLUSION

Defendants' January 26, 2012 joint motion for
reconsideration and judgment on the pleadings regarding the 1933
Act claims is granted.  Sherin and GE's January 26, 2012 joint
motion for reconsideration and judgment on the pleadings
regarding the 1934 Act claims is denied.  This ruling disposes
of all remaining claims against forty-two defendants.  The Clerk
of Court shall remove the following defendants from the case:
Goldman, Sachs & Co., Banc of America Securities LLC, Citigroup
Global Markets Inc., Deutsche Bank Securities Inc., J.P. Morgan
Securities Inc., Morgan Stanley & Co. Incorporated, Barclays
Capital Inc., Credit Suisse Securities (USA) LLC, UBS Securities
LLC, ABN AMRO Incorporated, Banca IMI S.p.A., BNP Paribas
Securities Corp., Daiwa Securities America Inc., HSBC Securities
(USA) Inc., ING Financial Markets LLC, Lloyds TSB Bank Plc,
Merrill Lynch, Pierce Fenner & Smith Incorporated, Mitsubishi
UFJ Securities International plc, Mizuho Securities USA Inc.,
Santander Investment Securities Inc., SG Americas Securities,

LLC, Blaylock Robert Van, LLC, CastleOak Securities, L.P., Samuel A. Ramirez & Company, Inc., Utendahl Capital Group, L.L.C., The Williams Capital Group, L.P., James I. Cash, Jr., William M. Castell, Ann M. Fudge, Claudio X. Gonzalez, Andrea Jung, Alan G. Lafley, Robert W. Lane, Ralph S. Larsen, Rochelle B. Lazarus, Sam Nunn, Roger S. Penske, Robert J. Swieringa, Robert C. Wright, Douglas A. Warner, III, Susan Hockfield, and James J. Mulva.

SO ORDERED:

Dated: New York, New York
       April 18, 2012

                              DENISE COTE
                              United States District Judge