**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | **Civ. No. 09-CIV-1951 (DLC)** |
| | ) | |
| **In re General Electric Co. Sec. Litig.** | ) | **ECF CASE** |
| | ) | |
| | ) | <u>ORAL ARGUMENT REQUESTED</u> |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**FOR JUDGMENT ON THE PLEADINGS**

WEIL, GOTSHAL & MANGES LLP

Greg A. Danilow
Paul I. Dutka
Christopher L. Garcia
Ashish D. Gandhi
Caroline Hickey Zalka
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for General Electric Company,*
*Jeffrey Immelt, and Keith Sherin*

## TABLE OF CONTENTS

**PAGE(S)**

PRELIMINARY STATEMENT ...........................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS ........................................................................4

ARGUMENT ..................................................................................................................8

**I.**   **THE SAC DOES NOT ALLEGE THAT GE'S JANUARY 23, 2009
       DISCLOSURES WERE CORRECTIVE** ...........................................................9

    **A.**   The SAC Alleges That GE's Disclosures Concealed, Not Revealed, the
             Truth on January 23, 2009 ...................................................................10

    **B.**   The SAC Does Not Allege a Specific January 23, 2009 Disclosure That
             "Corrected" a Specific Alleged Misstatement .......................................14

**II.**  **THE SAC DOES NOT ALLEGE THAT A PREVIOUSLY CONCEALED RISK
       MATERIALIZED ON JANUARY 23, 2009** ..................................................16

**III.** **INDEPENDENTLY, THE SAC'S FAILURE TO DISTINGUISH
       INACTIONABLE LOSSES ON JANUARY 23, 2009 REQUIRES DISMISSAL
       OF THE SAC** ............................................................................................20

CONCLUSION ...............................................................................................................23

US_ACTIVE:\44181514\8\47890.0203

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Alaska Laborer Employers Retirement Fund v. Scholastic Corp.*,
   2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010)........................................................15

*Amorosa v. AOL Time Warner Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ...................................................................................9

*Bank of New York v. First Millennium, Inc.*,
   607 F.3d 905 (2d Cir. 2010)..........................................................................................1

*Bell Atlantic Corporation v. Twombly*,
   550 U.S. 544 (2007).......................................................................................................9

*Davidoff v. Farina*,
   2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ............................................................13

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................................8-9

*Guan N. v. NYC Dept. of Education*,
   2013 WL 67604 (S.D.N.Y. Jan. 7, 2013) ...................................................................23

*In re AOL Time Warner, Inc. Securities Litigation*,
   503 F. Supp. 2d 666 (S.D.N.Y. 2007)........................................................................21

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   574 F.3d 29 (2d Cir. 2009)..........................................................................................13

*In re General Electric Co. Securities Litigation*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012).............................................................. 2, 22-23

*In re Initial Public Offering Securities Litigation*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005)........................................................................16

*In re Initial Public Offering Securities Litigation*,
   399 F. Supp. 2d 298 (S.D.N.Y. 2005)........................................................................22

*In re Lynch*,
   430 F.3d 600 (2d Cir. 2005)........................................................................................23

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
   568 F. Supp. 2d 349 (S.D.N.Y. 2008)........................................................................20

*In re Omnicom Group, Inc. Securities Litigation*,
   597 F.3d 501 (2d Cir. 2010)........................................................................................14

ii

*In re Refco Securities Litigation,*
   2012 WL 607612 (S.D.N.Y. Feb. 17, 2012)..........................................................8

*In re Security Capital Assurance Ltd. Securities Litigation,*
   2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)......................................................12

*Janbay v. Canadian Solar, Inc.,*
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...............................................14, 16

*Joffee v. Lehman Brothers, Inc.,*
   209 F. App'x 80 (2d Cir. 2006) ........................................................................20

*Kemp v. Universal American Financial Corp.,*
   2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .........................................................13

*Lattanzio v. Deloitte & Touche LLP,*
   476 F.3d 147 (2d Cir. 2007)........................................................................19, 21

*Lentell v. Merrill Lynch & Co. Inc.,*
   396 F.3d 161 (2d Cir. 2005).................................................................... *passim*

*Madu, Edozie & Madu, P.C. v. SocketWorks Limited Nigeria,*
   265 F.R.D. 106 (S.D.N.Y. 2010) ........................................................................8

*Murphy v. First Reliance Standard Life Insurance Company,*
   2010 WL 2243356 (E.D.N.Y. June 1, 2010) .......................................................8

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Financial
   Holdings Limited,*
   __ F. Supp. 2d __, 2012 WL 3283481 (S.D.N.Y. Aug. 13, 2012) .......................15

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.,*
   __ F. Supp. 2d __, 2012 WL 4714799 (S.D.N.Y. Sept. 27, 2012) ...................12, 15

*Pyatt v. Raymond,*
   462 F. App'x 22 (2d Cir. 2012) ..........................................................................8

*Solow v. Citigroup, Inc.,*
   2012 WL 1813277 (S.D.N.Y. May 18, 2012), *aff'd,*
   2013 WL 149902 (2d Cir. Jan. 15, 2013) ..........................................................15

*Solow v. Citigroup, Inc.,*
   2013 WL 149902 (2d Cir. Jan. 15, 2013) ......................................................15, 20

*Stratte-McClure v. Morgan Stanley,*
   784 F. Supp. 2d 373 (S.D.N.Y. 2011)................................................................14

iii

*Williams v. Time Warner Inc.*,
440 F. App'x 7 (2d Cir. 2011) ...........................................................................8

## STATUTES / RULES

Fed. R. Civ. P. 12(b)(6).........................................................................................1

Fed. R. Civ. P. 12(c) ..................................................................................1, 3, 23

Private Securities Litigation Reform Act of 1995,
15 U.S.C. § 78u-4 ...........................................................................................8

Securities Exchange Act of 1934,
15 U.S.C. § 78a ...............................................................................................2

US_ACTIVE:\44184315\1\47890.0203

Defendants General Electric Company ("GE"), Jeffrey Immelt, and Keith Sherin (collectively, "Defendants") respectfully submit this memorandum of law in support of their Motion for Judgment on the Pleadings and dismissal with prejudice of the Second Consolidated Class Action Complaint (the "SAC") under Federal Rule of Civil Procedure 12(c) (the "Motion").[1]

## PRELIMINARY STATEMENT

The SAC alleges that, beginning in the fall of 2008, GE engaged in a scheme to defraud investors and conceal material facts about its financial condition until the "truth" was finally "revealed" to investors in February and March 2009. But given Plaintiff's recent admission that it cannot establish loss causation for the alleged February and March 2009 corrective disclosures, the SAC is reduced to claiming loss causation for one, and only one, set of disclosures—on January 23, 2009. The SAC's allegations regarding GE's January 23 disclosures do not plead loss causation as a matter of law.

Of the 25 paragraphs that the SAC devotes to GE's January 23 disclosures, 23 paragraphs (SAC ¶¶ 9, 232-52, 411) allege instead that those disclosures contained over 60 false and misleading statements that artificially inflated GE's stock price. *See* SAC ¶¶ 246, 252. Then, completely contradicting itself, in the remaining two paragraphs (SAC ¶¶ 425, 429), the SAC claims, without trying to explain how, that these same January 23 disclosures "eliminat[ed] the inflation in the price" of GE securities, and that this decline in value "caused Lead Plaintiff and the Class economic harm." SAC ¶ 429. But—fatal to any pleading of loss causation—Plaintiff fails to (a) connect the decline in value to the correction of any prior misrepresentation or the

---

[1] Because Defendants have answered, Defendants move under Federal Rule of Civil Procedure 12(c). "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

materialization of a previously concealed risk, and (b) separate the decline in value from the decline caused by non-fraud factors.

*First*, the SAC does not plead a single corrective disclosure on January 23, 2009. Instead, the SAC devotes ten pages to alleging that on January 23, GE affirmatively concealed the truth about the four remaining claims in this case by issuing scores of false and misleading statements about GE's liquidity and funding, ability to maintain a quarterly dividend of $.31 per share in 2009, the quality of GE Capital's loan portfolios, and GE's GAAP accounting and asset values.[2] Simply put, the SAC alleges that on January 23, GE lied, repeatedly and extensively, about the subject matter of each remaining claim in this case. Critically, the SAC does not allege what purported falsehoods GE corrected on January 23, or how the January 23 disclosures revealed the truth about those never-identified falsehoods. Indeed, the SAC pleads that the "truth" regarding the alleged January 23 misstatements was not revealed until weeks and months later. For example, the SAC alleges that the falsity of GE's January 23 reassurances about the strength of its liquidity position and its ability to pay its 2009 dividend was revealed by a "surprise" February 27 dividend cut announcement that "shocked the market," not by anything GE disclosed on January 23. SAC at 116; ¶¶ 279-82a. Similarly, the SAC alleges that the falsity of GE's statements about the quality of GE Capital's loan portfolios was revealed in an investor

---

[2] After Judge Holwell's January 12, 2012 Opinion and Order, only four claims under the Securities Exchange Act of 1934 (the "1934 Act") remain in this litigation. (1) The "CP Claim," alleging that GE's September and October 2008 statements about its commercial paper program and liquidity position were false and misleading. SAC ¶¶ 171a, 171b, 181(c), 183a, 183b, 187a, 193a, 193d, 196e, 200b, 232-33, 235, 240, 243, 247-49. (2) The "Dividend Claim," alleging that GE and its corporate officers misled investors when they stated their opinions about GE's ability to maintain its dividend in 2009. SAC ¶¶ 166, 169, 174, 181(i), 184-85, 190, 192, 201, 207-08, 214, 220-21, 225-26, 232, 234, 240, 243, 245, 247-49. (3) The "Portfolio Claim," alleging that GE withheld information about GE Capital's subprime and non-investment-grade assets, rendering its statements about the strength of GE Capital's portfolios false and misleading. SAC ¶¶ 171-72, 181(b), (e), (h), 186-87, 224, 235-40. (4) The "GAAP Claim," alleging that GE violated GAAP by improperly shifting assets from short-term to long-term GAAP asset classes to avoid taking write-downs on the value of the assets. SAC ¶¶ 162(e), 181(g), 239, 358-64. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012) ("*GE I*").

meeting on March 19 in which GE "finally" revealed the credit composition of GE Capital's loan portfolios, not by anything GE disclosed on January 23. SAC at 121, ¶ 297. *See infra* Point I.

*Second*, the SAC fails to allege the alternative formulation of loss causation: that a foreseeable risk materialized on January 23 that was within the zone of risk concealed by an earlier alleged misrepresentation. In any event, Plaintiff could never sustain a claim based on materialization of the risk for the January 23 disclosures because any risks that could be said to have materialized on January 23 were repeatedly disclosed by GE, starting on the very first day of the Class Period.[3] Because "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), Plaintiff cannot base loss causation on a materialized-risk theory. *See infra* Point II.

*Third*, the SAC fails to allege loss causation for the independent reason that a plaintiff must plead a basis to plausibly separate the losses purportedly caused by the revelation of the fraud from the losses caused by non-fraud factors. But Plaintiff does not attempt to do so in the SAC. Instead, Plaintiff ascribes the entire decline in GE's stock price on January 23 to just the statements referenced in paragraph 425, entirely ignoring the myriad other disclosures on January 23 that have nothing to do with the fraud alleged in the SAC, *e.g.*, earnings declines and adverse prospects in GE's Industrial and other businesses, and the overall market decline caused by the financial crisis. *See infra* Point III.

For these reasons, and those set forth below, the SAC should be dismissed under Federal Rule of Civil Procedure 12(c) with prejudice.

---

[3] In this memorandum, "Class Period" refers to the newly shortened Class Period of September 25, 2008 – January 23, 2009. *See* H'rg Tr. 11:5-15, 14:15-15:2, Jan. 11, 2013.

US_ACTIVE:\44181514\8\47890.0203

## SUMMARY OF RELEVANT ALLEGATIONS

On January 23, 2009, before the market opened, GE reported its fourth quarter 2008 results in a press release. SAC ¶¶ 232-33. That same day, GE CEO Jeffrey Immelt appeared for an interview on CNBC. SAC ¶¶ 247-49. GE also made a website posting and held an investor earnings call. SAC ¶¶ 232-46.

In the SAC, Plaintiff devotes 23 paragraphs and 10 pages to a lengthy discussion of how those January 23 disclosures contained more than 60 different statements that misled the market about GE's liquidity and funding, ability to maintain its quarterly dividend at $.31 per share, the quality of GE Capital's loan portfolios, and the value of GE's assets.[4]

*Liquidity/Funding*. The SAC alleges that Mr. Immelt's January 23 statements that "we have significantly strengthened our liquidity position" (SAC ¶ 232), GE "ended the year with $48 billion total in cash, after paying down our commercial paper balance to $72 billion from $88 billion at the third quarter" (SAC ¶ 232), there was "lots of cash on the GE Capital balance sheet" (SAC ¶ 235), "we hit or beat every cash and liquidity commitment since the crisis began" (SAC ¶ 240), and "[f]rom a capital liquidity cash flow standpoint, I think we're in great shape" (SAC ¶ 240), among other statements, were false and misleading.

The SAC also attempts to plead how each of these statements purportedly was "false and misleading," alleging that GE concealed the truth about its liquidity and funding on January 23 by failing to disclose the information "set forth in ¶ 181" (SAC ¶ 246), including that the commercial paper markets were "frozen," "GE was having difficulty selling commercial paper in the private market," and "the fall-off in substantial portions of GE Capital's lending and/or

---

[4] For the Court's convenience, all paragraphs of the SAC that concern GE's disclosures on January 23, 2009 are excerpted and attached as Exhibit 1 to the Declaration of Greg A. Danilow, dated January 25, 2013 ("Danilow Decl.").

US_ACTIVE:\44181514\8\47890.0203

commercial real estate businesses and the freezing of the commercial paper markets gravely threatened the Company's ability to continue to generate revenues and cash" (SAC ¶ 181(c)). The SAC alleges that the loss-causing "truth" about GE's liquidity was not revealed until the risks concealed by the alleged misstatements materialized on February 27, 2009, when GE announced that it would reduce the quarterly dividend for the second half of 2009. *See* SAC ¶¶ 282a, 424.

*Dividend*. The SAC alleges that Mr. Immelt's January 23 statements that "we've got the cash, and we've got the operating model that's going to secure the dividend in this environment" (SAC ¶ 248), "we are committed to our plan for $1.24 per share [dividend] for the year" (SAC ¶ 232), "supporting the dividend and doing it without straining, doing it just by controlling our own destiny and by executing with excellence that is the best use of capital and capital allocation" (SAC ¶ 245), and "our priorities for 2009 are . . . [to] maintain the GE dividend" (SAC ¶ 240), among other statements, were false and misleading.

The SAC also attempts to plead how each of these statements purportedly was "false and misleading," alleging that GE concealed the truth about the dividend on January 23 by failing to disclose the information "set forth in ¶ 181" (SAC ¶ 246), including that "GE Capital was in dire financial straits in terms of not generating new business and revenues and therefore could not be a source of cash to fund the quarterly dividend" (SAC ¶ 181(i)). The SAC alleges that the "truth" about the dividend was not revealed until February 27, 2009 when GE "shocked" the market by announcing that it would reduce its quarterly dividend to $.10 per share. SAC ¶¶ 424, 426.

*GE Capital's Loan Portfolio Quality*. The SAC alleges that GE CFO Keith Sherin's statements that "I think the portfolio is in pretty good shape" (SAC ¶ 239), "[w]e've done a lot of strengthening in this portfolio" (SAC ¶ 238), "[w]e've increased loss reserves and I feel very

5

confident that we fully reflected what we expect in this environment" (SAC ¶ 239), "our senior secured [lending] positions are so important" (SAC ¶ 237), and "we think we have dramatically risk reduced financial services" (SAC ¶ 235), among other statements, were false and misleading.

The SAC also attempts to plead how each of these statements purportedly was "false and misleading," alleging that GE concealed the truth about GE Capital's loan portfolios by failing to disclose the information "set forth in ¶ 181" (SAC ¶ 246), including that "GE Capital was engaging in undisclosed lending practices to low-credit-quality borrowers that carried a substantially higher than disclosed risk profile" (SAC ¶ 181(h)), and "substantially engaging in high-risk consumer and commercial lending" (SAC ¶ 181(e)), that GE Capital was in "poor health" (SAC ¶ 181(f)), and that there had been a "substantial curtailment of business and revenue generation at GE Capital as of September 25, 2008" (SAC ¶ 181(h)). The SAC alleges that the "truth" about GE Capital's loan portfolios was "finally" revealed when GE announced on March 19, 2009 that (i) "under the Federal Reserve's stress testing, the 2009 profit estimate for GE Capital decreased by more than half . . . under the 'base' scenario, and that GE Capital would not make any profit under the 'adverse' scenario," (ii) "large amounts of GE Capital's loans were to subprime and 'junk' grade borrowers," and (iii) GE Capital "needed to increase loan loss reserves." SAC ¶¶ 13, 424, 428.

*Asset Values/GAAP Asset Classification*. The SAC alleges that Mr. Sherin's statements that "we have the ability to hold [GE Capital's real estate assets] for the long term. The assets from an accounting perspective are carried at historical costs. We test them for impairment under FAS 144 for long live assets, its reviewed every single quarter, but they are not mark to market,"

6

"[w]e originated these properties to hold them," and "[w]e'll hold these properties for five years or more," among other statements, were false and misleading. SAC ¶ 239.

Here too, the SAC attempts to plead why each of these statements purportedly was "false and misleading," alleging that GE concealed the truth about its inflated asset values on January 23 by failing to disclose the information "set forth in ¶ 181" (SAC ¶ 246), including that GE was "actively attempting to hide losses . . . [and] taking affirmative steps to 'hide assets until the market turned around' by making 'a switch on the balance sheet' using [asset] reclassifications," "concealed from investors the fact that its financial position was, in reality, substantially worse than reported" (SAC ¶ 181(g)), and "fail[ed] to record adequate loan loss reserves and impairments as required by GAAP" (SAC ¶ 246(a)). Although not alleged in the SAC, Plaintiff previously asserted that the truth of these alleged misstatements was revealed on February 27 and March 19, 2009 because the "overstated values of GE Capital's assets" were "connected" to the disclosures on those dates about GE's dividend reduction and GE Capital's 2009 earnings projection. *See* Reply Mem. in Supp. of Lead Pl.'s Mot. for Leave to File an Am. Compl. [ECF No. 164] ("Pl.'s MTA Reply") at 10 (citing SAC ¶¶ 426, 428).

Entirely ignoring the SAC's litany of allegations concerning how GE concealed the truth from the market on January 23, Plaintiff then summarizes three of GE's January 23 disclosures—that are each alleged to be false and misleading in the preceding paragraphs of the SAC—and alleges in paragraph 425 under the heading "Loss Causation/Economic Loss" that:

> On January 23, 2009, before the market open, GE released its fourth quarter 2008 and full year 2008 earnings results, reporting that its fourth quarter profits dropped by 46% and that GE Capital's quarterly profits dropped by a third. During GE's fourth quarter 2008 earnings call held that same day, CFO Sherin stated that "[o]verall, we expect both the commercial and the consumer delinquencies to get worse in 2009." CEO Immelt further announced that the forecast for credit losses at GE Capital was increased from $9 billion to $10 billion. On this news, GE's stock price fell by $1.45, dropping from $13.48 per

7

share on January 22, 2009 to $12.03 per share on January 23, 2009, a decline of 10.75%.

And in paragraph 429 the SAC alleges that:

> Based on the [January 23, February 27, March 2, and March 19, 2009 disclosures], the price of GE's common stock declined, eliminating the inflation in the price of those securities. That decline in value caused Lead Plaintiff and the Class economic harm.[5]

## ARGUMENT

In 2005, the Supreme Court clarified the standard for pleading loss causation in securities fraud cases. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-47 (2005). As the *Dura* Court explained, private rights of action under the federal securities laws exist "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345. In its decision, the Supreme Court made clear that the loss causation limitation applied with full force at the pleading stage because Congress, through the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(4), intended "to permit private securities fraud actions for recovery where, but only where, plaintiffs

---

[5] Plaintiff tried to amend paragraph 425 to add allegations concerning third parties' disclosures on January 23 and to assert additional theories about what those disclosures purportedly revealed about the truth. This Court rejected that attempt outright and Plaintiff cannot oppose this Motion by doing exactly what the Court has forbidden: supplementing its deficient pleading with assertions about what analysts said or what news articles revealed on January 23. On this Motion, the adequacy of Plaintiff's loss causation pleading must be determined on the four corners of the SAC. *See Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (affirming dismissal; rejecting plaintiff's argument "that the district court erred by failing to consider documentary materials that were not included in her original complaint"); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122-23 (S.D.N.Y. 2010) ("Courts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss."). Moreover, Plaintiff cannot submit or rely on an expert's affidavit in opposing this Motion (such as the declarations cited in support of its most recent unsuccessful motion for leave to amend). Expert affidavits have no place in motions addressed to the sufficiency of the pleadings. *See Pyatt v. Raymond*, 462 F. App'x 22, 24 (2d Cir. 2012) (affirming dismissal when trial court refused to consider plaintiffs' "expert reports [that] . . . were not attached to or integrated into the complaint, or incorporated therein"); *In re Refco Sec. Litig.*, 2012 WL 607612, at *3 (S.D.N.Y. Feb. 17, 2012) (rejecting plaintiffs' attempt to "present[] something entirely outside the complaint—in this case, an expert's affidavit—on a motion addressed to the pleadings"); *Murphy v. First Reliance Standard Life Ins. Co.*, 2010 WL 2243356, at *4 (E.D.N.Y. June 1, 2010) ("[A]n affidavit of an expert in the area of economics [is] . . . clearly an impermissible document for the Court to consider in ruling on a motion under Rule 12(b)(6)."). Any attempt by Plaintiff to defend the SAC with an affidavit from Mr. Torchio would be an end run of the Court's directive that Plaintiff cannot supplement or add to the SAC.

8

adequately *allege* and prove the traditional elements of causation and loss." *Id.* at 346 (emphasis added). Accordingly, the Supreme Court held that merely alleging the payment of an inflated purchase price, followed by the release of negative information about the company and a drop in its stock price, fails to adequately plead loss causation in a securities fraud complaint. *Id.* at 347.

In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court reaffirmed that *Dura* requires that "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with 'a largely groundless claim'" be allowed to proceed. *Id.* at 557-58 (quoting *Dura*, 544 U.S. at 347). The Supreme Court also instructed that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (quotations omitted; alteration in original).

In the Second Circuit, a plaintiff must allege facts plausibly showing "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (citations and quotations omitted; emphasis in original). A plaintiff must plausibly plead either (i) a corrective disclosure that "reveal[s] to the market the falsity of the prior" misrepresentation or (ii) the materialization of a risk previously concealed by an alleged misrepresentation. *Id.* at 175 & n.4; *see also Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011). The SAC does not come remotely close to alleging either loss-causation formulation for GE's January 23 disclosures.

## I.    THE SAC DOES NOT ALLEGE THAT GE'S JANUARY 23, 2009 DISCLOSURES WERE CORRECTIVE

To plead loss causation based on a corrective disclosure, a plaintiff must plead (i) a specific corrective disclosure, (ii) facts demonstrating how that corrective disclosure revealed the

US_ACTIVE:\44181514\8\47890.0203

truth of the allegedly false statement to the market, and (iii) a decline in the company's stock price following the corrective disclosure. *See Lentell*, 396 F.3d at 174-75 & n.4. But here the SAC never alleges how the January 23 disclosures revealed any previously hidden facts and actually alleges the opposite, that GE continued to conceal the truth of its alleged misrepresentations on January 23, 2009.

A.    **The SAC Alleges That GE's Disclosures Concealed, Not Revealed, the Truth on January 23, 2009**

The SAC alleges that GE concealed the truth about the subject matter of each remaining claim on January 23 by issuing more than 60 false and misleading statements concerning, among other subjects, GE's liquidity, plan and ability to maintain a quarterly dividend of $.31 per share, the quality of GE Capital's loan portfolios, and the value of GE's assets. The words and music of the SAC are clear: GE continued to lie on January 23, and it did not reveal the truth of any prior misrepresentations until much later.

*GE allegedly lied about its liquidity on January 23, 2009.* The SAC alleges that GE's January 23 reassurances and positive descriptions about the strength of GE's liquidity position were false and misleading because the commercial paper market was "frozen" during the Class Period and GE was having trouble issuing commercial paper. SAC ¶¶ 181(c), 246, 252. The SAC alleges that the supposedly concealed liquidity risk materialized on February 27, 2009, when GE announced the dividend reduction; according to the SAC, "GE's dividend . . . was cut to address cash flow and liquidity concerns." SAC ¶ 282a. Nothing in the SAC suggests that the falsity of a liquidity-related misstatement was revealed on January 23.

*GE allegedly lied about its shareholder dividend on January 23, 2009.* The SAC alleges that GE's January 23 disclosures concealed the purported truth that GE did not plan, and would not be able, to maintain its 2009 quarterly shareholder dividend at $.31 per share. SAC ¶¶ 181(i),

10

246, 252. The SAC alleges that the *falsity* of GE's January 23 reassurances about the dividend was revealed by the "surprise" February 27, 2009 announcement of GE's decision to reduce the dividend that "shocked the market," but not by anything that GE disclosed on January 23. SAC at 116, ¶¶ 279, 426. Indeed, Plaintiff describes the crux of the Dividend Claim by alleging that the "truth" of Mr. Immelt's January 23 reassurances about the dividend—including Mr. Immelt's January 23 statement that he wished he could "end all the speculation [about the dividend]"— was revealed when "GE slashed the Board Approved $1.24 per share dividend from $.31 per share per quarter to $.10 per share per quarter on February 27, 2009." Lead Pl.'s Opp'n to Defs.' Mot. to Dismiss [ECF No. 98] ("Pl.'s Opp'n to GE MTD"), at 4; *see also* SAC ¶ 9. No reading of the allegations in the SAC can support the claim that anything said about the dividend on January 23 was a loss-causing corrective disclosure.

*GE allegedly lied about GE Capital's loan portfolios on January 23, 2009.* The SAC alleges that GE's statements about GE Capital's loan portfolios on January 23 were false and misleading because GE concealed, among other things, the extent of GE Capital's subprime and non-investment-grade assets. SAC ¶¶ 181(b), 181(e), 181(h), 246. The SAC alleges that the falsity of these statements was revealed when GE "finally" revealed the credit composition of GE Capital's loan portfolios on March 19, 2009, not by anything GE disclosed on January 23. SAC ¶ 428. In Plaintiff's own words, no less than the "central allegation" of the SAC is that investors were misled about the material amount of subprime and other non-investment-grade debt at GE Capital until this information was ultimately disclosed on March 19. Pl.'s Opp'n to GE MTD, at 67. The SAC fails to allege that one word of GE's January 23 disclosures revealed the truth about GE Capital's loan portfolios.

11

*GE allegedly lied about its asset valuations on January 23, 2009.* The SAC alleges that

Mr. Sherin's January 23 statements concerning GE's ability to hold real estate assets for the long

term and the impairment testing of those assets were false and misleading. This is because,

according to the SAC, GE was improperly reclassifying assets, avoiding write-downs, and failing

to record adequate reserves, thus inflating the reported value of GE assets. *See* SAC ¶¶ 239,

246(a). Plaintiff has argued (although the SAC does not allege) that the truth of these alleged

misstatements was revealed on February 27 and March 19, 2009, on the theory that the

"overstated values of GE Capital's assets" were "connected" to GE's disclosures about the

dividend reduction and GE Capital's 2009 earnings. *See* Pl.'s MTA Reply at 10 (citing SAC ¶¶

426, 428).

In sum, not one word of the SAC alleges that GE revealed the "truth" about its liquidity,

shareholder dividend, the quality of GE Capital's loan portfolios, or asset values on January 23,

2009. Instead, it merely alleges that on the news of GE's fourth quarter 2008 and full year 2008

results, GE's "stock prices fell." SAC ¶ 425. Plaintiff's claims thus fail as a matter of law. *See In*

*re Sec. Capital Assurance Ltd. Sec. Litig.*, 2011 WL 4444206, at *4-6 & n.2 (S.D.N.Y. Sept. 23,

2011) (dismissing 1934 Act claims when plaintiff did "not allege that Defendants or anyone else

explicitly revealed facts concealed by Defendants' misstatements within the relevant time

period," such facts were instead allegedly revealed "well after the close of the class period," and

"the alleged 'partial corrective disclosures'" during the class period "cannot plausibly be

interpreted as 'reveal[ing] some then-undisclosed fact with regard to the specific

misrepresentations alleged in the complaint'" (quoting *In re Omnicom Group, Inc. Sec. Litig.*,

597 F.3d 501, 511 (2d Cir. 2010))); *see also Prime Mover Capital Partners L.P. v. Elixir*

*Gaming Techs., Inc.*, __ F. Supp. 2d __, 2012 WL 4714799, at *7 (S.D.N.Y. Sept. 27, 2012)

("Because the alleged 'truth' about these misstatements never was alleged to have reached the market, they could not have caused a decline in [defendant's] stock. Plaintiffs' failure to allege corrective disclosures is fatal to their allegations concerning these alleged misstatements." (citing *Lentell*, 396 F.3d at 175)).

Plaintiff cannot save the SAC by arguing that, although the January 23 disclosures are alleged—at length—to be misrepresentations that concealed the truth, they simultaneously serve as disclosures that revealed the truth because purportedly "[i]nvestors were not convinced" by the alleged misrepresentations. SAC ¶ 250.[6] First, the SAC does not contain those allegations. Second, the Second Circuit has held that a "[p]laintiff cannot have it both ways" by alleging that a misrepresentation is simultaneously a corrective disclosure. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements, namely, that Flag was doing well compared to its competitors, and simultaneously argue that the misstatement itself constituted a corrective disclosure, that is, the fact that the other companies were not doing well exposed the public to the truth about Flag's misstatements.").[7] Third, Plaintiff's bare-bones assertion, unsupported by a single pleaded fact, that the public doubted GE's disclosures is not enough to plead loss causation and cannot save the SAC from dismissal. *See Davidoff v. Farina*, 2005 WL 2030501, at *16 (S.D.N.Y. Aug. 22, 2005) (dismissing 1934 Act claims because "speculation that the

---

[6] For example, the SAC alleges that the purported correction referenced in paragraph 425—Mr. Sherin's January 23 statement that "[o]verall, we expect both the commercial and the consumer delinquencies to get worse in 2009"— was itself false and misleading. *Compare* SAC ¶¶ 238, 246 (alleging that statement from Mr. Sherin that "[o]verall, we expect both the commercial and the consumer delinquencies to get worse in 2009, but we're well reserved for this" was "false and misleading for the reasons set forth in ¶ 181"), *with* SAC ¶ 425 (referencing the same statement under heading "Loss Causation/Economic Loss").

[7] *See also Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *15 (S.D.N.Y. Jan. 10, 2007) (dismissing 1934 Act claims, holding that complaint does not adequately allege loss causation when "truth" merely "reiterates what Plaintiffs allege Defendants previously lied about").

13

public disbelieved [a] denial and therefore discounted the stock price is too strained an inference [of loss causation] even on a motion to dismiss" (citing *Lentell*, 396 F.3d at 175)).

### B.    The SAC Does Not Allege a Specific January 23, 2009 Disclosure That "Corrected" a Specific Alleged Misstatement

The SAC also fails to plead loss causation because under Second Circuit law, a corrective disclosure must identify which specific prior misrepresentation or omission it corrects. *Omnicom*, 597 F.3d at 511 (holding that to qualify as corrective, a disclosure must reveal "some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint") (citation omitted). The January 23 disclosures are not alleged to correct anything, much less a specific alleged misstatement. And the placement of three January 23 disclosures—that the SAC alleges are false and misleading—under the heading "loss causation/economic loss" in the SAC does not substitute for the requisite well-pleaded facts necessary to plausibly allege a corrective disclosure. *See* SAC at 169.

The Second Circuit and courts in this District have consistently dismissed securities fraud complaints for failing to plead facts showing that the alleged correction revealed the falsity of a specific alleged misrepresentation. *See, e.g.*, *Lentell*, 396 F.3d at 175 (plaintiffs failed to plead loss causation when they did "not allege that the subject of [defendant's allegedly] false recommendations . . . or any corrective disclosure regarding the falsity of those recommendations, is the cause of the *decline* in stock value that plaintiffs claim as their loss," or that defendants "concealed or misstated any risks" that caused plaintiffs' loss) (emphasis in original); *Janbay v. Can. Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (dismissing claims when "[n]either [allegedly corrective] announcement concerned improper revenue recognition, sham transactions or deficient controls, and thus did not reveal any 'relevant truth' about the purported fraud"); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d

14

373, 390-91 (S.D.N.Y. 2011) (dismissing 1934 Act claims because, *inter alia*, complaint did not contain "any facts linking the alleged misstatements the Company had made . . . to the events that caused the stock slide"); *Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*, 2010 WL 3910211, at *7 (S.D.N.Y. Sept. 30, 2010) (same, when the "press releases upon which Plaintiffs rely [as corrective disclosures] did not disclose the falsity of any prior statements or any of the alleged misconduct").[8]

Indeed, even a brief review of paragraph 425 confirms that the SAC alleges only the disclosure of bad news about GE's financial results on January 23 and then a stock price decline "on that news." Similar attempts to palm off bad news as loss-causation disclosures have been repeatedly rejected. Just last week, the Second Circuit affirmed Judge Sweet's dismissal of claims under the 1934 Act on this ground. *See Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *9 (S.D.N.Y. May 18, 2012), *aff'd*, 2013 WL 149902 (2d Cir. Jan. 15, 2013) (dismissing complaint for failure to plead loss causation because complaint did not allege that "a risk Defendants concealed came to light thereby causing the decline in stock value. Rather than relate back to Defendants' alleged misrepresentations" about Citigroup's capitalization and liquidity, the allegedly loss-causing events "relate to other negative information about the company," such as the announcements of operating losses and asset write-downs); *see also Scholastic*, 2010 WL 3910211, at *3, 7 (press releases announcing "lower than expected earnings," "challenges with" a business unit, "a net loss of $15.5 million" and "reduced . . . earnings guidance" did not establish loss causation because they "did not disclose the falsity of any prior statements or any

---

[8] *See also Prime Mover*, 2012 WL 4714799, at *7 (plaintiffs failed to plead loss causation when purported corrective disclosures "fail[ed] to show that the alleged 'truth' . . . had been revealed and caused a price decline"); *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, ___ F. Supp. 2d ___, 2012 WL 3283481, at *8 (S.D.N.Y. Aug. 13, 2012) (dismissing claims when "Plaintiff has not demonstrated a 'sufficient nexus' between" the alleged accounting violations and corrective disclosures, which would not have "put [investors] on notice that [defendant] was engaging in the type of fraudulent accounting practices that Plaintiff alleges").

of the alleged misconduct") (citing *Lentell*, 396 F.3d at 173); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (dismissing 1934 Act claims for failure to plead loss causation, noting that securities laws would be converted into an "insurance policy" if investors could sue for "downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions").

## II.   THE SAC DOES NOT ALLEGE THAT A PREVIOUSLY CONCEALED RISK MATERIALIZED ON JANUARY 23, 2009

As set forth above, the SAC fails to allege that GE's January 23, 2009 disclosures were corrective. Any attempt by Plaintiff to salvage its deficient loss causation pleading by arguing instead that GE's January 23 disclosures constituted the materialization of a previously concealed risk also fails.

First, allegations regarding a "materialization of risk" nowhere appear in the SAC. Nothing in the SAC alleges that the risk of lower earnings in Q4'08 or increased delinquencies and credit losses at GE Capital in 2009 was within the zone of risk concealed by a single alleged misrepresentation, much less any well-pleaded allegations explaining how the alleged misstatements concealed these risks. Plaintiff cannot oppose this Motion by arguing a materialization of risk theory that it has not alleged. *See Janbay*, 2012 WL 1080306, at *16 (rejecting "[a]n unalleged 'materialization of the risk' theory of loss causation" advanced in plaintiffs' opposition because the "materialization of the risk theory requires the complaint to plead that [p]laintiffs' purported 'loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" (citation omitted)).

Second, even if Plaintiff had alleged this theory, the SAC still fails. In paragraph 425, Plaintiff references just three of GE's January 23 disclosures: (i) that GE's and GE Capital's Q4'08 earnings were lower than GE's Q4'07 earnings (*i.e.*, GE's earnings had decreased by 46%

16

year over year); (ii) that GE anticipated increased delinquencies in GE Capital's commercial and consumer loan portfolios in 2009, and (iii) that GE forecasted $10 billion in credit losses in 2009. SAC ¶ 425. But GE repeatedly warned investors throughout the Class Period that GE's Q4'08 earnings would be within the earnings range ultimately reported on January 23, and that loan delinquencies, credit losses, and loan loss reserves were rising and could further rise.

With respect to earnings, in paragraph 425, Plaintiff points to GE's January 23 press release that disclosed "its fourth quarter profits dropped by 46% and that GE Capital's profits dropped by a third."[9] But the SAC does not allege that the risk of lower earnings in Q4'08 was concealed before January 23; it alleges the opposite. According to the SAC, "[f]or Q4 2008, which ended on December 31, 2008, GE had projected that it would earn between $0.36 and $0.42 per share, with a First Call consensus estimate of $0.37 per share . . . . As noted herein on January 23, 2009, . . . the Company announced earnings of $0.37 per share . . . within the Company's projections—and effectively right on the consensus estimate." SAC ¶ 411.[10]

With respect to increased losses and delinquencies at GE Capital, Plaintiff points to GE's January 23 update of its projected 2009 credit losses from $9 to $10 billion based on GE Capital's actual Q4'08 loss experience. SAC ¶ 425. But here too, GE disclosed from the very

---

[9] Plaintiff is ostensibly referring to the decline in GE's net earnings attributable to common shareowners based on a comparison of GE's Q4'08 results as compared to Q4'07 and the decline in GE Capital's net earnings attributable to common shareowners quarter-over-quarter from Q3'08 to Q4'08.

[10] Even a cursory review of GE's public disclosures cited throughout the SAC confirms that the Q4'08 earnings results announced on January 23 met the forecasted earnings guidance previously disclosed to investors. On September 25, 2008, GE announced that because "difficult conditions in the financial services markets are not likely to improve in the near future," GE had revised its earnings guidance for fiscal year 2008 to $19.5 - $21 billion, excluding potential charges. Danilow Decl., Ex. 2 (Ex. 99 to GE Form 8-K (Sept. 25, 2008)) at 1. On December 2, 2008, GE stated that it expected "to earn more than $19 billion for 2008, excluding potential charges; or more than $18 billion for 2008, including potential charges," thereby also disclosing that relative to the $14.2 billion earned during the first three quarters of 2008, GE's projected Q4'08 earnings would be more than $3.8 billion, including potential charges. Danilow Decl., Ex. 3 (Dec. 2, 2008 Press Release) at 1. In line with this guidance, on January 23, 2009, GE announced that it earned $18.1 billion in 2008, and $3.9 billion for Q4'08. *See* Danilow Decl., Ex. 4 (Jan. 23, 2009 Press Release) at 1.

US_ACTIVE:\44181514\8\47890.0203

first day of the Class Period that GE Capital could experience higher losses and delinquencies in the midst of an unprecedented and rapidly worsening credit cycle, and updated its credit loss projections accordingly:

- On September 25, 2008, Mr. Immelt warned that GE "expect[ed] to see higher losses in loss provisions and lower gains as the economy evolves."[11] Mr. Sherin similarly cautioned that "[w]e've got unprecedented financial market volatility. . . . [W]e're going to have higher delinquencies . . . [a]nd as you have higher delinquencies we will put up higher [loan loss] provisions" and "I don't have a specific number [regarding loss provisions] for you today. I think in the guidance that we're looking at, we're talking about continued pressure on losses in the next year period of another $1 billion after-tax across the portfolio could be in those ranges that we talked about. So, we're already seeing the credit pressure on the consumer side. . . . And I think what we would anticipate is that you're going to see more pressure on the commercial side."[12]

- During GE's October 10, 2008 Investor Presentation, Mr. Sherin stated: "If you look in the third quarter alone we had pretax losses of $451 million higher than the year-over-year . . . . We're going to see more pressure, and I think we are going to have higher losses, and we are planning for them," and "[w]e're going to see higher delinquencies; we are already seeing those. As we have higher delinquencies we're going to put up more loss provisions."[13] Mr. Immelt cautioned that "[w]e continue to increase our reserves to reflect the higher loss environment. . . .[a]nd we're planning for more in the fourth quarter and '09."[14]

- In connection with the October 10 presentation, GE also provided a "2009 framework" for credit losses, estimating that credit losses would be between $7.5 - $9 billion and Mr. Sherin stated that GE would "see more pressure [in the portfolios] and I think we are going to have higher losses and we are planning for them."[15]

- During the GE Capital Investor Presentation on December 2, 2008, GE updated its forecast for GE Capital's 2009 credit losses from $7.5 billion to approximately $9 billion based on the macroeconomic environment.[16] GE Capital's President and CEO Michael

---

[11] SAC ¶ 169.

[12] SAC at 60 ("September 25, 2008 Q3 2008 Earnings Release"); SAC ¶¶ 169-181 (quoting from the transcript of the September 25, 2008 investor call); Danilow Decl., Ex. 5 (Sept. 25, 2008 Tr.) at 4, 5, 8.

[13] SAC at 74 ("October 10, 2008 Q3 2008 Earnings Release"); SAC ¶¶ 185-196 (quoting from the transcript of the October 10, 2008 earnings call; Danilow Decl., Ex. 7 (Oct. 10, 2008 Tr.) at 9, 12-13.

[14] Danilow Decl., Ex. 7 (Oct. 10, 2008 Tr.) at 4.

[15] Danilow Decl., Ex. 6 (Oct. 10, 2008 Pres.) at 19; Danilow Decl., Ex. 7 (Oct. 10, 2008 Tr.) at 13.

[16] SAC at 89 ("December 2, 2008 Financial Services Investor Meeting"); SAC ¶¶ 208-218 (quoting from the transcript of the December 2, 2008 meeting); Danilow Decl., Ex. 8 (Dec. 2, 2008 Tr.) at 10; Danilow Decl., Ex. 9 (Dec. 2, 2008 Pres.) at 24; Danilow Decl., Ex. 6 (Dec. 10, 2008 Pres.) at 19.

Neal cautioned that "[t]here's always the risk that markets could be worse than we're forecasting but the result will be incremental rising losses not a cliff."[17]

- Just two weeks later during GE's December 16, 2008 Annual Investor Presentation, Mr. Immelt again warned, "Unemployment is probably going to grow. We're going to go through a credit cycle" and "[w]e are still going to see losses. And the losses are still going to be higher, much higher year over year."[18] Mr. Immelt further explained, "On the negative side, it's all about losses . . . . Again, I think we've planned conservatively. But this, again, is a world where the situation could change pretty fluidly."[19]

- On December 31, 2008, GE's fourth quarter closed and on January 23, 2009, GE disclosed its fourth quarter earnings results. In connection with that earnings release, GE updated its December 2, 2008 $9 billion credit loss projection to reflect the "the fourth-quarter actuals" and provide investors with GE's "current view" of credit losses reflecting the loss environment experienced in Q4'08.[20] GE informed investors that these revisions to the December 2 projections reflected GE's "[p]lan[] for tougher loss environment than we showed on 12/2."[21] Specifically, GE disclosed that based on the losses actually incurred in Q4'08, it was revising its projection to include an additional $1 billion in projected credit losses at GE Capital in 2009, upwardly revising the projection from $9 billion to $10 billion.[22]

Thus, under Second Circuit law, any materialized-risk theory fails to plead loss causation because the risks that could be said to have materialized on January 23 were fully disclosed by GE throughout the Class Period. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (affirming dismissal when defendant "provided substantial indicia of the risk that [the company] would file for bankruptcy," so the risk was not concealed) (quotations omitted); *Lentell*, 396 F.3d at 177 (same, when "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk" and

---

[17] Danilow Decl., Ex. 8 (Dec. 2, 2008 Tr.) at 12-13.

[18] SAC at 96 ("December 16, 2008 Annual Outlook Meeting"); SAC ¶¶ 219-231 (quoting from the transcript of the December 16, 2008 meeting); Danilow Decl., Ex. 10 (Dec. 16, 2008 Tr.) at 4, 6.

[19] Danilow Decl., Ex. 10 (Dec. 16, 2008 Tr.) at 9.

[20] SAC at 99 ("January 23, 2009 Announcement of Q4 2008 and FY 2008 Results"); SAC ¶¶ 232-252 (quoting from the transcript of the January 23, 2009 earnings call and CNBC interview of J. Immelt); Danilow Decl., Ex. 11 (Jan. 23, 2009 Tr.) at 8.

[21] Danilow Decl., Ex. 12 (Jan. 23, 2009 Pres.) at 20.

[22] Danilow Decl., Ex. 11 (Jan. 23, 2009 Tr.) at 8; Danilow Decl., Ex. 12 (Jan. 23, 2009 Pres.) at 20.

US_ACTIVE:\44181514\8\47890.0203

plaintiff had failed to "allege (i) facts sufficient to support an inference that it was defendant's fraud . . . that proximately caused plaintiff's loss; or (ii) fact sufficient to apportion the losses between the disclosed and concealed portions of the risk"); *Joffee v. Lehman Bros., Inc.*, 209 F. App'x 80, 81 (2d Cir. 2006) ("[P]laintiffs failed to allege that the defendants concealed from the market risks which later materialized" because "all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings.").

As the Second Circuit held in *Lentell*, merely intoning the phrase "materialization of the risk" does not state a claim. In words directly applicable here, the Second Circuit required dismissal when the allegation of a materialized risk "is a legal conclusion missing . . . the necessary allegations of fact to support the conclusion." *Lentell*, 396 F. 3d at 176.

## III.   INDEPENDENTLY, THE SAC'S FAILURE TO DISTINGUISH INACTIONABLE LOSSES ON JANUARY 23, 2009 REQUIRES DISMISSAL OF THE SAC

Finally, even if Plaintiff had pleaded that there were corrective disclosures or previously concealed risks that materialized on January 23, 2009, the SAC should still be dismissed. This is because the SAC entirely ignores both the effect of bad news disclosed on January 23, including significant declines in the financial results of GE's Industrial, media and technology divisions, increases in GE's loan loss reserves, and the overall market decline caused by the financial crisis.

As the Second Circuit recently confirmed, dismissal of 1934 Act claims is required when a complaint alleges corrective disclosures but "fails to distinguish the effects of the fraud alleged from those caused by the adverse market conditions existing at the time." *Solow*, 2013 WL 149902, at *2. In particular, dismissal is warranted where, as here, "the Complaint does not account for the fact that the [alleged corrective disclosure] contained other 'bad news.'" *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008). Likewise, when a stock price declines in response to a disclosure that simultaneously reveals

20

both a misstatement that is actionable and another misstatement that is not, the complaint is deficient if it has not "alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to" the correction of the actionable misstatement. *Lattanzio*, 476 F.3d at 158 (citing *Lentell*, 396 F.3d at 177); *accord In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 680 (S.D.N.Y. 2007) (dismissing complaint when, "even assuming that the plaintiff's allegations were sufficient to connect [defendant's misstatements] to stock declines," plaintiffs fail to "allege[]facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements") (quotations and citations omitted).

The SAC ascribes the entire decline in GE's stock price on January 23 to just three of GE's disclosures that day—reduced Q4'08 earnings results and anticipated increases in future delinquencies and credit losses at GE Capital (SAC ¶ 425)—and fails to apportion one cent of the $1.45 decline to the litany of other information GE also disclosed that bears no connection to the alleged fraud.

First, the SAC alleges but ignores that on January 23, "before the market opened, GE issued a press release . . . reporting that its Q4 profits dropped by 46% and that GE Capital's quarterly profits dropped by a third." SAC ¶ 232. That same press release also disclosed that "[f]ull-year earnings from continuing operations were . . . down 19% from . . . 2007."[23] The negative news about revenue was company-wide, extending far beyond loans at GE Capital. For example, profits for GE's Consumer & Industrial business segment were down 86% in the fourth quarter and 65% for the year,[24] and even "NBC Universal segment profits declined 6% in fourth quarter."[25] Likewise, the SAC cites a January 23 GE earnings call (SAC ¶¶ 235-45) but ignores

---

[23] Danilow Decl., Ex. 4 (Jan. 23, 2009 Press Release) at 2.

[24] Danilow Decl., Ex. 4 (Jan. 23, 2009 Press Release) at 6.

[25] Danilow Decl., Ex. 4 (Jan. 23, 2009 Press Release) at 2.

US_ACTIVE:\44181514\8\47890.0203

that on that call it was announced that "for Transportation you can see equipment orders were down 48% in the quarter and 59% for the year," and even "Healthcare, you can see was down 6%."[26] GE's company-wide earnings declines for Q4'08 are understandable in retrospect, as this was one of the worst quarters since the Great Depression. The undeniable effect of such a dramatic "marketwide phenomenon causing comparable losses to other investors" increases Plaintiff's burden to plausibly allege "that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174 (citations and quotations omitted).

The SAC's failure to separate the effects of GE's myriad disclosures on January 23 is by itself fatal. Plaintiff cannot bootstrap its remaining claims to the "commonplace event of a publicly traded company [disclosing negative news about revenue], coupled with a concomitant and predictable immediate drop in share prices." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005). The SAC should be dismissed for failure to even try to allege "'facts sufficient to apportion the losses' between that predictable immediate drop in share prices and any loss that might be attributable to" correcting actionable misstatements. *Id.* (quoting *Lentell*, 396 F.3d at 177).

Second, the SAC has failed to separate the effects of the multiple statements on January 23 that relate to portions of the SAC that have been dismissed from those statements that relate to one of the four remaining claims. For example, on January 23, GE disclosed that it had added $500 million in reserves for Q4'08 (SAC ¶ 236),[27] and added $700 million in impairments for Q4'08.[28] These disclosures pertain to the adequacy of GE's loan loss reserves—a claim that Judge Holwell dismissed from this case. *See GE I*, 857 F. Supp. 2d at 391 (finding, although the

---

[26] Danilow Decl., Ex. 11 (Jan. 23, 2009 Tr.) at 9.

[27] *See also* Danilow Decl., Ex. 11 (Jan. 23, 2009 Tr.) at 5.

[28] *See also* Danilow Decl., Ex. 11 (Jan. 23, 2009 Tr.) at 5.

US_ACTIVE:\44181514\8\47890.0203

SAC alleged "GE's loan loss reserves were misstated, plaintiff has not alleged facts to plausibly claim with sufficient particularity that this was the case"). Although information related to dismissed claims was released to the market on January 23, Plaintiff makes no attempt to disaggregate the drop in stock price that may have been caused by these inactionable disclosures from the damages it seeks. Because Plaintiff fails to apportion even a cent of the decline in GE's stock price on January 23 to the disclosures about inactionable reserves, the SAC should be dismissed.[29]

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice under Federal Rule of Civil Procedure 12(c).

---

[29] The "law of the case" presents no impediment to granting this Motion. "Only issues previously determined become the law of the case." *In re Lynch*, 430 F.3d 600, 604 (2d Cir. 2005) (quotations omitted). "Questions that have not been decided do not become law of the case merely because they *could* have been decided." *Guan N. v. NYC Dep't of Educ.*, 2013 WL 67604, at *12 (S.D.N.Y. Jan. 7, 2013) (quotations omitted; emphasis in original). Judge Holwell never ruled on the adequacy of the SAC's purported loss causation allegations related to GE's January 23 disclosures. Instead, Judge Holwell predicated his decision about loss causation on Plaintiff's allegations that GE later made loss-causing disclosures that revealed the truth about its dividend, liquidity, and GE Capital's loan portfolios on February 27 and March 19, 2009—allegations that Plaintiff has now withdrawn. *See GE I*, 857 F. Supp. 2d at 399.

Dated: New York, New York
       January 25, 2013

Respectfully submitted,

_____/s/ **Greg A. Danilow**_____
Greg A. Danilow
Paul I. Dutka
Christopher L. Garcia
Ashish D. Gandhi
Caroline Hickey Zalka

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for General Electric Company, Jeffrey Immelt, and Keith Sherin*

24